IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYED IQBAL RAZA, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-132 (JJF) |
| | ) | |
| SIEMENS MEDICAL SOLUTIONS USA, | ) | |
| INC., SIEMENS MEDICAL SOLUTIONS | ) | |
| HEALTH SERVICES CORP., SIEMENS | ) | |
| CORPORATION and SIEMENS AG, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
TO DEFENDANT SIEMENS AG'S MOTION TO DISMISS**

YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
Martin S. Lessner  (No. 3109)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th  Floor
Wilmington, Delaware  19899
(302) 571-6600

*Attorneys for Plaintiff*

Dated:  May 16, 2006

064935.1001

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................................... ii

NATURE AND STAGE OF PROCEEDINGS ...................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................... 3

STATEMENT OF RELEVANT FACTS ............................................................................... 4

ARGUMENT ............................................................................................................................ 7

    I.      THE COURT HAS PERSONAL
            JURISDICTION OVER SIEMENS AG ........................................................ 7

          A.      The Proper Standard Of Review ......................................................... 7

          B.      10 *Del. C.* § 3104(c)(1) Confers Specific
               Jurisdiction Over Siemens AG In Delaware ........................................ 8

          C.      10 *Del. C.* § 3104(c)(4) Confers Personal
               Jurisdiction Over Siemens AG In Delaware ..................................... 10

          D.      The Acts of Siemens Medical Solutions And Siemens
               Health Services Should Be Attributed To Siemens AG ................... 12

          E.      Personal Jurisdiction Over Siemens AG
               Is Consistent With Due Process ......................................................... 13

          F.      Siemens AG Cannot Offer A "Compelling
               Case" That Jurisdiction Is Unreasonable ........................................... 15

          G.      Service Upon Siemens AG Was Proper, And
               In All Events, The Issue Will Soon Be Moot .................................... 15

    II.      JURISDICTIONAL DISCOVERY ............................................................. 17

CONCLUSION ...................................................................................................................... 18

                                  

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Asahi Metal Industry Company, Ltd. v.*
*Superior Court of California, Solano County,*
480 U.S. 102, 94 L. Ed. 2d 92 (1987)................................................................. 14

*Beverly Hills Fan Co. v. Royal Sovereign Corp.,*
21 F.3d 1558 (Fed. Cir. 1994) ......................................................................... 9

*Colonial Mortgage Serv. Co. v. Aeronson,*
603 F. Supp. 323 (D. Del. 1985)..................................................................... 12

*Commissariat a l'Energie Atomique*
*v. Chi Mei Optoelectronics Corp.,*
395 F.3d 1315 (Fed. Cir. 2005) ...................................................................... 7

*Grand Entertainment Group v. Star Media Sales,*
988 F.2d 476 (3d Cir. 1993) ........................................................................... 8

*Graphics Control Corp. v. Utah Med. Prods., Inc.,*
149 F.3d 1382 (Fed. Cir 1998) ...................................................................... 7

*Hadley v. Shaffer,*
2003 U.S. Dist. LEXIS 14106 (D. Del. 2003) ........................................... 8, 9

*Hill v. Equitable Trust Co.,*
562 F. Supp. 1324 (D. Del. 1983).................................................................. 11

*In re Elonex Phase II Power Mgmt. Litig.,*
2003 U.S. Dist. LEXIS 7715 (D. Del. May 6, 2003)................................. 10, 11

*International Shoe Co. v. Washington,*
326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945)..................................... 13

*Jeffreys v. Exten,*
784 F. Supp. 146 (D. Del. 1992)................................................................... 10

*M & L of Del., Inc. v. Wallace,*
2004 U.S. Dist. LEXIS 21863 (D. Del. 2004) ........................................ 4, 7, 8, 15

*Massachusetts School of Law at Andover, Inc.*
*v. Am. Bar Ass'n,* 107 F.3d 1026 (3d Cir. 1997)..................................... 17

*Max Daetwyler Corp. v. Rolf Meyer,*
762 F.2d 290 (3rd Cir. 1985) ...................................................................... 13

*McNeil Nutritionals, LLC v. Sugar Ass'n,*
2005 U.S. Dist. LEXIS 7628
(D. Del. Apr. 29, 2005)................................................................................ 17

*Padcom Inc. v. NetMotion Wireless,*
2004 U.S. Dist. LEXIS 9658 (D. Del. May 24, 2004)............................... 8, 9

*Phillips Elecs. N. Am. Corp. v. Contec Corp.*,
  2004 U.S. Dist. LEXIS 3940 (D. Del. Mar. 11, 2004) .............................................................. 9

*Quinn v. Keinicke*,
  700 A.2d 147 (Del. Super. 1996) .................................................................................... 15, 16

*Siemens AG v. Fonar Corp.*,
  1995 U.S. Dist. LEXIS 22334 (D. Del. Apr. 27, 1995) ............................................................ 11

*Stonington Partners, Inc. v.*
  *Lernout & Hauspie Speech Products, N.V.*,
  2003 Del. Ch. LEXIS 72 (July 8, 2003) .............................................................................. 16

*Toys "R" Us, Inc. v. Step Two, S.A.*,
  318 F.3d 446 (3d Cir. 2003) ............................................................................................ 17

*Volkswagenwerk Aktiengesellschaft v Schlunk*,
  486 U.S. 694 (1988) ....................................................................................................... 16

*Vorhees v. Fischer & Krecke*,
  697 F.2d 574 (4th Cir. 1983) ............................................................................................ 16

*Waters v. Deutz Corp.*,
  460 A.2d 1332 (Del. Super. 1983) .................................................................................... 12

*Wesley-Jessen Corp. v. Pilkington Visioncare*,
  863 F. Supp. 186 (D. Del. 1993) ...................................................................................... 12

**Statutes**

10 *Del. C.* § 3104(a) ....................................................................................................... 12

10 *Del. C.* § 3104(c)(1) .............................................................................................. 3, 8, 9

10 *Del. C.* § 3104(c)(4) .............................................................................................. 3, 10

**Rules**

Fed. R. Civ. P. 12(b)(2) .................................................................................................... 2

Fed. R. Civ. P. 12(b)(4) .................................................................................................. 17

Fed. R. Civ. P. 12(b)(5) .............................................................................................. 2, 17

**Other Authorities**

Charles Alan Wright & Arthur R. Miller,
  FEDERAL PRACTICE AND PROCEDURE § 1354 (2004) ............................................................ 17

064935.1001

Defendant Siemens AG is apparently willing to litigate in this forum only when doing so suits its own business ends. At least four times over the past decade, Siemens AG has willingly used this Court (and its limited resources) to both prosecute and defend lawsuits on the merits. *See Siemens AG v. Fonar Corp.*, C.A. No. 95-261 (SLR), *Siemens Aktiengesellchaft v. LG Semicon Co.*, C.A. No. 98-514 (RRM), *Fenster Family Patent Holdings, Inc. v. Siemens AG*, C.A. No. 04-038 (JJF), and *TI Group Automotive Systems, (North America) Inc. v. Siemens AG*, C.A. No. 00-432 (GMS). Moreover, after moving to dismiss for lack of personal jurisdiction in this action, Siemens AG flatly refused to provide even a scintilla of jurisdictional discovery concerning its actual connections to this forum. Siemens AG's "fair weather" treatment of the District of Delaware ought not be tolerated.

Siemens AG's motion to dismiss should also be denied on the merits because Siemens AG uses an established distribution channel, in the form of its Delaware subsidiaries and other United States subsidiaries, to inject its products, including its SOARIAN products, into a stream of commerce that takes advantage of the United States market, including this forum. Siemens AG is also subject to personal jurisdiction in Delaware based upon the actions of its agents, defendants Siemens Medical Solutions Health Service Corporation and Siemens Medical Solutions USA, Inc., both of which are Delaware corporations.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Syed Iqbal Raza, M.D. filed this action against defendants Siemens AG, Siemens Corporation and Siemens Medical Solutions USA, Inc. ("Siemens Medical Solutions") on February 28, 2006. (D.I. 1) On March 29, Dr. Raza filed an Amended Complaint to add Siemens Medical Solutions Health Service Corporation ("Siemens Health Services") as a defendant. (D.I. 7) In the Complaint and the Amended Complaint (together, the "Complaint"),

Dr. Raza asserts two claims based on the defendants' misuse of his proprietary concepts, a claim for trade secret misappropriation and a claim for unjust enrichment.

Contrary to Siemens AG's assertions, it was properly served with process pursuant to the Hague Convention, as interpreted by the Delaware courts, on March 1, 2006, *infra* p. 15. (Ex. A) In all events, Dr. Raza is now in the process of serving Siemens AG through the Central Authority in Germany.  On May 1, this Court entered an order authorizing a special process server to perform such service. (D.I. 12)  Siemens AG's objection to service will therefore soon be moot (as well as incorrect).

By stipulation of counsel on April 17, 2006, the claims against defendant Siemens Corporation were dismissed without prejudice based on defense counsel's representations that Siemens Corporation has little or no business operations and had no substantive role in the events at issue in this action. (D.I. 9)   Defendants Siemens Medical Solutions and Siemens Health Services answered the Amended Complaint on April 18. (D.I. 10 and 11)

Siemens AG moved to dismiss the Amended Complaint pursuant to Rules 12(b)(2) and 12(b)(5) on May 2, 2006. (D.I. 15)  On May 5, Dr. Raza served limited jurisdictional discovery on Siemens AG (8 document requests and 15 interrogatories) and requested that it agree to stay Dr. Raza's response to its opening papers until such discovery was completed. (Exs. B and C) Dr. Raza's proposed discovery included document requests and interrogatories concerning such subjects as Siemens AG's ownership rights in the SOARIAN products, Siemens AG's revenues from sales of Siemens products in Delaware, and the names of the Delaware entities to which it or its subsidiaries have sold or licensed SOARIAN products. (*Id.*)  Siemens AG flatly refused to respond to any of Dr. Raza's proposed discovery. (Ex. D)

This is Dr. Raza's response to Siemens AG's motion to dismiss.

2

## SUMMARY OF ARGUMENT

1.    Because defendant Siemens AG has refused to provide jurisdictional discovery in this case, Dr. Raza need only establish a prima facie case for jurisdiction in order to shift the burden to Siemens AG to provide a "compelling case that the presence of some other consideration would render jurisdiction unreasonable."

2.    Defendant Siemens AG's motion to dismiss should be denied because Siemens AG uses an established distribution channel to inject its SOARIAN products into a stream of commerce that includes this forum, and thereby satisfies the requirements of 10 *Del. C.* § 3104(c)(1).

3.    Defendant Siemens AG's motion to dismiss should be denied because Siemens AG uses an established distribution channel to inject its products into this forum and derives revenues therefrom, and also because it has purposefully availed itself of the laws and benefits of this forum through its past litigation practices in the District of Delaware.  For these reasons, personal jurisdiction is proper pursuant to 10 *Del. C.* § 3104(c)(4).

4.    Defendant Siemens AG's motion to dismiss should denied because it has an agency relationship with at least two Delaware subsidiaries, both of which are subject to jurisdiction in this forum, and takes advantage of that relationship to derive revenues from the sales of Siemens products in Delaware.

5.    The exercise of personal jurisdiction over Siemens AG complies with Due Process because Siemens AG's conduct satisfies the requirements of *Asahi Metal Industry Company, Ltd. v. Superior Court of California, Solano County* for personal jurisdiction based on stream of commerce theory, and also because Siemens AG has sufficient contacts with this forum through its agent subsidiaries.

3

6.      Because defendant Siemens AG has willingly litigated in this forum on at least four occasions in the past ten years, it cannot present a "compelling case that the presence of some other consideration would render jurisdiction unreasonable."

7.      Defendant Siemens AG's motion to dismiss should be denied because Dr. Raza properly served Siemens AG pursuant to the Delaware long arm statute and in accordance with the Hague Convention.  In all events, Dr. Raza is now in the process of serving Siemens AG through the Central Authority in Germany, and this issue will therefore soon be moot.

8.      Dr. Raza sets forth below a case for personal jurisdiction sufficient to deny Siemens AG's motion outright.  Should, however, the Court conclude that the record is insufficient to demonstrate the presence of specific or general personal jurisdiction under the Delaware long arm statute, Dr. Raza respectfully requests that the Court order Siemens AG to respond to the jurisdictional discovery it previously rejected, and also permit Dr. Raza to take additional, reasonable jurisdictional discovery, including, if necessary, the taking of a deposition.

## STATEMENT OF RELEVANT FACTS

In the context of a motion to dismiss for lack of personal jurisdiction, the following facts must be viewed in the light most favorable to plaintiff.  *M & L of Del., Inc. v. Wallace*, 2004 U.S. Dist. LEXIS 21863 at *4-5 (D. Del. 2004).

Defendant Siemens AG is the parent company of the multinational network of subsidiaries operating under the "Siemens" brand name.  Siemens AG directs the operations of the network and through it employs approximately 419,200 people in approximately 190 countries worldwide. (Ex. E, Siemens AG, Annual Report (Form 20-F), at 4 (Nov. 29, 2004)).  In fiscal year 2004, Siemens AG reported net sales of $75.167 billion worldwide based on the sales of products such as washers, dryers, circuit breakers and microwaves, many of which are

available in Delaware retail stores, including Best Buy, Lowes and Home Depot. (*Id.* at 5; Ex. F, Declaration of Chad S.C. Stover)  Siemens AG, in its public filings, claims as its own the employees and sales of its subsidiaries, including two Delaware subsidiaries, defendants Siemens Medical Solutions and Siemens Health Services. (Ex. E, Siemens AG, Annual Report (Form 20-F), at 51-54 ).  In connection with Siemens AG's worldwide operations, it has litigated in this Court on at least four occasions over the past ten years, twice as a plaintiff and twice as a defendant, *infra* p. 11.

Plaintiff Syed Iqbal Raza, M.D. is the Director of the Children's Hospital Islamabad in Pakistan.  (D.I. 7 at ¶ 1)  In 1997, Dr. Raza set out to develop detailed methods for tracking and evaluating the performance of medical professionals with the ultimate purpose of creating new and novel software to make the processes for managing hospitals and hospital personnel more efficient. (*Id.* at ¶ 11)  He did so by collecting various types of data from 104 medical professionals through a research study named "Dr-SIR 104." (*Id.*)  By 2000, Dr. Raza had used the research data to develop his concept of "Dr-SIR," a hospital management software product embodying his methods. (*Id.*)

That same year, Dr. Raza was invited by officials at the Strengthening of Health Services Academy in Pakistan ("SHAIP") to present to them the concepts of Dr-SIR, and did so in September 2000. (*Id.* at ¶ 12)  After the presentation, the SHAIP officials requested that Dr. Raza provide them with written materials detailing the underlying concepts of Dr-SIR so that they could evaluate their potential. (*Id.*)  The SHAIP officials approved of Dr. Raza's work, and on October 9, 2000, SHAIP's Chief Technical Officer forwarded (with Dr. Raza'a permission) approximately 160 pages of the concept papers to the Counselor, Head Economic and Commercial Section of the German Embassy in Islamabad.  (*Id.*)  The Chief Technical Officer

5

inquired in the letter as to whether a German company would be interested in collaborating with Dr. Raza to develop a complete software product implementing his concepts for Dr-SIR. (*Id.*)

In November 2000, Dr. Raza briefed the Counselor on the concepts of Dr-SIR, whereupon the Counselor told Dr. Raza that he believed Siemens AG and its subsidiaries would be interested in partnering with Dr. Raza to develop a complete software product implementing his concepts for Dr. SIR. (*Id.* at ¶ 13)  Dr. Raza permitted the Counselor to forward his concept papers to Siemens AG for the limited purpose of determining whether Siemens AG would be interested in engaging in a joint venture to develop such a product. (*Id.*)

In January 2000, Dr. Raza received from Siemens AG's Pakistani subsidiary a letter stating that it considered Dr. Raza's papers "a very good effort," that it was not sufficiently related to the "Hospital Management side" of the Siemens organization to benefit from the software, that it did "intend to recommend to [its] various clients to contact [Dr. Raza] for further details," and that it "*appreciat[ed] Dr. Raza's efforts in developing the software [Dr-SIR]*" (*Id.* at ¶ 14 (emphasis added))  Importantly, neither Siemens AG nor its subsidiaries ever returned Dr. Raza's concept papers. (*Id.* at ¶ 15)

In October 2001, almost one year after Dr. Raza submitted his papers to Siemens AG, one of Siemens AG's Delaware subsidiaries launched the SOARIAN hospital management software product in the United States.  (*Id.* at ¶ 17)   The SOARIAN product incorporates a number of the proprietary concepts that Dr. Raza had disclosed to Siemens AG.  (*Id.* at ¶ 18)  Siemens AG has derived and continues to derive substantial revenues from its many products sold in the United States and in this forum, including the SOARIAN products.  (Ex. E, Siemens AG, Annual Report (Form 20-F), at 51-54  (claiming as its own all sales of Siemens products))

6

## ARGUMENT

### I.    THE COURT HAS PERSONAL JURISDICTION OVER SIEMENS AG.

Siemens AG is subject to personal jurisdiction because it uses an established distribution channel to place its products, including its SOARIAN products, into a "stream of commerce" that reaches Delaware.  Delaware courts have consistently recognized the "stream of commerce" theory as basis for personal jurisdiction.  *Commissariat a l'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1320-22 (Fed. Cir. 2005) (commenting on the Delaware courts' acceptance of the "stream of commerce" theory).  Siemens AG is also subject to personal jurisdiction because its agents' acts in relation to this forum can be attributed to it.

#### A.    The Proper Standard Of Review

The determination of whether this Court has personal jurisdiction over defendant Siemens AG is a two-part inquiry.  First, the Court must determine whether the Delaware long-arm statute authorizes personal jurisdiction over Siemens AG.  *Graphics Control Corp. v. Utah Med. Prods., Inc.*, 149 F.3d 1382, 1385 (Fed. Cir 1998).  If so, the Court must then determine whether the exercise of personal jurisdiction over Siemens AG would violate Federal Due Process.  *M & L*, 2004 U.S. Dist. LEXIS 21863 at *5.

Siemens AG suggests in its opening papers that it need only raise the issue of personal jurisdiction in order to shift the burden of establishing jurisdiction to Dr. Raza. (OB 3)  It further suggests that "[p]laintiff must come forth with affirmative, competent evidence beyond the bare allegations of the pleadings to support the Court's jurisdiction." (*Id.*)  Since filing its opening papers, however, Siemens AG has refused to provide even the most basic jurisdictional discovery, and, in doing so, has sought to prevent Dr. Raza from obtaining further affirmative, competent evidence of Siemens AG's contacts with this forum. (Ex. D)

7

This Court has concluded that where "personal jurisdiction is contested without the benefit of discovery, [the plaintiff] need only establish a prima facie case, with the record viewed in the light most favorable to [the plaintiff]" in order to proceed. *M & L*, 2004 U.S. Dist. LEXIS 21863 at *4-5. Moreover, upon presenting a prima facie case, "the burden then shifts to the defendant to 'present a *compelling case* that the presence of some other consideration would render jurisdiction unreasonable.'" *Hadley v. Shaffer*, 2003 U.S. Dist. LEXIS 14106, at *5 (D. Del. 2003) (emphasis added) (citing *Grand Entertainment Group v. Star Media Sales*, 988 F.2d 476, 483 (3d Cir. 1993)). That burden should weigh particularly heavily upon Siemens AG because, unlike instances in which a plaintiff simply does not initiate discovery in connection with responding to a motion to dismiss, Siemens AG has reviewed and affirmatively rejected each of Dr. Raza's discovery requests. (Ex. D)

**B.    10 *Del. C.* § 3104(c)(1) Confers Specific Jurisdiction Over Siemens AG In Delaware.**

The Delaware long arm statute "has been construed broadly to confer jurisdiction *to the maximum extent possible* under the due process clause." *Padcom Inc. v. NetMotion Wireless*, 2004 U.S. Dist. LEXIS 9658 at *5-6 (D. Del. May 24, 2004) (emphasis added). That standard applies to § 3104(c)(1), which states:

> (c)    As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> (1)    Transacts business or performs any character of work or service in the State ... .

The Delaware Supreme Court has recognized § 3104(c)(1) as a specific jurisdiction provision that requires a "nexus" between the cause of action and the conduct used as a basis for jurisdiction. *Padcom*, 2004 U.S. Dist. LEXIS 9658, at *12; *Hadley*, 2003 U.S. Dist. LEXIS 14106, at *22.

8

Dr. Raza alleges in his Complaint that Siemens AG has offered to sell and/or sold products in Delaware through its subsidiaries, and also that Siemens AG has marketed and/or sold SOARIAN products in Delaware directly and/or through its subsidiaries. (D.I. 7 at ¶¶ 9, 10) It is well-established in this jurisdiction that the requirements of § 3104(c)(1) are met where, as here, a defendant markets and sells the accused product in Delaware "through an established distribution channel." *Padcom*, 2004 U.S. Dist. LEXIS 9658, at *12 (citing *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564 (Fed. Cir. 1994) and *Phillips Elecs. N. Am. Corp. v. Contec Corp.*, 2004 U.S. Dist. LEXIS 3940, at *11-12 (D. Del. Mar. 11, 2004)). When such a channel exists, "no more is usually required to establish specific jurisdiction." *Id.*

There can be no reasoned dispute that Siemens AG has an "established distribution channel" for its SOARIAN products through Siemens Medical Solutions and Siemens Health Services. As for their collective marketing and sales activities in Delaware (beyond the SOARIAN website, which is obviously accessible in Delaware), Siemens AG has refused to provide any information about its activities in Delaware, including any information concerning its sale or licenses of SOARIAN products in Delaware, its communications with Delaware entities about SOARIAN products, or its revenues from sales of SOARIAN products in Delaware (although it claims all Siemens sales in its public filings, which would necessarily include Delaware sales). (Ex. B and C) Informal discovery reveals that Siemens Medical Solutions and Siemens Health Services both operate out of Malvern, Pennsylvania, and that they market SOARIAN nationwide (and worldwide). There should therefore be little doubt that the Siemens entities, including Siemens AG, have made inroads into Delaware with SOARIAN and will continue to do so. From this, the Court should infer that the Siemens entities, including Siemens AG, are actively marketing and selling or licensing SOARIAN products in Delaware.

9

**C.**   **10 *Del. C. § * 3104(c)(4) Confers Personal**
         **Jurisdiction Over Siemens AG In Delaware.**

The Court also has general jurisdiction over Siemens AG based on its use of an

established distribution channel to conduct business in Delaware. Title 10 *Del. C.* § 3104(c)(4),

which serves as the basis for Delaware courts to exercise general jurisdiction, states:

> (c)    As to a cause of action brought by any person arising from any of the acts
> enumerated in this section, a court may exercise personal jurisdiction over any
> nonresident, or a personal representative, who in person or through an agent:
>
>                                 *   *   *
>
> (4)    Causes tortious injury within the State or outside the State by an act or
> omission outside of the State if the person regularly does or solicits business,
> engages in any other persistent course of conduct in the State or derives
> substantial revenue from services, or things used or consumed in the State ….

Subsection (c)(4) must be interpreted "broadly, as reaching the 'maximum parameters of the due

process clause.'" *In re Elonex Phase II Power Mgmt. Litig.*, 2003 U.S. Dist. LEXIS 7715, at *11

(D. Del. May 6, 2003) (citing *Jeffreys v. Exten*, 784 F. Supp. 146, 151 (D. Del. 1992)).

This Court has determined that the requirements of § 3104(c)(4) are met when a

defendant derives revenues from the use of well-established distribution channels to sell its

products in Delaware. *In re Elonex*, 2003 U.S. Dist. LEXIS 7715, at *12.  Siemens AG does so

with respect to SOARIAN products, as described above, *supra* pp. 8-10.  It also sells numerous

other products in Delaware, including washers, dryers, circuit breakers and microwaves through

retail distribution chains such as Best Buy, Lowes and Home Depot. (Ex. F, Stover Dec.)

Although Siemens AG has specifically refused to provide any revenue information relating to

Delaware sales, there should be no doubt that it does derive revenues from such sales because it

claims as its own all Siemens sales worldwide, including those in Delaware.  (Ex. E, Siemens

AG, Annual Report (Form 20-F), at 5). Nothing more is needed to establish general jurisdiction.[1]

In addition to Siemens AG's use of established distribution channels to do business in Delaware, Siemens AG has also purposefully availed itself of the laws and benefits of this forum through past litigation activities. On at least four occasions over the last decade, Siemens AG has willingly litigated in this forum, twice as a defendant and twice as a plaintiff. *See Siemens AG v. Fonar Corp.*, C.A. No. 95-261 (SLR), *Siemens Aktiengesellchaft v. LG Semicon Co.*, C.A. No. 98-514 (RRM), *Fenster Family Patent Holdings, Inc. v. Siemens AG*, C.A. No. 04-038 (JJF), and *TI Group Automotive Systems, (North America) Inc. v. Siemens AG*, C.A. No. 00-432 (GMS).

In *Fonar*, Siemens AG, as plaintiff, opposed and prevailed on a motion to transfer, arguing that the District of Delaware "is recognized as having a commendable familiarity with complex litigation in general." 1995 U.S. Dist. LEXIS 22334, at *7 (D. Del. Apr. 27, 1995) In *Fenster Family Patents*, Siemens AG, as defendant, did not even assert lack of personal jurisdiction as an affirmative defense, much less move to dismiss on personal jurisdiction grounds. (Ex. G, Siemens AG Ans. (C.A. No. 04-038 (JJF))) This Court has previously concluded that a defendant purposefully availed itself of the laws and benefits of this forum based, in part, on that defendant's previous willingness to engage in litigation in this forum. *See Hill v. Equitable Trust Co.*, 562 F. Supp. 1324, 1331 (D. Del. 1983) (considering past litigation

---

[1]    This Court has found general personal jurisdiction under the established distribution channel theory even where the channel flows to retailers through unrelated third party distributors. *See In re Elonex*, 2003 U.S. Dist. LEXIS 7715 at *4-5, 12 (exercising general jurisdiction where defendant sold monitors to unrelated distributors, who then sold them to retailers, such as Best Buy, for resale in Delaware). Here the entire channel (except the retailers) is controlled by Siemens AG. Thus, the exercise of general jurisdiction in these circumstance is even more warranted.

11

in forum as factor weighing in favor of general jurisdiction); *Colonial Mortgage Serv. Co. v. Aeronson*, 603 F. Supp. 323, 327 (D. Del. 1985) (same). The result should be no different here.

**D.    The Acts Of Siemens Medical Solutions And Siemens
Health Services Should Be Attributed To Siemens AG.**

The Delaware long arm statute specifically states that the acts of an "agent" may be attributed to a principal. 10 *Del. C.* § 3104(a). This Court has defined the term "agent" broadly:

> It is true that a person who is controlled by a principal may be deemed an agent. However, the Delaware courts have made clear that as used in § 3104, the word "agent" is not constricted to that one definition. The long-arm statute "is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." [citation omitted] Delaware courts have found that an agency relationship may exist between corporate affiliates with close business ties.

*Wesley-Jessen Corp. v. Pilkington Visioncare*, 863 F. Supp. 186, 188 (D. Del. 1993). In *Wesley-Jessen*, the Court ultimately concluded that the acts of one affiliate could be attributed to another affiliate where the affiliates had "close corporate and business connections" and worked to achieve a common goal of selling products in Delaware and elsewhere. *Id.* The affiliates in *Wesley-Jessen Corp.* performed entirely different business functions, but because they both operated in accordance with a larger business unit and were presented to the marketplace as one unit, one affiliate was deemed to be an agent of the other for personal jurisdiction purposes. *Id.* at 188-89. *See Waters v. Deutz Corp.*, 460 A.2d 1332 (Del. Super. 1983) (finding foreign company marketing product through United States subsidiary subject to personal jurisdiction).

Siemens Medical Solutions and Siemens Health Services have more than sufficient business and corporate contacts with Siemens AG to be considered its agents. Even a cursory review of Siemens AG's public filings reveals that it treats its information systems business, which purportedly created SOARIAN, as an operating arm of the larger Siemens system, and not a separate entity. Siemens AG has reported that it "maintains research and development centers

12

at locations in the … United States," and that an "important project within *our information technology systems business* is the continued development of a new workflow management system, *Soarian.*" (Ex. E, Siemens AG, Annual Report (Form 20-F), at 54) (emphasis added) And, as explained above, Siemens AG claims those working in the United States for Siemens Medical Solutions and Siemens Health Services as its own employees and also claims all United States sales, including Delaware sales, as its own. (*Id.*)

There can be no dispute that Siemens AG and its subsidiaries share the common goal of selling products, including SOARIAN, in the United States, as indicated by the English version of the SOARIAN website which lists a German location and telephone number as the contact address. (Ex. H)  The SOARIAN website also does not distinguish between any of the Siemens entities, operating instead under the single brand name "Siemens." (*Id.*)  The acts of agents Siemens Medical Solutions and Siemens Health Services therefore ought to be attributed to Siemens AG for purposes of specific and general personal jurisdiction.[2]

**E.     Personal Jurisdiction Over Siemens AG Is Consistent With Due Process.**

This Court may exercise personal jurisdiction in accordance with Due Process where "'certain minimum contacts' exist between the non-resident defendant and the forum 'such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Max Daetwyler Corp. v. Rolf Meyer*, 762 F.2d 290, 293 (3rd Cir. 1985) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)).  Where personal jurisdiction is based on a stream of commerce theory, there are three separate standards that flow from the Supreme Court's decision in *Asahi Metal Industry Company, Ltd. v. Superior Court of*

---

[2]    Siemens AG's contention that Dr. Raza did not allege an agency relationship on the part of the defendants is simply wrong. (OB 11)  The Court need only look to paragraphs 8 and 9 of the Amended Complaint to see that Dr. Raza has sufficiently alleged an agency relationship. (Am. Comp. 3)

*California, Solano County*, 480 U.S. 102, 94 L. Ed. 2d 92 (1987). The most stringent of those standards was put forth by Justice O'Connor, and it requires that the stream of commerce be accompanied by some "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State." *Asahi Metal*, 480 U.S. at 112.[3]

Justice O'Connor provided the following examples of "additional" conduct: "advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* As detailed above, Siemens AG advertises in Delaware at least through its interactive Soarian website, which is seemingly operated from Germany (based on the German contact address), and it uses established distribution channels (in the form of its subsidiaries and third party retailers) to market its products in Delaware, *supra* 8-10, 13. Siemens AG therefore meets Justice O'Connor's standard.

Also, because the acts of Siemens AG's subsidiaries can be attributed to it, there is no question that Due Process is satisfied. Through agency, Siemens AG itself is consistently selling Siemens products through Delaware retailers and therefore has minimum contacts with this forum. Finally, there is no question that the exercise of jurisdiction would comport with notions of fair play and substantial justice, and any suggestion by Siemens AG to the contrary is absurd, given that it has availed itself of the laws and benefits of this Court on multiple prior occasions, *infra* p. 11.

---

[3]  Alternatively, Justice Brennen's standard does not require any additional conduct. *Asahi Metal*, 480 U.S. at 112 ("[A]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.").

**F.     Siemens AG Cannot Offer A "Compelling Case" That Jurisdiction is Unreasonable.**

Dr. Raza has now put forth a prima facie case for personal jurisdiction, both specific and general, as required by *M & L*, *supra* p. 8.  Given that Siemens AG has willingly submitted to the personal jurisdiction of this Court multiple times over the past ten years (and has also sued others in this forum during that time), it cannot be heard to suggest that there is a "compelling case" that jurisdiction would be "unreasonable," as required by *Hadley* to rebut  Dr. Raza's prima facie showing, *supra* p. 8.   Any suggestion to the contrary is simply not credible.

**G.     Service Upon Siemens AG Was Proper, And In All Events, the Issue Will Soon Be Moot.**

Siemens AG's contention that Dr. Raza's service of process was improper misstates Delaware law by conflating the concepts of  "service" and "notice."  It is true that Germany has rejected "service" through postal channels within its borders under the Hague Convention, but Dr. Raza did not serve process upon Siemens AG in Germany.   The complete service was performed on the Delaware Secretary of State. (Ex. A)  The sending of the process to Germany by registered mail was a notice function, and did not constitute any form of service.  Germany's reservations regarding "service" through postal channels are therefore inapplicable in the present circumstances.

The Delaware courts have distinguished between service and notice under the Hague Convention on multiple occasions.  In *Quinn v. Keinicke*, 700 A.2d 147 (Del. Super. 1996), then Judge Quillen explained:

> Based on a literal reading of this text, *the only party being served is the Secretary of State. All that the nonresident defendant receives is a copy of the same documents with notice that service has been made.* The registered mailing is simply the notice that the nonresident defendant must receive under the Due Process Clauses of the state and federal constitutions. (citation omitted)  It does not constitute service. The Delaware Secretary of State, not the nonresident defendant, is "served" under 10 *Del. C.* § 3112.

15

*Id*. at 155-56 (emphasis added).

In *Stonington Partners, Inc. v. Lernout & Hauspie Speech Products, N.V.*, 2003 Del. Ch.

LEXIS 72 (July 8, 2003), then Vice Chancellor Jacobs confirmed:

> Section 3104(b) of Delaware's long arm statute provides that *a defendant is effectively served with process when service is made upon Delaware's Secretary of State.*  Section 3104(b) does not require that the process documents be physically served upon the nonresident defendant. All that the statute requires is that a copy be sent to the nonresident defendant by registered mail.  Here, the plaintiffs initially served the complaint and summons upon the Delaware Secretary of State, and sent copies of the complaint to each Belgian defendant by registered mail. Because those documents were "sent" within the meaning of Delaware's long arm statute and Article 10(a) of the Convention, the plaintiffs complied with the service requirements of both. Service of process was, therefore, valid.

*Id*. at *10-11 (emphasis added).   Dr. Raza's service of process on Siemens AG under the

Delaware long arm statue was proper in view of *Quinn* and *Stonington Partners*, and fully

comports with the United States Supreme Court holding in *Volkswagenwerk Aktiengesellschaft v*

*Schlunk*, 486 U.S. 694 (1988) (plaintiff in a wrongful-death action properly served defendant

German automobile manufacturer by serving what state law deemed to be foreign corporation's

agent for service of process; because service was accomplished within the United States, the

Hague Convention did not apply; where service is valid and complete under both state law and

the due process clause of the United States Constitution the Hague Convention had no further

implications.).

In any event, Dr. Raza is now in the process of serving Siemens AG through the Central

Authority in Germany, in accordance with the Hague Convention. (D.I. 12)  Siemens AG's

objection to service will therefore soon be moot, in addition to being incorrect.  *See Vorhees v.*

*Fischer & Krecke*, 697 F.2d 574, 576 (4th Cir. 1983) ("the action should not have been

dismissed until the plaintiffs were given a reasonable opportunity to attempt to effect valid

16

service" under the Hague Convention); Charles Alan Wright & Arthur R. Miller, FEDERAL
PRACTICE AND PROCEDURE § 1354 (2004) (courts do not dismiss actions pursuant to Rule
12(b)(4) or 12(b)(5) when there is "a reasonable prospect that plaintiff ultimately will be able to
serve defendant properly.").

## II.    JURISDICTIONAL DISCOVERY

Dr. Raza has set forth a case for personal jurisdiction sufficient to deny Siemens AG's
motion outright.    Should, however, the Court conclude that the record is insufficient to
demonstrate the presence of specific or general personal jurisdiction under the Delaware long
arm statute, Dr. Raza respectfully requests that the Court order Siemens AG to respond to the
jurisdictional discovery it previously rejected. (Exs. B and C)  Dr. Raza should also be permitted
to take additional, reasonable jurisdictional discovery, including, if necessary, the taking of a
deposition.

Dr. Raza has specifically alleged that Siemens AG has offered to sell and/or sold
SOARIAN products in Delaware, and also that Siemens AG has marketed and/or sold
SOARIAN products and other Siemens products in Delaware through Siemens Medical
Solutions and Siemens Health Services. (D.I. 7 at ¶¶ 9, 10)  Where a plaintiff makes such
allegations, a request for jurisdictional discovery should only be denied if the plaintiff's claim is
"clearly frivolous." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)
(holding that "[a]lthough the plaintiff bears the burden of demonstrating facts that support
personal jurisdiction, [citation omitted] courts are to assist the plaintiff by allowing jurisdictional
discovery unless the plaintiff's claim is 'clearly frivolous'") (quoting *Massachusetts School of
Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997)); *McNeil
Nutritionals, LLC v. Sugar Ass'n*, 2005 U.S. Dist. LEXIS 7628, at *13 (D. Del. Apr. 29, 2005)

17

(permitting jurisdiction discovery relating to fifteen separate defendants under the "clearly frivolous" standard).  For all the reasons stated herein, there should be no dispute that Dr. Raza's claim is not "clearly frivolous."

## CONCLUSION

Dr. Raza respectfully submits that defendant Siemens AG's motion to dismiss should be denied for the reasons set forth above.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Date: May 16, 2006

_____
Martin S. Lessner  (No. 3109)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th  Floor
Wilmington, Delaware  19899
(302) 571-6600

*Attorneys for Plaintiff*

064935.1001

# EXHIBIT A

AO 440 (Delaware Rev. 7/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### District of Delaware

 **ORIGINAL**

**SUMMONS IN A CIVIL CASE**

SYED IQBAL RAZA, M.D.

            Plaintiff,

    v.

SIEMENS MEDICAL SOLUTIONS USA,
INC., SIEMENS CORPORATION,
and SIEMENS AG,

         Defendant.

CASE NUMBER:     0 6 – 1 3 2

TO: (Name and address of defendant)

    SIEMENS AG,
    c/o Delaware Secretary of State
    Division of Corporations
    John G. Townsend Bldg.
    401 Federal Street – Suite 4
    Dover, DE 19901

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

    Martin S. Lessner, Esquire
    Adam W. Poff, Esquire
    Young Conaway Stargatt & Taylor, LLP
    The Brandywine Building
    1000 West Street, 17th Floor
    P. O. Box 391
    Wilmington, DE  19899-0391

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this
summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint.  You must also file your answer with the Clerk of this Court within a reasonable
period of time after service.

PETER T. DALLEO

CLERK

_____
(By) DEPUTY CLERK

FEB 2 8 2006

DATE

AO 440 (Delaware Rev. 7/00) Summons in a Civil Action

# RETURN OF SERVICE

| Service of the Summons and Complaint was made by me[1] | DATE March 1, 2006 |
|---|---|
| NAME OF SERVER (*PRINT*) Edward Jones | TITLE Process Server |

*Check one box below to indicate appropriate method of service*

☒ Served personally upon the third-party defendant. Place where served: _Secretary of State of Delaware_ _401 Federal Street, Dover DE 19901. Service Accepted by Nancy Cue at 12:15 pm_

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____
_____
_____

☐ Other (specify): _____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _3/1/06_
/ Date

_Edward J Jones I_
Signature of Server

_32 Lockerman Street Ste 105 Dover DE 19904_
Address of Server

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYED IQBAL RAZA, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-132 (JJF) |
| | ) | |
| SIEMENS MEDICAL SOLUTIONS USA, | ) | |
| INC., SIEMENS MEDICAL SOLUTIONS | ) | |
| HEALTH SERVICES CORP., SIEMENS | ) | |
| CORPORATION and SIEMENS AG, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S JURISDICTIONAL DOCUMENT
## REQUESTS DIRECTED TO DEFENDANT SIEMENS AG

Pursuant to Rules 26 and 34 of the of the Federal Rules of Civil Procedure, plaintiff Syed Iqbal Raza, M.D. requests that defendant Siemens AG produce for inspection and copying within thirty (30) days hereof the documents described below, at the offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801.

## INSTRUCTIONS

1.      A request for a document shall be deemed to include a request for the original and final versions of the document, all drafts, alterations, modifications, changes and amendments thereto, as well as all non-identical copies or drafts of such documents, including any copy bearing non-identical markings or notations of any kind, as well as all transmittal sheets, cover letters, exhibits, enclosures or attachments to the document.

2.      Any document described herein is to be produced as it is kept in the ordinary course of business, in its original file folder, with all labels or similar markings intact, and with

the name of the person from whose files it was produced. Documents stored electronically shall be produced in electronic format as stored and/or copied exactly onto medium such as diskettes, "Zip" disks, CD-ROM, DVD-ROM, or the like, in addition to being printed out for purposes of production.

3.  Documents shall be produced in the condition and order of arrangement in which they existed when this request was served and shall not be "shuffled" or otherwise rearranged when produced.

4.  Each request herein should be construed independently and not with reference to any other request for the purpose of limitation.

5.  If it is not possible to produce any document called for by this request, or if any part of this request is objected to, the reasons for the failure to produce the documents or the objection should be stated specifically as to all grounds.

6.  If a document responsive to any request is no longer in Siemens AG's possession, custody or control, state what disposition was made of the document and the date of such disposition, and identify all persons having knowledge of the document's contents.

7.  If a document responsive to any request is no longer in Siemens AG's possession, but a copy of said document has been maintained by an agent, advisor or consultant (such as, but not limited to, any of Siemens AG's accountants, auditors, attorneys, financial advisors, or experts), include such document in the production.

8.  If any document responsive to any request has been destroyed, set forth the content of said document, the location of any copies of said document, the date of such destruction and the name of the person who destroyed the document or ordered or authorized such destruction.

2

9.    If Siemens AG claims any form of privilege or protection or other reason, whether based on statute or otherwise, as a ground for not producing requested documents, furnish a list identifying each document for which the privilege or protection is claimed, together with the following information:

(a)    type of document(s) (*e.g.*, memorandum, letter);

(b)    date of the document(s);

(c)    length of the document(s);

(d)    author or sender of document(s);

(e)    addressee and all other persons to whom copies of the document(s) were furnished, together with their job titles;

(f)    general subject matter of the document(s);

(g)    basis for withholding the document(s); and

(h)    the specific request to which such document(s) is (are) responsive.

10.    When one writing is responsive to more than one specific request, only one identical copy of the writing need be produced.

11.    The time period covered by the requests, unless otherwise indicated, is January 1, 2001 to the present.

12.    This request is continuing and requires further and supplemental production by Siemens AG as and whenever it acquires or makes additional documents between the time of the initial production hereunder and the time of the trial in this action, in accordance with Federal Rule 26(e). Siemens AG is requested to produce any such additional documents within five (5) days of their coming into Siemens AG's possession, custody or control, or the possession, custody or control of its agents or representatives. If any such additional documents or any

portion thereof are withheld from production upon a claim of privilege or for any other reason, Siemens AG is requested to promptly serve upon plaintiff a written identification of each such document or portion thereof, setting forth the information described in Instruction No. 9.

## DEFINITIONS

Notwithstanding anything else to the contrary herein, each word, term or phrase used in these requests is intended to have the broadest meaning permitted under the Federal rules of Civil Procedure. For purposes of these requests, the following definitions will apply, regardless of whether the defined word is capitalized or not:

A.    The words "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests information that might otherwise be construed to be outside its scope; the singular shall include the plural and the plural shall include the singular except as the context may otherwise dictate; the term "any" means "any and all" and the term "all" means "any and all;" the past tense shall include the present tense, and vice versa; and the word "including" means "including without limitation."

B.    "Communication" means any manner or means of disclosure, transfer, exchange or conveyance of information, including, but not limited to, any conversation, discussion, letter, memorandum, facsimile transmission, note, meeting, electronic mail, or other transfer of information, whether oral or written, or by any other means and includes any document that abstracts, digests, transcribes or records any communication.

C.    "Concerning" means relating to, referring to, regarding, describing, evidencing or constituting, directly or indirectly, in whole or in part.

D.    "Delaware Entity" means any entity that conducts business operations within the State of Delaware, regardless of whether that entity was created under the laws of Delaware.

4

E.    "Documents" shall have the broadest meaning possible under Federal Rules 26 and 34. The term as used herein includes all tangible items of any nature, both originals and copies, and all attachments and appendices thereto, of any printed, written, handwritten, typewritten, stenographic, photographic, computer-generated or recorded matter however produced or reproduced. Duplicates of produced documents identical in each detail need not be produced.

F.    "Relate to" or "relating to" mean concerning, regarding, referring to, discussing, supporting, constituting, comprising, containing, evidencing, setting forth, showing, disclosing, describing, explaining, summarizing, reflecting or mentioning.

G.    "Soarian" means any product that includes the term "Soarian" as part of its name and any software, object code or source code related to such product.

## DOCUMENT REQUESTS

1.    All documents concerning communications between defendant Siemens AG and a Delaware Entity

2.    All documents concerning Siemens AG's sales or licensing of products to a Delaware Entity

3.    All documents concerning communications relating to Soarian between defendant Siemens AG and another defendant or Siemens Corporation

4.    Documents sufficient to indicate the ownership of Soarian since 2001

5.    All patents and patent applications that relate to Soarian

6.    Documents sufficient to determine defendant Siemens AG's ownership interests in the other defendants and Siemens Corporation

5

064935.1001

7.    Documents sufficient to determine the revenues derived by Siemens AG from the sale or license of Soarian in the United States

8.    Documents sufficient to determine the revenues derived by Siemens AG from the sale or license of Soarian worldwide

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Date: May 5, 2006

Martin S. Lessner  (No. 3109)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th  Floor
Wilmington, Delaware  19899
(302) 571-6600

*Attorneys for Plaintiff*

6

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on May 5, 2006, copies of the foregoing document were served on the following counsel of record in the manner indicated:

BY HAND DELIVERY

Duncan Grant., Esquire
Pepper Hamilton LLP.
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709

BY FEDERAL EXPRESS

Kathleen A. Mullen, Esquire
Larry R. Wood, Jr., Esquire
Pepper Hamilton LLP.
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Martin S. Lessner (No. 3109)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com

*Attorneys for Syed Iqbal Raza, M.D..*

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYED IQBAL RAZA, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-132 (JJF) |
| | ) | |
| SIEMENS MEDICAL SOLUTIONS USA, | ) | |
| INC., SIEMENS MEDICAL SOLUTIONS | ) | |
| HEALTH SERVICES CORP., SIEMENS | ) | |
| CORPORATION and SIEMENS AG, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S JURISDICTIONAL INTERROGATORIES
## DIRECTED TO DEFENDANT SIEMENS AG

Pursuant to Rules 26 and 33 of the of the Federal Rules of Civil Procedure, plaintiff Syed Iqbal Raza, M.D. requests that defendant Siemens AG answer under oath the following interrogatories within thirty days hereof, and deliver such answers to the offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801.

### INSTRUCTIONS

1.    These interrogatories are continuing interrogatories, the answers to which are to be kept current.

2.    The time period covered by the interrogatories, unless otherwise indicated, is January 1, 2001 to the present.

### DEFINITIONS

Notwithstanding anything else to the contrary herein, each word, term or phrase used in these interrogatories is intended to have the broadest meaning permitted under the Federal Rules

of Civil Procedure.  For purposes of these interrogatories, the following definitions will apply, regardless of whether the defined word is capitalized or not:

A.    The words "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests information that might otherwise be construed to be outside its scope;  the singular shall include the plural and the plural shall include the singular except as the context may otherwise dictate; the term "any" means "any and all" and the term "all" means "any and all;" the past tense shall include the present tense, and vice versa; and the word "including" means "including without limitation."

B.    "Communication" means any manner or means of disclosure, transfer, exchange or conveyance of information, including, but not limited to, any conversation, discussion, letter, memorandum, facsimile transmission, note, meeting, electronic mail, or other transfer of information, whether oral or written, or by any other means and includes any document that abstracts, digests, transcribes or records any communication.

C.    "Concerning" means relating to, referring to, regarding, describing, evidencing or constituting, directly or indirectly, in whole or in part.

D.    "Delaware Entity" means any entity that conducts business operations within the State of Delaware, regardless of whether that entity was created under the laws of Delaware.

E.    "Soarian" means any product that includes the term "Soarian" as part of its name and any software, object code or source code related to such product.

## INTERROGATORIES

1.    For each owner of property rights in Soarian, identify the owner, the Soarian product(s) that it owns, and its percentage ownership of such product(s).

2

064935.1001

2.    For each patent that has issued that concerns Soarian, identify the country that issued the patent, the patent number, the entity to whom it was issued, and the current owner of the patent.

3.    For each patent application filed that concerns Soarian, identify the country in which the application was filed, the application number, and the entity that filed the application.

4.    For every sale or license of Soarian to a Delaware Entity, identify the Delaware Entity, the seller or licensor, the Soarian product(s) sold or licensed to the entity, the purchase price or licensing fee paid by the entity, and when, if ever, the entity stopped using the Soarian product(s).

5.    For every communication concerning Soarian between a defendant and a Delaware Entity (excluding written correspondence), identify the defendant, the Delaware Entity, and the date of the communication, and describe the substance of the communication.

6.    Identify    the    location    of    the    server    that    hosts    the    website www.healthcare.siemens.com/soarian/int/index_flash.html.

7.    Identify the location(s) of the source code for Soarian.

8.    For each Delaware Entity to whom defendant Siemens AG has sold or licensed products, identify the Delaware Entity, the product, and the date of the sale or inception of the license, as applicable.

9.    For each Delaware Entity to whom defendant Siemens AG has marketed products or communicated concerning the potential for a sale or license of one or more products, identify the Delaware Entity, the product(s), and the date(s) of the communication(s).

3

10.    For each conference in Delaware to which defendant Siemens AG has sent a representative, state the name of the conference, and identify the date of the conference and the attendee from defendant Siemens AG.

11.    For each employee of defendant Siemens AG that has been physically in the State of Delaware for business purposes, identify the employee, the date(s) the employee was in Delaware, and the purpose of the employee's presence in Delaware.

12.    Identify all products and equipment owned by defendant Siemens AG that is physically within the State of Delaware.

13.    Other than *Siemens AG v. Fonar Corp.*, C.A. No. 95-261 (SLR), *Siemens Aktiengesellchaft v. LG Semicon Co.*, C.A. No. 98-514 (RRM), *Fenster Family Patent Holding, Inc. v. Siemens AG*, C.A. No. 04-038 (JJF), and *TI Group Automotive Systems, (North America) Inc. v. Siemens AG*, C.A. No. 00-432 (GMS) identify all actions in which defendant Siemens AG has appeared as a party before the Delaware state or federal courts.

14.    Identify by year the revenues received by defendant Siemens AG from the sale or license of Soarian in the United States.

15.    Identify by year the revenues received by defendant Siemens AG from the sale or license of Soarian worldwide.

4

064935.1001

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Date: May 5, 2006

_____

Martin S. Lessner  (No. 3109)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th  Floor
Wilmington, Delaware  19899
(302) 571-6600

*Attorneys for Plaintiff*

5

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on May 5, 2006, copies of the foregoing document were served on the following counsel of record in the manner indicated:

BY HAND DELIVERY

        Duncan Grant., Esquire
        Pepper Hamilton LLP.
        Hercules Plaza, Suite 5100
        1313 N. Market Street
        Wilmington, DE  19899-1709

BY FEDERAL EXPRESS

        Kathleen A. Mullen, Esquire
        Larry R. Wood, Jr., Esquire
        Pepper Hamilton LLP.
        3000 Two Logan Square
        Eighteenth & Arch Streets
        Philadelphia, PA 19103-2799

        YOUNG CONAWAY STARGATT & TAYLOR, LLP

        Martin S. Lessner (No. 3109)
        Adam W. Poff (No. 3990)
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, Delaware  19801
        (302) 571-6600
        apoff@ycst.com

        *Attorneys for Syed Iqbal Raza, M.D..*

# EXHIBIT D

# Pepper Hamilton LLP
### Attorneys at Law

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

Larry R. Wood, Jr.
Direct dial: 215.981.4103
Facsimile: 215.981.4750
woodl@pepperlaw.com

May 10, 2006

*VIA FACSIMILE AND U.S. FIRST CLASS MAIL*

Adam W. Poff, Esquire
Young Conway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899

Re: *Raza v. Siemens Medical Solutions USA, Inc., et al.*
Civil Action No. 06-132 (JJF)

Dear Adam:

We received Plaintiff's document requests and interrogatories directed to Siemens AG, which you served on us on Friday, May 5, 2006. Plaintiff's discovery requests are improper for numerous reasons, including but not limited to the following:

First, as explained in Siemens AG's motion to dismiss, Plaintiff has not yet properly served Siemens AG with his summons and complaint.

Second, Federal Rule of Civil Procedure 26 expressly prohibits Plaintiff from engaging in discovery at this time. Rule 26 states that, except in limited circumstances not applicable here, or when permitted by a court order, "a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)." FED.R.CIV.P. 26(d).

Third, as explained in Siemens AG's motion to dismiss, Plaintiff's complaint is devoid of a single allegation linking Siemens AG to Delaware, and as such, Plaintiff's averments are insufficient as a matter of law to confer personal jurisdiction over Siemens AG.

Fourth, Plaintiff's complaint does not contain allegations sufficient to meet the necessary threshold required under the law to obtain jurisdictional discovery. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (jurisdictional discovery permissible only if plaintiff's complaint contains "factual allegations that suggest 'with reasonable particularity'" the existence of personal jurisdiction).

| Philadelphia | Washington, D.C. | Detroit | New York | Pittsburgh |
|---|---|---|---|---|
| Berwyn | Harrisburg | Orange County | Princeton | Wilmington |

**Pepper Hamilton LLP**
*Attorneys at Law*

Adam W. Poff, Esquire
Page 2
May 10, 2006

<u>Fifth</u>, Plaintiff's discovery requests are objectionable on numerous grounds, including that they are extremely overbroad and are unrelated to the Court's resolution of Siemens AG's pending motion to dismiss for lack of personal jurisdiction.

<u>Finally</u>, Plaintiff's discovery requests constitute an attempt to engage in an improper fishing expedition. In *Telcordia Technologies, Inc. v. Alcatel S.A.*, 2005 WL 1268061 (D. Del. May 27, 2005), Judge Sleet denied a request for jurisdictional discovery, and noted that "the United States Supreme Court has held that courts should 'exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position.'" *Id.* at *8 (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Dist. Iowa*, 482 U.S. 522, 546 (1987)).

As such, in response to your email from Friday, May 5, 2006, Siemens AG will not agree either to respond to such discovery or to stay Plaintiff's response to Siemens AG's motion to dismiss. If you have any questions, please do not hesitate to contact us.

Very truly yours,

Larry R. Wood, Jr.

LRW/mm

# EXHIBIT E

Copyright 2004 Disclosure Incorporated EDGARPlus(R)

COMPANY: SIEMENS AG TICKER: SI EXCHANGE: NYS

FORM-TYPE: 20-F

DOCUMENT-DATE: September 30, 2004 FILING-DATE: November 29, 2004

Full text  Company info  Contents  Other  Return

* * * * * * * * * * * * * * * * **TEXT OF FILING** * * * * * * * * * * * * * * * * *

Table of Contents

As filed with the Securities and Exchange Commission on November 29, 2004

SECURITIES AND EXCHANGE COMMISSIONWashington, D.C. 20549

FORM 20-F

   REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g)OF THE SECURITIES EXCHANGE ACT OF 1934 o

OR

 ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended September 30, 2004. D

OR

TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____. o

Commission file number: 1-15174

Siemens Aktiengesellschaft(Exact name of Registrant as specified in its charter)

Federal Republic of Germany(Jurisdiction of incorporation or organization)

   Wittelsbacherplatz 2D-80333 MunichFederal Republic of Germany(Address of principal executive offices)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

|                                  | Name of each exchange  |
| Title of each class              | on which registered    |

----------------------------------------------- -----------------------

American Depositary Shares, each representing one
     Common Share, no par value      New York Stock Exchange
     Common Shares, no par value*    New York Stock Exchange

* Listed, not for trading or quotation purposes, but only in connection with
  the registration of American Depositary Shares pursuant to the requirements
  of the Securities and Exchange Commission.

   Securities registered or to be registered pursuant to Section 12(g) of the
Act: None

   Securities for which there is a reporting obligation pursuant to Section
15(d) of the Act: None

   The number of outstanding shares of each of the issuer's classes of
capital or common stock as of September 30, 2004: 891,075,461 common shares, no
par value.

   Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports) and (2) has been subject to such
filing requirements for the past 90 days. Yes D  No o  Not applicable o

   Indicate by check mark which financial statement item the registrant has
elected to follow.

Item 17 o  Item 18 D

## TABLE OF CONTENTS

Page

-----

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

Item 1:  Identity of Directors, Senior Management and Advisers                              1
Item 2:  Offer Statistics and Expected Timetable                                    1
Item 3:  Key Information                                        1
Item 4:  Information on the Company                              6
Item 5:  Operating and Financial Review and Prospects                      49
Item 6:  Directors, Senior Management and Employees                        85
Item 7:  Major Shareholders and Related Party Transactions                  99
Item 8:  Financial Information                               99
Item 9:  The Offer and Listing                              99
Item 10: Additional Information                            101
Item 11: Quantitative and Qualitative Disclosure About Market Risk               117
Item 12: Description of Securities Other than Equity Securities              120
Item 13: Defaults, Dividend Arrearages and Delinquencies                  120
Item 14: Material Modifications to the Rights of Security Holders and Use of Proceeds  120
Item 15: Controls and Procedures                       120
Item 16A: Audit Committee Financial Experts                       120
Item 16B: Code of Ethics                        120
Item 16C: Principal Accountant Fees and Services                  121
Item 18: Financial Statements                        F-1
Item 19: Exhibits                          III-1
Exhibit 1.1
Exhibit 8.1
Exhibit 12.1
Exhibit 12.2
Exhibit 13.1
Exhibit 13.2
Exhibit 14.1

FORWARD LOOKING STATEMENTS

This Form 20-F contains forward-looking statements and information--
that is, statements related to future, not past, events. These statements may
be identified by words as "expects," "anticipates," "intends," "plans,"
"believes," "seeks," "estimates," "will" or words of similar meaning. Such
statements are based on our current expectations and certain assumptions, and
are, therefore, subject to certain risks and uncertainties. A variety of
factors, many of which are beyond Siemens' control, affect its operations,
performance, business strategy and results and could cause the actual results,
performance or achievements of Siemens worldwide to be materially different
from any future results, performance or achievements that may be expressed or
implied by such forward-looking statements. For us, particular uncertainties
arise, among others, from changes in general economic and business conditions,
changes in currency exchange rates and interest rates, introduction of
competing products or technologies by other companies, lack of acceptance of
new products or services by customers targeted by Siemens worldwide, changes in
business strategy and various other factors. More detailed information about
certain of these factors is contained throughout this report. Should one or
more of these risks or uncertainties materialize, or should underlying
assumptions prove incorrect, actual results may vary materially from those
described in the relevant forward-looking statement as anticipated, believed,
estimated, expected, intended, planned or projected. Siemens does not intend or
assume any obligation to update or revise these forward-looking statements in
light of developments which differ from those anticipated.

In this Form 20-F, references to "we," "us," "our," "Company" or "Siemens" are to Siemens Aktiengesellschaft and, unless the context otherwise requires, to its consolidated subsidiaries. In Item 4: "Information on the Company," we use the terms "we" and "us" to refer to a specific Siemens group. Throughout this annual report, whenever a reference is made to our Company's website, such reference does not incorporate information from the website by reference into this annual report. On February 22, 2001, our shareholders approved a stock split of one share for every two shares held. The stock split took effect for trading purposes on April 30, 2001. See Item 3: "Key Information-- Dividends." Except as otherwise specified, the share data in this document reflect this stock split.

i

Table of Contents

THIS PAGE INTENTIONALLY LEFT BLANK

ii

Table of Contents

PART I

ITEM 1: IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS

Not applicable.

ITEM 2: OFFER STATISTICS AND EXPECTED TIMETABLE

Not applicable.

ITEM 3: KEY INFORMATION
ITEM 4: INFORMATION ON THE COMPANY

OVERVIEW

Siemens traces its origins to 1847. Beginning with advances in telegraph technology, the Company quickly expanded its product line and geographic scope, and was already a multi-national business by the end of the 19th century. The Company formed a partnership under the name Siemens & Halske in 1847, reorganized as a limited partnership in 1889 and again as a stock corporation in 1897. The Company moved its headquarters from Berlin to Munich in 1949, and assumed its current name as Siemens Aktiengesellschaft, a stock corporation under the Federal laws of Germany, in 1966. The address of our principal executive offices is Wittelsbacherplatz 2, D-80333 Munich, Germany; telephone number +49 (89) 636 00.

During fiscal 2004, Siemens employed an average of 419,200 people in approximately 190 countries worldwide. In fiscal 2004, we had net sales of

75.167 billion. Our balanced business portfolio is based on leadership in electronics and electrical engineering. We have combined this expertise with a commitment to original research and development (R&D) to build strong global market positions in equipment for telecommunications and networking, industrial automation, power generation and medical diagnostics. We are also a major world competitor in rail transportation systems, automotive electronics and lighting. Our businesses operate under a range of regional and economic conditions. In internationally oriented long-cycle industries, for example, customers have multi-year planning and implementation horizons that tend to be independent of short-term economic trends. Our activities in these areas include power generation, power transmission and distribution, medical solutions and rail systems. By contrast, in fields with more industry-specific cycles, customers tend to have shorter horizons for their spending decisions and greater sensitivity to current economic conditions. Our activities in these areas include information and communications, automation and drives and lighting. Some activities, especially information and communications, medical solutions and automotive, are also influenced by technological change and the rate of acceptance of new technologies by end users.

In fiscal 2003, we vigorously pursued a strategy we called Operation 2003 with the overriding purpose to increase profitability through a set of strategic programs and initiatives aimed at achieving specific earnings margin targets for our business Groups and generating cash during a period of slow macroeconomic growth. Upon the successful completion of Operation 2003, we conducted a thorough review of our management system,

6

Table of Contents

in order to further refine and improve it. We expanded our top+ business excellence program at the start of fiscal 2004, integrating it into a reorganized Siemens Management System (SMS) consisting of three programs: Innovation, Customer Focus and Global Competitiveness. Launched in October 2003, the SMS motivates Siemens business Groups to further intensify their R&D activities to yield new and improved innovative products and to expand and develop customer relationships. Accordingly, we enhance their overall cost position as one way, among many others, to further advance Siemens' competitiveness in the global marketplace. In fiscal 2004, we began our "Go for Profit and Growth" initiative, which we will continue in fiscal 2005.

In the remainder of this section, we detail the SMS strategy, highlight portfolio optimization activities in recent years, and describe the long-term, broad-based management strategies that span all of our businesses and will guide our growth in the years ahead.

SIEMENS MANAGEMENT SYSTEM

Innovation--has been a hallmark of Siemens since its inception, and our commitment to innovation remains strong, with a total 5.063 billion of R&D expenses and approximately 6.7% of sales invested in R&D in fiscal 2004. Innovation cycles are increasingly shorter. The role of management is to identify opportunities to bring innovation to market as rapidly and profitably

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

as possible, such as by using common technology platforms across multiple businesses.

Customer focus--means meeting a customers' needs rather than simply selling a product or service. In practice, we market our products, solutions and services not only through our business Groups but also take advantage of cross-selling opportunities. We intend to maximize our customers' satisfaction and market penetration through various initiatives, including cross-selling programs. Throughout our Groups, we will initiate further emphasis of our service business to stimulate sales. It is important to treat our customers as partners, to involve them in our own development processes and to provide them with market-oriented solutions.

Global competitiveness--the third component of the Siemens Management System, concerns our ability to compete and market our products on a worldwide basis. Siemens is present in approximately 190 countries and benefits from its multicultural mix of managers and employees in these countries. It is our primary goal to secure competitive strength by utilizing and optimizing all parts of our worldwide value chain including procurement, production and hardware, development of software, shared services and back-office functions. In addition, we plan to expand our presence in our growth regions.

PORTFOLIO ACTIVITIES

Since fiscal 2002, we have completed the following significant transactions in our efforts to realign our businesses in order to achieve sustainable profitability growth:

Acquisitions

Acquisition of USFilter Corporation (USFilter) which offers water systems and services products in the municipal and industrial water treatment and supply market in the fourth quarter of fiscal 2004;
Acquisition of three entities not significant individually in fiscal 2004:
Trench Electric Holdings BV, Netherlands, BBC Technology Holdings Ltd., UK and the Huntsville, Alabama, USA business group of an automotive electronics manufacturer; and
Acquisition of the industrial turbine business of Alstom S.A. (Alstom), Paris, which was structured in two transactions; in the first transaction in April 2003, Power Generation (PG) acquired the small gas turbine business of Alstom; and in the second transaction in July 2003, PG acquired Alstom's medium-sized gas and steam turbine businesses.

7

Table of Contents

Dispositions

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

In the fourth quarter of fiscal 2004, Siemens divested a 74.9% interest in
SBS' banking software company KORDOBA Gesellschaft fur Bankensoftware mbH &
Co. KG (Kordoba);
Siemens contributed the Patient Care System and Electro Cardiography System
businesses of our Medical business Group into a joint venture with Dragerwerk
AG in exchange for a 35% interest in the joint venture Drager Medical AG &
Co. KGaA (Drager Medical) in June 2003. In October 2003, Siemens completed
the sale of its Life Support Systems business to Getinge AB, Sweden and
contributed the net proceeds from this sale to Drager Medical;
In September 2002, Siemens divested of several business activities to
Kohlberg Kravis Roberts & Co. L.P. (KKR), including units acquired as part of
our acquisition of the Atecs Mannesmann group, the Metering division of our
PTD Group, the Ceramics division of our PG Group and a regional service
business belonging to our ICN Group;
In July 2002, divestiture of Unisphere Networks, Inc.;
In fiscal 2002, divestiture of certain other businesses and assets related to
the acquisition of Atecs Mannesmann AG; and
Siemens decreased its ownership interest in Infineon Technologies AG
(Infineon) from 64.0% at the beginning of fiscal 2002 to 18.2% at the end of
fiscal 2004.

For a detailed discussion of our acquisitions and dispositions, see
"Notes to Consolidated Financial Statements."

ECONOMIC VALUE ADDED (EVA)

A core element of our strategy has been an emphasis on EVA as a
measurement of the success of each of our business Groups and of our Company as
a whole. Economic value added provides a measure of the return of a business
Group over its cost of capital. We believe that our management incentive
compensation, which is based on economic value added targets, plays a key role
in keeping us focused on our profitability goals.

CORPORATE STRUCTURE

Our corporate structure consists of fifteen different business Groups
active in seven different business areas.

The majority of our business is devoted to providing products and
services to customers based on Siemens' historical expertise in innovative
electrical engineering and electronics. We refer to this component of our
business as Operations, which is divided into the 13 operating Groups. These
Groups typically design, manufacture, market, sell, and service products and
systems, or help customers use and manage those products and systems. A Group
is equivalent to a reportable segment as defined by U.S. GAAP.

Another component of our Company is made up of two Groups, involved in
non-manufacturing activities such as financing, leasing, and real estate. We
refer to this component as Financing and Real Estate.

For a detailed description of our business Groups, see "--Description of Business."

In addition, we hold non-controlling interests in a number of businesses. The most significant of these is our interest in BSH Bosch und Siemens Hausgerate GmbH which manufactures consumer household appliances, often referred to as "white goods" and Fujitsu Siemens Computers for computers.

Our business Groups are supported by regional units and central corporate departments. Our regional units include sales units in each region where we operate to complement the sales efforts of our individual business Groups and take advantage of cross-marketing opportunities. Our corporate departments also support the business Groups with financial resources, human resources, planning and development and information and communications infrastructures.

8

Table of Contents

We operate through hundreds of subsidiaries, some of which are organized along the lines of our business Groups and others of which are organized on a geographic basis.

DESCRIPTION OF BUSINESS

Our seven business areas and fifteen Groups are as follows:

* The Groups ICN and ICM were combined into one Group named Communications (Com) as of October 1, 2004.

9

Table of Contents

INFORMATION AND COMMUNICATIONS

Information and Communication Networks (ICN)

|  | Year ended September 30, 2004 |
| --- | --- |
|  | ------------------ |
| Total sales | 6.994 billion |

External sales as percentage of Siemens net sales          8.41%
Group profit                                222 million

ICN develops, manufactures and sells comprehensive public and enterprise communication systems, including related hardware and software, and provides a wide variety of consultancy, maintenance and other services. ICN's worldwide customer base comprises service providers, such as network operators and internet service providers, as well as private companies, ranging from small businesses to large multinational enterprises.

Our focus has shifted from traditional communication systems that carry primarily voice (narrowband networks) to systems that can combine voice, data and multimedia, such as video transmissions (broadband or next generation networks). Our carrier business upgrades existing voice-centered networks primarily to allow the transmission of voice, data and multimedia, based on internet protocol (IP) (often referred to as IP convergence), so that service providers can address new revenue opportunities while protecting their significant investments in their existing networks. For our new customers, we also design and build new IP-based networks. Our enterprise business offers comprehensive communication products and solutions designed to increase productivity of enterprises by converging their voice and data networks on a single unified network infrastructure and by integrating real-time communication applications. Our Group is organized in three divisions: Carrier Networks, Carrier Service and Enterprise Networks.

Carrier Networks. This division is a leading system provider for public fixed-line communication network infrastructure. We offer innovative and comprehensive solutions designed to reduce the operating costs of our carrier customers and to increase the efficiency of their networks. Additionally, we provide applications that enable our customers to increase their revenues by allowing them to offer more products and services such as telephone and video conferencing and to thus carry more IP-converged traffic over their networks. Our customers worldwide include telephone operators, cable and other alternative operators, data carriers, internet service providers and application service providers.

Our product portfolio addresses each of the following three telecommunication networks segments: access, transport and control. For network access, we provide products and solutions that upgrade the portion of a telephone network between a home or a business and the first network switching system (the last mile) equipping it to carry not only voice but data requiring very high bandwidth. We also offer broadband equipment for homes and businesses, including modems for high-speed internet access. As part of our new network access strategy, in fiscal 2004, we initiated a comprehensive partnership with the Korean access specialist Dasan Networks Inc. (Dasan), in which we held a significant minority interest, giving us a strong local partner in Asia. After receiving approval from the German antitrust authorities, in fiscal 2005, we acquired a controlling interest in Dasan on October 18, 2004. Dasan offers broadband access products such as DSLAMs (DSL access multiplexers) and switches based on Ethernet. For network transport, we offer transport solutions for optical networks, which use light waves to transmit communications signals through fiber optic cables. Our transport solutions combine hardware and software designed to deliver higher transmission rates

between network elements. To complete our transport network product portfolio, in fiscal 2004, we entered into a global reseller agreement with the Chinese company, Photonic Bridges, Inc. (Photonic Bridges). For network control, we provide solutions which switch and direct voice, data and video signals within a network. In addition, our portfolio includes products for voice switching in traditional networks and for voice and data switching in IP converged networks, as well as interfaces between these narrowband and broadband networks. All our carrier products are offered under the common brand, SURPASS(R). In order to offer the full spectrum of network products for the Chinese market, during fiscal 2004, we increased our minority ownership in Beijing International Switching Company (BISC) to a majority ownership, and subsequently renamed it Siemens Communication Networks, Beijing (SCNB).

10

Table of Contents

For multimedia applications, we provide open application programming interfaces to members of our SURPASS partner program, "weSURPASS(R)." This allows "weSURPASS" partners to develop features and applications that enhance the value of SURPASS for its users. We have also launched SURPASS Home Entertainment allowing our carrier customers to create a customized strategy for entry into the multimedia business, providing both entertainment and communication services on TV.

Our portfolio is also complemented by the data routing products of Juniper Networks, Inc. (Juniper) for which we act as a global reseller.

Carrier Service. This division provides services for the network operation processes of our customers. The service portfolio comprises network maintenance and professional services. Network maintenance includes comprehensive service packages, including a customer interaction center, network care, repair and replacement services and "evolution services," which allow networks to keep pace with technological developments. Our professional services focus on operational out-tasking and also include consulting, design and education services.

Enterprise Networks. This division provides comprehensive real-time communication products and solutions for enterprises, government agencies and other organizations. Our products and services are based on our enterprise IP convergence architecture, called HiPath(R). Our portfolio contains a comprehensive range of communications platforms, a broad offering of traditional and IP phones and software-based telephone applications for personal computers, IP-based applications for customer relationship management and remote office environments, a wide array of installation and maintenance services, professional and managed services, and network security systems and solutions. In addition, our open, real-time communications application suite, OpenScape(R), integrates traditional telephony services with voice over IP and collaborative applications, such as multimedia conferencing, offering a fully integrated, real-time framework that simplifies business processes. As a result of the general shift towards open standards IP communications solutions, we are moving from a hardware-based business to an increasingly software-and solutions-driven business. Thus, our focus is on optimizing an enterprise's

business processes through software solutions which are integrated in its existing IT structure. We design our solutions to provide customers with a prompt return on investment and to open new business opportunities for them, such as through the integration of fax, e-mail, internet and video into existing telephone call center systems.

In order to extend our data networks and information technology security offerings, during fiscal 2004, we have entered into reseller agreements with Huawei Technologies Co. Ltd. (Huawei) and Oblix Inc. (Oblix).

During fiscal 2004, ICN continued to implement its LifeWorks(R) concept as its vision for the future of telecommunications worldwide. LifeWorks is a unified communications platform that incorporates elements of our SURPASS carrier technology and our HiPath enterprise technology in order to integrate the technologies, devices and applications of enterprises and carriers and to produce a single, homogeneous communications environment where information can be accessed at any time and from any remote point. As a further step to implement our LifeWorks vision, we have launched our HiPath Openscape and our SURPASS Home Entertainment.

ICN operates its own sales force in Germany and uses dedicated personnel in Siemens' worldwide network of regional sales units. Our global presence and our expertise in voice and IP communication allow us to deliver ready-for-use network solutions on a wide scale and of varied complexity throughout the world. Some of our more significant carrier customers include Deutsche Telekom, Telecom Italia, China Telecom, SBC and France Telecom, while our more significant enterprise customers include research and governmental institutions (including certain departments of the United States federal government), Ford Motor Company, DaimlerChrysler and RWE. Being faced with an almost stable market development, we have not experienced a significant change in the number of our carrier customers or in the number of our enterprise customers. Our larger contracts with both our carrier and enterprise customers often involve tens of millions of euros. We have no customer who contributed more than 5% of total sales in fiscal 2004.

We have provided, and expect to continue to provide, some of our customers with various forms of direct and indirect financing in connection with large infrastructure projects.

11

Table of Contents

We derive approximately two thirds of our sales from Europe, with 35% from Germany, and a smaller yet significant amount from the Americas, mainly the U.S.

ICN has established a number of smaller joint ventures in order to share costs and risks of developing new technologies, to manufacture products under local conditions and to facilitate market entry. In addition, we enter into strategic alliances in order to help achieve a leading position in the market for real-time communications. Typical examples are our strategic alliances with leading enterprise IT companies, such as IBM, Microsoft and SAP.

ICN's market continues to be characterized by:

Growth in the amount and speed of data communications traffic due to the increased availability of broadband access, multimedia applications, such as messaging and games, and real-time communications;

Continued convergence of voice, data and video communications and increasing volatility of such converged digital traffic within networks;

Decreasing revenues for many large carriers from fixed line telephony and voice due to mobile substitution, further price erosion, and migration to internet telephony (often referred to as voice over IP services);

Growing maturity of IP voice technologies, such as voice over IP, endangering more expensive traditional technologies and lowering market entry barriers faced by new competitors; and

Low levels of capital expenditure by carriers and enterprises in established voice infrastructure.

ICN is challenged by a changing competitive landscape. In addition to our traditional competitors, such as Alcatel, Lucent, Nortel and Avaya, there are also recent entrants, such as Huawei, UTStarcom and ZTE, targeting our traditional customers. As a result of the importance of IP convergence and the applications business, we also face new competitors which formerly focused on software, IT services and/or data networks, such as Microsoft, SAP, Cisco Systems and IBM.

For our carrier business, market conditions remained difficult throughout fiscal 2004, largely due to the continued weak level of capital expenditures among telecommunications operators. Our enterprise business suffered from a continuing reluctance to engage in IT spending, particularly in the United States and Germany.

In fiscal 2004, adjusting our research and development activities to reflect current market conditions, our research and development costs were 10.2 % of ICN total sales, compared to 11.8% of total sales in fiscal 2003. We remain focused on improving the efficiency of our research and development activities, which includes reducing and transferring development sites to lower-cost countries, as well as directing research and development efforts on targeted projects in order to decrease overhead costs and development time.

More generally, in response to the decline of ICN's volume and changes in the competitive landscape, we have undertaken further comprehensive adjustments to our cost structure and business portfolio and continued our efforts in working capital management. During fiscal 2004, we started to implement our ICN Top+ Program aiming for innovation in products and services, improved customer focus and profitable, sustainable growth in turnover and market share. We also continued to maintain our focus on the key elements of our former Profitability and Cash Turnaround (PACT) Program: improving management of working capital, cutting costs, reducing personnel, consolidating our worldwide manufacturing structure and improving portfolio management.

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

The large size of some of our projects occasionally exposes us to risks associated with technical performance, a customer, or a country. For additional information with respect to our long-term contracts, see Item 3: "Key Information-- Risk Factors."

Effective October 1, 2004, our ICN and ICM Groups were combined to form our new Siemens Communications (Com) Group. Com is organized into three businesses around the telecommunications industry with eight divisions. The devices business consists of Mobile Devices, Customer Premises Equipment Devices and Wireless Modules; the enterprise networks business consists of the two divisions Enterprise Systems and

12

Table of Contents

Enterprise Services; and the carrier networks business consists of the Mobile Networks, Fixed Networks and Carrier Services divisions.

Information and Communication Mobile (ICM)

Year ended
September 30, 2004

------------------

| | | |
|---|---|---|
| Total sales | 11.042 billion | |
| External sales as percentage of Siemens net sales | | 14.48% |
| Group profit | 347 million | |

ICM designs, manufactures and sells a broad range of mobile network products and systems and communication devices including mobile, cordless and corded fixed-line telephones. ICM is one of the world's leading providers of mobile infrastructure and devices.

In fiscal 2004, our Group comprised four divisions: Mobile Networks, Mobile Phones, Cordless Products, and Wireless Modules.

Mobile Networks. The Mobile Networks division provides mobile network operators and enterprises with a complete range of products for building, expanding and enhancing mobile networks, including the dominant second generation (2G) mobile standard, GSM, the mobile data standard, GPRS and the further enhancement of GPRS data transmission, EDGE, as well as the dominant third generation (3G) mobile technology, W-CDMA.

The division's product portfolio includes radio base stations, base station controllers, switching systems for mobile communications networks, intelligent network systems, applications, and microwave technology systems. The division has started to address the increasing demand of corporate customers offering mobile enterprise solutions to operators. Additionally, the

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

division also focuses on customized solutions in the areas of multimedia solutions and services for operators such as charging which use the division's hardware and software, as well as third party technology. Based on industry estimates of market share published by Gartner, Inc. in May 2004, our Mobile Networks division is among the leading global providers of GSM and W-CDMA networks and prepaid services.

The universal mobile telecommunications system (UMTS) standard used in 3G networks offers faster and more reliable transmission of voice, data and multimedia communications over mobile devices through higher efficiency and speed of radio transmission. These new types of mobile networks are expected to provide a platform for wireless Internet access and a variety of new applications. Supported by Mobisphere, our joint venture with NEC, we are well positioned in the UMTS market. We have already been awarded 30 commercial contracts for 3G network projects. Currently, we are working on a number of rollouts of W-CDMA infrastructure in Europe and Asia.

Mobile Phones. We offer digital mobile phones for all customer segments based on GSM/ GPRS and UMTS, the widely distributed mobile phone technology standards that allow faster data transmission rates. We build our major mobile phone products from common platforms to reduce production costs while allowing us to readily tailor features for different market segments. To broaden our mobile phone line, we continue to introduce high-end products, with multimedia capabilities. The core of our sales come from medium- and lower-priced phones designed for the consumer market. In fiscal 2004, we discontinued our Xelibri brand of fashion accessory phones.

During fiscal 2004, we launched a variety of new products, including:

SX1 smart phone, our first smart phone based on an open operating system offering multimedia capabilities, including audio, video and an integrated camera;
business phones, such as the S65, a high-end bar phone with BluetoothTM technology, exchangeable MultiMediaCard, integrated camera, and high resolution color display;

13

Table of Contents

fun phones, such as the M65 and the CX65, with a fashionable design and features such as multimedia messaging service (MMS), JAVATM technology, color displays, entertaining and easy to use menus, integrated camera with digital zoom, polyphonic ringer, video, and an attachable flash as an accessory; as well as basic-class multimedia phones like C65, for mainstream users;
the slider phone SL65, which features a distinctive design, allowing it to

slide open to reveal its keypad, and a camera with digital zoom and video;
clam shell phones, such as the entry level CF62 developed in China, featuring
a distinctive design with an antenna loop and an attractive illumination
concept, MMS, JAVATM technology, color display and an attachable camera;
market entry phones, including the A57, designed to appeal to first-time
users or price sensitive customers; and
a 3G phone, the U15, which provides a large variety of multimedia features,
including video and an MP3 player.

Currently, we rely on Infineon and Lumberg as significant suppliers of
semiconductors and other components for mobile handsets. As is common in our
industry, we also use electronic manufacturing services (EMS) providers, who
supply us with manufacturing capacity. In addition, we use original design
manufacturing (ODM) suppliers, who supply us with certain product design and
technology features that we use to serve market-specific needs.

Cordless Products. Our cordless products portfolio is based on digitally
enhanced cordless technology (DECT) and covers the entire range of products for
the consumer, home office, and small business segments. Apart from voice
products, we increasingly focus on data products, such as modems and set-top
boxes.

In fiscal 2004, we introduced a new generation of Gigaset cordless
phones. This is the first Gigaset cordless phone product line to provide access
to internet telephony (often referred to as "voice over IP"), making use of the
new Gigaset M34 universal serial bus (USB) device to link the cordless phone
with a personal computer. We also introduced the SL740/ SLX740, which is the
world's first cordless home phone with integrated camera and MMS.

Wireless Modules. Our Wireless Modules division produces communication
modules which enable wireless voice communications and machine-to-machine data
transfer. Our customers include them in personal data assistants, smart phones,
vending machines, traffic control systems, burglar alarms, measuring
instruments, navigation systems, automotive communication systems and other
electronic systems and devices.

Our communication modules are based on the GSM and GPRS mobile technology
standards. In fiscal 2004, our XT55 module was the first tri-band GPS/ GPRS
module to be introduced in the market. The XT55 can be used for fleet
management, asset tracking, person tracking and car security, as well as
various other applications that focus on location-based communication.

Our Siemens Mobile Acceleration GmbH continues to make strategic
investments in start-up companies in the mobile telecommunications field.

Our divisions continue to be actively involved in collaborative ventures.
Our Mobile Phones division increased its share in Symbian, a software licensing
joint venture that supplies an open operating system for data-enabled mobile
handsets. The company is jointly owned by wireless industry leaders, including
Nokia, Ericsson, Matsushita, Sony-Ericsson and us. In addition, our Mobile
Phones division entered into a strategic partnership with Chinese Ningbo Bird
Co., Ltd. (Bird), leveraging Bird's leading sales and distribution network with
the aim of achieving strong growth in China.

In fiscal 2004, our research and development costs were 10.6% of ICM's total sales, compared to 11.3% of total sales in fiscal 2003. In addition to Mobile Networks' significant long-term development efforts in UMTS, it has focused development efforts on GPRS and EDGE technology. With other leading industry participants, such as Ericsson, Huawei, NEC and Nortel, our Mobile Networks division also launched the Common Platform Radio Interface (CPRITM) initiative. The CPRITM focuses on a 3G radio base station design that divides the radio base

14

Table of Contents

station into a radio and a control part, by establishing one new public interface as the sole connecting point between the two parts. This is intended to allow each of the two parts to better benefit from technology advancements in its respective area. The CPRITM initiative generated its first products during fiscal 2004. Research for the next generation of mobile technologies has been intensified. For example, we participate in the European Union (EU) research for the next generation of mobile network architecture and technologies (beyond 3G). The Mobile Phones division is developing new product architectures in order to drive modularization of platforms, which enable flexible and quick product development. Cordless Products is a leading technology and innovation driver for the new fixed-line MMS standard in Europe, which allows sending and receiving multimedia like pictures and videos with fixed-line phones.

The technology relevant to our business continues to grow more and more complex, and the functionality of different products increasingly overlaps. As a result, ICM, like other competitors in the wireless market, may be more likely to face patent infringement and other intellectual property-related claims, which could have a negative impact on our competitive position.

Customers of our Mobile Networks division primarily include mobile network operators, as well as service providers and a variety of enterprises. Our Mobile Phones and Cordless Products customers are primarily large telecommunications operators, distribution companies and consumer retailers. Our Cordless Products division also sells cordless and corded telecommunications equipment to ICN for resale to business customers as part of its complete telecommunications solutions offerings. Customers of our Wireless Modules division primarily include information and communication device manufacturers, automobile manufacturers, IT vendors and other businesses.

In fiscal 2004, we continued our efforts in building our North American customer base as network providers in the United States continue to shift from TDMA (a 2G technology used only regionally) to GSM technology. In South America, we are taking advantage of the shift from TDMA to GSM standard, and the build-out of GSM in general, to grow our handset business.

We have provided and expect to continue to provide some of our customers with various forms of direct and indirect financing in connection with large infrastructure projects, including build-outs of 3G networks.

Our products and services are sold through our own sales units in approximately 70 countries, as part of Siemens' worldwide network of regional sales units. We derive over half of our sales from Europe and a smaller but significant amount from the Americas and the Asia-Pacific region.

We have approximately ten significant manufacturing and assembly locations worldwide, including six in Europe, of which four are located in Germany.

Fiscal 2004 brought a recovery in investment in mobile network technology due to the wide scale launch of commercial 3G services, continued investment in 2G and 2.5G mobile services and a growing market for services such as network integration and security. The mobile phones market continues to grow, especially for market-entry models, and in emerging markets such as India, the Middle East and Latin America, with a growing demand for ultra-low-cost phones. The prospects in both the mobile network and phone markets will depend on various factors, including the success of the commercial launch of 3G products and services and their widespread acceptance by consumers, the development of worldwide economic conditions and the severe financial constraints to which many wireless network providers are subject.

To improve and enhance profitability, ICM has continued its productivity program. The measures include process improvements, enhanced purchasing coordination, as well as headcount reduction. For example, we both continued and accelerated our increased use of low-cost development resources in China and India.

On an ongoing basis, demand for our products, systems and solutions depends on worldwide economic conditions and continuing growth in communications and information technology use in the areas and standards we serve. In the mature markets, the mobile phone industry is in a transition from serving a voice-centered market to addressing significant data services demand, and future demand for wireless equipment may depend on the availability and acceptance of such data services. Demand for wireless equipment will continue to be affected by the financial constraints facing most telecommunications operators, especially in Europe, which limit their ability

15

Table of Contents

to invest in wireless infrastructure. Demand for our mobile and cordless phone products also typically fluctuates by season, with most of the sales to the end-consumer historically occurring around the Christmas holidays. Due to generally short product life cycles in our mobile handset business, to remain competitive we must be able to design and successfully bring new products to market quickly and in sufficient amounts to meet customer demand.

We compete with both large, established mobile network and handset telecommunications manufacturers with a broad focus, as well as smaller start-up companies concentrating on particular market niches. In addition, we experience new competitors with a strong regional focus, for example China, who

build on their low cost structures and abilities to integrate third-party modules and components in their own products. In general, some of our most significant competitors include Nokia, Motorola, Nortel, Lucent, Ericsson, Sony-Ericsson, LG and Samsung, in mobile networks and mobile phones, and Matsushita, Atlinks, and Vtech, in other digital communications products. Additionally, in Mobile Networks, we are facing both low-cost competitors such as Huawei and ZTE and traditional IT firms such as Cisco, who are strengthening their market positions. Mobile Networks is also confronted with intensifying competition from telecommunications suppliers such as Ericsson and IT integrators such as Capgemini, Hewlett-Packard (HP) and Accenture, in the system integration market segment. Additional competitive pressure in mobile phones comes from network operators who are selling phones under their own brand (white label phones). Also, forward integrating technology providers, such as chip manufacturers, expand their share in the value creation as they are able to build more of the phones functionalities into their components. In addition, EMS suppliers, who possess the necessary manufacturing know-how, participate in the manufacturing value creation. In Wireless Modules, we are facing competition mainly from Wavecom and substitution risks from semiconductor companies such as Intel, Infineon and Texas Instruments.

The large size of some of our projects occasionally exposes us to risks associated with technical performance, a customer, or a country. For additional information with respect to our long-term contracts, see Item 3: "Key Information-- Risk Factors."

Several recent or proposed governmental actions may have an impact on our sales and costs. These include the EU directives concerning the disposal of used electronic equipment and the reduction of hazardous waste, and the possible establishment in the EU and other major markets of limits on the Specific Absorption Rate (SAR), a measure of the rate at which radio frequency energy is absorbed by the body, for hand-held phones and other devices. In addition, from 2006 on, the EU and China will exclude lead-containing electronic products from their markets. Our Mobile Phones and Wireless Modules divisions are preparing the migration to a lead-free product portfolio. See "--Environmental Matters." We are already running pilot projects intended to assure our compliance by the applicable dates. The potential impact of these environmental regulations on our sales or profitability will depend in part on how they are ultimately implemented through national legislation and enforced.

Effective October 1, 2004, our ICN and ICM Groups were combined to form our new Siemens Communications (Com) Group. Com is organized into three businesses around the telecommunications industry with eight divisions. The devices business consists of Mobile Devices, Customer Premises Equipment Devices and Wireless Modules; the enterprise networks business consists of the two divisions Enterprise Systems and Enterprise Services; and the carrier networks business consists of the Mobile Networks, Fixed Networks and Carrier Services divisions.

Siemens Business Services (SBS)

Year ended
September 30, 2004

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

```
                    -------------------
Total sales                 4.716 billion
External sales as percentage of Siemens net sales      4.79%
Group profit                40 million
```

16

Table of Contents

SBS provides information and communications services to customers in industry, the public sector, financial services, telecommunications, transportation and utilities. SBS designs, builds and operates both discrete and large scale information and communications systems, and provides related maintenance and support services.

SBS has expanded into the operation of communications systems to provide comprehensive information technology and communications solutions from a single source. SBS creates these solutions for customers by drawing on its management consulting resources to redesign customer processes; on our professional services to integrate, upgrade, build, install and maintain information technology systems; and on our operational capabilities to run these systems on an ongoing basis. SBS serves primarily external customers, who account for approximately 76% of total sales.

SBS has three divisions which reflect the types of services SBS offers. The Solution Business division offers project-oriented consulting, design and implementation services. These include selecting, adapting and introducing new solutions to support business processes, as well as integration of systems and enterprise applications. Many of our solutions are based on software platforms from our partners, such as SAP. The Operation-Related Services division provides outsourcing services (operation of a customers' IT infrastructure or of selected business processes), with a focus on full-scale IT operations spanning hosting, call center, network and desktop services. The Product-Related Services division offers infrastructure maintenance, including hardware and software maintenance and infrastructure service solutions, including security services and concepts designed to minimize business process interruption caused by failures in the IT infrastructure. In fiscal 2004, we generated more than a quarter of total sales from the Solution Business, less than half from Operation-Related Services and slightly more than a quarter from Product-Related Services. SBS will seek to expand its outsourcing business and formed a fourth division, Business Process Outsourcing, focusing on business process outsourcing, especially in the areas of human resource administration and financial service back-office operations as of October 1, 2004 to support this initiative.

SBS provides information technology solutions and services designed to support and optimize the following core processes of its customers:

customer relationship management to assist businesses in aligning their organizations to better serve the needs and requirements of their customers. In this area, SBS offers solutions for integrated management of all sales, marketing and customer care activities, including operation of call centers and the supply of sales control systems that allow businesses to follow and maintain their customer relationships by gathering and analyzing sales information;

business information management to improve our customers' business processes, by electronically structuring, processing, analyzing and evaluating data and information, and making it available around the clock. Our portfolio in this area includes services and solutions for business information, document and product data management;

supply chain management to facilitate the efficient interplay of all of a business' operational processes with those of its suppliers, from receipt of orders through production and shipment, enabling optimization of delivery times, capacities, inventories and production processes, as well as cost reductions. SBS offers a complete portfolio of offerings in this area, from planning, design and implementation of a customer's production and logistics information technology systems to the operation of production and logistics systems as an outsource services provider;

enterprise resource management to optimize a customer's internal management and production processes through the supply and support of configurable software packages for integrated management of a wide variety of the customer's business processes, from procurement to manufacturing and distribution to treasury management and accounting functions across different industries. SBS tailors standard software packages according to customer requirements to create and optimize solutions, making it available throughout the enterprise and offering global, around-the-clock support; and

e-commerce systems and solutions in a range of industries that allow customers to offer a variety of Internet-based services through design and implementation of software for on-line media, communications and transactions applications.

17

Table of Contents

Most of SBS consulting and design services relate to information technology and communications systems that we also build or operate. SBS designs and builds systems and provides services using the software of many companies with which it has established relationships, such as SAP, Microsoft, Siebel, i2 Technologies, Oracle and Computer Associates. We also provide technical support and maintenance of existing information and communication systems. As part of our outsourcing services, we provide the operation of an entire information technology system or only one or more discrete services, from data storage and processing to billing. Going forward, SBS will continue to focus on IT outsourcing activities while further intensifying its efforts in business process outsourcing.

Currently, the Group is focusing its efforts on the manufacturing

industry, public sector and financial services. For example, during fiscal 2004, we were selected as the single preferred bidder for a new IT-technology framework for the British Broadcasting Corporation (BBC), which resulted in a ten year contract with expected total contract volume of 2.7 billion. As part of that deal, we acquired BBC Technology, a commercial subsidiary of BBC which will transfer about 1,400 BBC Technology employees to us. Among our larger customers are Fujitsu Siemens Computers, Deutsche Bank and National Savings & Investment. At the same time, the percentage of our revenue derived internally from Siemens has declined, in general due to a decline in IT budgets across the majority of the Siemens business Groups. Although we compete with external service providers for all Siemens contracts and each Siemens business Group determines on an arm's length basis whether to do business with SBS, we remain the largest supplier of information technology and communications services to Siemens. Siemens businesses collectively continue to be our largest customer.

SBS operates worldwide in more than 40 countries, but we have traditionally generated most of our sales in Germany, followed by a significant percentage of sales to other European countries. In fiscal 2004, Germany represented slightly less than half of our total sales.

SBS has its own sales and delivery force, as well as relationships with selected companies that act as dedicated delivery partners in certain smaller regional markets, such as our relationship with Fujitsu in the Asia Pacific region and selected countries in South America. During fiscal 2004, SBS and Fidelity Information Services (FIS) formed a strategic partnership to offer banking solutions services on an international basis, albeit focusing initially on Germany. SBS will provide IT services and FIS will provide the banking software and solutions services of our KORDOBA Gesellschaft fur Bankensoftware mbH & Co. KG, in which it acquired a 74.9% interest in September 2004.

We continue to concentrate on improving our profitability through cost-cutting measures, including adaptation of capacity in selected segments, as well as several company-wide programs intended to enhance our operational efficiency. In addition, we have set up a global sourcing program to optimize the advantages of a globally distributed workforce.

Our most significant competitors vary by region and type of service. A few are global, full-service IT providers such as IBM's Global Services division and EDS. Our competitors that focus more narrowly on specific regions or customers include T-Systems, a unit of Deutsche Telekom, in Germany, and Capita, in the United Kingdom. Those focusing primarily on a particular service include Accenture in consulting, Capgemini in systems integration and Affiliated Computer Services in outsourcing. As a service business, SBS requires strong local presences and the ability to build close customer relationships and provide customized solutions while achieving economies of scale and successfully managing risks in large projects.

Consolidation of the IT Services market continued. Main international transactions have been the acquisitions of SchlumbergerSema (by Atos Origin) and of Transiciel (by Capgemini). In addition, HP acquired Triaton, the former IT subsidiary of ThyssenKrupp, focused on SBS' German home market. The competitive environment of business process outsourcing changed by the merger of Hewitt Associates and Exult. Nevertheless, the markets in which we operate essentially remain fragmented.

We enter into large scale, and sometimes long-term, projects. The large size of some of these projects, as well as the long-term frame contracts with our largest customers, occasionally expose us to technical performance, customer-or country-related risks. Risks associated with long-term outsourcing contracts remain a

18

Table of Contents

management priority at SBS. For additional information with respect to our long-term contracts, see Item 3: "Key Information-- Risk Factors."

AUTOMATION AND CONTROL

Automation and Drives (A&D)

|  | Year ended September 30, 2004 | |
|---|---|---|
| Total sales | 8.829 billion | |
| External sales as percentage of Siemens net sales | | 10.07% |
| Group profit | 1.077 billion | |

Our A&D Group is a market leader in factory automation, offering standard and customized electronic and electro-mechanical products and systems for industrial and electrical installation applications, as well as comprehensive automation solutions for durable goods manufacturing and certain raw materials and materials processing industries.

We offer products, solutions and services in four main areas, which combine various internal organizational units: low voltage control and installation technology; manufacturing automation; motion control and drive systems; and process automation.

Low voltage control and installation technology products include low voltage switchboards, circuit protection and distribution products and command and signaling devices. These products are used in the control cabinets of switchgear and control gear manufacturers and automation providers, who in turn serve producers of mechanical and electrical machinery and companies in the construction industry. We also offer electrical installation products such as circuit protection systems, small distribution board systems, wiring devices, switches and sockets for the distribution of electricity in residential and industrial buildings. Our modern "bus" systems for communication and monitoring links products and systems together and further links these to building automation systems. The "bus" systems are used principally in residential buildings and large commercial facilities such as plants and office buildings. In this area, we increasingly combine systems designed to optimize power

distribution and management, which we market under the name "totally integrated power," with factory automation systems, which we market under the name "totally integrated automation."

Manufacturing automation products include programmable logic controllers (PLCs), human machine interfaces (HMIs) for integrated automated systems using a single system platform, and industrial communications systems. Our main customers are the durable goods and capital equipment industries, especially mechanical engineering companies. In addition, we integrate these products into industry- or customer-specific hardware and software solutions and, for the automotive industry, plan, engineer and sell complete manufacturing automation solutions. Our products continue to keep pace with innovations in software and Internet-based capabilities.

Motion control and drive systems products include motors, drives and computerized numerical controls (CNCs) for machine tools, as well as automation and drive equipment for all types of production machines and material handling equipment. We also sell motors and drives, from low to high voltage, for various applications in different industries and in infrastructure facilities. Applications include rolling mills and ships, engines for all kinds of rail vehicles and ventilation and water and waste water transportation systems. We have recently developed and introduced a common drive platform, Sinamics, and a drive-based platform, Simotion, which we expect to utilize in motion control applications across product areas.

Process automation engineers and sells process instrumentation and analytics to companies in the raw materials and other materials processing and capital equipment industries. We plan, engineer and sell complete solutions that integrate these products for specific applications in the chemical, pharmaceutical, food and beverage, and non-metallic minerals industries. We use our computerized process control system, which we continually develop, as the basis for our batch and process solutions.

19

Table of Contents

In all of our business units, we supply consulting, design and support services to our customers, both independently, and as a part of, our sales contract work.

To offer our customers a broad portfolio of products and systems as a "one stop shop" supplier, we are strengthening our market position through acquisitions and joint ventures in the field of process instruments and drive systems. In order to improve our position in the low voltage installation sector, in fiscal 2004, we acquired the busbar trunking systems unit of the Moeller group. Busbar trunking systems are used to transmit and distribute electrical power in buildings and offer advantages compared to conventional cables. The business, with approximately 600 employees and four manufacturing locations, is expected to reinforce our market position in Europe, the Middle East and Asia.

We sell our products primarily through our own sales force in Germany and

through dedicated personnel in Siemens' worldwide network of regional sales units. We also sell a significant proportion of our products to original equipment manufacturers and third-party distributors for resale to end users. The majority of our sales to third parties goes to industrial customers in the mechanical and electrical machines industries. A significant portion is also made to distributors, system and software houses and engineering companies. For example, we reach customers of our electrical installation products and systems in the building construction industry through third-party distributors.

For many years, we have also cooperated closely with customers in the automotive and chemical industries and we are working to expand both our business and our cooperation in this area. To meet the distinctive needs of our customers in these industries, we have developed a broad range of standardized products tailored to specific industry segments, thus increasing efficiency in the planning, construction and commissioning of plants. While A&D serves a diverse group of customers, the other Siemens business Groups, such as Transportation Systems (TS), Industrial Solutions and Services (I&S) and Power Generation (PG), considered together, traditionally comprise our largest single customer, accounting for approximately 14.3% of our total sales in fiscal 2004. Because a portion of our business involves contracts for large scale automation solutions, our list of significant customers may vary substantially from year to year.

We derive more than two thirds of our sales from Europe, with 40% from Germany, and a smaller but significant amount from the Americas, mainly the United States. Our sales in China are growing in importance.

We have 54 significant manufacturing and assembly locations around the world, including 22 in the Americas, nine in Asia, and 23 in Europe, of which twelve are located in Germany.

In fiscal 2004, our research and development costs were 6.3% of A&D's total sales, compared to 6.2% of total sales, in fiscal 2003. Our research and development efforts are currently focused on implementing technological progress in micro-electronics, software technology and industrial communication into our products, systems and solutions; improving the functionality of our products; and enlarging our field of activities.

Economic conditions affecting our relevant markets improved during fiscal 2004, in particular in the United States and China, where we experienced sales and order growth.

Our goal is to grow sales in our traditional markets in Germany and Western Europe and to continue our expansion in Eastern Europe, the Americas and the Asia-Pacific region, in particular China. In addition, we intend to increase our profitability through productivity improvements and continuous cost management. In fiscal 2004, we have continued to streamline our portfolio through the disposal of small non-core operations. For example, we sold our in-house circuit board contract manufacturer to Sanmina-SCI Corporation, a U.S.-based electronics manufacturer.

Consolidation in our industry is occurring on multiple levels. Suppliers of automation solutions to manufacturing companies have supplemented their activities with drives technology. Suppliers of manufacturing and process control systems are cooperating or combining through acquisitions or

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

cooperative ventures with suppliers of field technology and outsource facility operation and monitoring activities to establish comprehensive automation suppliers. During the past fiscal year, some of our competitors have strengthened their portfolios through acquisitions and formation of joint ventures, primarily in Eastern Europe and China.

20

Table of Contents

Intense competition and rapid technical progress within our industry place significant pressure on prices. Average product lifetimes in our businesses tend to be short, typically from one to five years after introduction, and are even shorter where software and electronics play an important role. Product lifetimes tend to be longer in motors and in electronic devices.

Our principal competitors ABB, Emerson, Rockwell and Schneider Electric have broad business portfolios similar to ours. We also compete with specialized companies such as Eaton, Honeywell and Fanuc. Our U.S. competitors traditionally have had strong positions in software technologies, while some Japanese competitors have generally focused on large-scale production and cost cutting. Nevertheless, most of our major competitors have established global bases for their businesses. In addition, competition in the field has become increasingly focused on technological improvements to electronics and software.

Industrial Solutions and Services (I&S)

Year ended
September 30, 2004

------------------

| | | |
|---|---|---|
| Total sales | 4.290 billion | |
| External sales as percentage of Siemens net sales | | 4.19% |
| Group profit | 95 million | |

I&S develops, builds, and upgrades plants for industry and infrastructure facilities. With the development of sector-specific product families, I&S combines various drive-, automation-, information technology-, and maintenance-solutions from other Siemens Groups to form an integrated complete offering for the life cycle of a plant. I&S thus optimizes the production and operational processes of our customers in the sectors water, metals, traffic control, marine solutions, oil and gas, paper and mining.

Our four core competencies are:

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

industry sector solutions for customers in materials processing industries
and infrastructure-related industries including automation, instrumentation,
drives, power distribution and control systems;

information technology solutions that enhance productivity in facilities for
manufacturing and materials processing by linking different levels of
automation, process control and management information systems;

technical services, including plant construction and modernization, on-call
and logistics services and integral plant maintenance, as well as auxiliary
process management services provided to customers in a broad range of
industries; and

traffic control, including traffic guidance systems and transport telematics,
enables us to integrate different technologies and services into solutions
for modern traffic management, resulting in improved traffic mobility.

During fiscal 2004, we provided our solutions and services through the
following five divisions:

Industrial Plants uses industry-specific expertise to design, engineer
and deliver solutions tailored to the needs of customers in various industry
sectors. Increasingly, we focus on offering complete, integrated solutions
rather than isolated solutions serving a single function. For metal and
paper-processing industries, we provide automation and process control systems,
drive systems and electrical equipment used in plants that make, roll and
process steel and in mills producing pulp and paper. For the open-pit mining
industry, we offer solutions, including electrical power, drive and automation
systems for bulk material handling and processing. We also provide solutions
for off- and on-shore operations of the oil and gas industry, including power
and integrated drive systems, automation and process control. Our solutions and
services in the oil and gas segment address both upstream exploration, as well
as midstream transportation and pipeline activities. We also deliver propulsion
drives and integrated electrical systems for ships, as well as drive systems,
fuel cells and automation systems for submarines.

21

Table of Contents

Industrial Services is responsible for our industrial technical services
activities, providing a wide range of technical services covering each stage of
the lifecycle of industrial plants, infrastructure facilities and utilities. We
serve customers in a variety of industries. Under the trade name Siemens
Industrial Services, we provide engineering and general contracting services
for plant construction and modernization and deliver on-call and logistics
services, maintenance services, including predictive maintenance, as well as
auxiliary process management services. We are active globally on a local basis
through a network of about 200 service locations in more than 50 countries. Our
strong local presence allows us to be close to our customers, increasing speed
and efficiency in delivering our services.

Intelligent Traffic Systems offers automated systems for urban and

inter-urban traffic control and management. These systems include information technology for traffic detection, information and guidance and parking space management, in addition to solutions for electronic tolls and tunnel traffic guidance and access control. Our airfield technologies business provides systems and solutions for the accurate monitoring, navigation and control of aircraft ground movement, as well as a variety of lighting systems for the visual guidance of traffic on the airfield.

Water Technologies was established as a new division in August 2004 with the acquisition of USFilter Corporation (USFilter), a leading supplier of products and services with a broad customer base for municipal and industrial water treatment in North America, which we acquired in July 2004 from the Veolia Environnement group. With the acquisition, we expect to position ourselves as a leader in the growing global water and wastewater market. For additional information with respect to the USFilter acquisition, see "--Portfolio Activities--Acquisitions." Water Technologies offers products (filters, membranes, resin), integrated solutions (membrane systems, filtration solutions, chemical feed, ion exchange systems, disinfections systems, biological treatment) and outsourcing solutions (contract operations, "build-own-operate" solutions and customer asset management). Siemens will contribute its automation and electrical engineering expertise to USFilter's business. Synergies arising from the competencies of Siemens and USFilter will make Siemens a strong and attractive partner for our customers in the water business. I&S' global presence gives the existing USFilter business access to its worldwide facilities, thereby enhancing USFilter's market presence immediately and giving it the opportunity to expand its business internationally, especially in Europe and China. I&S' objective is to continue to expand the Siemens portfolio for the optimization of production processes in the process industry, especially in the oil & gas, metals & mining, and pulp & paper sectors.

IT Plant Solutions-- responsible for information technology plant solutions--provides high value-added solutions for the growing market in advanced industrial information technology and industry-specific manufacturing execution solutions. Beginning in fiscal 2005, the activities of IT Plant Solutions will be integrated within our other divisions. Through this realignment we hope to strengthen our focus on specific sectors, increase efficiencies and enhance synergies within our industry sector solutions.

In fiscal 2004, we continued efforts to rationalize our organization in order to improve profitability and competitiveness. Our goal is to focus I&S on its core competencies and higher margin businesses.

Our Industrial Plants division derives its sales revenues primarily from projects awarded on the basis of internationally solicited tenders. These projects tend to be performed under long-term, high-value contracts with a relatively limited number of customers. Intelligent Traffic Systems works predominantly with state and municipal customers under long-term fixed-price contracts. Our newly formed Water Technologies division focuses on municipal, as well as industrial and institutional customers. Our Industrial Services division provides services to numerous customers across a variety of industries, as well as to our Industrial Plants division and other Siemens Groups, principally A&D, Power Generation, Power Transmission and Distribution and Transportation Systems. Siemens businesses collectively continue to be our largest customer.

We market our services to our customers primarily through our dedicated sales force, supplemented by Siemens' worldwide network of regional sales units. We derive most of our total sales revenue from Europe and a smaller, but significant, amount from the Americas and increasingly from the Asia Pacific region. In fiscal 2004, we generated more than two thirds of total sales from projects and services performed in Europe, with 41% in Germany. In Europe, our primary goal is to increase our business outside of Germany. We are also seeking to continue our growth in selected markets in the Americas and Asia.

22

Table of Contents

Most of our research and development is undertaken in connection with specific projects for our customers, and our reported research and development expenses do not reflect those activities. Therefore, I&S does not traditionally incur high expenses relative to sales for research and development. In fiscal 2004, our research and development costs were 1.0% of I&S' total sales, compared to 0.9% of total sales, in fiscal 2003. Our principal ongoing research efforts relate to industrial information technology, innovative automation, drive systems and power supply, as well as e-solutions. These include, for example, Internet-based technologies, such as remote commissioning, diagnosis, monitoring and control of industrial systems and facilities. We are also developing self-training expert systems for improved plant diagnosis and troubleshooting, as well as tools for plant simulation in order to optimize plant efficiencies in areas such as production output and energy consumption. In 2004, we launched our product family strategy marketed under the name "Completely Integrated Solutions" which offers integrated solutions for specific industries.

Our competitors vary by business area and region. They range from large, diversified multinationals to small, highly specialized local companies. I&S' main competitors internationally include ABB, General Electric, Honeywell, Invensys and Alstom. Our Industrial Services division also competes with a large variety of small locally based suppliers of contracting, maintenance and support services. Unlike our principal competitors, we have not limited our Industrial Services business to particular industries, allowing us to take advantage of the growing demand for outsourced maintenance and support services in a variety of industries, including those for which Siemens does not provide products or systems and irrespective of the manufacturer of the original system or facility. We believe that we possess a competitive advantage in our unique combination of competences in the industrial sector and the information technology and technical services fields.

The large size of the projects performed by our Industrial Plants division occasionally exposes us to risks related to our technical performance, to a customer or to a country. For additional information with respect to our long-term contracts, see Item 3: "Key Information-- Risk Factors."

Logistics and Assembly Systems (L&A)

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

|                                                  | Year ended<br>September 30, 2004 |       |
| ------------------------------------------------ | -------------------------------- | ----- |
| Total sales                                      | 2.338 billion                    |       |
| External sales as percentage of Siemens net sales |                                 | 2.89% |
| Group profit                                     | 2 million                        |       |

L&A (formerly Siemens Dematic) designs, engineers, manufactures and sells factory automation and logistics automation equipment, systems and solutions, postal automation, electronics assembly systems and internal transport systems for on-site use. We are the largest participant in the material handling automation market overall. Following a reorganization of our divisional structure in fiscal 2004, our business consists of four divisions: Distribution and Industry Logistics, Airport Logistics, Postal Automation and Electronics Assembly Systems.

Our Distribution and Industry Logistics division designs, manufactures and assembles integrated distribution and factory logistic systems, and offers after-sales services to its customers. We automate materials flow, handling and logistics processes for major retail and wholesale operations and durable and non-durable goods manufacturers, principally in the chemical, pharmaceutical, food and beverage, and automotive sectors. In this division, we focus on globally standardized product and systems development, planning, information technology, material handling automation architecture and consulting in support of our systems sales.

Airport Logistics offers systems to track and control cargo in and around airport terminals, as well as a full range of baggage handling functions, from the check-in counter and screening, to baggage reclaim, including services and parts for such systems. We also provide security solutions for the aviation industry, integrating baggage screening and explosives detection technologies.

Postal Automation provides equipment for sorting of both standard and large letters (so-called flats); reading and coding systems; postal information technology; mail security solutions; and postal services such as product-

23

Table of Contents

related after-sales services and general contracting. As part of the Group's reorganization, the parcel and systems business was transferred to the Postal Automation division. Key customers for this business are the traditional post and parcel services, including the German and United States postal services. The United States Postal Service is our largest customer in this division, accounting for more than 5% of L&A's sales in fiscal 2004. Our target customers include private parcel and package carriers, of whom FedEx, UPS and DHL are current customers.

In the Distribution and Industry Logistics, Airport Logistics and Postal Automation divisions, we deliver value to our customers through the intelligent combination of electronics, software and mechanical elements in our integrated systems, solutions and services. Our products feature a wide range of transport systems and sorters. They are designed, using our industry specific knowledge, for precise control of materials flow and utilize optical character recognition systems in conjunction with complex computer software. These divisions are involved in the design, manufacture, integration, installation and service of systems and solutions. Other Siemens businesses and outside sources typically supply us with various components. For example, we purchase our electro and electronic equipment, including drives and programmable logic controllers, and some software from A&D. In fiscal 2004, the market for logistics continued to be negatively affected by weak capital spending by the manufacturing industry and logistics and postal service providers, resulting in excess capacity in our Airport Logistics and Distribution and Industry Logistics divisions. In the first quarter of fiscal 2004, the Airport Logistics division was able to secure the order for the installation of automated baggage and cargo handling systems at Dubai International Airport. In the second quarter of fiscal 2004, the Postal Automation division was awarded a large order from the United States Postal Service to supply systems and equipment for optimizing existing mail sorting systems.

We expect that going forward, our Distribution and Industry Logistics division will benefit from an increase in demand from traditional customers investing in integrated solutions. We believe that these integrated solutions--including information technology systems and our industry knowledge--create opportunities to increase our customer base. In addition, as formerly government-owned postal and airport authorities are deregulated and privatized, we believe that competition in the markets in which they operate will continue to increase. We expect that companies attempting to compete effectively will be likely to increase their investment in integrated, automated systems and technologies in order to improve their productivity and speed, creating an opportunity for us. We also expect that postal and parcel services in Eastern Europe will increasingly invest in automation. Furthermore, due to our large installed base of postal, logistics and production automation systems, we aim to continue generating sales over the coming years through value-added upgrading and servicing of this equipment base.

Our Electronics Assembly Systems division's principal products are surface mount technology (SMT) placement systems that automate the mounting of components onto printed circuit boards. These systems are capable of processing numerous component types and can be tailored to the requirements of individual line configurations by a complete modular platform concept. Our principal customers are manufacturers in the electronics field that use SMT, including manufacturers of mobile phones, handheld computers and automotive, industrial and consumer electronics, and, increasingly, electronic manufacturing services providers. Until recently, our focus has been on the technical qualities, speed and precision of our placement systems. Increasingly, we are designing, manufacturing and selling entire standardized SMT production line configurations, which integrate our SMT placement systems with the products of our strategic partners. Since our customers continue to be under pressure to reduce assembly costs, we support them with our know-how and expertise in process planning and improvement methodologies, the most common being "lean manufacturing", a system cutting out anything from the manufacturing process

that does not add value to the customer.

In fiscal 2004, the global assembly automation industry experienced a recovery, following several years of weakness in the electronics industry market. We are shifting our business focus to the Asia-Pacific region, where many of our customers in the electronics industry have moved their manufacturing locations. We are also penetrating new market segments for our placement systems through the introduction of products designed for mid-range companies with low-to medium-volume production requirements, variable batch sizes and frequent product changes. The market for electronics assembly systems, particularly in Asia, continues to be sensitive to pricing, which increases the pressure to contain costs in this division.

24

Table of Contents

L&A distributes its products primarily through its sales force in Germany and its local distribution companies throughout the world.

We derive the majority of our sales from Europe and the United States and an increasingly important portion from Asia-Pacific.

We have four significant manufacturing and assembly facilities in Germany and two in the United States. In fiscal 2004, we opened a new electronics assembly production facility in Singapore.

In fiscal 2004, our research and development costs were 5.5% of L&A's total sales, compared to 5.2% of total sales in fiscal 2003. Main areas of focus in the Electronics Assembly business include a new high performance SMT placement product, as well as the development of standardized modules which can be used across our various placement machine platforms. In the Distribution and Industry Logistics division, a main area of focus is so-called mechatronics. The objective of this initiative is the development of a globally applicable standard product family for conveyors. The aim is to reduce product and project costs (through increased economies of scale in manufacturing and project engineering, and reduction of project technical risks) and to increase the efficiency of our system development by improving repeatability, through increased modularity of our products and solutions.

In fiscal 2004, we continued to focus on improving profitability, including through consolidation of our production facilities, and shifting our resources and attention to what we view as the most promising markets. We have also focused on improving revenue generation from our service business. Furthermore, we have placed special emphasis on project management initiatives, in particular leadership development, additional training of project managers, performance controlling and benchmarking. Other measures designed to enhance profitability included increasing our efficiency in purchasing and reviewing our portfolio with a view toward divesting non-core activities. For example, in fiscal 2004, we sold to GEA AG our Colby Powder Systems, a business focused on the supply of equipment and integrated systems for handling and packing of powdered products.

Our main competitors in our Distribution and Industry Logistics, Airport Logistics and Postal Automation businesses are FKI Logistex (including the former Crisplant), Daifuku, Swisslog, Northrop Grumman (including Solystic), Lockheed Martin, Elsag, NEC, Toshiba, Pitney-Bowes and Bell & Howell. Other competitors operate within niche markets or offer market specialized technologies to their customers; these include Vanderlande, Schaeffer-Noell and Duerr. Competition in this area, including price competition, is strong due to weakened demand and excess capacity. Several of our competitors in the Distribution and Industry Logistics business are strengthening their presence in the United States market, a region from which we derive a substantial portion of our revenues. Major competitors of our Electronics Assembly Systems division include Panasonic Factory Solutions; Fuji Machine; Universal Instruments, a subsidiary of the Dover Group; and Assembleon. In the growing and price-sensitive market segment for mid-range placement machines, we compete with Yamaha and Juki.

The large size and complexity of some projects performed by our Distribution and Industry Logistics, Postal Automation and Airport Logistics divisions expose us to risks related to technical performance. For additional information with respect to our long-term contracts, see Item 3: "Key Information-- Risk Factors" and Item 5: "Operating and Financial Review and Prospects-- Segment Information and Analysis-- Operations-- Automation and Control-- Logistics and Assembly Systems."

Based on the results of the analysis of current projects in conjunction with the changing markets described above, as well as the structural challenges to attaining originally targeted profitability, management revised its related business plan and concluded that goodwill for the Distribution and Industry Logistics and Airport Logistics division was impaired. For further information with respect to the goodwill impairment, see Item 5: "Operating and Financial Review and Prospects-- Segment Information and Analysis-- Operations-- Automation and Control-- Logistics and Assembly Systems" and "Notes to Consolidated Financial Statements."

25

Table of Contents

Siemens Building Technologies (SBT)

|  | Year ended<br>September 30, 2004 |  |
| --- | --- | --- |
|  | ------------------ |  |
| Total sales | 4.247 billion |  |
| External sales as percentage of Siemens net sales |  | 5.55% |
| Group profit | 108 million |  |

SBT provides products, systems, solutions and services for monitoring and

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

regulating the temperature, fire safety, ventilation, electricity, lighting and security of commercial and industrial property, tunnels, ships and aircraft. In addition, we also provide planning, management and technology-related electrical contracting services in connection with building projects.

During fiscal 2004, SBT consisted of the following six divisions:

Security Systems offers solutions and services for electronic building security, including intruder detection and alarm systems, closed-circuit television video-surveillance, personal identification and building access control systems, as well as managed services such as centralized monitoring and control of each of these individual systems.

Fire Safety offers solutions and services to the non-residential markets for fire detection and protection, including computerized gas leakage and fire alarms and non-water based fire extinguishing systems, as well as comprehensive computer-based danger management systems that centrally monitor and control each of these individual systems.

Fire & Security Products manufactures and sells system components for the global fire safety and security industry. Our products serve to protect against fire, burglary, unauthorized access and loss of assets. We market our products primarily to system builders and integrators, installers and original equipment manufacturers (OEM). Our products are also used by other Siemens Groups and are incorporated into solutions and services offered by SBT's other divisions, in particular Security Systems and Fire Safety.

Building Automation offers solutions to the non-residential markets for automating and regulating heating, ventilation and air conditioning (HVAC), electricity and lighting, including computerized building automation systems that integrate and manage all of these functions for an entire building. In addition, the division offers maintenance and training services for its systems. Building Automation also provides energy solutions and services, aiming to improve a building's energy costs, reliability and performance while minimizing impact on the environment. For example, we refurbish buildings to improve their energy efficiency and provide our customers with a guaranteed level of energy cost savings. We also arrange for financing of the refurbishment.

HVAC Products manufactures and sells controls, sensors, detectors, valves and actuators used in systems that regulate heating, ventilation and air conditioning, electricity and lighting in buildings and factories. This division sells to the Building Automation division and to original equipment manufacturers (OEM), value-added partners, resellers and installers.

During fiscal 2004, we divested the majority of our Facility Management Services division. To optimize our portfolio, we disposed of the operations of the division's facility management unit which operated and maintained entire building sites for tenants and owners as an outsource provider and offered facility management consulting services to building operators. In addition, we significantly downsized the activities of the project business unit which provides services relating to the planning and management of electrical contracting projects.

Effective as of October 1, 2004, the divisions Fire Safety and Fire &

Security Products will be merged to form a new division, Fire Safety and
Security Products, that will be responsible for all activities including
products, systems, solutions and services for the fire safety business and the
security products business.

Our customers consist of a large, widely dispersed group of locally-based
building owners, operators and tenants, building construction general
contractors, mechanical and electrical contractors, OEM of HVAC systems,
wholesalers, specialized system builders and installers. The project business
in Security Systems, Fire Safety and Building Automation generated sales of
approximately 2.1 billion in 2004. More than 75% of this volume is

26

Table of Contents

attributable to orders with a volume less than 750,000. The average project
size is 30,000 and most projects are 25,000 or less.

SBT has a decentralized business organization that combines a small
central headquarters, design and manufacturing at sites in seven countries in
Europe, North America and Asia and our own distribution network, consisting of
approximately 400 local sales, project execution and services branch offices in
more than 40 countries. In order to improve cost synergies with Siemens'
regional companies, we integrated the majority of SBT's local organizations
with the Siemens regional companies during fiscal 2004. For some markets, we
also distribute our products and systems through a network of independent field
offices and distributors. Our services businesses and sales network have
significant local presences arising from the need to be close to the customers
and buildings that use our products, systems and services. Our manufacturing
and design sites and our regional sales units with their branch offices are
connected to each other and to our central management by a central
communications network.

We sell our products and systems throughout the world, and derive nearly
two thirds of sales from Europe, nearly one third from the Americas, primarily
the United States, and the remainder from Asia Pacific.

We have 11 manufacturing and assembly facilities worldwide, including 7
in Europe, of which three are located in Germany. In fiscal 2004, we continued
to take measures to scale back our production capacity and finalized the
closure of production plants in Staefa (Switzerland) and Redditch (United
Kingdom). We have relocated most operations at those locations to our existing
sites in Switzerland and Germany and outsourced some operations to the Czech
Republic. We also disposed of an assembly factory in Nelm (Switzerland).

In fiscal 2004, our research and development costs were 3.6% of SBT's
total sales, compared to 3.3% in fiscal 2003. The trend in our industry is
toward the use of "open" platforms which are compatible with all current
standards used in the building management systems market. We are working to
develop "open" system platforms and systems with backward and forward
compatibility that will enhance product flexibility and protect a customer's
investment by allowing our customers to create linked systems with products

from different suppliers. We are also working to develop "remote control" building automation systems that will allow the user to control a building's maintenance, safety and security systems offsite via the Internet. We strive to become a market leader in new technologies. In fiscal 2004, for example, we established a partnership with ZN Visage to develop and market 3-D face recognition systems for use in building security.

Traditionally, the HVAC, electricity, security and fire safety systems used in buildings have been designed and sold as separate, stand-alone systems that could not be integrated to combine functions or allow for centralized control. During the past several years, the increased use of computers in building systems has allowed manufacturers to link individual systems and to offer multi-function building automation systems. We continue our efforts to develop and offer building management solutions, which use a common technological platform and can therefore integrate various building management features. SBT offers such integrated building automation systems globally. Sales have occurred primarily in the United States, Europe and other selected countries, such as Australia.

Our near-term strategy is to grow profitable business fields at rates that at least keep pace with the market overall. We expect our Security Systems division to grow in part through cross-selling to existing customers of the Building Automation and Fire Safety divisions. The Fire & Security Products and HVAC Products divisions are making a wider range of their products available to third-parties and are refocusing their sales and marketing functions to achieve stronger growth in third-party customer channels. In addition, both divisions are expanding their offering of products and components for OEM, making more of our existing products available for offering on an OEM-basis. Our Systems and Services divisions (Security Systems, Fire Safety and Building Automation) are using their current large installed base of building technology products and systems as a means of generating service and maintenance contracts. Going forward, we intend to increase the portion of sales generated from services.

Our focus is on improved profitability and growth. We have strengthened our productivity improvement initiatives, which include process improvements, enhanced purchasing coordination, reduction of our product

27

Table of Contents

portfolio, reducing sales of low-margin segments and headcount reductions. We also consolidated our manufacturing capacity, as described above, in order to improve productivity.

SBT has a leading position in the worldwide markets for fire safety and building automation. Three of our divisions, Fire Safety, Building Automation and HVAC Products, which account for approximately 80% of SBT's sales, each operate in very concentrated markets in which the top three or four providers control more than half of the market. The main global competitors for Fire Safety, are Tyco and Honeywell; for HVAC Products, they are Honeywell, Invensys, Danfoss and recently Schneider, through its acquisition of TAC and Andover Controls; while for Building Automation, Johnson Controls and Honeywell

are the largest competitors. In the building automation field, we face additional competition from niche competitors offering web-based solutions and from new entrants, such as utility companies and consulting firms, exploiting an increased demand for energy cost management. The recent downturn in the building automation market has created overcapacity and prompted downward pressure on prices. Likewise, the market for fire safety solutions has experienced increased price competition as a result of a shift of production to low-cost countries.

The security solutions and products markets are fragmented, with many locally based companies and, in certain instances, a few large globally-based competitors holding relatively small market shares. In the electronic security solutions and products market, Tyco is a market leader. Telecommunication companies and defensecontractor firms are also beginning to enter the market for security solutions. Consolidation is beginning to occur in certain areas. For example, General Electric and United Technologies have become active competitors in the security products market through acquisitions. Despite this emerging consolidation trend, the market remains fragmented. Many of our competitors focus on a particular product, system or service, or have a regional orientation. We plan to continue to expand our customized solutions business, where we can build close relationships with our end-user customers by providing high value-added services. We will further focus on providing security solutions integrated with Fire Safety and/or Building Automation systems.

POWER

Power Generation (PG)

|  | Year ended September 30, 2004 |
|---|---|
| | ------------------ |
| Total sales | 7.527 billion |
| External sales as percentage of Siemens net sales | 9.98% |
| Group profit | 961 million |

PG provides customers worldwide with a full range of equipment necessary for the efficient conversion of energy into electricity and heat. We also customize gas and steam turbines in the smaller output range, which can be used as drives for compressors or large pumps, to meet specific project needs. We offer a broad range of power plant technology, with activities that include: development and manufacture of key components, equipment, and systems; planning, engineering and construction of new power plants; and comprehensive servicing, retrofitting and modernizing of existing facilities.

PG consists of three businesses, each with a clear market focus on specific customer groups and technologies: Fossil Power Generation; Industrial Applications; and Instrumentation and Control. Fossil Power Generation is by far the largest of our businesses, accounting for approximately 67% of total sales in fiscal 2004.

Power plants, together with transmission and distribution grids, are the fundamental parts of a system that meets the requirements of individual households and business and industrial customers for a reliable supply of power delivered to a high quality standard.

A power plant's function is the efficient conversion of primary energy, such as coal or gas, into electricity. In a fossil fuel plant, the power generation process begins with working media such as water, steam or compressed air, which are initially transferred to high pressure states by heating in boilers or combustion sections of gas turbines. Thereafter, steam and gas turbines convert this energy into mechanical energy, which in turn is converted into electricity by generators. In so-called combined cycle plants, a combination of gas and steam

28

Table of Contents

turbines is used to reach highly efficient conversion rates of nearly 60%. At the end of the process, electricity is fed into transmission grids from the plant site.

Fossil Power Generation includes power plants and systems engineering, as well as components and equipment engineering and manufacturing, such as fossil fuel-fired power plants, co-generation heat and power plants. Our fossil fuel power generation business concentrates on turbo generators, gas and steam turbines in the larger power range, with an emphasis on combined-cycle gas and steam power plants. We also perform power plant service, such as maintenance, rehabilitation and operations.

Industrial Applications includes steam and gas turbines in the small and medium power ranges, as well as turbo generators, turbo compressors, compressor solutions for the oil and gas industry, and offers complete engineering services for power plants. Our activities encompass design, engineering, supply and service. We develop and manufacture steam turbines for application in industrial, municipal and independent heat and power generation and for mechanical drives, as well as turbo compressors. In addition, we offer our customers combined cycle power plants. In the renewable energy sector, we also offer biomass power plants.

We expanded our product portfolio in this area in fiscal 2003, through the acquisition of the small gas turbine (3-15 megawatts) and medium gas turbine (15-50 megawatts) businesses and industrial steam turbine businesses of Alstom S.A., Paris (Alstom). We see the products and services we acquired from Alstom as complementing the pre-existing portfolio of our Industrial Applications division. In particular, the acquisition has strengthened our product offering for the oil and gas industry, including gas and steam turbines for power generation and mechanical drives which complement our compressor products. The acquisition has furthered our efforts to provide a complete range of products and services from one source to our customers and gives PG a leading position worldwide in the marketplace for industrial power and compressor solutions. With an installed base of approximately 3,500 gas

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

turbines and 4,100 steam turbines, the acquisition has also created new opportunities to grow our service business.

Our installed base of thermal power plant capacity (all power ranges) of more than 650 gigawatts provides us with a good opportunity to grow our service business.

Instrumentation and Controls designs, installs and commissions instrumentation and control systems and related equipment for use in power generation, including information technology solutions providing management applications from the plant to the enterprise level. We also provide a wide variety of related services.

Additional areas of PG's activity include the development and production of systems based on emerging technologies such as fuel cells.

We also have minority stakes in joint ventures in the areas of nuclear and hydropower generation. We account for these investments under the equity method.

Although we aim to expand primarily through internal growth, we will continue to make acquisitions and form alliances where appropriate to increase market penetration, share costs or technologies and adapt to market changes. In July 2004, we announced a proposed joint venture with Interros. This joint venture, which is subject to regulatory approvals, would own a majority stake in OAO Power Machines, a Russian turbine manufacturer. Siemens plans to hold an at-equity investment in the joint venture. We have committed to make an ongoing investment in OAO Power Machines over the next three to five years. Furthermore, on October 20, 2004, we entered into an agreement to acquire the Danish company, Bonus Energy A/S, one of the major suppliers of wind energy systems worldwide. With the acquisition, we are expanding our product portfolio and are entering the growing international wind energy business. The acquisition is conditional upon the approval of the relevant competition authorities. The closing is planned in December 2004.

PG's principal customers are large power utilities and independent power producers, as well as construction engineering firms and developers. Because certain areas of our business, such as power plant construction, involve working on medium- or longer-term projects for customers who may not require our services again in the short term, our most significant customers may vary significantly from year to year. The Ministry of Electricity, in Kuwait; Union Fenosa, in Spain; and Calpine Corporation and Bechtel Power Corporation, in the United

29

Table of Contents

States, are among our largest customers. We also generate an increasing portion of sales from industrial customers, who represent an important market for smaller power plants, turbines and compressor solutions.

Our business activities vary widely in size from component delivery and

comparatively small projects to turnkey contracts for new power plant construction with contract values of more than half a billion euro each. The large size of some of our projects occasionally exposes us to risks related to technical performance, a customer or a country. For additional information with respect to our long-term contracts, see Item 3: "Key Information-- Risk Factors."

Our sales efforts are conducted by our own dedicated sales organizations in Germany, the United States and Asia, supported by Siemens' worldwide network of regional sales units.

We derive more than one third of our sales from Europe. The remainder of our sales is geographically well balanced.

We have 14 significant manufacturing and assembly facilities worldwide, including three in the Americas and eleven in Europe. Of these, six are located in Germany. We manufacture steam turbines principally at the Mulheim (Germany) plant, turbo generators in Charlotte (United States), 60 Hertz gas turbines in Hamilton (Canada), 50/60 Hertz gas turbines in Berlin (Germany) and turbo compressors in Duisburg (Germany). Through our acquisition of Alstom's industrial turbine businesses, we have added manufacturing sites in Brno (Czech Republic), Finspong (Sweden), Lincoln (United Kingdom) and Nuremberg (Germany).

PG's research and development efforts are currently focused on advancing products and concepts that combine turbo machinery technologies (gas and steam turbines, generators and compressors), particularly for use in new power plant designs combining high efficiency and lower emissions. Our research and development is also targeted at improving a plant's capability to meet short-term variations in power demand and the reduction of life-cycle costs for new power plants, particularly by enhancing the durability of parts and components. Weare also working to further boost operating efficiency and performance of new and existing power plants while reducing the emissions of such plants. In fiscal 2004, our research and development costs were 4.0% of PG's total sales, compared to 3.7% of total sales, in fiscal 2003.

The worldwide market for new power plants has stabilized near the high level experienced in the late 1990s. The development has been driven primarily by the strong economic development in China, which accounts for almost half of worldwide power equipment orders. The demand for gas turbines in the United States in fiscal 2004 remained relatively unchanged at historically low levels due to overcapacity built up during the recent gas turbine power plant boom. Project cancellations have created a market, mainly in the United States, for turbines that have been already manufactured but are not in operation. This trend has had a negative effect on overall demand and prices.

In the medium term, we anticipate a moderate growth in demand for new power plants, especially for combined-cycle plants. We believe that fossil fuel-fired power plants will likely continue to dominate the power market, accounting for the majority of total new units sold. Although the power generation industry is a long-cycle business, it is affected by trends in cyclical industries and fluctuations in fuel prices that can have implications for demand for certain product types. Rising gas prices, for example, are creating focus on fuel diversification and coal-fired power plants. Factors contributing to worldwide demand for new plants and retrofitting services

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

include deregulation and the need for reduced emissions and higher fuel efficiency. Furthermore, we expect that power plant retirement in industrialized countries will create an additional market in which we plan to participate. We believe that competition in deregulated power supply markets will give our customers an incentive to replace existing units which have ceased to be competitive.

In fiscal 2004, we continued to adapt our workforce at various locations, in line with lower market capacities. We have implemented a cost containment program by further process improvement efforts and optimization of our manufacturing network. We are working to further boost operating efficiency and performance of our service activities.

Our industry is one in which a relatively small number of companies, some with very strong positions in their domestic markets, play a key role. Our principal competitors vary by business, but primarily include General

30

Table of Contents

Electric, Alstom Power, Mitsubishi Heavy Industries, as well as Hitachi and Toshiba in fossil power generation. Within industrial applications, we face competition from General Electric, Solar, MAN Turbo and Dresser Rand. In instrumentation and controls, where the market is more fragmented, ABB is our main competitor. The decreased demand in our markets has intensified competition. Potential new competitors face significant barriers, including high capital investments in engineering and production capacity, the high cost of research and development and of developing a customer base, the need for broad systems know-how and global economies of scale.

Power Transmission and Distribution (PTD)

|  | Year ended<br>September 30, 2004 | |
| --- | --- | --- |
|  | ------------------ | |
| Total sales | 3.611 billion | |
| External sales as percentage of Siemens net sales | | 4.38% |
| Group profit | 238 million | |

PTD supplies energy utilities and large industrial power users with equipment, systems and services used to process and transmit electrical power from the source, typically a power plant, to various points along the power transmission network and to distribute power via a distribution network to the end-user.

At the first step of the power transmission and distribution process, power generated by a power plant is transformed to a high voltage that can be

transported efficiently over long distances along overhead lines or underground cables. This step occurs at or near the site of the power plant, and requires transformation, control, transmission, switching and protection systems. At the second stage of the process, the power passes through one or more substations, which use distribution switchgear to control the amounts delivered and circuit breakers and surge arresters to protect against hazards in transmitting the power. At this stage, transformers step down the voltage to a medium level at which it can be safely distributed in populated areas. In the final stage of the process, distribution transformers step down the voltage again to a level usable by end-users and metering systems measure and record the locations and amounts of power transmitted.

We provide our customers with turn-key transmission systems and distribution substations, discrete products and equipment for integration by our customers into larger systems; information technology systems and consulting services relating to the design and construction of power transmission and distribution networks. We offer the following solutions, products and services, presented roughly in the order in which they are used in a power transmission and distribution network. Our internal divisions are organized around the following products:

power systems control equipment and information technology systems, including computerized power management systems used to operate power transmission networks, determine customer needs and regulate the flow of power from power plants to the distribution network (offered through our Energy Management and Information Systems division, which, as of the beginning of fiscal year 2005, has been combined with our Power Automation division and renamed Energy Automation);

transformers including both the power transformers used at the beginning of the transmission process to step up the voltage of the power generated by power plants to a voltage that can be carried efficiently on the power network, and the distribution transformers and their components used at the end of the distribution process to step down power from high voltage to lower voltage levels for the end-user;

high voltage products and ready-to-use systems, in both alternating and direct current, used in the physical transmission of power from power plants to the distribution network before the voltage is stepped down for distribution in populated areas, including ready-to-operate indoor and outdoor high voltage substations and the switchgear and protection systems required to control the flow of power and prevent damage to the power transmission network;

protection and substation control systems including equipment and systems used at power distribution network substations, such as relays and computerized protection and control equipment (offered through

31

Table of Contents

our Power Automation division, which, as of the beginning of fiscal year
2005, has been combined with our Energy Management and Information Systems
division and renamed Energy Automation); and

medium voltage equipment including circuit breakers and distribution
switchgear systems and components that regulate the flow of power on the
distribution network before it is stepped down to a low voltage level for the
end-user.

In addition to our equipment and systems, we offer a growing range of
services and integrated solutions for various stages in the power transmission
and distribution process. These include: technical support and maintenance
services and, to an increasing extent, outsourcing projects and operations;
consulting relating to the planning, design and optimization of power
transmission and distribution networks; information technology services and
solutions to support customer management and energy trading; training programs;
and metering services for electric, gas and heat. We also provide analytical
and consulting services, as well as equipment and systems, in the power quality
field that are designed to improve the availability and reliability of power
transmitted by analyzing and reducing the causes of power fluctuations and
failures. Power quality systems and services have become increasingly important
with the growing use of sensitive computerized, electronic and other equipment
requiring continuous power with very little fluctuation in voltage or
frequency. Our PTD Services division aims specifically at responding to our
customers' increasing demands for these services.

In July 2004, we acquired Trench Electric Holding, B.V. (Trench), a
leading manufacturer of components of high voltage power distribution and
transmission systems. In 2003, Trench employed approximately 1,800 employees
and had annual sales of roughly 250 million. The acquisition is expected to
strengthen our high-voltage product portfolio, allowing us to offer our
customers a full spectrum of high voltage products from a single source, and to
expand our market position in China and North and South America.

Our power transmission and distribution customers are primarily power
utilities and independent power distributors. Due to deregulation in the power
industry, our customer base continues to diversify from one formerly composed
almost exclusively of power utilities responsible for all stages in power
transmission and distribution to one that includes an increasing number of
independent system operators and power distributors supplying services at
different points of the power transmission and distribution network. We have
increased our sales to industrial customers, providing them with equipment and
systems for power networks associated with manufacturing facilities. We
distribute our systems and components through our sales force in Germany and
through dedicated personnel in the regional Siemens sales units worldwide.

We generate our sales from project business, as well as from sales of
systems, components and services. A relatively small portion of our project
business involves construction of large power networks and other projects with
values of more than 50 million. Most of our business is generated from smaller
projects and sales of systems and components to a variety of smaller customers.

We strive to provide our customers with complete solutions.

Demand for our products and services depends on several factors, including investment in building and upgrading of power transmission and distribution networks in developing countries, demand for new power generation primarily in industrializing countries and demand for new products, systems and services in connection with deregulation and liberalization in the power industry. In light of these factors, future demand is likely to come, to a large extent, from emerging industrialized countries and regions with growing energy requirements, including Asia, especially China and India, Eastern Europe and the Americas. We continue to evaluate opportunities to penetrate these markets, including formation of joint ventures with local partners to help us secure future project work.

Although the power transmission industry in industrial countries is a mature business, additional demand for our products, systems and services arises in the industrial world as utilities and private power companies respond to deregulation by seeking ways to improve efficiency and reduce costs. Deregulation has also increased demand for more sophisticated products, such as systems used in energy trading among suppliers, and for related services, such as metering. New orders to replace old equipment have also been driven by changing requirements due to environmental regulation. In addition to responding to these new sources of demand, we continue to seek new

32

Table of Contents

markets for expansion, in particular in the United States and Asia, and to develop innovative new products and systems to respond to ongoing pricing pressures in our markets.

We derive approximately forty percent of our sales from Europe and more than one quarter from the Asia-Pacific region. While regions in the developing world represent growth markets for power transmission and distribution products and systems, our activities there can also expose us to risks associated with economic, financial and political disruptions that could result in lower demand or affect our customers' ability to pay. Our largest projects in the developing world currently include two developments in the People's Republic of China: the Three Gorges Dam project and the construction and equipping of converter stations for a new high-voltage direct-current transmission line for the transportation of 3,000 megawatts of electricity across 940 kilometers. Our other ongoing significant projects include the supply of two converter stations for a submarine cable link across the Bass Straits between Tasmania and the state of Victoria on the Australian mainland. As a consortium leader of the project, we supply and install the high-voltage direct-current equipment which allows transmission of electrical power with low energy losses over long distances.

The large size of some of our projects occasionally exposes us to risks associated with technical performance, a customer or a country. For additional information with respect to our long-term contracts, see Item 3: "Key Information-- Risk Factors."

We have significant manufacturing and assembly facilities worldwide, including in the Americas, Asia, and Europe, in particular in Germany. In fiscal 2004, we acquired additional manufacturing capacity as part of our acquisition of Trench. In fiscal 2004, our research and development costs were 2.5% of PTD's total sales, compared to 3.1% of total sales, in fiscal 2003.

Competition in our markets comes primarily from a small group of large, multinational companies offering a wide variety of products, systems and services, although a few notable specialists maintain strong positions in certain niches. Globally, our most significant competitors include ABB, the Areva Group, which acquired Alstom's power transmission and distribution activities in 2004, and General Electric, as well as Japanese competitors. In some of our markets, increasing international competition is emerging from low-cost countries, such as China and India. To improve our competitive position, in recent years we have located new production facilities and expanded production in the Asia-Pacific region, allowing us to work more closely with our customers, reduce costs and meet local content requirements. We are party to several joint ventures in China, our second largest market. During fiscal 2004, we continued initiatives to improve productivity and enhance the efficiency of our business processes.

TRANSPORTATION

Transportation Systems (TS)

Year ended
September 30, 2004

------------------

| | | |
|---|---|---|
| Total sales | 4.310 billion | |
| External sales as percentage of Siemens net sales | | 5.70% |
| Group profit | (434) million | |

We are a leader in the global rail industry, offering a full range of products and services for railway transportation. We offer our customers innovative solutions and systems in such areas as modular vehicle concepts for mass transit and mainline systems; technology for driverless metros and computer-controlled electronic switches; optical sensor systems; and global positioning system (GPS)-based service and diagnostic concepts, among others. We combine rolling stock with automation and power product offerings in our turnkey systems business, and combine service and maintenance activities in our integrated services unit. Rolling stock refers to all major components of rail vehicles, including locomotives, railway cars, subway cars and streetcars.

33

We develop, manufacture and sell a full range of rolling stock in three product-focused divisions:

Mass Transit--This division includes both the former light rail and heavy rail divisions, which we merged as of October 1, 2003, as part of a wider realignment to strengthen our market position in rolling stock. Our products include subway and suburban rapid transit trains, subway cars, as well as their subsystems and components and streetcars, light rail vehicles and their components.

Locomotive--Our products include electric and European standard diesel-electrical locomotives for passenger or freight rail. In addition to our manufacturing operations, we also refurbish and maintain locomotives and locomotive pools and provide locomotive leasing services tailored to meet the requirements of deregulated local rail operators.

Trains--Our products comprise rail vehicles with traction equipment integrated into the running gear and distributed over the entire train, including high speed trains, tilting trains, regional and rapid transit units and passenger coaches, as well as subsystems and components.

Our rolling stock business was our largest in terms of sales in fiscal 2004.

In our automation and power business, we conduct our operations in two divisions:

Rail Automation--For passenger and freight railway operations, we develop, manufacture and sell central control systems, signaling systems and equipment, interlockings and automated train control systems that regulate a train's speed through automatic application of its brakes when it exceeds speed limits or fails to respond to a signal. We sell entire systems and networks, as well as individual products for integration into existing signaling systems. For mass transit, we develop, manufacture and sell operation control centers for the operation of signals and switches in rail yards and between destinations, and signaling and vehicle control systems (including automated, driverless systems).

Electrification--For high speed, main line and mass transit, we supply products and systems for contact line and rail power supply.

Our automation and power business was our second largest in terms of sales in fiscal 2004.

In our Turnkey Systems division, we aim to optimize the design and construction of entire railway systems. We cooperate closely with the other TS businesses, integrating their products and services to offer turnkey projects from a single source. Among our active projects during fiscal 2004, were the

Transrapid project in China (an electromagnetically elevated and propelled high-speed train), the construction of the new Kaohshiung subway system in Taiwan, and a new light rail transit system in the Venezuelan city of Maracaibo. We also assist our customers with arranging financing in cooperation with Siemens Financial Services.

With our Integrated Services division, we are placing an increasing emphasis on our service and maintenance activities. We provide corrective and preventive maintenance services, replacement and spare parts for our own products and for products manufactured by others. We also provide training, documentation and consulting services relating to a wide variety of customer needs, with a particular focus on extending the life-cycle of our customers' investments in their rail products and systems.

Our primary customers are transport authorities and national and private rail companies worldwide. Deutsche Bahn is a significant customer of TS. We distribute our products through our own sales force in Germany and through dedicated personnel in the local Siemens companies worldwide.

Germany and other European countries have traditionally been our most important regional markets. We believe the most important regional growth markets are in the Americas and the Asia-Pacific region. Demand in the German market for railway transportation products has continued to decline in recent years, especially in fiscal 2004, as a result of reduced government funding of, and low investment in, the German rail transportation systems and we expect that trend to continue for the foreseeable future. We derive approximately three quarters of our sales from Europe with 32% in Germany and a smaller but significant amount from Asia-Pacific.

We have approximately fifteen significant manufacturing, assembly and testing locations worldwide, including eleven in Europe, of which five are located in Germany.

34

Table of Contents

In fiscal 2004, our research and development costs were 3.1% of TS' total sales, compared to 3.2% of total sales in fiscal 2003.

The world markets for products and services in the railway transportation industry continue to be in flux. Despite the trend toward privatizing state-owned railways and liberalization of the railways markets, national authorities continue to have influence in areas such as security and deregulation, or as general watchdog authorities over transport or railway facilities. In many countries, governments impose local content requirements, the fulfillment of which is often a basic precondition for market entry. The number of rail operators is increasing, and both new and traditional operators, are focusing not only on quality but also on price and low life-cycle costs that drive their own profitability. Price pressure is further influenced by budget constraints faced by many state operators, requiring innovative financing solutions. In fiscal 2004, our industry continued to face increasing prices for some key components since there are only a limited number of

suppliers, partly as a result of consolidation in the industry. There is a growing trend towards the outsourcing of servicing and maintenance of systems and equipment.

To address these market trends, we continue to pursue the following strategic goals:

Rolling Stock--Focus on innovation in design and engineering; and to enter new geographic markets, in part by expanding our partnerships worldwide and tailoring them case-by-case to meet both project needs and local content requirements.

Automation and Power--Capitalize on and expand our existing international presence, experience and technological leadership to become a global supplier of products and systems platforms, particularly in the area of traffic automation solutions.

Integrated Services--Expand through strategic alliances in service enterprises; emphasize our "System plus Service" segment, which offers a complete package of new products plus service and maintenance; enter the market for third-party maintenance and improve our market penetration through e-business.

The large size of our projects occasionally exposes us to risks associated with technical performance, a customer or a country. In the recent past, we have experienced losses in connection with such risks. For example, in fiscal 2004, we experienced significant charges in our rolling stock business. The charges primarily related to our innovative low-floor light rail vehicle with a modular platform concept, marketed under the name Combino. Following an internal report on fatigue strength concerns with our Combino trams, as a precautionary measure, we advised our customers to take vehicles that have traveled distances of over 120,000 kilometers temporarily out of service. We have formed a specific subdivision with teams of internal and external experts working on a long-term solution for the Combino fleet. By the end of fiscal 2004, we have made considerable progress towards identifying suitable measures that will enable the affected Combino components to be improved and are also making headway towards a permanent repair solution. In this context, we are currently intensifying our quality program and are introducing new processes in order to enhance systematic detection and minimization of business risks and quality assurance of projects. We also continue to explore possibilities for cooperation with other companies in our industry as a means of reducing development costs, meeting local content requirements, improving market access, reducing risks and meeting customer requests. For additional information with respect to our long-term contracts, see Item 5: "Operating and Financial Review and Prospects-- Segment Information and Analysis-- Operations-- Transportation-- Transportation Systems" and Item 3: "Key Information-- Risk Factors."

We compete in our industry, on a global scale, with a relatively small number of large companies and with numerous small to midsized competitors who are either active on a regional level or specialize within narrow product spectrums. Our principal competitors are Alstom and Bombardier.

35

Table of Contents

Siemens VDO Automotive (SV)

<table>
<tr><td></td><td>Year ended<br>September 30, 2004</td><td></td></tr>
<tr><td></td><td>-------------------</td><td></td></tr>
<tr><td>Total sales</td><td>9.001 billion</td><td></td></tr>
<tr><td>External sales as percentage of Siemens net sales</td><td></td><td>11.96%</td></tr>
<tr><td>Group profit</td><td>562 million</td><td></td></tr>
</table>

SV designs, manufactures and sells integrated electrical, electronic and electromechanical systems and modules and individual components used in automotive applications. Our product range includes components and systems used in automobile powertrains, body electronic systems, safety and chassis systems, electric motor drives, information and cockpit systems, and driver information, communication and multimedia systems.

We offer our systems and products in the following four divisions:

Powertrain, including components, modules and systems for use in diesel and gasoline fuel injection handling, drive train transmission management and air intake systems, fuel pumps, supply units, as well as engine actuators and emissions controls and sensors;

Chassis & Carbody, including active and passive electronic safety systems, such as crash and occupant sensors for controlling airbags and seatbelts and for monitoring air pressure in tires; chassis electronics used in steering and braking; electric motor drives for use in antilock brakes, heating, ventilation and engine cooling systems and power windows and sunroofs; drive systems for electric and hybrid vehicles; access control and security systems with electric door and seat controls and radio receivers within the vehicle; intelligent switching units and climate control units;

Interior & Infotainment, including complete cockpit systems, driver's workplace systems in commercial vehicles, instrument clusters, tachographs, human-machine interface displays, heads-up displays for passenger and commercial vehicles; car audio, navigation and telematics and complex multimedia systems; and

Service & Special Solutions, which offers spare parts and accessories for passenger and commercial vehicles, fleet management systems and hardware and software products for car audio, navigation, and telematics.

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

Some of our recent product innovations and developments include:

common-rail injection systems with piezo-electronic actuators, resulting in
 quieter and lower emission diesel engines;
innovative gas sensors such as our NOx sensor and our Ozone sensor, which help
 car manufacturers comply with ever more stringent emission standards;
integrated powertrain management, allowing significant savings in fuel
 consumption;
color heads-up display that projects information about driving conditions and
 navigation instructions onto the windshield;
voice-controlled car communication computer for passenger cars, which includes a
 multimedia system, as well as climate and speed control function;
digital tachograph that collects important data concerning the operation of
 vehicles, allowing more sophisticated management of fleets;
contactless and modular fuel level sensors for long-life, high-performance fuel
 supply systems;
tire pressure monitoring system;
advanced weight sensing (AWS), which adjusts the safety settings on seat belts
 and airbags depending on the passenger's weight;

36

Table of Contents

an advanced radar system for crash avoidance and adaptive cruise control; and
an optical passenger detection device that makes airbags more intelligent and offers greater
 protection to passengers.

In addition to researching and developing these and other innovations, we
also design and manufacture systems and modules, which typically offer superior
profit margins and better opportunities for maintaining customer relationships,
compared to selling individual components.

Most of our customers are large automobile manufacturers, including four
of the world's five largest automobile manufacturers. We also sell components
to suppliers of complete automotive systems and modules. Our car manufacturer
customers frequently contract for a supplier to provide a system or set of
components for the production run of a particular car model or engine line. In
fiscal 2004, our ten largest customers together accounted for more than
three-quarters of our total sales.

Base materials and components account for about half of the total cost of
our products. We rely on a few suppliers to provide us with most of our

semiconductors, other electronic components and some other base materials and components. These suppliers include Infineon, Philips and ST Microelectronics, for semiconductors; Tyco, for wire housings and connectors; and ALCOA for drives.

We have our own independent sales force, which is active worldwide. We generate two thirds of our sales in Europe, with 31% in Germany, and a smaller but significant amount from the Americas, mainly in the United States, with an increasing share in the Asia-Pacific region. In fiscal 2004, we continued our sales initiative directed at increasing our sales in China, Japan, Korea and other Asian countries. The Japanese market is still served mostly by local and in-house suppliers.

We have approximately 51 manufacturing and assembly facilities, including 16 in the Americas and 25 in Europe. Of these, 10 are located in Germany.

In fiscal 2004, our research and development costs were 8.4% of SV's total sales, compared to 8.3% of total sales in fiscal 2003. To secure competitiveness in markets with ongoing price pressure, we must continue to make productivity gains and develop innovative products. Investment in new technologies has also grown in importance due to the increasing use of electronics and related software in automobiles, and as more manufacturers offer former options such as theft protection and safety devices as standard features in an effort to increase margins. Additionally, environmental concerns have increased demand for direct injection and other new engine technologies offering improved efficiency, as well as for fuel cells and other possible alternatives to the internal combustion engine. In addition to continuing to invest in research and development, we must also continue to attract and retain skilled engineers and other technically proficient employees to remain technologically competitive.

For the last several years, automobile manufacturers and their suppliers have been going through a period of significant change and consolidation, and we expect this trend to continue. Opportunities and competition for independent suppliers have increased as car manufacturers have spun-off or exposed their former in-house suppliers to increased competition. For example, during fiscal 2004, we acquired from DaimlerChrysler its automotive electronic products facility, located in Huntsville, Alabama (United States). Manufacturers, in an effort to achieve cost efficiencies and ease of production, are also using more pre-assembled systems and modules instead of individual components. Systems and modules integrate all of the components needed for major automotive subsystems, such as the cockpit or vehicle safety systems. These systems and modules are assembled near or at the customer's production site on a "just-in-time," "just-in-sequence" delivery basis for assembly directly onto the chassis without significant further modification, sometimes using the customer's production machinery. The trend toward greater use of modules and systems has increased pressure on suppliers of individual components and smaller companies to combine or form alliances, resulting especially in growing convergence of electronics and mechanical component suppliers and making the industry more capital intensive.

In fiscal 2004, demand in the mass market for passenger cars stagnated, whereas demand in the truck market increased. Automobile production levels declined in the Americas and Western Europe, especially Germany. The Asia-Pacific region, with a growing market in China, did not fully offset this

worldwide trend. Globalization and

37

Table of Contents

the opening of markets to competition continue to put downward pressure on prices. Customers that incorporate our products into their own equipment make ever greater demands on both our performance and the quality of our products. In the current market environment, many automobile manufacturers extract price and other concessions from their suppliers, including SV, and some of our automobile manufacturer customers have cancelled or postponed new development projects with us. For SV, however, the impact of these developments is partly offset by our focus on automotive electronics, which constitutes an increasingly large percentage of the cost of each automobile produced. Increased demand for diesel engines also led to growth in sales of our common-rail injection systems with piezo-electronic actuators.

In response to these difficult market conditions, we are continuing our program to cut costs, increase productivity, optimize our product and project portfolio, and reduce inventory, personnel and the production and assembly facilities. In fiscal 2004, we continued to shift production facilities to locations where we can reduce our manufacturing costs and/or be closer to our customers. However, other major suppliers are also moving manufacturing and engineering capacities to China and Eastern Europe to contain costs.

We are a first-tier supplier to automobile manufacturers in North America, South America and Asia. Our most significant competitors are generalists with a broad product range, systems integration capabilities and global presence. These include Bosch, Toyota's Denso and the independent, former in-house suppliers Visteon and Delphi, all of which are significantly larger than we are. Moreover, in Europe, Denso, Visteon and Delphi continue to be aggressive competitors and Denso is expected to enter the common-rail diesel market in 2005. Competition from low-cost suppliers from Asia and Eastern Europe is increasing in commodity products, such as electrical motors. Finally, additional competitive pressure could also result from a vertical integration between semiconductor suppliers and traditional automotive suppliers, such as in the case of NEC and Nestec or Infineon and Sensonor.

MEDICAL

Medical Solutions (Med)

Year ended
September 30, 2004

-------------------

| | | |
|---|---|---|
| Total sales | 7.072 billion | |
| External sales as percentage of Siemens net sales | | 9.27% |
| Group profit | 1.046 billion | |

Med develops, manufactures and markets diagnostic and therapeutic systems and devices, as well as information technology systems for clinical and administrative purposes. We provide technical maintenance, professional and consulting services. We also work with Siemens Financial Services to provide financing and related services to our customers. We are one of the leading companies in our field.

Our offerings include:

medical imaging systems, representing a full range of systems including x-ray, computed tomography, magnetic resonance, nuclear medicine and ultrasound, as well as related computer-based workstations enabling the health care professional to retrieve and process relevant information. Our imaging systems are used to generate, in various modalities and without surgery, morphological and functional images of, and related information concerning, the human body, such as internal organs. This information is used both for diagnostic purposes and in preparation for potential treatment, including interventional and minimally-invasive procedures. We focus on technically innovative products, examples of which are our computed tomography scanner, Somatom Sensation 64; our magnetic resonance scanner, Magnetom Avanto with a total imaging matrix; and or our x-ray angiography platform Axiom Artis;

information technology systems, including image management systems and systems for clinical and administrative applications. Our information technology systems are used to facilitate digital storage, retrieval and transmission of medical images and other clinical and administrative information, facilitating efficient workflows in health care environments. Our offerings include web-based products using the Internet as the communication medium;

38

Table of Contents

electromedical systems, including patient monitoring systems, life support systems and electrophysiological measuring systems. These systems are primarily used in critical care situations and during surgery for the purpose of patient transport, monitoring vital functions via body sensors, supporting breathing and administering anesthetic agents. Our product portfolio further includes respiratory machines designed for home care and systems for intensive neonatal care. We provide such electromedical systems primarily through our joint venture with Drager Medical of Lubeck, Germany, which was formed in fiscal 2003 in which we hold a 35% share. In October 2003, we sold our Life Support Systems business, which provided anesthesiology and

ventilation equipment, to Getinge AB, a Swedish medical technology group, as
a condition to European antitrust approval for the joint venture with Drager;
oncology care systems, including linear accelerators, which are used for
cancer treatment; and
hearing aids and related products and supplies.


Our medical imaging operations are the largest part of our business,
representing about 70% of total sales in fiscal 2004. These businesses are
organized into divisions according to the type of medical imaging system
offered, including Magnetic Resonance, Computed Tomography, Ultrasound,
Angiography, Fluoroscopic and Radiographic Systems, Nuclear Medicine and
Special X-Ray Systems. Our Health Services division, which focuses on
information technology systems, represents the second largest part of our
business.

Over the long term, we expect worldwide demand for our products and
services to continue to grow due to a variety of factors, including the growing
population of older people, the trend toward early diagnosis and the
improvement of health care delivery in developing countries. In addition,
efforts in many industrialized countries to contain health care costs are
driving a need for improved efficiency in diagnostic and therapeutic processes.
For example, health care providers must be able to deliver patient information
to every other caregiver who needs it. This need continues to fuel demand for
integrated information technology systems, including electronic patient
records, as well as related professional consulting and implementation
services.

Our customers are health care providers such as hospital groups and
individual hospitals, group and individual medical practices and outpatient
clinics. Our products are sold and serviced primarily through our own dedicated
personnel. A small portion of our sales involve delivery of certain of our
products and components to competitors on an original equipment manufacturing
(OEM) basis.

We have a strong worldwide presence. The United States is our largest
single geographic market, representing 46% of our total sales in fiscal 2004.
In addition, we derive nearly one third of our sales from Europe and a smaller
but significant amount in the Asia-Pacific region.

Our worldwide business is reflected in our regional organization. The
headquarters for our oncology care systems business and, in the medical imaging
field, our Ultrasound and Nuclear Medicine divisions, as well as our Health
Services division, are located in the United States. The remaining divisions
are headquartered in Germany. Excluding our joint ventures, we have
approximately 16 significant manufacturing and assembly facilities worldwide,
including six in North America and five in Europe. Of these, three are located
in Germany.

We have research and development and OEM cooperation agreements with
various companies, including with Bruker, in the field of magnetic resonance
imaging; Toshiba, in the field of ultrasound and magnetic resonance imaging;
Philips, in computed tomography systems; and Matsushita, for low- and mid-range
ultrasound systems. We also have joint ventures with CTI Molecular Imaging,

Inc., to develop and manufacture Positron Emission Tomography systems which are new scanning systems capable of showing the chemical functioning of an organ or tissue; with Philips and Thales, to manufacture flat panel detectors for medical imaging; and with Mochida Pharmaceutical Co. Ltd., in the field of ultrasound in Japan.

R&D plays an important role in our business. We maintain research and development centers at locations in Europe, the United States and Asia. In fiscal 2004, our research and development costs were 8.8% of Med's total sales, compared to 9.1% of total sales in fiscal 2003. Approximately two-thirds of our research and development expenditure is typically spent on medical imaging systems. An important project within our information technology systems business is the continued development of a new workflow management system, Soarian, designed to optimize information-based processes throughout the entire cycle of a patient's diagnosis and

39

Table of Contents

treatment. Several applications of this workflow management system have already been sold and are in use at customer sites.

Our goal is to become the preferred partner for health care providers around the world by supporting their efforts in optimizing their workflow, that is their diagnostic and therapeutic processes. Our strategy is to combine our knowledge and innovative products in medical engineering and information technology with our experience in process improvement and consulting to provide comprehensive customer solutions. In addition, we are intensifying our activities in molecular medicine.

We seek to make selective investments in innovative businesses to strengthen our product portfolio. In 2004, we acquired minority interests in several companies. These include peS Gesellschaft fur Medizinische Diagnosesysteme mbH, a German company focused on the development of point of care immunoassay systems that allow rapid and accurate diagnosis of various diseases (so-called "lab on a chip"). We also acquired CADVision, a small Israeli company developing software for computer-aided detection and diagnosis of breast lesions. In addition, we acquired the remaining share from our partner Oxford Instruments plc in the Oxford Magnet Technology Ltd. joint venture and renamed the business to Siemens Magnet Technology Ltd.

Our principal competitors in medical imaging are General Electric, Philips, Toshiba, Hitachi and Hologic. Other competitors include McKesson HBOC, Cerner and IDX, for information technology systems; Phonak, Resound, Starkey, Widex and William Demant, for hearing aids; and Elekta and Varian Medical, for oncology care systems. The trend toward consolidation in our industry continues. General Electric recently acquired both Instrumentarium, a leading supplier of critical care and patient monitoring systems and solutions, and Amersham, a leading provider of imaging enhancing agents and systems for disease research and drug development. The latter acquisition was the first to combine medical technology and life sciences businesses, reflecting the growing importance of molecular medicine for diagnosis and therapy. Competition among

EDGARPlus(R) FORM-TYPE: 20-F FILING-DATE: November 29, 2004

the three leading companies in our field-- Siemens, General Electric and Philips-- continues to be strong, including with respect to price.

LIGHTING

Osram

|  | Year ended September 30, 2004 |
| --- | --- |
|  | ------------------- |
| Total sales | 4.240 billion |
| External sales as percentage of Siemens net sales | 5.51% |
| Group profit | 445 million |

Our Lighting Group, Osram, offers a full spectrum of lighting products for a variety of applications. Osram designs, manufactures or sells the following types of lighting products and related materials, components and equipment through the following six divisions:

General Lighting: incandescent, halogen, compact fluorescent, fluorescent and high-intensity discharge lamps for household and commercial applications, and public buildings, spaces and streets;

Automotive Lighting: halogen, incandescent and xenon discharge lamps for use in motor vehicle headlights, brake lights, turn signals and instrument panels, and, through an equal joint venture with Valeo, completed head- and tail-light assemblies for distribution in North America;

Photo-Optic Lighting: special purpose halogen and high-intensity discharge lamps for lighting airport runways, film studios, microchip manufacturing plants, video and overhead projectors and medical and other applications requiring very intense lighting. Effective October 1, 2004, we renamed the division to Display/ Optic. The display applications within the General Lighting and the sale of LED products for displays of our Opto-Semiconductors divisions was transferred to the Display/ Optic division;

Opto-Semiconductors: light emitting diodes (LED), organic light emitting diodes (OLED), high power laser diodes and other semiconductor devices that generate visible light and ultraviolet and infrared radiation for use in interior and exterior automotive lighting and other applications, electronic equipment

40

Table of Contents

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYED IQBAL RAZA, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-132 (JJF) |
| | ) | |
| SIEMENS MEDICAL SOLUTIONS USA, | ) | |
| INC., SIEMENS MEDICAL SOLUTIONS | ) | |
| HEALTH SERVICES CORP., SIEMENS | ) | |
| CORPORATION and SIEMENS AG, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF CHAD S.C. STOVER, ESQUIRE

I, Chad S.C. Stover, declare as follows:

1.     I am an attorney with the law firm of Young Conaway Stargatt & Taylor, LLP, and I am admitted to practice before the United States District Court for the District of South Carolina, the Supreme Court of the State of South Carolina, and the United States Patent and Trademark Office..

2.     I submit this declaration in support of Dr. Raza's Answering Brief in Opposition to Defendant Siemens AG's Motion to Dismiss.

3.     As of Sunday May 14, 2006, according the Best Buy's website at www.bestbuy.com, the following Siemens products were available for sale at Best Buy's Wilmington, Delaware store located at 2201 Farrand Drive, Wilmington, Delaware 19808:  (1) Siemens 1.8 cubic foot Over-the-Range Microwave, Model Number HF36V305 and (2) Siemens Washer/Dryer Pedestal, Model Number WZ20395.

4.     On Monday, May 15, 2006, I confirmed by personal phone call at 10:16 AM to Lowe's of Christiana, Store #0217, 800 Eden Circle, Bear, Delaware 19701, that the following

items were on hand and available for purchase: (1) Siemens 125 Amp, 4/8 Load Center, Model Number LW204TLU and (2) Siemens 200 Amp, 4/8 Load Center, Model Number LW004NRU.

5.     On Monday, May 15, 2006, I confirmed by personal phone call at 10:25 AM to Home Depot Christiana, Store #1601, 1301 New Churchman's Road, Newark, Delaware 19713, that the following items were on hand and available for purchase: (1) Siemens 15 Amp Circuit Breaker, Item Number 328082 and (2) Siemens 20 Amp Circuit Breaker, Item Number 991041.

*     *     *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

DATED: May 16, 2006

_____
CHADS.C. STOVER

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FENSTER FAMILY PATENT HOLDINGS, INC., ELSCINT LTD., and ELSCINT INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | C.A. No. 04-0038 (JJF) |
| SIEMENS MEDICAL SOLUTIONS USA, INC., SIEMENS MEDICAL SYSTEMS, INC., SIEMENS CORPORATION, and SIEMENS AG, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## ANSWER TO FIRST AMENDED COMPLAINT
## AND COUNTERCLAIM

Defendants Siemens Medical Solutions USA., Inc., Siemens Medical Systems, Inc.,

Siemens Corporation, and Siemens AG (collectively "Siemens") respond to the First Amended

Complaint of Plaintiffs Fenster Family Patent Holdings, Inc., Elscint Ltd., and Elscint Inc.

(collectively "Plaintiffs"), as follows:

        1.     Deny knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in paragraph 1.

        2.     Deny knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in paragraph 2.

        3.     Deny knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in paragraph 3.

        4.     Deny knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in paragraph 4.

5.    Deny the allegations contained in paragraph 5, except admit that Siemens Medical Solutions USA, Inc. is organized under the laws of the State of Delaware and has its principal place of business at 51 Valley Stream Parkway, Malvern, PA.

6.    Deny the allegations contained in paragraph 6.

7.    Deny the allegations contained in paragraph 7 except admit that Siemens Corporation is organized and existing under the laws of the State of Delaware, has its principal place of business at 153 East 53d Street, New York, NY, and is the parent corporation of Siemens Medical Solutions USA, Inc.

8.    Deny the allegations contained in paragraph 8, except admit that Siemens AG is a corporation organized under the laws of Germany, and has its principal place of business at Wittelsbacherplatz 2, 8033 Munich, Germany.

9.    Admit that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

10.    Deny the allegations in paragraph 10, except admit that Siemens Medical Solutions USA, Inc. and Siemens Corporation are incorporated in Delaware and subject to jurisdiction in this Court.

11.    Deny the allegations in paragraph 11.

12.    Deny the allegations in paragraph 12.

13.    Deny the allegations in paragraph 13.

14.    Deny the allegations in paragraph 14.

15.    Deny the allegations in paragraph 15, except admit that the '728 patent is entitled "Digital Fluorography" and that what appears to be an accurate copy of the '728 patent is attached as Exhibit 1 of the First Amended Complaint.

16.    Deny the allegations in paragraph 16, except admit that the '864 patent is entitled "Method of Determining Stenosis of Blood Vessels" and that what appears to be an accurate copy of the '864 patent is attached as Exhibit 2 of the First Amended Complaint.

17.    Deny the allegations in paragraph 17, except admit that the '990 patent is entitled "Radiographic Method and Apparatus for the Visualization of the Interior of a Body Particularly Useful for the Visualization of a Subject's Circulatory System" and that what appears to be an accurate copy of the '990 patent is attached as Exhibit 3 of the First Amended Complaint.

18.    Deny the allegations in paragraph 18, except admit that the '146 patent is entitled "Automatic Misregistration Correction" and that what appears to be an accurate copy of the '146 patent is attached as Exhibit 4 of the First Amended Complaint.

19.    Deny the allegations in paragraph 19, except admit that the '398 patent is entitled "Superinterlacing Imaging Systems" and that what appears to be an accurate copy of the '398 patent is attached as Exhibit 5 of the First Amended Complaint.

20.    Deny the allegations in paragraph 20, except admit that the '949 patent is entitled "Systems and Methods for Translating Radiation Intensity into Pixel Values" and that what appears to be an accurate copy of the '949 patent is attached as Exhibit 6 of the First Amended Complaint.

21.    Deny the allegations in paragraph 21, except admit that the '518 patent is entitled "Arrangement for Processing Data in Digital Flurographic Systems" and that what appears to be an accurate copy of the '518 patent is attached as Exhibit 7 of the First Amended Complaint.

22.     Deny the allegations in paragraph 22, except admit that the '620 patent is entitled "Data compression System" and that what appears to be an accurate copy of the '620 patent is attached as Exhibit 8 of the First Amended Complaint.

23.     The allegations in paragraph 23 require no response.

24.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 24.

25.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 25.

26.     Deny the allegations in paragraph 26.

27.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 27.

28.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 28.

29.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 29.

30.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 30.

31.     Deny the allegations of paragraph 31, except admit that Siemens AG received a letter dated October 19, 2000 from attorneys purporting to represent Fenster Family Patent Holdings, Inc. ("FFPH") and refer to that letter for its contents.

32.     Deny the allegations in paragraph 32, except admit that Siemens AG received a letter dated May 13, 2002 from attorneys purporting to represent Plaintiffs and refer to that letter for its contents.

990518v1

33.     Deny the allegations in paragraph 33.

34.     Repeat and reallege the responses set forth in paragraphs 1-33 above as if fully set forth herein.

35.     Deny the allegations in paragraph 35.

36.     Deny the allegations in paragraph 36.

37.     Deny the allegations in paragraph 37.

38.     Deny the allegations in paragraph 38.

39.     Deny the allegations in paragraph 39.

40.     Deny the allegations in paragraph 40.

41.     Deny the allegations in paragraph 41.

42.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 42.

43.     Deny the allegations in paragraph 43.

## First Affirmative Defense

44.     The First Amended Complaint fails to state a claim upon which relief can be granted.

## Second Affirmative Defense

45.     Siemens has not infringed any claim of the Patents-in-Suit, either directly, indirectly, literally or under the doctrine of equivalents.

## Third Affirmative Defense

46.     Siemens has not contributorily infringed or induced infringement of any claim of the Patents-in-Suit, literally or under the doctrine of equivalents.

5

### Fourth Affirmative Defense

47.　　Plaintiffs are estopped from asserting that Siemens has infringed or is infringing any claim of the Patents-in-Suit by virtue of statements, amendments or other actions taken during the prosecution of those patents.

### Fifth Affirmative Defense

48.　　The Patents-in-Suit are invalid for failure to comply with the requirements of Title 35 of the United States Code, including but not limited to Sections 101, 102, 103 and 112.

### Sixth Affirmative Defense

49.　　Plaintiffs' claims are barred by the doctrine of laches.

### Seventh Affirmative Defense

50.　　Plaintiffs' claims are barred by the doctrine of equitable estoppel.

### Eighth Affirmative Defense

51.　　Upon information and belief, Plaintiffs' claims for damages are barred by failure to mark.

### Ninth Affirmative Defense

52.　　Plaintiffs' claims are barred in part by the statute of limitations.

### DECLARATORY JUDGMENT COUNTERCLAIM

Siemens Medical Solutions USA, Inc., alleges as follows for its Counterclaim, against Fenster Family Patent Holdings, Inc., Elscint, Ltd., and Elscint, Inc.:

53.　　This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, 35 U.S.C. § 1 et seq., and is based

6

upon an actual and judiciable controversy between the parties with respect to the infringement and validity of U.S. Patent Nos. 4,555,728 (the "'728 patent"); 4,692,864 (the "'864 patent"); 4,459,990 (the "'990 patent"); 4,685,146 (the "'146 patent"); 4,644,398 (the "'398 patent"); 4,595,949 (the "'949 patent"); 4,590,518 (the "'518 patent");and 4,777,620 (the "'620 patent") (collectively, the "Patents-in-Suit"). This Court has jurisdiction over the subject matter of this counterclaim based upon 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, and the patent laws of the United States, 35 U.S.C. § 1 et seq. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

54.    This Court has personal jurisdiction over Fenster Family Patent Holdings, Inc. ("FFPH"), Elscint, Ltd., and Elscint, Inc. FFPH, Elscint, Ltd., and Elscint, Inc. have submitted to this Court's jurisdiction by filing their Complaint in this action.

55.    Siemens Medical Solutions USA, Inc., is a corporation organized under the laws of Delaware having its principal place of business at 51 Valley Stream Parkway, Malvern, PA.

56.    Upon information and belief, FFPH is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 300 Delaware Avenue, Wilmington, Delaware 19801. FFPH has alleged that it is the exclusive licensee of the Patents-in-Suit. FFPH is one of the plaintiffs in this action.

57.    Upon information and belief, Elscint Ltd. is an Israeli Company having an address at 13 Noah Moses Street, Tel Aviv 67442. Elscint Ltd. has alleged that it is the owner of the Patents-in-Suit. Elscint Ltd. is one of the plaintiffs in this action.

58.    Upon information and belief, Elscint Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts having an address of c/o

7

Corporation Service Company, 84 State Street, Boston MA 02109. Elscint Inc. is one of the plaintiffs in this action.

59.    FFPH, Elscint Ltd., and Elscint Inc. have alleged in this action that Siemens has infringed and is infringing the Patents-in-Suit.

60.    Siemens Medical Solutions USA, Inc. has not infringed any claim of the Patents-in-Suit, either directly, indirectly, literally or under the doctrine of equivalents.

61.    Siemens Medical Solutions USA, Inc. has not contributorily infringed or induced infringement of any claim of the Patents-in-Suit, literally or under the doctrine of equivalents.

62.    FFPH, Elscint Ltd., and Elscint Inc. are estopped from asserting that Siemens Medical Solutions USA, Inc. has infringed or is infringing the Patents-in-Suit by virtue of statements, amendments or other actions taken during the prosecution of those patents.

63.    The Patents-in-Suit and all claims therein are invalid for failure to comply with the requirements of Title 35 of the United States Code, including but not limited to Sections 101, 102, 103 and 112.

64.    Plaintiffs' claims are barred by the doctrine of laches.

65.    Plaintiffs' claims are barred by the doctrine of equitable estoppel.

66.    Upon information and belief, Plaintiffs' claims for damages are barred by a failure to mark.

67.    For the reasons set forth above, Siemens Medical Solutions USA, Inc. seeks a judgment declaring that the Patents-in-Suit are invalid and not infringed.


WHEREFORE, Siemens respectfully prays the Court enter judgment:

990518v1

A.    Dismissing the First Amended Complaint, with prejudice, and denying

Plaintiffs the relief requested in the First Amended Complaint;

B.    Enjoining Plaintiffs from asserting U.S. Patent Nos. 4,555,728; 4,692,864;

4,459,990; 4,685,146; 4,644,398; 4,595,949; 4,590,518 and 4,777,620 against Siemens;

C.    Declaring that the claims of U.S. Patent Nos. 4,555,728; 4,692,864;

4,459,990; 4,685,146; 4,644,398; 4,595,949; 4,590,518 and 4,777,620 are not infringed by

Siemens;

D.    Declaring that the claims of U.S. Patent Nos. 4,555,728; 4,692,864;

4,459,990; 4,685,146; 4,644,398; 4,595,949; 4,590,518 and 4,777,620 are invalid and/or

unenforceable;

E.    Declaring the case exceptional under 35 U.S.C. § 285 and awarding

Siemens its reasonable attorneys' fees and expenses in this action; and

F.    Awarding such other and further relief as the Court deems just and proper.


Dated:  April 28, 2004

CONNOLLY BOVE LODGE & HUTZ, LLP

_Arthur J. Connolly III_

*Of Counsel*:

Arthur G. Connolly III (#2667)
The Nemours Building
Eugene M. Gelernter
Chad J. Peterman                              1007 North Orange Street
Melissa Mandrgoc                              PO Box 2207
PATTERSON, BELKNAP,                           Wilmington, DE 19899-2207
    WEBB & TYLER LLP
1133 Avenue of the Americas                   *Attorneys for Defendants Siemens Medical*
New York, New York 10036                      *Solutions USA, Inc., Siemens Medical Systems,*
(212) 336-2000                                *Inc., Siemens Corporation and Siemens AG,*
                                              *and for Counterclaim-Plaintiff Siemens*
                                              *Medical Solutions USA, Inc.*

990518v1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 28, 2004, I caused copies of the foregoing to be

served upon the following counsel of record in the manner indicated:

**By Hand Delivery**
Josy W. Ingersoll, Esq.
John W. Shaw, Esq.
Adam W. Poff , Esq.
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Drive, 17th Floor
Wilmington, DE 19899

**By Federal Express**
Neil F. Greenblum, Esq.
Michael J. Fink, Esq.
Jill M. Browning, Esq.
Van C. Ernest, Esq.
Greenblum & Bernstein, P.L.C.
1950 Roland Clark Place
Reston, VA 20191


Arthur G. Connolly, III (#2667)


#331355v1

# EXHIBIT H

**SIEMENS**

Siemens Medical Home

Medical Solutions

Pro ducts & Systems     Clinical Solutions     Services     Education     About us     Country Information

Soarian® INT Home

How to make patient access     Soarian™ knows



## Soarian® International

- **Workflow Engine**
- **Embedded Analytics**
- **Smart User Interface**
- **Functional Overview**
- **Soarian® Cardiology**
- **Soarian® Clinical Access**
- **News**
- **FAQs**
- **Contact**

## Soarian®

### Redefining The Way Healthcare is delivered

It is knowledge on a whole new level. Personal. Actionable. Comprehensive. Soarian is the dynamic health information solution that synchronizes workflow across your entire enterprise. Soarian knows how health systems work. How you work. It functions as an intuitive member of your team. Anticipating your needs. Simplifying your tasks. It orchestrates patient care by bringing together clinical, financial, therapeutic and diagnostic information. To help you make better and faster decisions. Help avoid medical errors. Reduce regulatory snarls. Control costs. Raise satisfaction across the board. And make patients feel valued. At the simplest, yet most profound level, Soarian will create a whole new healthcare experience.

### Know more

Soarian - an intelligent and intuitive information solution that synchronizes workflow across the enterprise. Soarian coordinates disjointed processes and provides comprehensive access to information - bringing all pieces together.

- Soarian is **workflow engineered** to synchronize processes across the health enterprise.
- Soarian has a **smart user interface** that anticipates the needs and unique work processes of individual users.
- Soarian is designed with **embedded analytics** that empower users to monitor, measure and act.

Downlo

Soarian® (543 KB)

Brochu

"Imagine System" (

"Soarian System A (pdf - 46 I

"Soarian Managem (pdf - 77 I

Country Brochu

UK Datas "Introduc Soarian" 

http://www.healthcare.siemens.com/soarian/int/index_flash.html          5/16/2006





Siemens Medical Home

Products & Systems    Clinical Solutions    Services    Education    About us    Country Information

Soarian® INT Home  |  Contact

## Soarian® International

- ⊁ **Workflow Engine**
- ⊁ **Embedded Analytics**
- ⊁ **Smart User Interface**
- ⊁ **Functional Overview**
- ⊁ **Soarian® Cardiology**
- ⊁ **Soarian® Clinical Access**
- ⊁ **News**
- ⊁ **FAQs**
- Contact

## Contact

**Siemens Medical Solutions
Health Services GmbH**
Henkestraße 127
91052 Erlangen
Fax: 0049 9131 84 2379
**www.siemensmedical.com**

We welcome your questions and comments on Soarian®:
**soarian@siemens.com**

Downlo
Soarian®
(543 KB)

# Unreported Cases

LEXSEE

IN RE: ELONEX PHASE II POWER MANAGEMENT LITIGATION

C.A. Nos.: 01-082 GMS; 01-083 GMS, 01-084 GMS; 01-085 GMS, 01-086 GMS;
01-087 GMS, 01-088 GMS; 01-089 GMS, 01-090 GMS; 01-091 GMS, 01-092 GMS;
01-093 GMS, 01-095 GMS; 01-096 GMS, 01-097 GMS; 01-098 GMS, 01-099 GMS;
01-100 GMS, 01-101 GMS; 01-102 GMS, 01-103 GMS; 01-104 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 7715

May 6, 2003, Decided

**SUBSEQUENT HISTORY:** Motion granted by, Motion denied by In re Elonex Phase II Power Mgmt. Litig., 2003 U.S. Dist. LEXIS 10717 (D. Del., June 23, 2003)

**PRIOR HISTORY:** In re Elonex Phase II Power Mgmt. Litig., 2002 U.S. Dist. LEXIS 19552 (D. Del., Oct. 15, 2002)

**DISPOSITION:**
 [*1] Defendant's motion to dismiss for lack of personal jurisdiction denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, two companies, sued defendants, certain companies that manufactured and sold computer systems or computer monitors, for alleged patent infringement. The lawsuit related to technology that concerned power management in computer monitors. One of the defendants, a foreign company, moved to dismiss for lack of personal jurisdiction.

**OVERVIEW:** The court held that the foreign company had, for many years, been the first link in precisely the kind of indirect distribution chain that had been found sufficient to establish personal jurisdiction. Specifically, the company sold it monitors to two United States monitor companies with nationwide re-seller networks, who in turn distributed the foreign company's monitors to retailers with Delaware operations. Furthermore, the foreign company maintained a website through which customers in Delaware could obtain customer support. Thus, the foreign company had the requisite minimum contacts, as required by the Due Process Clause for exercising personal jurisdiction. Furthermore, the knowing and purposeful shipment of monitors satisfied Delaware's long-arm statute, specifically Del. Code Ann.

tit. 10 § 3104(c)(4). Because the foreign company undeniably derived substantial revenue from these activities, it was subject to jurisdiction under Delaware's long-arm statute. As the court had already found that the exercise of personal jurisdiction was proper and complied with both due process and the Delaware long-arm statute, venue in the forum district was also proper.

**OUTCOME:** Defendant's motion to dismiss was denied.

**CORE TERMS:** monitor, personal jurisdiction, venue, website, networks, purposeful, patent, channel, lawsuit, worldwide, download, long-arm, customer, patent infringement, stream of commerce, purposefully, subjecting, well-known, indirect, shipment, entry of default, well-established, nationwide, undeniably, internet, software, retailers, shipped, driver, retail

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
[HN1] The Due Process Clause requires that, in order to subject a defendant who is not present within the territory of the forum to personal jurisdiction, a court must first make sure that the party has certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court"

in the forum as a result of its conduct. Finally, even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN2] Notwithstanding the existence of a defendant's purposeful minimum contacts with the forum, a court must consider whether the minimum requirements inherent in the concept of "fair play and substantial justice" defeat the reasonableness of the assertion of jurisdiction, even if the defendant has purposefully engaged in forum activities. This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendant to litigation within the forum.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN3] In the context of the exercise of personal jurisdiction, progress in communications and transportation have made the defense of a lawsuit in a foreign tribunal less burdensome.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN4] Under Del. Code Ann. tit. 10, § 3104(c)(4), a court may exercise personal jurisdiction over anyone who causes injury either inside or outside of the State "by an act or omission outside of the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." The United States District Court for the District of Delaware interprets this language broadly, as reaching the maximum parameters of the due process clause.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Venue > Individual Defendants*
[HN5] Venue lies ipso facto if a district court has personal jurisdiction over the defendant.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Venue > Corporations*
[HN6] Venue is proper in a judicial district where the defendant corporation is subject to personal jurisdiction at the time the action is commenced. 28 U.S.C.S. § 1391(b)(1), (c).

**COUNSEL:** For Elonex IP Holdings, Ltd, Eip Licensing BV, Elonex Phase II Power Management Litigation, PLAINTIFFS (01cv82): Andre G Bouchard, Bouchard, Margules & Friedlander, Wilmington, DE USA.

For Elonex Phase II Power Management Litigation, PLAINTIFF (01cv82): Donald F Parsons, Jr, Julia Heaney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Compaq Computer Corp, Proview International Holdings Ltd, DEFENDANTS (01cv82): William J Wade, Richards, Layton & Finger, Wilmington, DE USA.

For LG Electronics Inc, DEFENDANT (01cv82): Richard K Herrmann, Blank Rome LLP, Wilmington, DE USA.

For Delta Electronics Inc, Amtran Technology Co, Ltd, Daewoo Electronics Co, Ltd, Compal Electronics, Inc, DEFENDANTS (01cv82): Richard L Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Delta Electronics Inc, DEFENDANT (01cv82): John T Meli, Jr, Fish & Richardson, PC, Wilmington, DE USA.

For NEC Corp, DEFENDANT (01cv82): Steven J Balick, Ashby & Geddes, Wilmington, DE USA.

For Gateway Inc, Acer Communications & Multimedia, Inc, DEFENDANTS (01cv82): Allen M Terrell, Jr, Richards,
 [*2] Layton & Finger, Wilmington, DE USA.

For Gateway Inc, Necx Direct LLC, DEFENDANTS (01cv82): Dominick T Gattuso, Richards, Layton & Finger, Wilmington, DE USA.

For Lite-on Technology Corp, DEFENDANT (01cv82): Robert W Whetzel, Richards, Layton & Finger, Wilmington, DE USA.

For ADI Corp, DEFENDANT (01cv82): Josy W Ingersoll, John W Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For ADI Corp, Daewoo Electronics Co, Ltd, DEFENDANTS (01cv82): David L Finger, David L Finger, Esq, Wilmington, DE USA.

For Chuntex Electronics Co, Ltd, CTX International Inc, DEFENDANTS (01cv82): Rudolf E Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

For Acer Communications & Multimedia, Inc, CTX International Inc, DEFENDANTS (01cv82): Gerard M O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

For Acer Communications & Multimedia, Inc, DEFENDANT (01cv82): John C Andrade, Basil C Kollias, Parkowski & Guerke, PA, Dover, DE USA.

For Jean Co Ltd, DEFENDANT (01cv82): Donald W Huntley, Donald W Huntley, Esq, Wilmington, DE USA.

For Tatung Corp, DEFENDANT (01cv82): James C Strum, Stradley, Ronon, Stevens & Young, Wilmington, DE USA.

For
[*3] Apple Computer, DEFENDANT (01cv82): Frederick L Cottrell, III, Richards, Layton & Finger, Wilmington, DE USA.

For Korea Data Systems Co, Ltd, DEFENDANT (01cv82): Richard H Morse, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Envision Peripherals Inc, Top Victory Electronics (Taiwan) Co, Ltd, Aoc International, DEFENDANTS (01cv82): Richard D Kirk, Morris, James, Hitchens & Williams, Wilmington, DE USA.

For Necx Direct LLC, DEFENDANT (01cv82): Allen M Terrell, Jr, Richards, Layton & Finger, Wilmington, USA.

JUDGES: Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

OPINIONBY: Gregory M. Sleet

OPINION:

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On February 13, 2001, the plaintiffs, Elonex I.P. Holdings, Ltd. and EIP Licensing, B.V. (collectively "Elonex"), filed this action against certain companies that manufacture and sell computer systems or computer monitors. n1 The complaint alleges infringement of U.S. Patent Numbers 5,389,952 ("the '952 patent"), 5,648,799 ("the '799 patent"), and 5,649,719 ("the '719 patent"). The lawsuit relates to technology that concerns power management in computer monitors.

> n1 In December 1998, Elonex I.P. Holdings Ltd. and Elonex plc filed a related lawsuit against another group of defendants on substantially the same grounds ("Elonex Phase I litigation").

[*4]

On May 21, 2001, Elonex requested entry of default against the defendant Jean Co., Ltd. ("Jean"). The Clerk of the Court entered default against Jean on June 18, 2001. On January 31, 2003, Elonex then moved for entry of default judgment against Jean. On February 20, 2002, counsel entered an appearance on behalf of Jean.

Presently before the court is Jean's motion to dismiss for lack of personal jurisdiction. For the following reasons, the court will deny this motion.

### II. BACKGROUND

Jean is an international monitor and electronics manufacturer, with its principle place of business in Taipei, Taiwan. In 2001, Jean had more than $ 316 million in worldwide sales.

From March 1995 until April 1996, Elonex alleges that Jean shipped 404,855 monitors to the United States. Since 1998, ViewSonic Corporation and eMachines, Inc. -- two United States monitor companies with nationwide re-seller networks--have been among Jean's biggest customers. According to Jean's 1999 Annual Report, ViewSonic alone accounted for 22.91% of Jean's worldwide monitor sales in 1998. In 1999, ViewSonic purchased 30.4% of Jean's total 1999 monitor sales. In 2001, ViewSonic purchased 39.7% of Jean's total [*5] monitor sales. Likewise, in 1999, eMachines purchased 12.94% of Jean's worldwide monitor sales.

Additionally, both ViewSonic and eMachines have well-established retail distribution networks. ViewSonic monitors are available from retailers such as Best Buy, Office Depot, and CompUSA. Likewise, eMachines monitors are sold in Delaware at Best Buy, Office Depot, and Circuit City. Both ViewSonic and eMachines also sell monitors directly to consumers via their own internet websites. Thus, the Jean monitors sold to ViewSonic and eMachines are resold in Delaware and throughout the United States.

Furthermore, Delaware purchasers of Jean monitors

can download monitor software and obtain customer service via Jean's website. Visitors to the website can also download drivers for Jean monitors and obtain technical support via e-mail. Finally, Jean's website lists an "East Coast" service facility located in New Jersey.

## III. DISCUSSION

### A. Due Process

[HN1] The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "has certain minimum contacts with [the [*6] forum] state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe*, 326 U.S. 310, 316, 90 L. Ed 95, 66 S. Ct. 154 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 85 L. Ed. 278, 61 S. Ct. 339 (1940)). In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980). Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994).
[*7]

In *Beverly Hills Fan*, the Federal Circuit addressed the question of whether Ultec, a People's Republic of China corporation with a manufacturing facility in Taiwan, was subject to personal jurisdiction in Virginia. 21 F.3d at 1560. Ultec claimed that it was not subject to personal jurisdiction in Virginia because it did not have any Virginia assets, employees, or a license to do business in that state. *Id.* Acknowledging that Ultec's sole contact with the forum resulted from indirect shipments through the stream of commerce, the Federal Circuit held that Ultec "purposefully shipped the accused fans into Virginia through an established distribution channel The cause of action for patent infringement is alleged to rise out of these activities. No more is usually required to establish specific jurisdiction." *Id. at 1560, 1564-65.*

The court's decision in *Motorola Inc. v. PC-Tel, Inc.* is likewise instructive in resolving the present issue. 58 F. Supp. 2d 349 (D. Del. 1999). In that case, the court described the accused infringer's sales activities as follows:

> Altocom does not (and, it seems, cannot) contest the fact that its
>
> [*8] softmodems are integrated into a variety of consumer electronic products which are manufactured by well-known multi-national corporations like Compaq, Phillips, Samsung, Sharp, Song, and the like. These goods are then put into the world-wide distribution networks which place them for sale in equally well-known retail stores such as Caldor, Circuit City, CompUSA, Office-Max, Sears, Service Merchandise, and others -- all of which have outlets in Delaware.

58 F. Supp. 2d at 352. Relying on *Beverly Hills Fan*, the court rejected AltoCom's arguments and held that exercising personal jurisdiction comported with due process. *See id. at 355-56.*

In the present case, as in *Beverly Hills Fan*, Jean's president states in his declaration that Jean makes no direct sales to the United States. He further states that Jean has no United States offices or subsidiaries. However, the court concludes that Jean has, for many years, been the first link in precisely the kind of indirect distribution chain that the Federal Circuit found sufficient to establish personal jurisdiction. Specifically, Jean sells it monitors to ViewSonic and eMachines, who in turn distribute [*9] Jean's monitors to retailers with Delaware operations. Given ViewSonic's and eMachines' extensive re-reseller networks in Delaware and on the Internet, Jean cannot credibly claim it had no inkling that some of its monitors would make their way into Delaware via well-established distribution channels.

Jean further maintains an interactive website through which customers in Delaware, and elsewhere, can download driver software, as well as obtain customer support. On its website, it also lists "Global Service Centers," including an "East Coast" service facility in New Jersey. These facts further support the court's conclusion that Jean's undeniably substantial and regular monitor sales into ViewSonic's and eMachines' national distribution networks constitute "purposeful minimum contacts" with Delaware.

[HN2] Notwithstanding the existence of Jean's purposeful minimum contacts with this forum, the court must consider whether the "minimum requirements

inherent in the concept of 'fair play and substantial justice ...' defeat the reasonableness of [the assertion of] jurisdiction, even [if] the defendant has purposefully engaged in forum activities." *Asahi Metal Indust. Co. v. Superior Court, 480 U.S. 102, 116, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987).*

[*10] This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendants to litigation within the forum. *See Beverly Hills Fan, 21 F.3d at 1568.*

In the present case, Delaware clearly has a substantial interest in discouraging injuries in the state, including patent infringement injury. It has also been the sole forum for the Elonex Power Management Litigation for several years. Finally, and as the *Beverly Hills Fan* court noted, [HN3] "progress in communications and transportation" have made "the defense of a lawsuit in a foreign tribunal less burdensome." *21 F.3d at 1569* (internal quotation and citation omitted). Thus, the court concludes that any burden on Jean "is not sufficiently compelling to outweigh" Elonex's and Delaware's interests. *Id.*

### B. Delaware's Long-Arm Statute

The second step in the court's analysis into the propriety of subjecting Jean to personal jurisdiction in this forum is the determination of whether any of the provisions of Delaware's long-arm statute apply. *See* DEL.

[*11] CODE. ANN. tit. 10 § 3104. While Jean contends that it does not fall within the grasp of any of *Section 3104*'s provisions, Elonex contends that at least two of the provisions apply here. For purposes of this order, the court need only discuss one.

[HN4] Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who causes injury either inside or outside of this State "by an act or omission outside of the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." DEL. CODE. ANN. tit. 10, § 3104(c) (2001). n2 The court will interpret this language broadly, as reaching the "maximum parameters of the due process clause." *See Jeffreys v. Exten, 784 F. Supp. 146, 151 (D. Del. 1992).*

n2 This subsection provides general jurisdiction over the nonresident defendant. *See Mendelson v. Delaware River and Bay Auth., 56 F. Supp. 2d 436, 439 (D. Del. 1999).* Accordingly, it is immaterial whether the jurisdictional contact is related to the claim. *See id.*

[*12]

As discussed above in Section III A, Jean has intentionally sold monitors using nationwide distribution channels. This knowing and purposeful shipment of monitors satisfies the act requirement of *Section 3104(c)(4).* *See Beverly Hills Fan, 21 F.3d at 1571.* Because Jean undeniably derives substantial revenue from these activities, it is subject to jurisdiction under Delaware's long-arm statute. *See* Chang Decl. at PP 3-7 (discussing Jean's revenue from sales to ViewSonic and eMachines).

### C. Venue

Jean finally asserts that, pursuant to *28 U.S.C. § 1391(c),* venue is improper in this district. Jean's argument is meritless, however, because "the venue issue is subsumed in the personal jurisdiction issue. [HN5] Venue lies ipso facto if ... the district court has personal jurisdiction over [the defendant]." *North American Philips Corp. v. American Vending Sales, Inc., 35 F.3d 1576, 1577 n.1 (Fed. Cir. 1994); see also 28 U.S.C. § 1391(b)(1) & (c)* (stating that [HN6] venue is proper in a judicial district where the defendant corporation is subject to personal jurisdiction at the time the action is commenced).

[*13] As the court has already found that the exercise of personal jurisdiction is proper and complies with both due process and the Delaware long-arm statute, venue in this district is also proper.

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Jean's Motion to Dismiss (D.I. 856) is DENIED.

Dated: May 6, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE

M & L OF DELAWARE, INC., a Delaware corporation, Plaintiff, v. BENJAMIN
WALLACE and JOSEPH MALONE, DVM, Defendants.

Civil Action No. 03-521-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 21863

October 18, 2004, Decided

**DISPOSITION:** Malone's motion to dismiss was granted and Wallace's motion to dismiss was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a horse trainer and a veterinarian, moved to dismiss plaintiff horse owner's action for breach of contract, negligence, and trespass to chattels for lack of personal jurisdiction. The horse trainer also moved to dismiss the action for insufficient service of process.

**OVERVIEW:** The owner hired the trainer and agreed it have its horse shipped to Canada for training. The trainer decided that the horse should be castrated in order to improve its performance. The veterinarian performed the surgery in Canada. The owner brought an action against defendants to recover damages it allegedly suffered as a result of the castration. The veterinarian moved to dismiss for lack of personal jurisdiction. The trainer moved to dismiss for lack of personal jurisdiction and insufficient service of process. The court found that the trainer's horses took part in six races within the State of Delaware. The trainer held a racing license in Delaware. The trainer's actions in Delaware could be viewed as a kind of marketing because his actions in Delaware led the owner to contact him. No notions of fair play and substantial justice would be offended by requiring him to defend himself in Delaware. With respect to the veterinarian, the court found that, at the time of the incident, there were absolutely no contacts between him and Delaware. Finally, the court held that the trainer would not be unduly harmed by allowing the owner additional time to properly effect service of process.

**OUTCOME:** The court granted the veterinarian's motion to dismiss the action. The court denied the horse trainer's motions to dismiss the action.

**CORE TERMS:** horse, personal jurisdiction, long-arm, trainer, trained, website, motion to dismiss, process server, fair play, castration, comport, confer, training, surgery, license, transacting business, purposefully, interactive, marketing, watching, nexus, lack of personal jurisdiction, cause of action, horse trainer, accessible, advertise, serving, racing, raced, won

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN1] A plaintiff bears the burden of making a prima facie showing that the court has personal jurisdiction over the defendants. When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a prima facie case, with the record viewed in the light most favorable to the plaintiff.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN2] The determination of whether a defendant is subject to personal jurisdiction requires a two-part analysis. First, the court must determine whether the language of the Delaware long-arm statute, Del. Code Ann. tit. 10, § 3104(c), reaches the defendant. Second, if the court finds that the defendant's conduct gives rise to personal jurisdiction under the long-arm statute, the court must then determine whether subjecting the defendant to jurisdiction in Delaware would comport with the Due Process Clause of the Fourteenth Amendment.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*

[HN3] The Delaware long-arm statute is construed broadly to confer jurisdiction to the maximum extent possible under the Due Process Clause of the Fourteenth Amendment. Nevertheless, a court begins its analysis with the Delaware long-arm statute.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN4] See Del. Code Ann. tit. 10, § 3104(c)(1).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
[HN5] Delaware state courts interpret the "transacting business" provision of Del. Code Ann. tit. 10, § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Civil Procedure > Appeals > General Overview*
[HN6] Once it is determined that there is personal jurisdiction under the state long-arm statute, the court must look to ensure that the granting of specific personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. The United States Court of Appeals for the Third Circuit has held that foreseeability that the defendant's conduct would cause him to be hauled into court in the forum state is critical to the due process analysis. In particular, a defendant's deliberate attempt to enter, advertise, and promote itself can be sufficient to confer specific personal jurisdiction over the defendant. Even minimal marketing efforts are held sufficient to confer personal jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
[HN7] Once it is decided that a defendant purposefully established minimum contacts within the forum state, those contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice. The United States Court of Appeals for the Third Circuit has held that cases are rare in which minimum requirements in the concept of fair play and substantial

justice defeat the reasonableness of jurisdiction even though the defendant has purposefully engaged in forum activities.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview*
[HN8] Fed. R. Civ. P. 4(m) does not contain a time limit for serving foreign defendants.

COUNSEL:
   [*1]  For M & L OF DELAWARE, INC., A DELAWARE CORPORATION, Plaintiff: Adam L. Balick, Balick & Balick Wilmington, DE.

For BENJAMIN WALLACE, Defendant: Adam Wyatt Poff, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For JOSEPH MALONE, DVM, Defendant: Robert J. Katzenstein, Smith, Katzenstein, & Furlow, Wilmington, DE.

JUDGES: Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

OPINIONBY: Kent A. Jordan

OPINION:

MEMORANDUM ORDER

I. INTRODUCTION

   M & L of Delaware, Inc., a Delaware corporation ("M&L" or "Plaintiff") filed suit against Benjamin Wallace ("Wallace") and Joseph Malone, D.V.M. ("Malone") alleging breach of contract, negligence, and trespass to chattels in connection with the castration of Plaintiff's horse known as "Mr. Commander." Subject Matter Jurisdiction is invoked under 28 U.S.C. § 1331.

   On October 2, 2003, Malone filed a motion to dismiss M&L's complaint for lack of personal jurisdiction. (Docket Item "D.I." 5.) On December 3, 2003, Wallace filed a motion to dismiss M&L's complaint for lack of personal jurisdiction and insufficient service of process. For the reasons set forth below, Malone's motion to dismiss is granted and Wallace's
   [*2]  motion to dismiss is denied.

II. BACKGROUND

Plaintiff is a corporation involved with the breeding and racing of standardbred horses. (D.I. 22, Ex. A at 1.) Wallace is a horse trainer who has previously traveled to Delaware to race horses and has sent here horses he has trained. (D.I. 24 at 2.) Having seen Wallace's horses in Delaware on one of those occasions, representatives of the Plaintiff contacted Wallace by telephone on May 28, 2002 to discuss the possibility of Wallace training Mr. Commander. (D.I. 22, Ex. A at 2.) Shortly thereafter, the parties arranged to have Mr. Commander shipped to Ontario, Canada for training with Wallace. (*Id.*) After the horse arrived in Ontario, Wallace decided that, in order to improve the horse's performance, it should be castrated. (D.I. 19, Ex. A at 2.) He then called Malone, a veterinary doctor, and engaged his services to castrate Mr. Commander. (*Id.*) Malone performed the surgery in Ontario on June 6, 2002. (*Id.*) After learning of Mr. Commander's castration M&L, had the horse transferred to another trainer. (D.I. 22, Ex. A at 2.)

Wallace does not have a place of business in Delaware, nor does he advertise in Delaware or [*3] maintain a website. (D.I. 24 at 1, 5-6.) From 1999 through 2002, horses trained by Wallace raced in Delaware on six occasions. (D.I. 22, Ex. E.) Wallace personally attended two races in 1999; he did not attend the other above-mentioned races. (D.I. 24 at 2.) Horses trained by Wallace have won $ 62,397 in Delaware. (D.I. 22, Ex. E.) From at least 1999 through 2002, Wallace had a license to train horses in Delaware and has been listed as the trainer of record for horses he has sent here. (D.I. 24, Ex. A; D.I. 22, Ex. F at 41; D.I. 22, Ex. E.) Delaware law prohibits trainers from taking part in races without first obtaining a permit. (D.I. 22, Ex. Fat 41.)

While Malone has performed work for the Plaintiff and at one time was licensed as a Veterinarian in Delaware, that license lapsed in 2000, and, at the time he performed the surgery at issue, he had no ties to Delaware. (D.I. 11 at 4-5; D.I. 6, EX. 1.) Malone maintains a website that is accessible in Delaware. (D.I. 11, Ex D.) With respect to the surgery, Malone had no contact with the Plaintiff or anyone else in Delaware.

On May 30, 2003, Plaintiff filed a complaint against Wallace and Malone to recover damages it allegedly suffered [*4] as a result of Mr. Commander's castration. (D.I. 1.) In August of that year, Plaintiff attempted to serve Wallace in Ontario, however, this attempt did not satisfy the requirements for service under the Hague Convention for service in Canada. *See infra* at 7. Plaintiff maintains that it is now in the process of serving Wallace under the Hague Convention. (D.I. 22 at 9-20.)

## III. DISCUSSION

[HN1] The plaintiff bears the burden of making a *prima facie* showing that the court has personal jurisdiction over the defendants. *Intel Corp. v. Broadcom Corp., 167 F. Supp. 2d 692, 699 (D. Del. 2001).* When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a *prima facie* case, with the record viewed in the light most favorable to the plaintiff. *American Bio Medica Corp. v. Peninsula Drug Analysis Co., 1999 U.S. Dist. LEXIS 12455 at *5-6 (D. Del. Aug. 3, 1999); Siemens Aktiengesellschaft v. LG Semicon Co., Ltd., 69 F. Supp. 2d 622, 624 (D. Del. 1999).*

[HN2] The determination of whether a defendant is subject to personal jurisdiction requires a two-part analysis. *Broadcom, 167 F. Supp. 2d at 700*; [*5] *Siemens, 69 F. Supp. 2d at 624; Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 293 (3d Cir. 1985).* First, the court must determine whether the language of the Delaware long-arm statute, *10 Del. C. § 3104(c)*, reaches the defendant. *Broadcom, 167 F. Supp. 2d at 700.* Second, if the court finds that the defendant's conduct gives rise to personal jurisdiction under the long-arm statute, the court must then determine whether subjecting the defendant to jurisdiction in Delaware would comport with the Due Process Clause of the Fourteenth Amendment. *Id.* (citing *Intel Corp. v. Silicon Storage Tech., Inc., 20 F. Supp. 2d 690, 694 (D. Del. 1998)).*

[HN3] The Delaware long-arm statute has been construed "broadly...to confer jurisdiction to the maximum extent possible under the due process clause." *La Nuova D & B, S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986).* Nevertheless, the Court begins its analysis with the Delaware long-arm statute.

Pertinent portions of the Delaware long-arm statute provide:

> (c) [HN4] As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court [*6] may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> ***
>
> (1) Transacts any business or performs any character of work or service in the State;

*10 Del. C. §§ 3104(c)(1), (c)(3) & (c)(4).* [HN5] Delaware state courts have interpreted the "transacting business" provision of *§ 3104(c)(1)*

as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. *See La Nuova, 513 A.2d at 768.*

[HN6] Once it is determined that there is personal jurisdiction under the state long-arm statute, the court must look to ensure that the granting of specific personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. *Broadcom, 167 F. Supp. 2d at 700.* The Third Circuit has held that foreseeability that the defendant's conduct would cause him to be hauled into court in the forum state is critical to the due process analysis. *Id.* In particular, a "defendant's deliberate attempt to enter, advertise and promote itself" can be sufficient to confer specific personal jurisdiction over defendant. *United States Golf Ass. v. U.S. Amateur Golf Ass., 690 F. Supp. 317, 320 (D.N.J. 1988)* [*7] (holding that where a defendant has no connections to the state in question, a direct mail solicitation to the plaintiff was adequate to confer personal jurisdiction.) Even minimal marketing efforts have been held sufficient to confer personal jurisdiction. *See Clay v. Hopperton Nursery, Inc., 533 F. Supp. 476, 478 (D. Ky. 1982)* (holding that where a defendant advertised in a trade journal that had 152 subscribers in the state in question, and the plaintiff only vaguely recalled seeing the ad, the exercise of personal jurisdiction was nevertheless appropriate.)

[HN7] Once it has been decided that a defendant purposefully established minimum contacts within the forum State, those contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (U.S. 1985)* (internal citations omitted). The Third Circuit has held that cases are "rare . in which minimum requirements in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully [*8] engaged in forum activities." *Pennzoil Prods. Co. v. Colelli & Assocs., 149 F.3d 197, 207 (3d Cir. 1998)* (internal citations omitted).

A. Personal Jurisdiction of Wallace

Of note in this case, Wallace's horses took part in six races over a two and a half year period within Delaware. (D.I. 22, Ex. E.) As the trainer of record for these races, Wallace was prominently listed as the trainer of the horses in the U.S. Trotting Association Literature. (D.I. 22, Ex C-E.) For the privilege of training horses that competed in Delaware, Wallace had to, and did, obtain a racing license in Delaware. (D.I. 24, Ex. A at 1.) As Wallace is a seasoned horse trainer it is reasonable to assume that he was aware that his name would be listed and accessible by people watching races in Delaware. Consequently, it was foreseeable that people involved in the horse racing industry would watch the races in Delaware and contact Wallace, based, at least partially, on the performance of the horses he trained. In fact, from watching Wallace's trained horses excel at such races, Plaintiff decided to contact him and contract for his services. (D.I. 22, Ex A.) Wallace's efforts in Delaware can [*9] properly be viewed as a kind of marketing, and because Wallace's actions in Delaware led Plaintiff to contract with him and the alleged injury resulted from that contract, the necessary nexus is present under Delaware's long-arm statute section 3104(c)(1).

Notions of fair play and substantial justice will not be offended by requiring Wallace to defend himself here. He has trained horses that have won a more than *de minimis* sum in Delaware (D.I. 22, Ex. E), and as the trainer of record his compensation is derived from the horses winnings in Delaware. Additionally, as earlier noted, Wallace was listed as the trainer of the horses that raced here and acquired name recognition among race enthusiasts, including Plaintiff. Consequently, Wallace can fairly be haled into court in Delaware. I therefore hold that this court has personal jurisdiction over Wallace.

B. Personal Jurisdiction of Dr. Malone

With respect to Dr. Malone, at the time of the incident there were absolutely no contacts between him and Delaware. The Plaintiff argues that Dr. Malone's professional relationship with Plaintiff, maintenance of his website, and his professional obligation to obtain informed consent [*10] before castrating Mr. Commander constitute the minimum contacts necessary to support a finding of personal jurisdiction over Dr. Malone. (D.I. 11 at 8-9.) None of these acts are fairly seen as having occurred in Delaware or having arisen from acts occurring in Delaware, and as such, none of them can be used to establish personal jurisdiction. n1 *See La Nuova, 513 A.2d at 768.* Therefore, I hold that the court lacks

personal jurisdiction over Malone.

> n1 The website is not alleged to be interactive or to otherwise be a vehicle for transacting business in Delaware. *See Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 454-55 (3d Cir. 2003)* (holding that the operator of a commercially interactive website, without specifically directing its selling towards the residents of the forum in question, is not subject to jurisdiction there.)

C. Wallace's Service of Process

Lastly, Wallace argues that he was not properly served under the Hague Convention and that the complaint against [*11] him should therefore be dismissed. (D.I. 19 at 12.) On October 21, 2003, a process server delivered the Summons, Complaint and Civil Coversheet to Wallace, who signed that he had received the documents. (D.I. 22, Ex. J.) This service is insufficient under the Hague Convention. n2 (D.I. 24, Ex. L.) [HN8] Federal Rule of Civil Procedure 4(m), however, does not contain a time limit for serving foreign defendants. Additionally, Wallace is aware of this litigation, as he has submitted briefs to this court opposing personal jurisdiction. Therefore, I find that Wallace is not unduly harmed by allowing

Plaintiff additional time to properly effect service of process.

> n2 The Hague Convention requires that all documents be forwarded to Canada's central process server. *See* HAGUE CONVENTION ON SERVICE ABROAD OF JUDICIAL AND EXTRA JUDICIAL DOCUMENTS IN CIVIL AND COMMERCIAL MATTERS, LEXIS 20 U.S.T. 361, 16-18 (1969). In this case the documents were not delivered through the central process server, and, consequently, service was not effective.

[*12]

IV. CONCLUSION

Therefore, it is hereby ORDERED that Defendant Benjamin Wallace's Motion to Dismiss (D.I. 18) is DENIED, and Defendant Joseph Malone, D.V.M.'s Motion to Dismiss (D.I. 5) is GRANTED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

October 18, 2004
Wilmington, Delaware

LEXSEE

**McNEIL NUTRITIONALS, LLC, Plaintiff, v. THE SUGAR ASSOCIATION, et al., Defendants.**

**C.A. No. 05-69 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2005 U.S. Dist. LEXIS 7628**

**April 29, 2005, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a distributor of a sugar substitute, sued defendants, a sugar association, its member companies, a sugarbeet association, and a public relations firm, alleging a violation of § 43(a) of the Lanham Act, 15 U.S.C.S. § 1125(a), and violations of Delaware's trade practices and unfair competition laws. Defendants moved to dismiss, alleging that the court lacked personal jurisdiction over 15 of the 20 defendants.

**OVERVIEW:** Thirteen of the 17 member companies disavowed any direct contacts with Delaware or participation in the statements that appeared on the sugar association's website about which plaintiff complained. However, the 13 companies were listed on the website, and while the court was not prepared to say that was enough to establish personal jurisdiction, such proof was some indication that the member companies were amenable to suit, and it was enough to allow plaintiff to take limited and appropriate jurisdictional discovery from the 13 objecting member companies. Although a closer question, the fact that the website verified that the sugarbeet association had four representatives on the sugar association's board was enough to permit limited jurisdictional discovery to be taken from it as well. Finally, as for the public relations firm, the evidence suggested that besides setting up the website, it sent information regarding the product to a Delaware reporter, and held itself out as a contact point. While those acts may have been insufficient to establish personal jurisdiction, they were sufficient to permit limited discovery from the firm.

**OUTCOME:** The court denied the motion to dismiss and ruled that plaintiff would be permitted to take limited and appropriate jurisdictional discovery from all 15 defendants that challenged the court's personal jurisdiction.

**CORE TERMS:** sugar, website, discovery, jurisdictional, personal jurisdiction, sucralose, amenable, board of directors, scientific affairs, public education, public policy, growers, internet, campaign, excerpt, staff, objecting, exercise personal jurisdiction, present action, defendant-company, accessible, frivolous, comprised, reporter, residents, producers

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Discovery > Relevance*
[HN1] Although a plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is clearly frivolous. Thus, resolution of a motion to dismiss begins with the presumption in favor of allowing discovery to establish personal jurisdiction. However, the court must be satisfied that there is some indication that the particular defendants are amenable to suit in the forum. For example, a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery. Likewise, a mere unsupported allegation that a defendant transacts business in an area is clearly frivolous. Rather, there must be some competent evidence to demonstrate that personal jurisdiction over a defendant might exist before allowing discovery to proceed.

**COUNSEL:**
[*1] For McNeil Nutritionals LLC, Plaintiff: John G. Day, Steven J. Balick, Ashby & Geddes, Wilmington, DE; Sarah Elizabeth DiLuzio, Potter Anderson & Corroon, LLP, Wilmington, DE.

For The Sugar Association, The Amalgamated Sugar Company, American Crystal Sugar Company, American Sugar Cane League, American Sugar Refining Inc., Atlantic Sugar Hawaiian Sugar & Transportation Cooperative, Imperial Sugar Company, Michigan Sugar Company, Minn-Dak Farmers Cooperative, Okeelanta Corporation, Osceola Farms Company, Rio Grande Valley Sugar Growers Inc., Southern Minnesota Beet Sugar Cooperative, Sugar Cane Growers Cooperative of Florida, United States Sugar Corporation, Western Sugar Cooperative, Wyoming Sugar LLC, American Sugarbeet Growers Association, Qorvis Communications LLC, Defendants: Sarah Elizabeth DiLuzio, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM

### I. INTRODUCTION

On February 8, 2005, plaintiff McNeil Nutritionals, LLC ("McNeil") brought the present action against The Sugar Association, The Sugar Association's seventeen member companies, n1 the American [*2] Sugarbeet Growers Association, and Qorvis Communications, LLC ("Qorvis"). The complaint alleges one count of false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1998), one count of deceptive trade practices in violation of the Delaware Uniform Deceptive Trade Practices Act, Del. Code Ann. tit. 6, §§ 2531 et seq., and one count of unfair competition and product disparagement in violation of Delaware common law. (D.I. 1 PP 60-71.) On March 25, 2005, a Motion to Dismiss was filed on behalf of all twenty defendants, in which it is argued (among other things) that the court does not have personal jurisdiction over fifteen of the defendants. (D.I. 28.) McNeil responded with a Motion for Enlargement of Briefing Schedule in Order to Permit Discovery Necessary to Respond to Motion to Dismiss. (D.I. 30.) For the following reasons, the court will grant McNeil's motion and permit limited and appropriate jurisdictional discovery.

n1 The Sugar Association's seventeen member companies include: The Amalgamated Sugar Co., American Crystal Sugar Co., American Sugar Cane League, American Sugar Refining, Inc., Atlantic Sugar Ass'n, Hawaiian

Sugar & Transportation Coop., Imperial Sugar Co., Michigan Sugar Co., Minn-Dak Farmers Coop., Okeelanta Corp., Osceola Farms Co., Rio Grande Valley Sugar Growers, Inc., Southern Minnesota Beet Sugar Coop., Sugar Cane Growers Coop. of Florida, United States Sugar Corp., Western Sugar Coop., and Wyoming Sugar Co.

[*3]

### II. DISCUSSION

The Sugar Association is a Delaware non-profit corporation (D.I. 28 Ex. C P 1), comprising seventeen member companies who are "producers and growers of sugar in the United States" (D.I. 34 Ex. 3). Its stated mission is "educating health professionals, media, government officials, and the public about sugar's goodness." (Id.) McNeil, on the other hand, is a Delaware limited liability company that markets products containing the no-calorie sweetener sucralose, which is sold under the name Splenda. (D.I. 1 P 3.) Obviously, sugar and Splenda are competing products. McNeil alleges that a decrease in sugar consumption in recent years (id. P 37) has led The Sugar Association to mount "a false and malicious smear campaign" against Splenda through press statements and internet websites, including The Sugar Association's "Truth About Splenda" website (id. PP 1-2; see also id. PP 41-55). Consequently, McNeil brought the present action against The Sugar Association and nineteen others. As mentioned above, the twenty defendants include The Sugar Association, its seventeen member companies, the American Sugarbeet Growers [*4] Association, and Qorvis. Of those twenty, thirteen member companies, the American Sugarbeet Growers Association, and Qorvis argue that they do not have sufficient contacts with Delaware for the court to exercise personal jurisdiction over them in this matter. Rather than answering the defendants' contentions, McNeil argues it should be permitted to engage in limited jurisdictional discovery.

[HN1] "Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003) (internal citations omitted). "Thus, resolution of this motion begins with the presumption in favor of allowing discovery to establish personal jurisdiction." Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474 (D. Del. Oct. 5, 1995). However, "the court must be satisfied that there is some indication that [these] particular defendant[s] [are] amenable to suit in this forum." Id. at 475. For example, "a plaintiff may not

Page 2

rely on the bare allegations in [*5] his complaint to warrant further discovery." *Id.* at 476. Likewise, "a mere unsupported allegation that [a] defendant 'transacts business' in an area is 'clearly frivolous.'" *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir. 1997). *See also B.L. Poe v. Babcock Int'l,* 662 F. Supp. 4, 7 (M.D. Pa. Mar. 14, 1985) ("Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."). Rather, "there must be *some* competent evidence to demonstrate that personal jurisdiction over [a] defendant might exist before allowing discovery to proceed." *Hansen,* 163 F.R.D. at 475. *See also Impact Labs, Inc. v. X-Rayworld.com, Inc.,* 2003 U.S. Dist. LEXIS 12700, No. 03-211-GMS, 2003 WL 21715872, at *3 (D. Del. July 24, 2003) (permitting jurisdictional discovery on the basis of an affidavit merely reflecting that a defendant-company's President and CEO held out the defendant-company's [*6] principal place of business as Delaware).

## A. The Thirteen Member Companies

The thirteen member companies n2 objecting to personal jurisdiction disavow (by individual affidavits) the notion that they have any direct contacts with Delaware. n3 (See D.I. 28 Exs. D-P.) Furthermore, The Sugar Association's President and CEO, Andrew C. Briscoe III, asserts in his affidavit ("the Briscoe affidavit") that The Sugar Association did not obtain either "approval" or "specific approval" from board members or member companies in issuing the various statements complained of in McNeil's complaint. (D.I. 28 Ex. C PP 8-12.) Therefore, the defendants argue, "McNeil should be required to make a preliminary showing that the individual Members were involved in determining the content of the 'Truth About Splenda' website or engaged in other activity generically charged in the complaint before this Court permits discovery." (D.I. 31 at 3.)

n3 One exception is Imperial Sugar Co., a Texas corporation. Imperial Sugar admits to (1) deriving less than 0.1% of its revenue in Delaware, (2) selling to Delaware customers over the internet, and (3) filing for Chapter 11 protection in Delaware in 2001, which was allegedly resolved within that same year. (D.I. 28 Ex. H.)

[*7]

n2 These thirteen companies include: American Crystal Sugar Co., American Sugar Cane League, Atlantic Sugar Ass'n, Hawaiian Sugar & Transportation Coop., Imperial Sugar Co., Michigan Sugar Co., Minn-Dak Farmers Coop., Osceola Farms Co., Rio Grande Valley Sugar Growers, Inc., Southern Minnesota Beet Sugar Coop., Sugar Cane Growers Coop. of Florida, Western Sugar Coop., and Wyoming Sugar Co.

McNeil responds by pointing to the following statement on The Sugar Association's website, on a page entitled "Who We Are":

The Sugar Association's member companies are producers and growers of sugar in the United States. The Board of Directors is comprised of decision-making representatives from each of these companies or organizations. . . . Three advisory committees *comprised of member company staff* help guide the direction of Public Policy, Public Education, and Scientific Affairs for the Association.

(D.I. 34 Ex. 3 (emphasis added).) n4 Furthermore, each of the thirteen objecting member companies is listed on the website as either (or both) a board member or a member company. [*8] Of course, it is well established that a defendant's mere "status as a stockholder and officer of a Delaware corporation is an insufficient basis for the court to exercise personal jurisdiction over him pursuant to [the long-arm statute]." *Impact Labs,* 2003 U.S. Dist. LEXIS 12700, 2003 WL 21715872, at *2. However, McNeil's theory of jurisdiction is that the member companies are (1) "acting under the guise of a Delaware corporation (the [Sugar] Association)," (2) "to falsely attack and disparage a product sold by a Delaware limited liability company (McNeil)," and (3) "thereby causing economic injury in the State of Delaware." (D.I. 33 at 8.) Although the court is not prepared at this juncture to hold that proof of these three assertions would necessarily establish personal jurisdiction, such proof would at least constitute "some indication" that the member companies are amenable to suit in Delaware. Indeed, the website's assertion that staff from member companies help to guide public policy, public education, and scientific affairs of The Sugar Association certainly gives evidentiary credence, albeit thinly, to McNeil's jurisdictional theory. Moreover, the excerpt satisfies the defendants' [*9] demand that McNeil make a preliminary showing as to the member companies' involvement in "The Truth About Splenda" website or other activities charged in the complaint. Therefore, the court will permit McNeil to

take limited and appropriate jurisdictional discovery from the thirteen objecting member companies.

n4 Excerpts from The Sugar Association's website were submitted as part of the affidavit of McNeil's counsel, Steven A. Zalesin. (D.I. 34.) The court notes that The Sugar Association's website is separate from the "Truth About Splenda" website, excerpts of which were also submitted as part of Zalesin's affidavit.

## B. The American Sugarbeet Growers Association

According to the Briscoe affidavit, the American Sugarbeet Growers Association is not a member of The Sugar Association. (D.I. 28 Ex. C P 7.) Instead, it allegedly "facilitates the selection" of four sugarbeet growers to sit on The Sugar Association's board of directors in an advisory capacity only. (Id.) Furthermore, Luther Markwart, [*10] Executive Vice President of the American Sugarbeet Growers Association, submitted an affidavit in which he asserts that the advisory board members representing his organization have "no authority to approve any policy, actions, or financial obligations taken by the Sugar Association." (D.I. 28 Ex. Q P 18.) Markwart also denies any contacts between his organization and Delaware. (D.I. 28 Ex. Q.) The only other evidence regarding the American Sugarbeet Growers Association that the court can find is in the website excerpt provided by McNeil, which merely verifies that the organization has four representatives on The Sugar Association's board of directors. (D.I. 34 Ex. 3.)

The question of whether to permit jurisdictional discovery with regard to this defendant is a closer case. The dispositive evidence regarding the member companies is the website's statement that staff from *member* companies help to guide the direction of public policy, public education, and scientific affairs for The Sugar Association. Yet, it is undisputed that the American Sugarbeet Growers Association is *not* a member company. Were the court to strictly construe the website's language, the evidence [*11] would be inapposite. However, taking notice of the fact that statements on the internet are often written without the same precise intent as are, say, claims in a patent, and recalling the presumption in favor of permitting jurisdictional discovery, the court is convinced that the evidence presented by McNeil is sufficient to permit limited and appropriate jurisdictional discovery to be taken from the American Sugarbeet Growers Association as well.

## C. Qorvis

Qorvis is allegedly a public relations firm that aids The Sugar Association in promoting its "education program about the chemical sucralose." (D.I. 28 Ex. R P 19.) But according to the affidavit of Michael Petruzello, Qorvis' Managing Partner, the "Truth About Splenda" website "was designed and is maintained by Qorvis' web designer in Virginia." (Id.) Petruzello further asserts that the "website, which is not targeted at Delaware or its residents, does not advertise Qorvis' services, allow visitors to contract for Qorvis' services, offer any products or services for sale, solicit donations of any kind, or generate revenues for Qorvis." (Id.) The only contact with Delaware admitted by Qorvis in connection with its work [*12] for The Sugar Association is the sending of one postcard, out of five to ten thousand sent as part of a national mailing campaign regarding sucralose, to a health reporter for the Wilmington News Journal in New Castle, Delaware. (Id. P 16.) Qorvis also maintains a website accessible from Delaware, but it "is not commercially interactive and cannot be used to conduct commercial activities with Delaware residents." (Id. P 17.) Qorvis' other admitted contacts with Delaware are relatively insignificant and unrelated to the present litigation. However, Petruzello's affidavit fails to mention that the "Truth About Splenda" website contains the following invitation: "For more information about the 'Truth About Splenda' campaign or to get involved, please contact Rich Masters at Qorvis Communications. . . ." The sentence continues by offering Masters' contact information, including his telephone number and email address. (D.I. 34 Ex. 1.)

In their motion to dismiss, the defendants argue that the mere ownership or maintenance of a passive website accessible in Delaware does not render Qorvis amenable to suit in this jurisdiction. (D.I. 28 at 19.) Here, [*13] however, the evidence suggests Qorvis has done more than that. In addition to creating and maintaining the "Truth About Splenda" website for a Delaware corporation, Qorvis sent information regarding sucralose to a Delaware reporter, and held itself out as the point of contact for anyone interested in learning about or becoming involved with the campaign of a Delaware corporation. While these acts may or may not ultimately be sufficient to establish personal jurisdiction, they certainly give "some indication" that Qorvis is amenable to suit in Delaware. Thus, McNeil will be permitted to take limited and appropriate jurisdictional discovery from Qorvis.

## III. CONCLUSION

For the aforementioned reasons, McNeill will be permitted to take limited and appropriate jurisdictional

discovery from all fifteen above-mentioned defendants.

Dated: April 29, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

IT IS HEREBY ORDERED THAT:

1. McNeil Nutritionals, LLC's ("McNeil") Motion for Enlargement (D.I. 30) be GRANTED;

2. McNeil be permitted to take limited and appropriate jurisdictional discovery from the following fifteen defendants: American

 [*14] Crystal Sugar Co., American Sugar Cane League, Atlantic Sugar Ass'n, Hawaiian Sugar & Transportation Coop., Imperial Sugar Co., Michigan Sugar Co., Minn-Dak Farmers Coop., Osceola Farms Co., Rio Grande Valley Sugar Growers, Inc., Southern Minnesota Beet Sugar Coop., Sugar Cane Growers Coop. of Florida, Western Sugar Coop., Wyoming Sugar Co., the American Sugarbeet Growers Association, and Qorvis Communications, LLC;

3. McNeil shall answer the defendants' Motion to Dismiss (D.I. 28) by July 29, 2005; and

4. The defendants shall reply to McNeil's answer in the time provided by the Local Rules.

Dated: April 29, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

5 of 5 DOCUMENTS

**PADCOM, INC., Plaintiff, v. NETMOTION WIRELESS, INC. and DATABASE SOLUTIONS, INC., Defendants.**

**Civ. No. 03-983-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2004 U.S. Dist. LEXIS 9658**

**May 24, 2004, Decided**

**SUBSEQUENT HISTORY:** Summary judgment denied by Padcom, Inc. v. Netmotion Wireless, Inc., 2006 U.S. Dist. LEXIS 6548 (D. Del., Feb. 22, 2006)

**DISPOSITION:** [*1] Defendants' motion to dismiss and to transfer denied.

**COUNSEL:** Josy W. Ingersoll, Esquire, John W. Shaw, Esquire, and Adam W. Poff, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Of Counsel: Neil F. Greenblum, Esquire, Van C. Ernest, Esquire and Jill M. Browning, Esquire of Greenblum & Bernstein, P.L.C., Reston, Virginia.

Mary B. Graham, Esquire and James W. Parrett, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. Of Counsel: John Allcock, Esquire, M. Elizabeth Day, Esquire, William G. Goldman, Esquire and Michael G. Schwartz, Esquire of Gray, Cary Ware & Freidenrich, LLP, Palo Alto, California.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

MEMORANDUM OPINION

Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

On October 26, 2003, plaintiff Padcom Inc. ("Padcom") filed this patent action alleging infringement of its United States Patent Nos. 6,418,324 ("the '324 patent") and 6,198,920 ("the '920 patent") by defendants NetMotion Wireless, Inc. ("NetMotion") and Database Solutions, Inc. ("DSI"). (D.I. 1) Padcom also contends that NetMotion intentionally and wrongfully interfered with [*2] contractual and business relations with potential customers.

NetMotion has moved to dismiss based on lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) and improper venue under Fed. R. 12(b)(3). (D.I. 9) DSI has moved to transfer the remaining portion of the litigation to the Northern District of California pursuant to 28 U.S.C. § 1404(a). n1 Alternatively, if the court dismisses NetMotion and declines to transfer the case against DSI, defendants move to stay this action pending resolution of the California case. Padcom opposes the motion (D.I. 23, 24) and defendants' have filed their reply. (D.I. 27, 28)

n1 On November 7, 2003, NetMotion and DSI filed a declaratory action in the Northern District of California mirroring the issues raised in this action. By order and stipulation dated December 10, 2003, the California action was stayed pending resolution of this first-filed action. NetMotion Wireless, Inc. v. Padcom, Inc., 03-cv-04963-MMC, (N.D. Ca. 2003)(D.I. 12). A case management conference is scheduled for June 18, 2004. (Id., D.I. 19)

[*3]

**II. BACKGROUND**

**A. The parties**

Padcom is a Pennsylvania corporation with its principal place of business in Bethlehem, Pennsylvania. Founded in 1989, Padcom is in the business of developing, making, licensing, selling and servicing software and hardware products that enhance connectivity for

wireless network uses. (D.I. 1) The patent-in-suit relate to wireless communications and data transfers between remote devises and host systems. (D.I. 10)

NetMotion is a corporation organized under the laws of Washington with a principal place of business in Seattle, Washington. (D.I. 11) NetMotion is in the business of designing, developing and selling mobility software. Mobility software is client/server based software that extends the enterprise network to the mobile environment and allows mobile users on both wide area and local area networks secure access to the enterprise application and information. (D.I. 10) NetMotion's corporate office, research and development facility, and engineering, sales, marketing and manufacturing facilities are all located in Seattle. Of NetMotion's 53 employees, 46 reside in Washington. The other seven employees reside in Ohio, Pennsylvania, Florida, [*4] Georgia, Texas, California and Illinois. (D.I. 11) NetMotion maintains and supports a web site in Washington. The web site provides: 1) company and product information; 2) partner information; and 3) download information. None of NetMotion's products are available for purchase through its website; however, free trial versions of NetMotion's software are available for download from the web site. (D.I. 12)

On February 2, 2001, a predecessor of NetMotion, WRQ, Inc., entered into a Value Added Reseller ("VAR") agreement with DSI. (D.I. 11, Ex. A) DSI is a Delaware corporation with its principal place of business in Cherry Hill, New Jersey. (D.I. 13) DSI does not have an office in Delaware. DSI is in the business of providing integrated enterprise applications, databases and network solutions. DSI is a reseller of NetMotion products, however, DSI has never used, manufactured, sold or offered for sale any NetMotion product in Delaware or elsewhere. D.I. 13 P 6) Pursuant to the VAR agreement, NetMotion has agreed to indemnify DSI.

### III. STANDARD OF REVIEW

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court [*5] may dismiss a suit for lack of jurisdiction over the person. According to the United States Supreme Court,

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

Omni Capital Int'l v. Rudolf Wolff & Co., 484 U.S. 97, 104, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987). The principle pronounced above is traditionally described as a two-step analysis: First, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendant's right to due process.

Rule 4(e)(1) of the Federal Rules of Civil Procedure states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed broadly to confer jurisdiction to the maximum extent possible under the due [*6] process clause. n2 LaNuova D & B S.p.A. v. Bowe Co. Inc., 513 A.2d 764, 768 (Del. 1986).

> n2 According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995). The Court has instructed that, "in interpreting the meaning of state long-arm statutes, we defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1386 (Fed. Cir. 1998). The court acknowledges that the Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the constitutional due process analysis, as some courts have done.

[*7]

However, since the Delaware Supreme Court has not determined that § 3104(c) is coextensive with federal due process, the court must determine whether the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendant's constitutional rights to due process. Intel Corp. v. Silicon Storage Tech., Inc., 20 F. Supp. 2d 690, 694 (D. Del. 1998); see generally, Int'l Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945).

Once a jurisdictional defense is raised, the burden is on the plaintiff to demonstrate with reasonable particularity that sufficient minimum contacts have occurred

with between the forum state and defendant to support jurisdiction. n3 Provident National Bank v. California Federal Savings & Loan Assoc., 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiff must demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities within the forum state. In contrast, general jurisdiction does not require that the defendant's connections be related [*8] to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state. American Bio Medica Corp. v. Peninsula Drug Analysis Co., 1999 U.S. Dist. LEXIS 12455, Civ. No. 99-218-SLR, 1999 WL 615175 (D. Del. 1999).

> n3 The record reflects that the parties have engaged in limited jurisdictional discovery. (D.I. 24, Ex. A, Ex. B)

The Delaware long-arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent:

> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply services or things in this State;
> (3) Causes tortious injury in the State by an act or omission in this State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the [*9] State;
> (5) Has an interest in, uses or possesses real property in the State; or
> (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

10 Del. C. § 3104(c). The above provisions have been construed "liberally so as to provide jurisdiction to the maximum extent possible" in order "to provide residents a means of redress against those not subject to personal service within the State." Boone v. Oy Partek Ab, 724 A.2d 1150, 1156-57 (Del. Super. 1997).

## IV. DISCUSSION

NetMotion argues that its contacts with Delaware are too attenuated to establish either specific or general jurisdiction under Delaware's long-arm statute. (D.I. 10)

Padcom asserts that NetMotion is subject to jurisdiction under three sections of the Delaware long-arm statute: § 3104(c)(1), (c)(4) and (c)(3). Padcom argues that § 3104(c)(1) and (c)(4), confer jurisdiction because NetMotion has repeatedly transacted and solicited business in Delaware. Specifically: (1) NetMotion shipped an [*10] infringing product to the Wilmington Police Department to enable them to evaluate the product in anticipation of a sale; (2) NetMotion has contacted Delaware residents by mail, email and telemarketing, either cold calling or in response to inquiries about the product; and (3) NetMotion operates a national interactive web site.

In opposition, NetMotion presents the affidavit of its CFO, Bob Colliton. (D.I. 12, 28) Colliton avers:

> NetMotion maintains and supports a web site in the state of Washington, but none of NetMotion's products are available for purchase through NetMotion's web site. NetMotion's web site offers free trial down-loads of its software, as well as white papers that outline the capabilities of NetMotion's software products.
> NetMotion has not contacted or otherwise engaged any company in Delaware to download a free trial version of NetMotion's software. NetMotion is aware of one trial download of its software from an entity in Delaware - the Wilmington Police Department. This download was not the result of any targeted or direct marketing on the part of NetMotion. Instead, the Wilmington Police Department was directed to NetMotion's web site through an offer [*11] that Hewlett-Packard included in the purchase of certain models of their iPAQ products. In particular, Hewlett-Packard included marketing information on a number of third party products on the installation CD for the iPAC. NetMotion was one of the wireless companies that Hewlett-Packard chose to include product information about, with a link to NetMotion's web site for a free trial version of the software. At no time prior to or after

this download has any employee contacted the Wilmington Police Department. NetMotion's advertising strategy is national in nature. It is not directed to any particular region, state or company. On occasion, NetMotion has utilized the services of a third party telemarketing organization to obtain information regarding potential customers. Prospective customers in Delaware may have been contacted by this third party organization.

(D.I. 12) He states further that NetMotion has never used, sold, manufactured or offered for sale an accused product in Delaware. In his reply declaration, however, Colliton does acknowledge that in January 2004, NetMotion electronically transmitted its Mobility Connection Newsletter nationwide. Over 12,000 received this [*12] material, including 23 entities in Delaware. Nonetheless, Colliton indicates that no revenue was received from the 23 emails. Padcom responds that it is unnecessary to consummate a sale for jurisdictional purposes. American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc., 1999 U.S. Dist. LEXIS 12455, Civ. No. 99-218-SLR, 1999 WL 615175 (D. Del. 1999). Padcom maintains that NetMotion's activities are part of a general business plan to solicit business in Delaware.

The Delaware Supreme Court has interpreted § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. LaNuova D & B S.p.A. v. Bowe Co., 513 A.2d at 768. Section 3104(c)(4) is a general jurisdiction provision that allows the defendants contacts with the forum state to be unrelated to the cause of action. The Federal Circuit has found that when a defendant has "purposefully shipped the accused [product] into [the forum state] through an established distribution channel no more is usually required to establish specific jurisdiction." Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564 (Fed. Cir. 1994). [*13]

The record reflects that NetMotion made trial versions of products available on its web site for downloading by consumers located anywhere. There is no evidence of any restrictions on location of the download. NetMotion likewise placed its products into the stream of commerce by allowing Hewlett-Packard to include marketing information about NetMotion with a link to a free trial version of its software and a link NetMotion couches the relationship with Hewlett-Packard as one-sided, i.e., "Hewlett-Packard chose to include product information", the court interprets this as a mutually beneficial agreement.

The Third Circuit Court of Appeals recently explored the contacts necessary for a court to have specific jurisdiction over a defendant based on the operation of a web site. Toys "R" Us, Inc., v. Step Two, S.A., 318 F.3d 446 (3d Cir. 2003). In so doing, the Court acknowledged the traditional jurisdictional rules have to be adjusted to account for new factual scenarios created by the Internet.

> Under traditional jurisdictional analysis, the exercise of specific personal jurisdiction requires that the "plaintiff's cause of action is related to or arises out [*14] of the defendant's contacts with the forum." Beyond this basic nexus, for a finding of specific personal jurisdiction, the Due Process Clause of the Fifth Amendment requires (1) that the "defendant have constitutionally sufficient minimum contacts with the forum," and (2) that "subjecting the defendant to the court's jurisdiction comports with traditional notions of fair play and substantial justice,"

Id. at 451 (citations omitted); see also, Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997) (sliding scale analysis for personal jurisdictional issues in web site cases).

The Third Circuit's test is whether the defendant "intentionally and knowingly transacted business with residents of the forum state, and had significant other contacts with the forum besides those generated by its web site." Toys "R" Us, 318 F.3d at 453. There, the Court considered a trademark infringement and unfair competition action filed pursuant to the Lanham Act, 15 U.S.C. § 1501 et seq., and New Jersey state law. The defendant was a Spanish corporation that owns or franchises toy stores in Spain and [*15] nine other countries but none in the United States. The defendant lacked any offices, bank accounts or employees in the United States. Further, the defendant did not direct any advertising or marketing efforts in the United States. The record did reflect that some merchandise for defendant's stores was purchased in the United States. From defendant's Internet web site, consumers could make online purchases; however, the site clearly was intended for users outside of the United States. For example, the price of items was noted in Spanish pesetas and Euros and goods ordered from the site could only be shipped within Spain. The electronic newsletter could be received by anyone with the only requirement being name and email address. In reversing and remanding to the district court on the issue of jurisdictional discovery, n4 the Third Circuit recognized that

the record was too limited to provide an "occasion to spell out the exact mix of Internet and non-Internet contacts required to support an exercise of personal jurisdiction [,instead,] that determination should be made on a case-by-case basis by assessing the 'nature and quality of the contacts.'" Id. at 453; (quoting [*16] Zippo, 952 F. Supp. at 1127). Non-Internet factors that a district court should consider are: business trips to the forum state; telephone and fax communications directed to the forum state; purchase contracts with forum state residents; contracts that apply the law of the forum state; and advertisements in local newspapers. Toys "R" Us, 318 F.3d at 453-454. Other relevant evidence that might support the exercise of personal jurisdiction is that the defendant purposely and knowingly conducted business in the forum state by directly targeting its web site to the state. Id. at 454.

> n4 The district court denied plaintiff the opportunity to conduct jurisdictional discovery to address the defendant's motion attacking jurisdiction.

In light of this authority, the court finds that NetMotion knowingly conducted business with Delaware residents. Discovery has revealed that the Wilmington Police Department at least tried to use the free trial download of NetMotion's mobility [*17] software. (D.I. 24, Ex. G) The emails between the Wilmington Police Department reflect correspondence directed to correct problems associated with the use of the trial program in order to persuade the user to purchase the alleged infringing product. (Id.)

Using a third party telemarketer, NetMotion contacted Delaware businesses to solicit business and purchases. NetMotion selected seven Delaware entities n5 for contact by a third party telemarketer in the summer of 2003. (D.I. 24, Ex. A, pgs. 61-64) Additionally, NetMotion specifically targeted Delaware health care facilities. n6 NetMotion also mailed promotional materials to a targeted market of public safety organizations. n7 The documents were mailed to provide information about the products to encourage purchase. (D.I. 24, Ex. A, pgs. 44-45) If NetMotion did not intend to have Delaware residents as clients, it could have specifically excluded them from tele-marketers and their direct calling list. The fact that the marketing program did not generate sales belie the fact that attempts were made in Delaware, with knowledge and purpose, to do business.

> n5 The entities were: Dover Police Department, Industrial Affairs Division, Laurel Volun-

teer Fire Department, New Castle County Police Department, Newark Police-Traffic Division, Delaware State Police, Wilmington Police Department. (D.I. 24, Ex. A p. 61, Ex. K)

[*18]

> n6 Alfred I. Dupont Hospital, Bayhealth Medical Center at Kent, Beebe Medical Center, Christiana Hospital, Delaware Hospital-Chronically Ill, Delaware Psychiatric Center, Milford Memorial Hospital, Nanticoke Memorial Hospital, Riverside Health Care Center, Saint Francis Hospital, Stockley Center, and the Wilmington VA Medical Center. (D.I. 24, Ex. A, p. 89, Ex. M)

> n7 These agencies were identified as: Delaware State Police (Dover), Kent County Emergency Communications, Sussex County Emergency Medical Services, New Castle County Police Department, Wilmington Public Safety, Wilmington Police Department, Delaware State Police (Odessa), Delaware State Police (Wilmington), Newark Police Department. (D.I. 24, Ex. A)

Having found jurisdiction proper under the Delaware long-arm statute, the analysis becomes whether the exercise of jurisdiction comports with the Due Process Clause of the United States Constitution. See Int'l Shoe Co. v. Washington, 326 U.S. at 310. Due process mandates that the defendant have certain minimum contacts with the forum state to ensure that the lawsuit [*19] does not offend "traditional notions of fair play and substantial justice." Id. at 316. In Burger King Corp. v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985), the Supreme Court added the further requirement that the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." Id. at 475 n.18. Further, the Court has directed that courts consider: 1) whether the defendant reasonably could have anticipated being haled into the forum state's court, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-293, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980); 2) the burden imposed on the defendant by litigating in that forum, Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987); and 3) plaintiff's interest in the forum state, id.; see also, Provident National Bank v. California Federal Savings & Loan Assoc., 819 F.2d at 437 (Third Circuit held that plaintiff must show significantly more than mere minimum contacts to establish [*20] general jurisdiction).

As discussed above, the record reflects NetMotion's web site and the marketing promotion by Hewlett-Packard enabled users to download the accused products anywhere, but importantly in Delaware. By targeting businesses in the state, NetMotion knew that its conduct and connections with Delaware were such that they reasonably should have anticipated being brought to this forum.

## V. MOTION TO TRANSFER

DSI has moved to transfer venue from this district to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a), n8 arguing that the declaratory judgment action there provides a more convenient forum for the litigation. Padcom counters that a plaintiff's choice of forum is the paramount consideration in determining a transfer request. Wesley-Jessen v. Pilkington Visioncare Inc., 157 F.R.D. 215 (D. Del. 1993). NetMotion n9 argues that the court should transfer the case to the United States District Court for the District of Washington.

n8 Title 28, Section § 1404(a) provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

[*21]

n9 NetMotion filed a third action in the Superior Court of the State of Washington, King County, alleging that Padcom has tortiously interfered with NetMotion's contracts and business expectancies. NetMotion Wireless Inc. v. Padcom, Inc., 04-cv-622-JCC (W.D. Wa 2004). Padcom removed the matter to the United States District Court for the Western District of Washington on March 24, 2004. (Id., D.I. 1) On April 27, 2004, Padcom moved to transfer to the case to the United States District Court for the District of Delaware or to stay pending resolution of the instant case. (Id., D.I. 8) NetMotion has filed opposition to the transfer motion, to which Padcom has filed a reply. (Id., D.I. 11, 12) On May 4, 2004, Padcom, in the instant action, moved to enjoin prosecution of the subsequently filed action in the Western District of Washington and has

requested that the court schedule a Rule 16 Conference. (D.I. 33)

Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience [*22] and the interests of justice. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988); Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192, 208 (D. Del. 1998). The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981) (citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970), cert. denied, 401 U.S. 910, 27 L. Ed. 2d 808, 91 S. Ct. 871 (1971)). "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". ADE Corp. v. KLA-Tencor Corp., 138 F. Supp. 2d 565, 567 (D. Del. 2001); Shutte, 431 F.2d at 25.

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. C.R Bard, Inc. v. Guidant Corp., 997 F. Supp. 556, 562 (D. Del. 1998); Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 U.S. Dist. LEXIS 20803, Civ. No. 01-199-SLR, 2001 WL 1617186 (D. Del. 2001). [*23] Although transfer of an action is usually considered as less convenient to a plaintiff if the plaintiff has not chosen its "'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." In re ML-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993).

The Third Circuit Court of Appeals has indicated the analysis for transfer is very broad. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). Although emphasizing that "there is no definitive formula or list of factors to consider," id., the court has identified potential factors it characterized as either private or public interest. The private interests include: (1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses-but only [*24] to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." Id. (citations omitted).

The public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." Id. (citations omitted).

The court is unpersuaded that the private or public interests warrant a transfer. Both plaintiff and defendant DSI are located within close proximity to this court, in Pennsylvania and New Jersey, respectively. Although defendant NetMotion is located in Seattle, Washington, it is a company trying to conduct business on a nationwide basis, including Delaware. Therefore, consistent with the deference afforded a plaintiff's choice of forum as well as the record established [*25] on the jurisdictional discovery issue, the court is satisfied that this litigation can be maintained without undue burden to the parties.

## VI. CONCLUSION

For the reasons stated, defendants' motion to dismiss and to transfer (D.I. 9) is denied. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 24th day of May, 2004, consistent with the memorandum opinion issued concomitantly,

IT IS ORDERED that:

1. Defendants' motion to dismiss and to transfer is denied. (D.I. 9)

2. Defendants shall file their Answer on or before June 11, 2004.

Sue L. Robinson

United States District Judge

LEXSEE

**PHILIPS ELECTRONICS NORTH AMERICA CORPORATION and U.S. PHILIPS CORPORATION, Plaintiffs, v. CONTEC CORPORATION, COMPO MICRO TECH, INC., SEOBY ELECTRONICS CO., LTD., REMOTE SOLUTION CO., LTD., F/K/A HANGO ELECTRONICS CO., LTD., HANGO REMOTE SOLUTION, INC., Defendants.**

**Civil Action No. 02-123-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2004 U.S. Dist. LEXIS 3940**

**March 11, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion granted by Philips Elecs. N. Am. Corp. v. Contec Corp., 220 F.R.D. 415, 2004 U.S. Dist. LEXIS 4255 (D. Del., 2004)
Reargument denied by, Motion to strike denied by, Summary judgment granted, in part, summary judgment denied, in part by Philips Elecs. N. Am. Corp. v. Remote Solution Co., 2004 U.S. Dist. LEXIS 19807 (D. Del., Sept. 9, 2004)

**DISPOSITION:**
[*1] Defendant Remote Solution's motion to dismiss for lack of personal jurisdiction denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent owners sued defendant manufacturer for infringement of their patent directed to remote control units for controlling home appliances. Pursuant to Fed. R. Civ. P. 12(b)(2), the manufacturer moved to dismiss for lack of personal jurisdiction.

**OVERVIEW:** Jurisdiction was proper under Del. Code Ann. tit. 10, § 3104(c)(1) because the patent owners had presented competent evidence that an established distribution channel existed through which the manufacturer's accused products were shipped to, distributed, and sold in Delaware. Exercising jurisdiction over the manufacturer comported with the requirements of the Due Process Clause given that the accused products arrived in Delaware through the manufacturer's purposeful shipment through an established distribution channel. Moreover, litigating the case in Delaware did not offend traditional notions of fair play and substantial justice, especially since the manufacturer had executed an agreement to defend another entity against all claims of patent infringement, thereby showing that the

manufacturer was well aware of and prepared for the possibility of litigation where the entity did business, including Delaware. Finally, Delaware had an abiding interest in protecting the property interests of its resident, including its corporate citizens, such as the patent owners.

**OUTCOME:** The motion to dismiss was denied.

**CORE TERMS:** customer, patent, patent infringement, channel, personal jurisdiction, competent evidence, declaration, manufacturing, forum state, manufactured, long-arm, residents, lack of personal jurisdiction, exercise personal jurisdiction, business relationship, purchase agreement, motion to dismiss, distributed, manufacture, subsidiary, discovery, shipped, indemnification, entity, principal place of business, notions of fair play, cause of action, jurisdictional, infringement, anticipated

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*
[HN1] When a non-resident defendant's motion to dismiss challenges personal jurisdiction, the plaintiff has the burden to show the basis for the court's jurisdiction over that defendant. To satisfy this burden, the plaintiff must make a prima facie showing that the court may exercise personal jurisdiction over the defendant. After discovery has begun, the plaintiff must sustain this burden by establishing jurisdictional facts through sworn affidavits or other competent evidence.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN2] Determining whether a non-resident defendant is subject to personal jurisdiction requires a two-part analysis. First, the court must determine whether the language of the forum state's long-arm statute reaches the defendant. Second, if the court finds that the defendant's conduct gives rise to personal jurisdiction under the long-arm statute, the court must then determine whether subjecting the defendant to jurisdiction in the forum state would comport with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN3] See Del. Code Ann. tit. 10, § 3104(c)(1).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN4] See Del. Code Ann. tit. 10, § 3104(c)(4).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
[HN5] Delaware state courts interpret the "transacting business" provision of Del. Code Ann. tit. 10, § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Burdens of Proof*
[HN6] The United States Court of Appeals for the Federal Circuit holds that, where a defendant has purposefully shipped the accused product into the forum state through an established distribution channel, no more is usually required to establish specific jurisdiction for purposes of a patent infringement claim.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN7] In order to meet the requirements of Del. Code

Ann. tit. 10, § 3104(c)(1), a non-resident defendant's actions must be directed at residents of Delaware and the protection of Delaware laws.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN8] Due process requires that sufficient minimum contacts exist between the defendant and the forum state to satisfy traditional notions of fair play and substantial justice. In considering whether jurisdiction may extend to a defendant, courts should primarily consider whether the defendant has purposely availed itself of the forum state's law and whether the defendant reasonably could have anticipated being haled into the courts of the forum state. Courts should also consider the burden imposed on the defendant by having to litigate in a foreign forum, as well as the interests of the plaintiff and the forum state.

**COUNSEL:** For PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, U.S. PHILIPS CORPORATION, plaintiffs: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For COMPO MICRO TECH, INC., defendant: Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For HANGO REMOTE SOLUTION, INC., defendant: David L. Finger, David L. Finger, Esq., Wilmington, DE.

For REMOTE SOLUTION CO., LTD., third-party defendant: David L. Finger, David L. Finger, Esq., Wilmington, DE.

For COMPO MICRO TECH, INC., counter-claimant: Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, U.S. PHILIPS CORPORATION, counter-defendants: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

### MEMORANDUM ORDER

I. INTRODUCTION

This is a patent infringement case. Jurisdiction is proper under 28 U.S.C. § 1338. Presently before me is a

Motion to Dismiss for Lack of Personal Jurisdiction (the "Motion") filed

[*2] by defendant Remote Solution Co., Ltd. ("Remote Solution") pursuant to Federal Rule of Civil Procedure 12(b)(2). (Docket Item ["D.I."] 105.) For the following reasons, Remote Solution's Motion will be denied.

## II. BACKGROUND

Plaintiffs Philips Electronics North America Corporation and U.S. Philips Corporation (collectively, "Philips"), both Delaware corporations, filed an action on February 12, 2002, alleging that Contec Corporation ("Contec"), also a Delaware corporation, was infringing U.S. Patent No. 4,703,359 n1 (the "'359 patent") and 5,872,562 n2 (the "'562 patent"), both owned by Philips. n3 The technology disclosed in the '359 and '562 patents is directed to remote control units ("RCUs") for controlling home appliances from different manufacturers and categories. See '359 patent, col 1, lns. 15-17; '562 patent, col 1, lns. 13-16 (attached to D.I. 1 as Exs. A and B). On September 17, 2002, Philips filed an amended complaint joining Remote Solution and others as additional defendants in this action. (D.I. 41, 42.) Remote Solution is a Korean corporation with its principal place of business in Kimcheon City, Kyongbuk, Korea.

[*3] (D.I. 41, Ex. A at P 6.) Philips alleges that Remote Solution "manufactures and designs RCUs that infringe the patents in suit under a manufacturing and purchase agreement with Contec, and is subject to personal jurisdiction in [the District of Delaware]." (Id. at P 12.) One of the types of RCUs accused of infringement in this case is Remote Solution's model RT U49C. (Id.)

n1 The '359 patent, entitled "Universal Remote Control Unit With Model Identification Capability," names as inventors Robin B. Rumbolt, William R. McIntyre, and Larry E. Goodson. The '359 patent issued on October 27, 1987 and was assigned to Philips on May 25, 1993. (D.I. 42, Ex. A at P 16.)

n2 The '562 patent, entitled "Universal Remote Control Transmitter With Simplified Device Identification," names as inventors Donald P. McConnell and William R. McIntyre. The '562 patent issued on February 16, 1999 and was assigned to Philips on the same day. (D.I. 42, Ex. A at P 17.)

n3 Defendants Contec Corporation and Seoby Electronics Co. are no longer involved in this case, having submitted to a Consent Judgment on August 28, 2003. (D.I. 258.)

[*4]

Remote Solution filed its Motion on January 24, 2003, arguing that this court cannot properly exercise personal jurisdiction over it under Delaware's long-arm statute, 10 Del. C. § 3104, or consistent with the requirements of the Due Process Clause. (D.I. 106 at 4, 9.) In support of its Motion, Remote Solution submitted the Declaration of its Director, Suk-Kyu Park. (Id., Ex. A.) In his declaration, Mr. Park stated that Remote Solution does not have any offices, facilities, subsidiaries or employees in Delaware; is not registered to do business in Delaware; has not contracted to supply services or things in Delaware; has no sales force in Delaware; has derived no revenues from sales in Delaware; does not own any property, assets or bank accounts in Delaware or maintain any offices in Delaware. (Id. P 4, 7-10.) According to Mr. Park, Contec is Remote Solution's only customer for the accused RT U49C RCU. (Id. P 5.) Mr. Park further stated that Remote Solution maintains a website to provide information about its products, but Remote Solution does not accept orders through its website. (Id. P 12.)

After Remote Solution filed its Motion, the parties conducted jurisdictional

[*5] and substantive discovery until September 15, 2003. (D.I. 286 at 2.) The following facts are taken from Philips' opposition to Remote Solution's Motion. (D.I. 286.) Since Philips' factual allegations are not directly controverted, they are taken as true for purposes of determining jurisdiction in this court. See Beverly Hills Fan Co. V. Royal Sovereign Corp., 21 F.3d 1558, 1563 (Fed. Cir. 1994).

In 1997, Remote Solution decided to expand its RCU sales by entering the United States consumer market. (Id. at 5 (citing deposition testimony of Suk-Kyu Park at D.I. 287, Ex. 14).) To that end, Remote Solution hired David Ahn, a native Korean living in California, as its exclusive sales agent in the United States. (Id.) Mr. Ahn established Hango Electronics, Inc., d/b/a Remote Solution ("HEI") in California, for the sole purpose of soliciting customers in the United States on behalf of Remote Solution. (Id. (citing deposition testimony of David Ahn at D.I. 287, Ex. 3).) HEI is an independent corporation of which Mr. Ahn is the sole owner and employee. (Id.)

In 1999, HEI entered into a Manufacturing and Purchase Agreement with Contec, L.P., a New York limited

[*6] partnership, wherein Contec L.P. retained HEI to design and manufacture RCUs and sell them to Contec L.P. n4 (D.I. 287, Ex. 15 at 1.) HEI also agreed to "defend any suit or proceeding brought against Contec L.P. to the extent that such suit or proceeding is based on a claim that the [RCUs] constitute an infringement of any valid United States ... patent ...." (Id. at 3.) In 2000, with Mr. Ahn's consent, HEI changed its name to Remote

Page 3

Solution, the name under which Mr. Ahn conducts business in California. (*Id.* at 6.)

> n4 The relationship between Contec L.P. and Contec Corporation was fleshed out at oral argument. At some point in time, Contec L.P., a New York entity, merged with Contec LLC, another New York entity, which then merged with Contec Corporation, a Delaware entity. (D.I. 338 at 67:16-25.)

According to Mr. Ahn, Remote Solution's business plan was to sell as many RCUs as possible. (*Id.*) As a result of his extensive efforts to market the RCUs, Mr. Ahn acquired Contec, TiVo, Inc., Harman Kardon,

[*7] Inc. and Hy-Tek Manufacturing Co., Inc. as customers for Remote Solution. (*Id.*) Remote Solution does not design its own remote controls, rather, it manufactures them according to its customers' specifications. (*Id.* at 7.) Contec is a Delaware corporation with its principal place of business in New York, and its primary business is to sell refurbished cable set top boxes and RCUs to major cable companies in the United States. (*Id.* at 10.) Contec's customers include Comcast, which provides cable television services to residents of Delaware. (*Id.*) Generally, Remote Solution knows who Contec's customers are because Remote Solution marks the RCUs with those customer's logos. (*Id.*; D.I. 287, Ex. 10.) Remote Solution knew that Comcast was one of Contec's customers, as it sent drawings of the Comcast logo to Contec via email on April 24, 2002. (D.I. 287, Ex. 36.)

In 2000, Remote Solution established a subsidiary in the United States, Hango Remote Solution, Inc. ("Hango"). (D.I. 286 at 8.) Remote Solution was a 70% shareholder in Hango and Mr. Ahn owning the remaining 30%. (*Id.*) About half of Hango's revenue came from sales of Remote Solution's RCUs, Hango's primary

[*8] business was marketing an MP3 player called Personal Jukebox. (*Id.* at 8-9.) Ultimately, however, Hango's business failed, and the company folded in December 2002. (*Id.* at 9.) Thereafter, Remote Solution began litigating this case on Hango's behalf as well as its own, filing an answer to the complaint and a motion to amend the answer to include a crossclaim against Contec for indemnification in the event Hango is found liable for patent infringement. (*Id.* at 9; *see also* D.I. 287, Ex. 2 at 8.)

Remote Solution has sold at least 1,969,849 of the accused RCUs in the United States since November 22, 2000. (D.I. 286 at 2 (citing Expert Report of Kerry Ruoff at D.I. 287, Ex. 1).) Based on the records obtained from TiVo, one of Remote Solution's customers, Philips

discovered that at least 2,000 infringing RCUs manufactured by Remote Solution for TiVo have been sold or used in Delaware since March 31, 1999. (D.I. 286 at 3, 13.) According to TiVo's records, 1,738 residents of Delaware subscribed to TiVo's service between March 31, 1999 and May 28, 2003. (*Id.* (citing Declaration of Matthew P. Zinn at D.I. 287, Ex. 39 P 12).) Because TiVo sells its digital video

[*9] recorders ("DVRs") bundled with the RCUs manufactured by Remote Solution, it is likely that more than 1,500 Remote Solution RCUs are being used for TiVo recorders in Delaware today. (*Id.* (citing D.I. 287, Ex. 39 PP 6, 17).) Furthermore, since January 1, 2000, more than 1,000 DVRs bundled with RCUs manufactured by Remote Solution were sold in Delaware at two retailers, specifically, 654 were sold at BestBuy and 406 were sold at Circuit City. (*Id.* (citing Declaration of Scott Jacobi at D.I. 287, Ex. 40 P 7; Declaration of Mark Smucker at D.I. 287, Ex. 41 P 9).)

## III. DISCUSSION

[HN1] When a non-resident defendant's motion to dismiss challenges personal jurisdiction, the plaintiff has the burden to show the basis for the court's jurisdiction over that defendant. *Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692, 699 (D. Del. 2001) (citing *Wright v. American Home Products*, 768 A.2d 518, 526 (Del. Super. 2000)). To satisfy this burden, Philips must make a *prima facie* showing that this court may exercise personal jurisdiction over Remote Solution. *Id.* After discovery has begun, the plaintiff must sustain this burden

[*10] by "establishing jurisdictional facts through sworn affidavits or other competent evidence." *Id.* (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)).

[HN2] Determining whether Remote Solution is subject to personal jurisdiction requires a two-part analysis. *Id.* at 700; *see also Siemens Aktiengesellschaft v. LG Semicon Co., Ltd.*, 69 F. Supp. 2d 622, 624 (D. Del. 1999). First, I must determine whether the language of Delaware's long-arm statute, 10 Del. C. § 3104(c), reaches Remote Solution. *Broadcom*, 167 F. Supp. at 700. Second, if I find that Remote Solution's conduct gives rise to personal jurisdiction under the long-arm statute, I must then determine whether subjecting Remote Solution to jurisdiction in Delaware would comport with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* (citing *Intel Corp. v. Silicon Storage Tech, Inc.*, 20 F. Supp. 2d 690, 694 (D. Del. 1998)).

### A. Jurisdiction over Remote Solution is Proper Under § 3104(c)(1) of Delaware's Long-Arm Statute

Philips contends that Remote Solution is subject to jurisdiction

[*11] under sections 3104(c)(1) and (c)(4) of the Delaware long-arm statute (D.I. 286 at 17, 20), which provide:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
> ***
> [HN3] (1) Transacts business or performs any character of work or service in the State;
> ***
> [HN4] (4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State ...

10 Del. C. §§ 3104(c)(1) & (c)(4). [HN5] Delaware state courts have interpreted the "transacting business" provision of § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. See La Nuova D & B. S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986). [HN6] The Federal Circuit has held that, where a defendant has "purposefully shipped the accused [*12] [product] into [the forum state] through an established distribution channel ... no more is usually required to establish specific jurisdiction." Beverly Hills Fan, 21 F.3d at 1564. Moreover, [HN7] in order to meet the requirements of § 3104(c)(1), Remote Solution's actions must be directed at residents of Delaware and the protection of Delaware laws. See Thorn EMI N. Am. v. Micron Technology, 821 F. Supp. 272, 274 (D. Del. 1993) (citing Sears, Roebuck & Co. v. Sears, 744 F. Supp. 1289, 1292 (D. Del. 1990)).

Philips argues that Remote Solution has shipped the accused RCUs into an established distribution channel as part of a general business plan that results in sales of the accused products in Delaware. (D.I. 286 at 18.) In response, Remote Solution argues that it merely had a general plan to serve the national market and that its activities were not directed specifically toward Delaware. (D.I. 309 at 2, 4.)

I find that Philips has presented competent evidence that an established distribution channel exists through which accused RCUs manufactured by Remote Solution are shipped to, distributed, and sold in Delaware. First, the

[*13] evidence shows that Remote Solution and Contec have enjoyed a close business relationship since at least as early as 1999, when, in a manufacturing and purchase agreement governed by New York law, Remote Solution agreed to defend one of Contec's predecessors against any claims of patent infringement. Furthermore, Remote Solution is seeking indemnification from Contec for Hango, Remote Solution's defunct subsidiary, in the event Hango is found liable for patent infringement in this case. Philips has also presented competent evidence that Remote Solution knew that Comcast, a major provider of cable television services in the State of Delaware, was one of Contec's customers for the accused RCU. Given all of these facts, and in light of Remote Solution's ongoing business relationship with Contec, it was reasonably foreseeable that the accused RCUs would make their way into the Delaware market through Contec's customers. Documents obtained from Remote Solution show that Contec was selling the accused RCUs to Comcast, such that Remote Solution knew or should have known that the accused RCUs were being sold or distributed in Delaware. See Thorn EMI, 821 F. Supp. at 275-76.

[*14]

Finally, Philips has competent evidence that the accused RCUs are present in Delaware in large numbers, and were present in Delaware prior to its filing suit, as a result of Remote Solution manufacturing the accused RCUs for TiVo. Because Philips has presented competent evidence of an established distribution channel that caused the accused RCUs to be sold and distributed in Delaware, and that the accused RCUs are actually present in Delaware, I find that jurisdiction over Remote Solution is proper under § 3104(c)(1), and I need not address the issue of whether jurisdiction over Remote Solution is proper under § 3104(c)(4). n5

> n5    Remote    Solutions    relies    upon Commissariat A. L'Energie Atomique v. Chi Mei Optoelectronics Corp., 293 F. Supp. 2d 423, reconsideration denied, 293 F. Supp. 2d 430 (D. Del. 2003) (granting defendant's motion to dismiss for lack of personal jurisdiction in patent infringement case) in support of its motion to dismiss. There are key factual distinctions between this case and Commissariat. First, unlike the plaintiff in Commissariat, Philips requested and conducted jurisdictional discovery which uncovered evidence of actual sales and the presence of the accused device in Delaware prior and subsequent to the date the complaint was filed, evidence that was lacking in Commissariat. Second, that Remote Solution (1) agreed to

defend a predecessor of Contec from patent infringement and (2) is seeking indemnification from Contec should Hango be found liable for patent infringement is evidence of Remote Solution's close business relationship with Contec, and its knowledge of the established distribution channel through which its products were being sent into Delaware. Thus, the quantum of evidence upon which to rest personal jurisdiction in this case is significantly greater than in *Commissariat*.

[*15]

B. Exercising Jurisdiction over Remote Solution in Delaware Comports With the Requirements of the Due Process Clause

[HN8] Due process requires that sufficient minimum contacts exist between the defendant and the forum state to satisfy "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945). In considering whether jurisdiction may extend to a defendant, courts should primarily consider whether the defendant has purposely availed itself of the forum state's law, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985), and whether the defendant reasonably could have anticipated being haled into the courts of the forum state, *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-92, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980). Courts should also consider the burden imposed on the defendant by having to litigate in a foreign forum, as well as the interests of the plaintiff and the forum state. *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 114, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987).

In this case, the accused RCUs arrived in Delaware through

[*16] Remote Solution's purposeful shipment of

them through an established distribution channel. *See Beverly Hills Fan,* 21 F.3d at 1565. Philips has "stated all of the necessary ingredients for an exercise of jurisdiction consonant with the requirements of due process," namely, that Remote Solution placed the accused products in the stream of commerce, that it knew the likely destination of the products, and that its conduct and connections with Delaware were such that they should reasonably have anticipated being brought into court here. *Id. at 1566.*

Finally, litigating this case in Delaware would not place such a burden on Remote Solution as to offend traditional notions of fair play and substantial justice, especially since Remote Solution has executed an agreement to defend Contec L.P. against all claims of patent infringement, which proves that Remote Solution was well aware of and prepared for the possibility of litigation where Contec did business, including Delaware. Nor has Remote Solution shown that it does not have the resources to fairly litigate this case in Delaware. *See Thorn EMI,* 821 F. Supp. at 276. Moreover, "Delaware [*17] has an abiding interest in protecting the property rights of its residents[,]" *id.,* including corporate citizens such as Philips. Thus, exercising jurisdiction over Remote Solution in this case comports with the requirements of the Due Process Clause.

IV. CONCLUSION

For these reasons, it is hereby ORDERED that Remote Solution's Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 105) is DENIED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware
March 11, 2004

LEXSEE

**SIEMENS MEDICAL SYSTEMS, INC., a Delaware corporation, and SIEMENS AG, a German corporation, Plaintiffs, v. FONAR CORPORATION, a Delaware corporation, and RAYMOND V. DAMADIAN, M.D. MRI SCANNING CENTERS MANAGEMENT CO., INC., a Delaware corporation, Defendants.**

**Civil Action No. 95-261-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**1995 U.S. Dist. LEXIS 22334**

**April 27, 1995, Filed**

**DISPOSITION:** d
[*1] Defendants' motion to dismiss, stay or transfer action denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In plaintiff corporation's action seeking a declaratory judgment that it had had not infringed certain of defendant company's patents and that defendant was guilty of certain inequitable conduct in securing the patents, the court (United States) considered a motion brought by the company and other defendants to dismiss, stay, or transfer the case from the district in which it was pending to another district court pursuant to 28 U.S.C.S. § 1404.

**OVERVIEW:** Plaintiff was a Delaware corporation with its principal place of business in New Jersey. Two defendants were Delaware corporations headquartered in the Eastern District of New York. The court ruled that defendants failed to meet their burden of showing that the relevant factors warranted dismissal. As to the motion to transfer, the court ruled that the fact that plaintiffs were incorporated in Delaware was a legitimate reason for their forum choice. Even if the Eastern District of New York were the more convenient trial forum for the parties and non-party witnesses, such would not be sufficient to compel transfer. Further, defendants did not demonstrate that litigation in Delaware imposed on them a unique or unexpected burden. Nor did the efficient use of judicial resources require transfer. As a practical matter, defendants could compel their employee-witnesses to testify without a subpoena. The court was not persuaded that the net cost of litigating in Delaware would be significantly greater than that of litigating in the Eastern District of New York. Neither the "access to proof" factor nor the interests of justice required transfer. There was no basis for granting a stay.

**OUTCOME:** The court denied defendants' motion to dismiss, stay, or transfer.

**CORE TERMS:** patent, convenience, inventor, infringement, choice of forum, familiarity, technology, effective, unwilling, motion to dismiss, shopping, defendants contend, judicial economy, attendance, compelled, balance of convenience, declaratory judgment, patent infringement, compulsory process, motion to transfer, legitimate reason, subject matter, present action, file suit, presently, incorporation, inconvenient, expenditure, unexpected, paramount

**LexisNexis(R) Headnotes**

*Civil Procedure > Declaratory Judgment Actions > Federal Judgments*
[HN1] See 28 U.S.C.S. § 2201(a).

*Civil Procedure > Jurisdiction*
[HN2] Ordinarily, where an action has been filed in two federal district courts, the court in which the action was first filed will preside over the litigation.

*Civil Procedure > Venue > Federal Venue Transfers*
*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
[HN3] See 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
*Civil Procedure > Judicial Officers > Judges > Discretion*
[HN4] Congress intended through 28 U.S.C.S. § 1404 to place discretion in a district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. The standard under which transfer applications are considered requires district courts to consider the convenience of parties and witnesses, the interest of justice, and whether the action could have been brought in the transferee court.

*Civil Procedure > Venue > Federal Venue Transfers*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN5] As a general rule, because the plaintiffs' choice of forum is accorded substantial weight, to obtain a transfer the burden is on the defendants to establish that the balance of convenience of the parties and witnesses strongly favors the defendants. Plaintiffs' choice of forum is paramount. The deference to the plaintiffs' choice of forum will apply so long as the plaintiffs have chosen the forum for some legitimate reason.

*Civil Procedure > Venue > Federal Venue Transfers*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN6] While transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen its "home turf" or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer.

*Business & Corporate Law > Corporations > Formation > Place of Incorporation*

*Civil Procedure > Venue > Federal Venue Transfers*
[HN7] Absent some showing of a unique or unexpected burden, a corporation should not be successful in arguing that litigation in the state of incorporation is inconvenient.

*Civil Procedure > Venue > Federal Venue Transfers*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
[HN8] In analyzing the "interest of justice" factor for the purposes of a motion to transfer under 28 U.S.C.S. § 1404(a), a court looks to judicial resources, cost to the parties, access to proof, and the availability of compulsory process.

**COUNSEL:** For SIEMENS MEDICAL SYSTEMS, INC., plaintiff: Frederick L. Cottrell, III, Robert W. Whetzel, Richards, Layton & Finger, Wilmington, DE.

For FONAR CORPORATION, RAYMOND V. DAMADIAN, defendants: Thomas P. Preston, Duane, Morris & Heckscher, Wilmington, DE.

For SIEMENS MEDICAL SYSTEMS, INC., counter-defendant: Frederick L. Cottrell, III.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM ORDER

#### I. INTRODUCTION

On April 27, 1995, Siemens Medical Systems, Inc. brought this action in the United States District Court for the District of Delaware against Fonar Corporation ("Fonar") for a declaratory judgment that Siemens had not infringed certain Fonar patents and that Fonar was guilty of certain "inequitable conduct" in securing the patents. On June 15, 1995, Siemens served Fonar and Raymond V. Damadian, M.D. MRI Scanning Centers Management Co. ("RVDC") an amended complaint adding a patent infringement claim against both defendants. In its amended complaint, Siemens seeks a declaratory judgment that U.S. Letters patent 5,061,897 (the " '897 patent"), [*2] 4,675,609 (the " '609 patent"), 4,871,966 (the " '966 patent"), 3,789,832 (the " '832 patent"), and 4,616,180 (the " '180 patent") are invalid and not infringed.

Presently before the court is defendants' motion to dismiss, stay or transfer the case from this District to the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1404. (D.I. 13) For the reasons discussed below, the motion will be denied.

## II. BACKGROUND

Plaintiff Siemens Medical Systems, Inc. ("Siemens") is a Delaware corporation with its principal place of business in Iselin, New Jersey. Siemens is a wholly-owned subsidiary of plaintiff Siemens AG, a German corporation. Defendants Fonar and RVDC are Delaware corporations. Fonar is headquartered in Melville, New York, in the Eastern District of New York.

On September 2, 1992, Fonar filed a patent infringement suit in the United States District Court for the Eastern District of New York against, inter alia, General Electric Company ("the GE litigation"), alleging, inter alia, infringement of the '966 patent and the '832 patent. By letter dated October 7, 1992, Fonar charged Siemens with infringement [*3] of these same patents and stated its intent to file suit for infringement upon the completion of the GE litigation.

In April of this year, prior to the jury verdict on liability in the GE litigation, Siemens instituted the present action. On June 14, 1995, plaintiffs' amended complaint was filed. Two days later, on June 16, 1995, Fonar filed an action in the Eastern District of New York charging Siemens with infringement of the '897 patent and the '609 patent, which Fonar had asserted against defendant Hitachi in the GE litigation. n1 On June 19, 1995, Fonar filed the pending motion.

n1 Hitachi settled at the outset of trial. (D.I. 13 at 7 n.2)

## III. DISCUSSION

### A. Motion to Dismiss

Title 28, Section 2201 provides, in relevant part:

[HN1] In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights or other legal relations of any interested party seeking such declaration, whether or not further [*4] relief is or could be sought.

28 U.S.C. § 2201(a). [HN2] Ordinarily, where an action has been filed in two district courts, the court in which the action was first filed will preside over the litigation. Optical Recording Corp. v. Capitol EMI Music, Inc., 803 F. Supp. 971 (D.Del. 1992). Defendants contend, however, that "where a party purposefully misuses [Section 2201] to engage in forum shopping, dismissal is the rule." (D.I. 13 at 9, citing Pacific Employers Ins. Co. v. M/V Captain W.D. Cargill, 751 F.2d 801, 804 (5th Cir.), cert, denied, 474 U.S. 909, 88 L. Ed. 2d 244, 106 S. Ct. 279 (1985) and Ven-Fuel, Inc. v. Dep't of the Treasury, 673 F.2d 1194, 1195 (11th Cir. 1982)). Here, defendants argue,

> Siemens' misuse of the Declaratory Judgment Act is obvious . . . . It clearly did not file this suit to avoid accrual of avoidable damages. Those damages have already multiplied unchecked over the three years of willful infringement that have elapsed since Siemens was offered license terms in October 1992. Nor did Siemens sue here to obtain an early adjudication of its rights. It knew [*5] Fonar was prepared to file suit immediately after the GE Litigation concluded if Siemens failed to negotiate a license in good faith. . . . Siemens' earnest race to the courthouse began only when the GE Litigation drew to its inevitable close.

(Id. at 10-11) (citation omitted).

Moreover, defendants argue, the first filed rule may be abandoned where inconsistent with judicial and litigant economy and the just and effective disposition of disputes. (Id. at 13, citing Serco Services Co., L.P. v. Kelly Co., Inc., 51 F.3d 1037, 34 U.S.P.Q.2d 1217 (Fed.Cir. 1995)). In the present case, defendants aver, "the inventions at issue are exceedingly complex," and "the technology of the patents in suit is the same as the technology and patents involved in the later-filed action in the Eastern District of New York[,]" and "the same technology involved in the GE Litigation recently concluded before Judge Waxler in that District." (D.I. 13 at 12-13) According to defendants, the Eastern District's "familiarity with the subject matter of the litigation will reduce the expenditure of judicial resources in the handling of this case, a consideration which 'alone is sufficient [*6] . . . to justify departure from the first filed rule.'" (Id. at 13, quoting Optical Recording, 803 F. Supp. at 974). Defendants contend that Siemens' amendment of its complaint to add a claim for infringement of the '180 patent does not change the analysis, primarily because the '180 patent is "self-evidently similar to those involved in the GE Litigation." (D.I. 13 at 15)

Lastly, defendants argue that a declaratory judgment action can be dismissed "in the interests of judicial economy and for the convenience of the parties and the witnesses." (D.I. 13 at 17) (citations omitted). According to defendants, "the convenience of the litigants virtually compels dismissal here," in that (1) Siemens is headquartered in Iselin, New Jersey; (2) Fonar has no offices in Delaware; and (3) documents and witnesses relating to the patents at issue, their prosecution, and Fonar's enforcement of them, are all located in New York. n2 Should any witness be unwilling, defendants contend, their attendance at trial could be compelled only in New York. (D.I. 13 at 18)

> n2 According to defendants, all four of the named inventors on the '966 patent, all three of the named inventors on the '609 patent, and the "lead" inventor on the '897 patent reside in the Eastern District of New York, the named inventor on the '832 patent resides in Woodbury, New York, and the inventor on the '180 patent "apparently lived in Ohio at the time the patent was issued." (D.I. 13 at 7-9)

[*7]

Plaintiffs respond that they chose the Delaware forum not for reasons of forum shopping, but because it was more convenient than the New York forum, and that dismissal is therefore unwarranted. (D.I. 14 at 11-12) (citations omitted) Moreover, plaintiffs argue, the prosecution of this action in Delaware is not inconsistent with judicial and litigant economy and the just and effective disposition of disputes. According to plaintiffs,

> because many of the patents and issues involved in the prior GE cases are different from those here, little if any judicial economy would be achieved by having this case tried in the Eastern District of New York. Of the four Fonar patents involved here, only two were tried in the prior GE case, and they were tried to a jury rather than the judge. The Siemens' patent was not before that court at all.

(Id. at 18) (emphasis in original). As for effective disposition, plaintiffs contend, the Delaware court "moves faster [than the New York court], as reflected in the Annual Report of the Administrative Office of the United States Courts (the "AO Report"), and is recognized as having a commendable familiarity with complex litigation in general,

[*8] and with patent litigation in particular." (D.I. 14 at 12) Nor, plaintiffs argue, does the convenience of the parties or witnesses warrant dismissal. According to plaintiffs, (1) Melville, New York is only 147 miles from

Wilmington; (2) Wilmington is "more centrally located, which makes it more accessible to Siemens' New Jersey and North Carolina locations, and avoids the judicially-recognized and infamous traffic congestion in New York City and Long Island;" and (3) the location of documents is irrelevant. (D.I. 14 at 7, 12)

Based on the record before it, the court concludes that defendants have failed to meet their burden of demonstrating that the relevant factors warrant dismissal. Plaintiffs have not clearly engaged in forum shopping in contravention of the purpose behind the Declaratory Judgment Act. Nor is the court persuaded that reasons of judicial and litigant economy, the just and effective disposition of disputes or the convenience of the parties or witnesses justify dismissal. Therefore, defendants' motion to dismiss will be denied.

**B. Motion to Transfer**

Title 28, Section 1404(a) provides:

> [HN3] For the convenience of the parties and the witnesses in the interests
> [*9] of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

[HN4] Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988). "The standard under which transfer applications are considered requires district courts to consider the convenience of parties and witnesses, the interest of justice, and whether the action could have been brought in the transferee court." SportsMEDIA Technology Corp. v. Upchurch, 839 F. Supp. 8, 9 (D.Del. 1993). The parties do not dispute that this action could have been brought in the Eastern District of New York.

[HN5] As a general rule, "because plaintiffs' choice of forum is accorded substantial weight, the burden is on the defendants to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." Bergman v. Brainin, 512 F. Supp. 972, 973 (D.Del. 1981) (citing
[*10] Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970), cert denied, 401 U.S. 910, 27 L. Ed. 2d 808, 91 S. Ct. 871 (1971)) (emphasis added). Plaintiffs' choice of forum is "paramount." See, e.g., Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 157 F.R.D. 215, 216 (D.Del. 1993). Indeed, the deference to the plaintiffs'

choice of forum will apply so long as the plaintiffs have chosen the forum for some legitimate reason. See, Tuff-Torq Corp v. Hydro-Gear Ltd. Partnership, 882 F. Supp. 359, 362 (D.Del. 1994). n3 In the present case, plaintiffs have a legitimate reason for their forum choice: the fact that defendants are incorporated in Delaware. n4 Therefore, even if Delaware is not plaintiffs' "home turf" for purposes of this action, deference to plaintiffs' choice will still apply.

n3 See also In re M.L.-Lee Acquisition Fund II, L.P., 816 F.Supp 973, 976 (D.Del. 1993) (emphasis added) [HN6] ("While transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen its "home turf" or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer.").

[*11]

n4 As this court has previously held:

At the outset, the fact that [defendant] incorporated in Delaware should not be disregarded lightly. By incorporating in Delaware, it can be assumed that [defendant] desired the benefits that it believed Delaware provides to chartered corporations. [Defendant] chose Delaware as its legal home and should not now complain that another [party] has decided to sue [defendant] in Delaware.

Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 821 F. Supp. 962, 965 (D.Del 1993).

With respect to convenience of the parties and witnesses, defendants contend that (1) Siemens' headquarters in Iselin, New Jersey is "a comparatively short distance from the Eastern District of New York courthouse in Hauppauge[;]" and (2) "documents and witnesses relating to the patents, their prosecution, and Fonar's enforcement of them, are all located in New York. (D.I. 13 at 18) As noted above, plaintiffs counter that (1) Melville, New York is only 147 miles from Wilmington; (2) Wilmington is "more centrally located, which makes it more

[*12] accessible to Siemens' New Jersey and North

Carolina locations, and avoids the judicially-recognized and infamous traffic congestion in New York City and Long Island;" and (3) the location of documents is irrelevant. (D.I. 14 at 7, 12)

Even if the Eastern District of New York were the more convenient trial forum for both the parties and the non-party witnesses, this would not be sufficient to compel a transfer. This court in Wesley-Jessen analyzed an analogous situation in which a defendant made a similar showing, and concluded that transfer was inappropriate for three reasons. First, the court noted that, being a company engaged in business throughout the United States, the claim that litigation away from the most convenient forum is burdensome is somewhat suspect. 157 F.R.D. at 218. Defendant Fonar is similarly situated with business operations throughout the United States. (D.I. 14 at 6) The second factor noted by the court in Wesley-Jessen is the incorporation of defendant in Delaware. Here again, the court outlined the heightened burden on such a business. [HN7] "Absent some showing of a unique or unexpected burden, these corporations should not be successful in [*13] arguing that litigation in their state of incorporation is inconvenient." Id. Finally, the court noted the somewhat archaic nature of the "convenience of the parties" factor in determining a motion to transfer.

A third reason for denying the motion to transfer is that technological advances have substantially reduced the burden of having to litigate in a distant forum . . .. These technologies have shortened the time it takes to transfer information, reduced the bulk or size of documents or things on which information is recorded and can be transferred and have lowered the cost of moving that information from one place to another.

Id. The court finds that defendants have not demonstrated that litigation in Delaware imposes on them a unique or unexpected burden.

The final factor to be addressed by the court is the interest of justice. [HN8] In analyzing this factor the court looks to judicial resources, cost to the parties, access to proof, and the availability of compulsory process. Critikon, 821 F. Supp. at 966. With respect to judicial resources, defendants argue that the New York court's "familiarity with the subject matter of this litigation [*14] will reduce the expenditure of judicial resources in the handling of this case . . .." (D.I. 13 at 13) As noted above, plaintiffs respond that the Delaware court "moves faster, as reflected in the . . . AO Report . . ., and is recognized as having a commendable familiarity with complex litigation in general, and with patent litigation in particular." (D.I. 14 at 12) Specifically, plaintiffs

contend,

the AO Report for the 12-month period ending in September 1994 reported that each judge in the Eastern District of New York had 663 pending cases. That case load is more than four times the 155 pending cases per judge in the District of Delaware. The AO Report also indicated that the median time from filing to trial in civil cases is 26 months in the Eastern District of New York, compared with 16 months in the District Court of Delaware.

(Id. at 18) (emphasis in original). Moreover, plaintiffs argue,

because many of the patents and issues involved in the prior GE cases are different from those here, little if any judicial economy would be achieved by having this case tried in the Eastern District of New York. Of the four Fonar patents involved here, only two [*15] were tried in the prior GE case, and they were tried to a jury rather than the judge. The Siemens' patent was not before that court at all.

(Id.) (emphasis in original).

Based on these arguments, the court is not persuaded that this case would be resolved in the Eastern District of New York more efficiently or expeditiously than in the District of Delaware. The efficient use of judicial resources does not require the transfer of this case.

Addressing compulsory process, defendants argue that "should any [of the New York] witnesses prove to be unwilling, their attendance at trial can be compelled only if the trial proceeds in New York." (D.I. 13 at 18) These witnesses include "most of the named inventors of the patents in issue . . .." (D.I. 19 at 5) Plaintiffs respond that "Fonar has not provided a single example of a witness who is unwilling to attend trial in Delaware." According to plaintiffs, the patent inventors specifically identified by defendants are all employed by Fonar, and their attendance can be compelled regardless of the reach of this court's subpoena power. (Id. at 20)

The court agrees with plaintiffs that here, as in Critikon, 821 F. Supp. at 967, [*16] defendants

ha[ve] not represented to the court that [the witnesses] would be unwilling to testify at trial voluntarily. [To the extent these witnesses are] ... employee[s] of [Fonar], ... the court must assume that [they] would be willing to testify absent a

subpoena.

Accordingly, the court finds that this factor does not weigh strongly in defendants' favor.

Defendants make no specific argument concerning the cost to the parties, and the court is not persuaded that the net cost of litigating in Delaware will be significantly greater than that of litigating in the Eastern District of New York.

With respect to access to proof, defendants contend that transfer is appropriate because "documents and witnesses relating to the patents at issue, their prosecution, and Fonar's enforcement of them, are all located in New York." (D.I. 13 at 18) Plaintiffs respond that

discovery by document production and deposition normally proceeds in patent cases without regard to the location of the forum, in that documents are either made available for inspection where they are kept by the producing party, or copies are simply provided to the requesting party's counsel. [*17] Depositions normally proceed where the witness is located or at counsel's office. . . . Fonar's counsel is located in Minnesota . . ..

(D.I. 14 at 19-20)

As this court held in Critikon:

The location of documents, in the context of access to proof, in a document-intensive case such as this can be misleading. No matter where the trial is held, [defendants'] ... counsel and [plaintiffs'] ... counsel will be required to travel to [various places] to select and produce the requested discovery. Regardless of where trial is held, the documents will be copied and mailed to the offices of counsel and subsequently transported to trial.

821 F. Supp. at 966-67. For this reason, the court finds that defendants have not established that this factor compels the transfer of this action.

Based on the record as it presently stands, defendants have failed to demonstrate that the interests of justice dictate transferring this action.

## C. Motion to stay

Lastly, defendants urge this court to stay these proceedings pending resolution of the action Fonar filed

against Siemens in the Eastern District of New York after plaintiffs filed the present action.

[*18] (D.I. 13 at 19). The court finds no basis in this record for granting this relief and, therefore, the motion to stay will be denied.

## IV. CONCLUSION

Therefore, at Wilmington, this 1st day of November, 1995, IT IS ORDERED that defendants' motion to dismiss, stay or transfer this action (D.I. 13) is denied.

Sue L. Robinson

United States District Judge

LEXSEE

**STONINGTON PARTNERS, INC., et al., Plaintiff, v. LERNOUT & HAUSPIE SPEECH PRODUCTS, N.V., et al., Defendants.**

**C.A. No. 18524-NC**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

**2003 Del. Ch. LEXIS 72**

**January 31, 2003, Submitted**
**July 8, 2003, Decided**

**PRIOR HISTORY:** Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods., N.V., 2002 Del. Ch. LEXIS 123 (Del. Ch., Oct. 23, 2002)

**DISPOSITION:**
 [*1] Plaintiffs' motions for default judgment and for damages following default judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs investors sued defendants foreign corporation and its executives for fraud. Default judgment was previously entered against all defendants except one. The investors moved for a default judgment against the remaining executive and a determination of damages against all defendants.

**OVERVIEW:** Stock the investors received in a transaction with defendants became worthless. The foreign executive was properly served by registered mail under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, art. 10(a), 20 U.S.T. 361 (Hague Convention) allowing judicial documents to be sent to foreign parties through postal channels. The Delaware Secretary of State was served, under Delaware's long arm statute, Del. Code Ann. tit. 10, § 3104(b), further satisfying the Hague Convention. The executive waived defective service, under Del. Ch. Ct. R. 12(h)(1), by failing without excuse to timely answer the complaint. Under Del. Ch. Ct. R. 55(b), an evidentiary hearing on damages was unnecessary as the investors sought a sum certain, and discovery would provide no relevant information. The investors were entitled to the difference between the value of the stock they surrendered and the value of the stock they received, which was zero. Because of the egregious fraud, prejudgment interest at the federal discount rate plus five percent was proper.

**OUTCOME:** The investors' motions for default judgment as to one corporate executive defendant and for damages were granted.

**CORE TERMS:** stock, mail, prejudgment interest, default judgment, out-of-pocket, service of process, entry of default, discovery, default, arm, worthless, waived, nonresident, monthly, evidentiary hearing, registered mail, matter of right, properly served, timely manner, rescission, defrauded, measured, purchase price, enlargement of time, ownership interest, unjust enrichment, defective process, reasons discussed, money damages, actual notice

**LexisNexis(R) Headnotes**

*Civil Procedure > Pretrial Judgments > Default > Default Judgments*
*Civil Procedure > Pretrial Judgments > Default > Relief From Default*
[HN1] Under Del. Ch. Ct. R. 55(b), the Delaware Chancery Court may enter a default judgment where a party has failed to appear, plead, or defend a case. The party seeking entry of the default must apply for that relief, and thereafter, the court may conduct whatever hearings, or request whatever information, it requires to enable it to determine what damages are appropriate.

*Governments > Courts > Court Records*
*International Law > Dispute Resolution > Service of Process*
[HN2] Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, art. 10(a), 20 U.S.T. 361 permits judicial documents to be sent directly to foreign parties through postal channels. Article 10(a) relevantly provides that provided the state of destination does not object, the present convention shall not interfere

with the freedom to send judicial documents, by postal channels, directly to persons abroad.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
***International Law > Dispute Resolution > Service of Process***
[HN3] Delaware case law holds that where the requirements for service of process under the Delaware long arm statute are satisfied, then so, too, are the service requirements under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Matters, Nov. 15, 1965, 20 U.S.T. 361.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
***Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview***
[HN4] Del. Code Ann. tit. 10, § 3104(b) of Delaware's long arm statute provides that a defendant is effectively served with process when service is made upon Delaware's Secretary of State. Section 3104(b) does not require that process documents be physically served upon a nonresident defendant. All that the statute requires is that a copy be sent to the nonresident defendant by registered mail.

***Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail***
***International Law > Dispute Resolution > Service of Process***
***International Law > Treaty Interpretation > Particular Treaties > Hague Convention***
[HN5] Delaware Courts interpret the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, art. 10(a), 20 U.S.T. 361, broadly to effect its intended purpose, which is to simplify service of process upon nonresident defendants abroad.

***Civil Procedure > Pleading & Practice > Service of Process > Waivers > General Overview***
[HN6] Where a defendant fails without excuse to answer a complaint in a timely manner, the defense of defective process is deemed to have been waived. Del. Ch. Ct. R. 12(h)(1).

***Civil Procedure > Pleading & Practice > Service of Process > Waivers > General Overview***
[HN7] When a party receives actual notice of a suit there is no due process problem in requiring him to object to

any ineffective service within the period prescribed by Del. Ch. Ct. R. 12(h)(1) and the defense of ineffective service is one that he certainly can waive if he wishes to do so.

***Civil Procedure > Pretrial Judgments > Default > Default Judgments***
[HN8] Once a default is established, the defaulting party loses standing to contest the factual allegations of the claim.

***Civil Procedure > Pretrial Judgments > Default > General Overview***
[HN9] Del. Ch. Ct. R. 55(b) provides that a court may hold a post-default hearing to determine the amount of damages or to establish the truth of any averment by evidence if it finds such a hearing to be necessary. Where a default has occurred, it is common for courts to determine the damages that the plaintiffs are entitled to recover, and then enter judgment accordingly. The damages are calculated from the established facts and other record evidence. Hearings are commonly held where the amount of damages is unknown, but in all events, the issue of whether or not to hold a hearing remains entirely within the trial court's discretion. There is no "entitlement" to a hearing as a matter of right.

***Contracts Law > Remedies > Compensatory Damages > General Overview***
***Contracts Law > Remedies > Restitution***
[HN10] Where a party to a contract is entitled to a money judgment for having been defrauded into surrendering property, one measure of recovery is restitutionary, i.e., the extent of the wrongdoer's unjust enrichment measured by the value of the surrendered property at the time of its improper acquisition. Alternatively, a court may award the plaintiffs their "out-of-pocket" loss, which is the difference between the value of what they gave up and the value of what they received in return.

***Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest***
[HN11] An award of prejudgment interest is within a trial court's discretion.

***Civil Procedure > Judicial Officers > Judges > Discretion***
***Civil Procedure > Remedies > Judgment Interest > General Overview***
[HN12] The legal rate of interest, which is the federal discount rate plus five percent, is a benchmark from which a court may deviate in its sound discretion.

**COUNSEL:** David C. McBride, John W. Shaw, and Dawn M. Jones, Esquires of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; and Max W. Berger, Steven B. Singer, and Gerald H. Silk, Esquires of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Attorneys for Plaintiffs.

Henry A. Heiman and Susan E. Kaufman, Esquires of HEIMAN, GOUGE & KAUFMAN, Wilmington, Delaware; Anthony M. Feeherry, and Gus P. Coldebella, Esquires of GOODWIN PROCTER LLP, Boston, Massachusetts; Neal J. Levitsky, Esquire of FOX ROTHSCHILD LLP, Wilmington, Delaware; and Donald H. Chase, Esquire of MORRISON COHEN SINGER & WEINSTEIN, LLP, New York, New York; Attorneys for Defendants.

**JUDGES:** JACOBS, JUSTICE. *

> * Sitting by designation as Vice Chancellor under Del. Const., Art. IV, § 13(2).

**OPINIONBY:** JACOBS

**OPINION:**

### MEMORANDUM OPINION

JACOBS, JUSTICE *

> * Sitting by designation as Vice Chancellor under Del. Const., Art. IV, § 13(2).

[*2]

Presently pending are two motions presented by the plaintiffs. The first seeks the entry of default judgment against defendant Jozef Lernout. The second seeks a determination of damages, following the entry of default judgment, against all defendants. For the reasons discussed below, both motions will both be granted.

### I. FACTS

The plaintiffs are Stonington Partners, Inc., the Stonington Capital Appreciation 1994 Fund, L.P., and Stonington Holdings, L.L.C. (collectively "Stonington"). n1 Stonington owned approximately 96% of the issued and outstanding capital stock of Dictaphone Corporation, a Delaware corporation ("Dictaphone"). In May 2000, Stonington sold their interest in Dictaphone to the defendants. n2 This lawsuit arises out of that sale.

> n1 Stonington Partners, Inc., a Delaware

corporation, is the management company that controls the Stonington Capital Appreciation 1994 Fund. Stonington Capital Appreciation 1994 Fund, L.P. is a Delaware limited liability company. All three plaintiff entities have their principal place of business in New York.

> n2 Dictaphone, which is headquartered in Connecticut, develops, manufactures, markets, services, and supports integrated voice and data management systems and software.

[*3]

Four defendants were joined in this action. The corporate defendant, Lernout & Hauspie Speech Products, N.V. ("L&H"), is a Belgian corporation whose principal places of business are located in Ieper, Belgium and Burlington, Massachusetts. The three individual defendants are Jozef Lernout ("Lernout"), Pol Hauspie ("Hauspie"), and Nico Willaert ("Willaert"). n3 Default judgments were entered against defendants Hauspie and Willaert at an earlier stage of this case. n4

> n3 Lernout and Hauspie are the co-founders of L&H. Until November 9, 2000, both were managing directors and co-chairmen of L&H's board of directors. Willaert was L&H's vice-chairman, and was also a managing director until November 9, 2000. Both Willaert and Hauspie were directors of L&H until November 22, 2000.

> n4 *Stonington Partners, Inc. v. Lernout & Hauspie Speech Products, N.V.,* 2002 Del. Ch. LEXIS 123 (Del. Ch., Oct. 23, 2002) (Jacobs, V.C.).

In May 2000, L&H purchased Stonington's 96% interest in Dictaphone in exchange [*4] for L&H stock then worth $ 489,183,707. As a result, Dictaphone became a wholly owned subsidiary of L&H. Six months later, in early November 2000, L&H announced that because of "accounting irregularities," it had restated its publicly-filed financial statements for 1998, 1999, and the first half of 2000. As a result, $ 373 million of revenues that L&H had publicly reported for the period January 1998 through June 2000, evaporated.

Days later, on November 29, 2000, L&H filed for bankruptcy in both the United States and Belgium. The effect of those proceedings was to render essentially worthless the L&H stock that Stonington had received in connection with L&H's May 2000 purchase of Stonington's Dictaphone stock.

Stonington commenced this action on November 27, 2000, claiming that the defendants had defrauded them. Stonington sought rescission of the Dictaphone stock transaction; or alternatively, money damages for the value of the L&H stock as of the merger date; plus prejudgment interest.

The defendants were served with process on December 6, 2000. On October 30, 2001, eleven months after this action was filed, Lernout moved for an enlargement of time to answer or otherwise respond [*5] to the complaint. Hauspie and Willaert never entered an appearance in this action until January 11, 2002, at which time they resisted Stonington's motion for the entry of default judgment against them. By Opinion dated October 23, 2002, this Court granted the plaintiffs' motion for default judgment against Hauspie and Willaert, and denied Lernout's motion for enlargement of time. n5 Thereafter, the plaintiffs brought on the pending motions.

n5 *Stonington Partners, 2002 Del. Ch. LEXIS 123, at *32.*

## II. THE GOVERNING LAW AND THE PARTIES' CONTENTIONS

The plaintiffs seek the entry of a default judgment against Lernout and an award of damages against all the defendants. [HN1] Under Rule 55(b), this Court may enter a default judgment where a party has failed to appear, plead, or defend a case. The party seeking entry of the default must apply for that relief, and thereafter, the Court may conduct whatever hearings, or request whatever information, it requires to enable it to determine what damages [*6] are appropriate. n6

n6 *See* Ch. Ct. R. 55(b).

Lernout contends that no default judgment can be entered against him, because he was improperly served with process under the Hague Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Convention"). Lernout argues that because he is a citizen and resident of Belgium, service of process on him by registered mail was a nullity.

The plaintiffs disagree. They contend that default judgment is fully warranted, because Lernout waived any service of process defense by failing to respond in a timely manner after receiving actual notice of the complaint. They further contend that under the Convention, service by mail is permissible.

Assuming that the motion for default judgment against Lernout is granted, the plaintiffs also seek a determination of damages against all defendants. Stonington contends that because rescission is impracticable, they are instead entitled to damages of $ 489,183,707, plus prejudgment interest [*7] of $ 51,364,289 per year. Defendants Hauspie and Willaert contend, for various reasons, that the amount of damages being requested was improperly calculated. Lernout contends that the damages should be measured by the plaintiffs' out-of-pocket loss, *i.e.,* the difference between the value of the property that the plaintiffs gave up and the value of the property that they received. Lernout also argues that the plaintiffs are not entitled to prejudgment interest as a matter of right.

The plaintiffs next contend that under Rule 55(b), this Court, in its discretion, may determine damages without a live evidentiary hearing. Stonington argues that the Rule permits the Court to determine damages based on affidavits and other evidentiary materials filed after the entry of default judgment, thereby obviating the need for a hearing and discovery. The defendants disagree. They contend that they are entitled to discovery and to a live hearing as a matter of right.

The above-recited contentions boil down to two issues. The first is whether the motion for entry of default judgment against Lernout should be granted. The second is whether a hearing and discovery are necessary to determine damages, [*8] and if not, what the appropriate amount of damages should be.

I turn to those issues.

## III. ANALYSIS

### A. The Motion For Default Judgment Against Lernout

This Court has previously found that the plaintiffs have satisfied the test for the entry of a default judgment against Lernout. n7 Its reasons were set forth at length in the Court's earlier Opinion, n8 and will not be repeated here. In this Opinion, what the Court considers are Lernout's newly proffered reasons why, despite his default, judgment should not be entered against him. Lernout argues that service was improper. The plaintiffs respond that service was proper for three independent reasons. First, service was proper under the Convention because the plaintiffs complied with the Delaware long arm statute. Second, Lernout was properly served through the mail as permitted by the Convention. Third, Lernout has waived any objection to ineffective service. The

Court determines that all of plaintiffs' arguments are meritorious.

n7 *Stonington Partners, 2002 Del. Ch. LEXIS 123, at *15-*17.*

n8 *See id.*

[*9]

1. Lernout Was Properly Served

Lernout contends that he was improperly served with process under the Convention. He argues that the Convention requires that he be personally served, which was not done here. Lernout is wrong. [HN2] Article 10(a) of the Convention n9 permits judicial documents to be sent directly to foreign parties through postal channels. The Article relevantly provides that "provided the State of destination does not object, the present Convention shall not interfere with ... the freedom to send judicial documents, by postal channels, directly to persons abroad..." n10 Neither the United States nor Delaware "objected."

n9 Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, art. 10(a), *20 U.S.T. 361.*

n10 *See id.*

[HN3] Delaware case law holds that where the requirements for service of process under the Delaware long arm statute are satisfied, then so, too, are the service requirements under the Convention. n11

[*10]  [HN4] Section 3104(b) of Delaware's long arm statute provides that a defendant is effectively served with process when service is made upon Delaware's Secretary of State. n12 Section 3104(b) does not require that the process documents be physically served upon the nonresident defendant. All that the statute requires is that a copy be sent to the nonresident defendant by registered mail.

n11 *Quinn v. Keinicke, 700 A.2d 147, 155-56 (Del. Super. 1996)* (holding service of process sufficient because Delaware's long-arm statute required actual service upon Delaware Secretary of State but only notice to defendant). The courts have split over the meaning of Article 10(a) of the Convention. A majority of courts follow the position asserted in *Quinn,* namely that the word "send" in Article 10(a) means "service." *But see*

*Bankston v. Toyota Motor Corp., 889 F.2d 172 (8th Cir. 1989)* (maintaining that Article 10(a) does not endorse service by mail). The *Bankston* court employed a literal interpretation of Article 10(a), and found that when they drafted the Convention, the drafters intended to distinguish between the terms "service" and "send." *See id. at 173-74.*

[*11]

n12 *10 Del. C. § 3104(b).*

Here, the plaintiffs initially served the complaint and summons upon the Delaware Secretary of State, and sent copies of the complaint to each Belgian defendant by registered mail. Because those documents were "sent" within the meaning of Delaware's long arm statute and Article 10(a) of the Convention, the plaintiffs complied with the service requirements of both. Service of process was, therefore, valid.

2. Service By Mail Is Permitted Under The Convention

In addition, and in the alternative, the plaintiffs argue that service was promptly effected under the Convention, which permits service of process by mail. [HN5] Delaware Courts have interpreted Article 10(a) of the Convention broadly to effect its intended purpose, which is to simplify service of process upon nonresident defendants abroad. n13 Lernout's arguments -- which advocate different requirements for service than those permitted by the Convention -- are without merit. n14

n13 *See Quinn, 700 A.2d at 156-60. See also Wright v. American Home Products, Inc., 768 A.2d 518, 526 (Del. Super. 2000)* (adopting the dicta of the *Quinn* ruling).

[*12]

n14 *See Quinn, 700 A.2d at 159* (citing *Hague Service Convention,* reprinted in 28 *U.S.C.A.* Rule 4 at 219-21 nn. 3, 3c, 11a. 11d (West 1992)). The Court is also persuaded by the fact that objection to any Article is permitted and certain states found it necessary to object to service of mail. Belgium did not object to service by mail, as did other signatories. Among the states objecting to service by mail, as they understood Article 10(a) to provide for, were Mexico, Bulgaria, and China. Other states, such as Canada and Pakistan, explicitly agreed to

service of process by mail under Article 10(a). *See also* United States Department of State Opinion Regarding the *Bankston* Case and Service by Mail to Japan under the Hague Service Convention, 30 I.L.M. 260, 261 (1991). It is apparent that the United States Department of State takes the position that service by mail is permitted under the Convention.

Thus, for the two reasons addressed above, Lernout was properly served under the Delaware long arm statute and the Convention. n15 But, there is a third reason.

[*13] [HN6] Where, as here, a defendant fails without excuse to answer the complaint in a timely manner, the defense of defective process is deemed to have been waived. n16 Here, because Lernout failed without excuse to answer in a timely manner, he is precluded from raising the defective process defense on the ground of waiver.

n15 *Stonington Partners, Inc., 2002 Del. Ch. LEXIS 123, at *31 n. 29.*

n16 Ch. Ct. R. 12(h)(1); *see Tuckman v. Aerosonic Corp., 394 A.2d 226, 232-33 (Del. Ch. 1978).* (holding that failure to assert defenses promptly resulted in a waiver). Rule 12(a) requires that an answer be served within 20 days of service of the complaint on defendant unless the time for answering is extended, and therefore, under normal circumstances a defendant would be held to have waived the defenses of lack of jurisdiction over the person and insufficient service of process if the defenses had not been raised in the answer or by motion before service of the answer. In either event whether raised by motion or pleading, the maximum time allowed would have been 20 days from service of the complaint on a defendant. *See id. at 233. See also* 5a Wright & Miller, *Federal Practice and Procedure,* § 1391 (2d ed. 1990). [HN7] "But when the party has received actual notice of the suit there is no due process problem in requiring him to object to the ineffective service within the period prescribed by Rule 12(h)(1) and the defense is one that he certainly can waive if he wishes to do so." *See id.* at 756.

[*14]

**B. The Motion For A Determination Of Damages**

[HN8] Once a default is established, the defaulting party loses standing to contest the factual allegations of the claim. n17 Because default judgments have been granted against Lernout, Willaert, and Hauspie, the only remaining issue is what relief is appropriate. The appropriate relief in these circumstances is damages.

n17 *Gebelein v. Four State Builders, 1982 Del. Ch. LEXIS 479,* at *4 (Del. Ch. Oct. 8, 1982) (citing *Thomson v. Wooster, 114 U.S. 104 (1885))* (hereinafter "*Gebelein I*").

1. Discovery And Hearing Unnecessary

Because Dictaphone has now been absorbed into a subsidiary of L&H, I find that the equitable remedy of rescission is impractical. Accordingly, the Court will award money damages. n18

n18 *Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983).*

[*15]

The defendants argue that before damages can be determined, they are entitled to take discovery and have an evidentiary hearing. [HN9] Rule 55(b) provides that the Court may hold a post-default hearing to determine "the amount of damages or to establish the truth of any averment by evidence..." if it finds such a hearing to be necessary. n19 Where a default has occurred, it is common for courts to determine the damages that the plaintiffs are entitled to recover, and then enter judgment accordingly. The damages are calculated from the established facts and other record evidence. n20 Hearings are commonly held where the amount of damages is unknown, but in all events, the issue of whether or not to hold a hearing remains entirely within the Court's discretion. n21 There is no "entitlement" to a hearing as a matter of right.

N19 Ch. Ct. R. 55(b).

n20 *See Pope v. U.S., 323 U.S. 1, 12, 89 L. Ed. 3, 65 S. Ct. 16 (1944)*

n21 *Gebelein v. Four State Builders, 1983 Del. Ch. LEXIS 492,* at *1-*2 (Del. Ch. Feb. 24, 1983) (hereinafter "Gebelein II"). 10 Wright & Miller, *Federal Practice* § 2688 (1973).

[*16]

In this case, damages can be determined without a live evidentiary hearing. The defendants contend that a hearing is needed, because plaintiffs' request for damages

is not for a "sum certain." The Court disagrees. L&H was willing to exchange 9,064,329 shares of its own common stock in exchange for Stonington's 96% ownership interest in Dictaphone. On the day of the transfer, that L&H stock was worth $ 489,183,707 on a market value basis. n22

> n22 Calculated as follows: 9,064,329 shares of L&H stock having a market value of $ 53.969 per share on May 5, 2000, the date of the transaction.

The defendants also seek discovery relating to the damages issue, specifically, information that would enable them to analyze Dictaphone's financial condition at the time of the transaction. This argument fails for two reasons. First, the defendants have not shown how such discovery would have any discernible relevance to the issue of damages, even under the flexible standard of Rule 26. Second, the defendants had ample opportunity [*17] to analyze Dictaphone's financial statements during and as part of their due diligence, when they acquired the Dictaphone stock on May 5, 2000. The defendants should have performed their due diligence at that time. They cannot be permitted to do so now under the guise of conducting discovery, particularly where, as here, the only practical effect would be to delay this proceeding for no legitimate purpose.

The Court next turns to the issue of how damages should be computed.

2. Determination of Damages

[HN10] Where, as here, a party to a contract is entitled to a money judgment for having been defrauded into surrendering property, one measure of recovery is restitutionary, *i.e.*, the extent of the wrongdoer's unjust enrichment measured by the value of the surrendered property at the time of its improper acquisition. n23 Alternatively, the Court may award the plaintiffs their "out-of-pocket" loss, which is the difference between the value of what they gave up and the value of what they received in return. n24 The plaintiffs here seek damages in the amount of $ 489,183,707. The defendants argue that damages should not exceed the plaintiffs' "out-of-pocket" loss, which would require [*18] subtracting from the $ 489,183,707, the present worth of Stonington's L&H stock.

> n23 *See Morris v. Thayer*, 1991 Del. Ch. LEXIS 190, at *7 (Del. Ch. Nov. 15, 1991); *see also Restatement (First) of Restitution* § 151 (1937).

> n24 *Morris*, 1991 Del. Ch. LEXIS 190, at *7.

That contention, even if accepted, is of no help to the defendants. Here, damages of $ 489,183,707 would be justified whether measured by restitutionary (*i.e.*, unjust enrichment) or out-of-pocket standard, n25 because the L&H stock is currently worth nothing ($ 0). n26

> n25 In many cases, these amounts would differ, but due to the underlying facts of this case, they are the same.

> n26 Therefore, the plaintiffs' out-of-pocket loss is $ 489,183,707 ($ 489,183,707 less $ 0); and because no proof was offered that the value of L&H stock at any time after the transaction was worth more than $ 0, the defendants were unjustly enriched by $ 489,183,707.

[*19]

Here, damages will be computed on the "out-of-pocket" basis. The issues, therefore, become: (i) what was the value of the Dictaphone stock and (ii) what was the value of the L&H stock exchanged therefor, at the time of the transaction?

In this case, the parties contracted for the sale of plaintiffs' Dictaphone stock in exchange for L&H stock that had a particular value at that time. The plaintiffs contend that their damages should equal the market price of the L&H stock they received on the day of the Dictaphone transfer. On May 5, 2000, the day of the transfer, the market price of L&H stock was $ 53.969 per share. Because Stonington received 9,064,329 shares of L&H stock, L&H must have regarded the value of Stonington's 96% ownership interest in Dictaphone as worth $ 489,183,707 ($ 53.969 x 9,064,324).

The defendants do not contest that value. n27 They claim, however, it must be reduced by the value of the L&H stock that they received and presently own. As a theoretical matter that is true, but in fact it makes no difference because, as a result of the fraud perpetrated by defendants, L&H's stock value is worthless. n28 Measuring damages under the "out-of-pocket" approach, this [*20] Court finds that plaintiffs gave up Dictaphone stock having a value equivalent to $ 489,183,707 (based on the then-market price of L&H stock), in exchange for 9,064,329 shares of L&H that are now worthless. Therefore the plaintiffs will be awarded their "out-of-pocket" loss of $ 489,183,707 ($ 489,183,707 less $ 0). n29

n27 Hauspie & Willaert Ans. Br. at 4.

n28 The L&H stock is no longer publicly traded. L&H stock declined dramatically, falling from a high of $ 72.50 in March 2000 to $ .76 on December 29, 2000. On December 6, 2000, the common stock of L&H was de-listed by Nasdaq. Thereafter, L&H voluntarily de-listed from Nasdaq Europe in March 2001. *See The Commission Files Fraud Action against Lernout & Hauspie Speech Products, at* http://www.sec.gov/litigation/litreleases/lr17782.htm (Oct. 10, 2002). The SEC has also revoked its registration. L&H stock is no longer listed on the Pink Sheets Registry. There no longer exists any public market for L&H stock.

n29 *See Tam v. Spitzer,* 1995 Del. Ch. LEXIS 116, at *28-*30 (Del. Ch. Aug. 17, 1995). The damages in a fraud case are calculated by determining the amount a party should have received at the time of a transaction less the value of what that party actually received. In *Tam,* the plaintiffs purchased a business for $ 103,500. Plaintiffs later learned that the defendants had defrauded them and the company was actually worth $ 58,210 less. This Court awarded damages in the form of a $ 58,210 reduction in the purchase price. Here, however, because the L&H stock is worthless, there is no value to subtract from the purchase price.

[*21]

The parties also dispute the plaintiffs' claim for prejudgment interest. [HN11] An award of prejudgment interest is within this Court's discretion. n30 Given the defendants' egregious fraud, prejudgment interest is appropriate in this case. n31 [HN12] The legal rate of interest, which is the Federal Discount Rate plus 5%, is a benchmark from which the Court may deviate in its sound discretion. n32 The Court finds no reason to deviate from the legal rate in this case.

n30 *Gaffin v. Teledyne,* 611 A.2d 467, 467 (Del. 1992).

n31 *RGC Int'l Investors, LDC v. Greka Energy Corp.,* 2001 Del. Ch. LEXIS 107, at *68 (Del. Ch. Aug. 22, 2001).

n32 *See 6 Del. C. § 2301.*

To calculate the appropriate rate of prejudgment interest, the Court must first determine when prejudgment interest began to accrue. Here interest began accruing on the date the fraud was perpetrated on the plaintiffs - May 5, 2000. Accordingly, prejudgment interest will be awarded for the period

[*22] May 5, 2000 up to and including the date of judgment. n33

n33 To afford counsel guidance in determining the prejudgment interest rate, they should average (i) the monthly Federal Discount Rate (Federal Funds) for the months of May 2000 to December 2000 (6.61875%), (ii) the composite Federal Discount Rate for 2001 (3.40%), and for 2002 (1.17%), and (iii) the monthly rates from January 2003 until the date that the judgment becomes final. To the resulting percentage, 5% should be added to arrive at the legal rate. *See RGC Int'l Investors,* 2001 Del. Ch. LEXIS 107, at *69. The monthly and weekly figures are available online at http://www.federalreserve.gov/releases/H15. The yearly figures are available at http://www.federalreserve.gov/releases/H15/data/a/dwb.txt.

## IV. CONCLUSION

For the reasons discussed, the plaintiffs' motions for the entry of default judgment against defendant Lernout, and for a determination of damages following entry of default judgment against defendants Lernout, Willaert, [*23] and Hauspie are granted. Counsel shall confer and submit an appropriate form of order.

## CERTIFICATE OF SERVICE

I, Adam W. Poff, Esquire, hereby certify that on May 16, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Duncan Grant., Esquire
> Pepper Hamilton LLP.
> Hercules Plaza, Suite 5100
> 1313 N. Market Street
> P.O. Box 1709
> Wilmington, DE 19899-1709

I further certify that May 16, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY FEDERAL EXPRESS**

> Larry R. Wood, Jr., Esquire
> Kathleen A. Mullen, Esquire
> Pepper Hamilton LLP.
> 3000 Two Logan Square
> Eighteenth & Arch Streets
> Philadelphia, PA 19103-2799

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com

*Attorneys for Syed Iqbal Raza, M.D..*