**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SYED IQBAL RAZA, M.D., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 06-132 (JJF) |
| | : | |
| SIEMENS MEDICAL SOLUTIONS USA, INC., | : | |
| SIEMENS MEDICAL SOLUTIONS HEALTH | : | |
| SERVICES CORP., SIEMENS CORPORATION | : | |
| and SIEMENS AG, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANT SIEMENS AG'S REPLY BRIEF
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

OF COUNSEL:

Kathleen A. Mullen
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000 (Telephone)
(215) 981-4750 (Fax)


Dated:  May 23, 2006

Duncan Grant (DE No. 2994)
Larry R. Wood, Jr. (DE No. 3262)
Phillip T. Mellet (DE No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
(302) 777-6500 (Telephone)
(302) 421-8390 (Fax)

*Attorneys for Defendant Siemens AG*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................................... 1

II.     ARGUMENT ........................................................................................................... 2

      A.     Plaintiff Misconstrues the Appropriate Legal Standard......................................... 2

            1.     Dr. Raza Has Failed to Establish Any Basis for Jurisdictional
                 Discovery. .............................................................................................. 2

      B.     Plaintiff Has Not Properly Served Siemens AG. ................................................... 4

      C.     Dr. Raza Has Not Demonstrated Any Basis For Jurisdiction Over Siemens
         AG. ............................................................................................................................ 5

            1.     Dr. Raza Has Failed to Make a *Prima Facie* Showing of Specific
                 Jurisdiction. ........................................................................................... 5

            2.     Dr. Raza Has Failed to Make a *Prima Facie* Showing of General
                 Jurisdiction. ........................................................................................... 6

            3.     Dr. Raza Cannot Ignore Corporate Formalities to Suggest
                 Jurisdiction Under Agency Principles. .................................................... 9

III.    CONCLUSION....................................................................................................... 11

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*Ace & Company, Inc. v. Balfour Beatty PLC*, 148 F. Supp. 2d 418 (D. Del. 2001)........................9

*Ames v. Whitman's Chocolates*, Civ. No. 91-3271, 1991 WL. 281798 (E.D. Pa. Dec. 30, 1991) ...................................................................................................................................2

*Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458 (D. Del. 1991)............................9

*B.L. Poe v. Babcock International*, 662  F. Supp. 4 (M.D. Pa. 1985) ...............................3

*Bauman v. Daimlerchrysler AG*, Civ. No. 04-00194, 2005 WL. 3157472 (N.D. Cal. Nov. 22, 2005) ..................................................................................................................................8

*Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc.*, 295 F. Supp. 2d 400 (D. Del. 2002) .......................................................................................................................5

*Bowers v. Neti Technologies, Inc.*, 690 F. Supp. 349 (E.D. Pa. 1988) ...........................8

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)...................................................8

*C.R. Bard Inc. v. Guidant Corp.*, 997 F. Supp. 556 (D. Del. 1998) ...................................4, 6, 7, 9

*Colonial Mortgage Service Co. v. Aerenson*, 603 F. Supp. 323 (D. Del. 1985)............................8

*Hansen v. Neumueller GmbH*, 163 F.R.D. 471 (D. Del. 1995) .......................................2

*Hill v. Equitable Trust Co.*, 562 F. Supp. 1324 (D. Del. 1983) .......................................8

*ICT Pharmaceuticals, Inc. v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 147 F. Supp. 2d 268 (D. Del. 2001) ..................................................................................................9

*IDS Life Insurance Co. v. SunAmerica Life Insurance Co.*, 136 F.3d 537 (7th Cir. 1998)............7

*Massachusetts School of Law at Andover, Inc. v. American Bar Association*, 107 F.3d 1026 (3d Cir.), *cert. denied*, 522 U.S. 907 (1997) ...................................................2

*Murphy Brothers v. Michetti Pipe Stringing, Inc,.*, 526 U.S. 344 (1999)........................4

*Provident National Bank v. California Federal Savings & Loan Associate*, 819 F.2d 434 (3d Cir. 1987)..................................................................................................3

WL: #188951 v1 (41SN01!.DOC)

*Reach & Associate v. Dencer Imperial Rubber Industrial*, 269 F. Supp. 2d 497 (D. Del. 2003) ....................................................................................................................6, 9

*Sanitec Industries Inc. v. Sanitec Worldwide, Ltd.*, 376 F. Supp. 2d 571 (D. Del. 2005) .....7, 8, 10

*E.I. DuPont de Nemours and Company v. Rhodia Fiber and Resin Intermdiates, S.S.A.*, 197 F.R.D. 112 (D. Del. 2000) ................................................................................4

*Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District Iowa*, 482 U.S. 522 (1987).................................................................................2

*Soma Medical International v. Standard Chartered Bank*, 196 F.3d 1292 (10th Cir. 1999) .........8

*TI Group Automotive Systems v. VDO North America LLC*, Civ. No. 00-432, 2002 WL. 484838 (D. Del. March 7, 2002)................................................................................6

*Telcordia Technologies, Inc. v. Alcatel S.A.*, Civ. No. 04-874, 2005 WL. 1268061 (D. Del. May 27, 2005) .........................................................................................3

*Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446 (3d Cir. 2003).................................................2

WL: #188951 v1 (41SN01!.DOC)

## I.     <u>INTRODUCTION</u>

Dr. Raza hopes to avoid dismissal of Siemens AG by ignoring the strict corporate formalities maintained by Siemens AG with subsidiaries directly or indirectly owned by it. Indeed, Dr. Raza fails even to address the Declaration submitted by Siemens AG confirming that Siemens AG does not do business in Delaware, that Siemens AG maintains a strict corporate policy of separateness and independence from its subsidiaries, and that it does not control its subsidiaries' activities.  Instead, Dr. Raza constructs a superficial argument by pointing to the brand "Siemens" and speculating that an agency relationship may exist based on the business of that brand.  This argument is without basis.  Dr. Raza offers no evidence whatsoever to suggest that Siemens AG exercises control over Siemens Medical Solutions Health Services Corporation ("Health Services"), the manufacturer of Soarian®; over Siemens Medical Solutions USA, Inc. ("Medical Solutions"), the entity that markets and sells Soarian® in the United States; or over any other directly or indirectly owned subsidiary.[1]

Dr. Raza's Answering Brief reflects a fundamental misunderstanding of the law as it relates to his burden of proof, service upon a foreign entity under the Hague Convention, and the minimum contacts necessary to establish personal jurisdiction, including the principle that filing actions to protect intellectual property rights does not establish general jurisdiction. Siemens AG is a German company with no contacts with the state of Delaware and neither the complaint nor Dr. Raza's Answering Brief contains any averments or competent evidence

---

[1]  *See* Declaration of James T. McAvoy, attached hereto as Exhibit A.  Defendant Health Services manufactures Soarian®, and Defendant Medical Solutions markets and sells Soarian® in the United States.  *See id* ¶¶ 3-4 .  Both of these Defendants have answered Dr. Raza's Amended Complaint.

linking Siemens AG and Delaware.  Dr. Raza's reliance on generalities, speculation and naked

conclusions is insufficient as a matter of law.

## II.    ARGUMENT

### A.    Plaintiff Misconstrues the Appropriate Legal Standard

#### 1.    Dr. Raza Has Failed to Establish Any Basis for Jurisdictional Discovery

Jurisdictional discovery is not appropriate unless a plaintiff has asserted a *prima*

*facie* basis to establish jurisdiction over the defendant, or stated differently, unless a plaintiff

"presents factual allegations that suggest 'with reasonable particularity' the possible existence of

the requisite 'contacts between [the party] and the forum state." *Toys "R" Us, Inc. v. Step Two,*

*S.A.*, 318 F.3d 446, 456 (3d Cir. 2003).  Without such allegations, the plaintiff's jurisdictional

claim is considered to be "clearly frivolous" and discovery is not permissible.[2]  *See id.; see also*

*Massachusetts School of Law at Andover, Inc. v. American Bar Association*, 107 F.3d 1026,

1042 (3d Cir.) (affirming denial of jurisdictional discovery and noting that an unsupported

allegation that the defendant "transacts business" in an area is "clearly frivolous"), *cert. denied*,

522 U.S. 907 (1997).  In *Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 476 (D. Del. 1995), the

court explained that "a plaintiff may not rely on the bare allegations in his complaint to warrant

further discovery." *Id.*  Further, in *Ames v. Whitman's Chocolates*, Civ. No. 91-3271, 1991 WL

281798, at *3 (E.D. Pa. Dec. 30, 1991)[3], the court rejected plaintiff's request for jurisdictional

discovery, noting that "since [plaintiff] has not contradicted the [defendant] parent corporation's

---

[2]    The Supreme Court has specifically cautioned lower courts to "exercise special
vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome,
discovery may place them in a disadvantageous position." *Societe Nationale Industrielle*
*Aerospatiale v. United States District Court for Southern Dist. Iowa*, 482 U.S. 522, 546 (1987).

[3]    All unreported cases are attached hereto at Exhibit C.

WL: #188951 v1 (41SN01!.DOC)

affidavit evidence, this Court is persuaded that it would be inappropriate to allow plaintiff to conduct a fishing expedition to construct a basis for jurisdiction." *See also B.L. Poe v. Babcock Int'l*, 662 F. Supp. 4, 7 (M.D. Pa. 1985) ("Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied").

Judge Sleet recently denied a plaintiff's request for jurisdictional discovery directed to a foreign parent where, like here, the plaintiff's allegations of jurisdiction were insufficient as a matter of law. *See Telcordia Technologies, Inc. v. Alcatel S.A.*, Civ. No. 04-874, 2005 WL 1268061, at ** 8-9 (D. Del. May 27, 2005). In *Telcordia*, the plaintiff brought a patent infringement action against Alcatel USA, a Delaware corporation, as well as that company's foreign parent Alcatel S.A., a French corporation. *Id.* at *1. In response to Alcatel S.A.'s motion to dismiss for lack of personal jurisdiction, the plaintiff attempted to base jurisdiction on an agency theory and requested jurisdictional discovery. *Id.* at *3. Judge Sleet rejected the plaintiff's argument that the parent and subsidiary "effectively operated as one," and further rejected plaintiff's request to conduct jurisdictional discovery, explaining that, like here, plaintiff's allegations were insufficient as a matter of law. *Id.* at ** 3-4, *8-9. In the face of the plaintiff's legally insufficient agency allegations, the Court concluded that "granting Telcordia's request for jurisdictional discovery would amount to allowing it to conduct a fishing expedition in order to form a basis for jurisdiction." *Id.* at *9.

Dr. Raza's request for jurisdictional discovery on Siemens AG is similarly without merit and based on incorrect assumptions. Dr. Raza's complaint is devoid of any assertions of jurisdiction, let alone assertions that meet the Third Circuit's requirement that such allegations suggest the existence of jurisdiction with "reasonable particularity." *See Provident*

-3-

*National Bank v. California Federal Savings & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir. 1987). Moreover, Dr. Raza has met Siemens AG's declaration evidence with only speculation and innuendo based only on the use of the "Siemens" brand name.  Delaware courts have rejected such attempts.  *See C.R. Bard Inc. v. Guidant Corp.*, 997 F.Supp. 556, 561 (D. Del. 1998) (rejecting agency and alter ego theory where subsidiary used parent's brand name).[4]

As such, Dr. Raza has failed to carry his burden of establishing by a preponderance of the evidence that minimum contacts have occurred sufficient to confer personal jurisdiction over Siemens AG, and further, the legal insufficiency of his allegations demonstrate that jurisdictional discovery is not appropriate.

B.    Plaintiff Has Not Properly Served Siemens AG

Dr. Raza attempts to create an argument that he properly accomplished service on Siemens AG merely by notifying Siemens AG of the action by mail.  *See* DI 20 at 15-17. Despite his efforts, it is clear that "[t]he Hague Convention applies where civil litigants have cause to transmit judicial or extrajudicial documents internationally."  *See E.I DuPont de Nemours and Company v. Rhodia Fiber and Resin Intermdiates, S.S.A.*, 197 F.R.D. 112, 123 (D. Del. 2000).  Dr. Raza does not dispute this well settled principle.  Unlike the *Quinn v. Keinicke* case cited by Dr. Raza (where the foreign state did not object to receiving judicial documents by postal channels), the Federal Republic of Germany has expressly objected to the transmittal of

---

[4]  Despite Dr. Raza's attempt to impugn Siemens AG for failing to respond to his discovery requests even though he has not yet served Siemens AG under the Hague Convention and the Federal Rules of Civil Procedure prohibit discovery at this time absent a court order, Dr. Raza cites no legal authority to fault Siemens AG for protecting its interests, nor could he, as such discovery is inappropriate.  *See Murphy Bros. v. Michetti Pipe Stringing, Inc*,. 526 U.S. 344, 347 (1999) (stating it is a "bedrock principle that an individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process.").

judicial documents by mail.  *See* DI 16 at 4-7.  As such, Dr. Raza has not properly served Siemens AG.

Dr. Raza tacitly admits the insufficiency of service by stating that he is "now in the process of serving Siemens AG through the Central Authority in Germany, in accordance with the Hague Convention."  *See* DI 20, at 16.  Thus, this Court should dismiss this action against Siemens AG given that Dr. Raza has yet to, and indeed may never, properly serve Siemens AG as required under the Hague Convention.

C.    <u>Dr. Raza Has Not Demonstrated Any Basis For Jurisdiction Over Siemens AG</u>

1.    <u>Dr. Raza Has Failed to Make a *Prima Facie* Showing of Specific Jurisdiction</u>

Dr. Raza claims that this Court can exercise specific jurisdiction over Siemens AG on the basis of Section 3104(c)(1), but admits, as he must, that, for purposes of specific jurisdiction, a nexus between the cause of action and the conduct allegedly establishing personal jurisdiction must exist.  *See* DI 20, at 8.  Indeed, for purposes of specific jurisdiction under Section 3104(c)(1), the acts alleged to support jurisdiction must be directed at Delaware residents and the protections of Delaware laws.  *Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc.*, 295 F.Supp.2d 400, 405 (D. Del. 2002).

Dr. Raza has not established, and indeed, cannot establish, a *prima facie* showing of specific jurisdiction under Section 3104(c)(1).

<u>First</u>, Dr. Raza, a Pakistani national, complains about an alleged misappropriation of trade secrets that purportedly occurred in Pakistan.  As such, he has not shown any jurisdictional act directed toward Delaware residents.

<u>Second</u>, Dr. Raza incorrectly relies on patent infringement cases which have based jurisdiction on a non-resident's use of an established distribution channel to market and sell *its* allegedly infringing products into Delaware.  *See* DI 20 at 9.  Unlike the defendants in the

-5-

cases cited by Dr. Raza, Siemens AG does not manufacture Soarian®.  *See* Ex. A ¶ 3; *see also C.R. Bard*, 997 F.Supp. at 561 (rejecting jurisdiction of non-resident parent on basis that it engaged in no production activities with respect to the product at issue).[5]

Accordingly, no basis exists for the exercise of specific jurisdiction over Siemens AG.

### 2.  Dr. Raza Has Failed to Make a *Prima Facie* Showing of General Jurisdiction

Dr. Raza also asserts that this Court can exercise general jurisdiction over Siemens AG on the basis of Section 3104(c)(4).  The exercise of general jurisdiction is appropriate only where a non-resident defendant engages in a "persistent course of conduct" in Delaware.  *C.R. Bard*, 997 F.Supp. at 561.  As this Court explained in *Reach & Assoc. v. Dencer Imperial Rubber Indus.*, 269 F.Supp.2d 497, 505 (D. Del. 2003), "[w]hile seemingly broad, the standard for general jurisdiction is high in practice and not often met."  *Id.*

Dr. Raza bases his assertion of general jurisdiction on three categories, none of which supports the exercise of general jurisdiction.

First, Dr. Raza argues that jurisdiction is proper where a defendant uses distribution channels "to sell *its* products in Delaware."  *See* DI 20 at 10 (emphasis supplied).  As explained above, Soarian® is not manufactured by Siemens AG and Siemens AG does not do business in the state of Delaware.  Thus, Dr. Raza has failed to establish that Siemens AG engages in a "persistent course of conduct" in Delaware as required by Section 3104(c)(4).

---

[5]    Dr. Raza's contention that Siemens AG's report must include Soarian® sales does nothing to advance his position on purported agency liability.  *See TI Group Automotive Systems v. VDO North America LLC*, Civ. No. 00-432, 2002 WL 484838, at *3 (D. Del. March 7, 2002) (dismissing claim that a parent's inclusion of a subsidiary's financial information in annual report supports agency theory of liability on parent and stating that parent's "annual report would necessarily include financial information about its subsidiaries").

Second, Dr. Raza speculates that Siemens AG sells other products in Delaware, including consumer household appliances, such as washers and dryers. *See* DI 20, at 10. That assertion is incorrect. Siemens AG does not manufacture the various consumer household appliances described in Dr. Raza's Answering Brief. *See* Declaration of Erhard Meitinger dated May 19, 2006, attached hereto as Exhibit B, ¶ 5. The entity that manufacturers those products, BSH Bosch und Siemens Hausgeräte GmbH, merely licenses the "Siemens" brand name for some of its products. *Id.* Dr. Raza is hoping to establish jurisdiction over Siemens AG, not based on Siemens AG's minimum contacts with the forum, but based on a superficial use of the "Siemens" brand name. The law is clear, however, that use of a parent's brand name, even in the context of a parent and subsidiary (which this is not) is insufficient as a matter of law to confer general jurisdiction on the parent. *See C.R. Bard*, 997 F.Supp. at 561 ("the court finds that [subsidiary's] use of [parent's] name does not justify the exercise of jurisdiction" over parent under Section 3104(c)(4)).[6]

Finally, Dr. Raza cites to four cases in which Siemens AG was involved (two as a plaintiff and two as a defendant) and argues that its presence in those actions alone constitutes a sufficient basis to confer general jurisdiction. The law, however, does not support Dr. Raza's argument. The cases cited by Dr. Raza do not hold that mere participation in litigation in the forum confers general jurisdiction on a non-resident. Rather, those cases found jurisdiction on

---

[6] Although mentioning a website, Dr. Raza does not rely on that to establish jurisdiction, nor could he. Several courts have held that the mere maintenance of a website cannot confer general jurisdiction upon a non-resident. *See Sanitec Industries Inc. v. Sanitec Worldwide, Ltd.*, 376 F.Supp.2d 571, 574 (D. Del. 2005); *C.R. Bard*, 997 F.Supp. at 561; *see also IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) (Posner, C.J.) (holding that a parent's advertising of its subsidiaries' products and services is insufficient to confer personal jurisdiction and noting that "if these relations between [defendant] and Illinois are sufficient to bring the company within the jurisdiction of the Illinois courts, then virtually every large company is within that jurisdiction").

the basis of substantial contacts with Delaware reflecting a persistent course of conduct in the state – contacts that are simply not present in this case.  In *Hill v. Equitable Trust Co.*, 562 F.Supp. 1324, 1330-31 (D. Del. 1983), the court exercised jurisdiction on the basis of defendant's "substantial contacts with Delaware," including the ownership of several bank accounts and participation in commercial loans in the state.  Similarly, in *Colonial Mortgage Service Co. v. Aerenson*, 603 F.Supp. 323, 327 (D. Del. 1985), the Court exercised general jurisdiction based on defendant's entering 200 loan agreements with Delaware mortgagors.

Contrary to Dr. Raza's position, participation in lawsuits either as a plaintiff or as a defendant is not sufficient as a matter of law to confer general jurisdiction over a defendant. Indeed, courts routinely conclude that filing an action to protect a property interest does not subject that litigant to general jurisdiction.  In *Sanitec Industries,* this Court held:  "[T]he Court concludes that filing UCC financing statements and appearing in state court are not the kinds of activities that constitute the kind of 'substantial and continuous local activity' necessary to subject [defendant] to general personal jurisdiction."  376 F. Supp. 2d at 574.  *See also Soma Medical International v. Standard Chartered Bank*, 196 F.3d 1292, 1296 (10th Cir. 1999) (filing of five civil cases insufficient to show the "substantial and continuous local activity necessary to subject defendant to general jurisdiction"); *Bauman v. Daimlerchrysler AG*, Civ. No. 04-00194, 2005 WL 3157472, at **8-9 (N.D. Cal. Nov. 22, 2005) (rejecting argument that foreign parent's pursuit of litigation in California, including suits to protect its patent rights, was sufficient to subject it to general jurisdiction there).[7]

---

[7]   Similarly, courts conclude that defending claims will not subject the litigant to general jurisdiction.  *See*, *e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 470, n. 11 (1985) (defendant conceded personal jurisdiction for purposes of litigating trademark claim, but was permitted to litigate issue of personal jurisdiction for breach of contract claim); *Bowers v. Neti*

(continued...)

Dr. Raza has failed to demonstrate any competent evidence to establish that substantial, continuous or persistent contacts exist between Siemens AG and the state of Delaware. To the contrary, Siemens AG does not conduct business in Delaware, it engages in no sales or marketing activities in Delaware, it owns no real or personal property in Delaware, it has no employees in Delaware and it is not obliged to pay any taxes in Delaware. *See See* DI 15, Ex. A, ¶ 3. In short, Siemens AG lacks any presence in Delaware to satisfy the "high standard of a 'persistent course of conduct' required" under Section 3104(c)(4). *Reach & Assoc.*, 269 F. Supp. 2d at 505.

 3. Dr. Raza Cannot Ignore Corporate Formalities to Suggest
  Jurisdiction Under Agency Principles

It is firmly established that the mere ownership of a Delaware subsidiary cannot confer jurisdiction over a over a non-Delaware parent. *See Ace & Company, Inc. v. Balfour Beatty PLC*, 148 F.Supp.2d 418, 422-23 (D. Del. 2001); *see also ICT Pharmaceuticals, Inc. v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 147 F.Supp.2d 268, 274 (D. Del. 2001) ("The court will not lightly set aside corporate formalities in order to hail a foreign corporation into this judicial district.").

To establish personal jurisdiction over a non-resident defendant on an agency theory, a court must focus on the arrangement between the parent and subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim. *C.R. Bard, Inc. v. Guidant Corp.*, 997 F.Supp. 556, 560 (D. Del. 1998). "The agency theory . . . examines the degree of control which the parent exercises over the subsidiary." *Applied*

_____

(continued...)

*Technologies, Inc.*, 690 F. Supp. 349, 356-57 (E.D. Pa. 1988) (no personal jurisdiction over defendants who earlier consented to jurisdiction in a separate action).

-9-

*Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1463 (D. Del. 1991). Under the agency theory, "only the precise conduct shown to be instigated by the parent is attributed to the parent." *Id.* at 1464.

Here, Dr. Raza does not assert personal jurisdiction under the alter ego theory (and certainly could not). Instead, in addition to arguing (incorrectly, as explained above) that jurisdiction exists over Siemens AG, a German company, in its own right, he also argues that jurisdiction exists over Siemens AG under an agency theory. However, Dr. Raza is wrong and fails to support his arguments with any competent evidence. *See Sanitec Industries, Inc.*, 376 F. Supp.2d at 573 (plaintiff has burden to establish minimum contacts by preponderance of the evidence, and "must sustain its burden of proof . . . through sworn affidavits or other competent evidence").

Indeed, reflecting the lack of any support for his position, Dr. Raza ignores the declaration of Erhard Meitinger that belies Dr. Raza's bare conclusions. Siemens AG has demonstrated that, in addition to the fact that Siemens AG does not do any business or have any business presence in Delaware, Siemens AG is a separate entity from subsidiaries directly or indirectly owned by it. All corporate formalities are observed, and Siemens AG and its various subsidiaries: have separate officers and independent boards of directors; conduct separate board meetings; maintain separate minutes; maintain separate books and records; and have separate headquarters and office space. *See* DI 15, Ex. A; *see also* Ex. B, ¶¶ 3-4. Further, all transactions between Siemens AG and its various subsidiaries "are conducted on an 'arms-length' basis." DI 15, Ex. A, ¶ 6. Siemens AG does not direct the activities of its various subsidiaries, including Health Services and Medical Solutions. *See id.*, ¶ 5; Ex. A ¶¶ 3-4.

Dr. Raza has not alleged, and indeed, cannot allege as it is inconsistent with the facts, that Siemens AG controls the activities of Health Services or Medical Solutions. Similarly, Dr. Raza has failed to allege that Siemens AG "instigated" any of the actions which Dr. Raza now tries to attribute to Siemens AG.  Accordingly, Dr. Raza's attempts to rest personal jurisdiction on agency concepts must also be rejected.  *See Ace & Co, Inc.*, 148 F. Supp. at 425 (now Chief Judge Robinson concluding that the facts do not justify an assertion of personal jurisdiction under the agency theory).

## III.    <u>CONCLUSION</u>

For the reasons set forth above and for all of the reasons contained in Siemens AG's Opening Brief, this Court should grant Siemens AG's Motion to Dismiss Plaintiff's Complaint against it with prejudice.

Respectfully submitted,


/s/ Larry R. Wood, Jr.

OF COUNSEL:

Kathleen A. Mullen
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000 (Telephone)
(215) 981-4750 (Fax)



Dated:  May 23, 2006

M. Duncan Grant (DE No. 2994)
Larry R. Wood, Jr. (DE No. 3262)
Phillip T. Mellet (DE No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
(302) 777-6500 (Telephone)
(302) 421-8390 (Fax)

*Attorneys for Defendant Siemens AG*

WL: #188951 v1 (41SN01!.DOC)

## CERTIFICATE OF SERVICE

I, Phillip T. Mellet, hereby certify that on this 23rd day of May, 2006, I caused to

be served the foregoing Defendant Siemens AG's Reply Brief in support of its Motion to

Dismiss Plaintiff's Complaint *via* CM/ECF and hand delivery upon the following:

> Martin S. Lessner, Esquire
> Young, Conaway Startgatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE  19899
> mlessner@ycst.com



> /s/ Phillip T. Mellet
> Phillip T. Mellet (DE No. 4741)

*EXHIBIT A*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SYED IQBAL RAZA, M.D., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 06-132 (JJF) |
| | : | |
| SIEMENS MEDICAL SOLUTIONS USA, INC., | : | |
| SIEMENS MEDICAL SOLUTIONS HEALTH | : | |
| SERVICES CORP., SIEMENS CORPORATION | : | |
| and SIEMENS AG, | : | |
| | : | |
| Defendants. | : | |

## DECLARATION OF JAMES T. McAVOY

I, James T. McAvoy, make the following declaration under penalty of perjury under the laws of the United States:

1.      My name is James T. McAvoy.  I am employed by Siemens Medical Solutions Health Services Corporation ("Health Services") as a Project Manager Level 5 (Technical) and Patent Manager, in Malvern, Pennsylvania.  I have been working for Health Services for the past 33years (27 of which were for the predecessor company Shared Medical Systems Corporation, acquired by Siemens in 2000) and am familiar with Soarian®.  I understand that a lawsuit has been filed against Health Services, Siemens Medical Solutions USA, Inc., and Siemens AG in the federal district court for the District of Delaware.  I am over the age of twenty-one and give this declaration on the basis of my personal knowledge, investigation and belief for use in that litigation.

2.      I have reviewed Plaintiff's Answering Brief in Opposition to Defendant Siemens AG's Motion To Dismiss ("Answering Brief").  A number of the statements and inferences made in that Answering Brief relating to the manufacture, marketing and sales of Soarian® are not factually accurate.

3.      Soarian® is manufactured by Health Services, not by Siemens AG.  Health Services is a wholly owned subsidiary of Siemens Medical Solutions USA, Inc.

4.    Soarian® is marketed and sold in the United States by Siemens Medical Solutions USA, Inc., a wholly owned subsidiary of Siemens Corporation.  Siemens AG does not market or sell Soarian® in the United States.

Dated: May 22, 2006

_James T. McAvoy_____
Name: James T. McAvoy
Title:   Project Manager, Level 5 (Technical)

*EXHIBIT B*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYED IQBAL RAZA, M.D., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 06-132 (JJF) |
| | : | |
| SIEMENS MEDICAL SOLUTIONS USA, INC., | : | |
| SIEMENS MEDICAL SOLUTIONS HEALTH | : | |
| SERVICES CORP., SIEMENS CORPORATION | : | |
| and SIEMENS AG, | : | |
| | : | |
| Defendants. | : | |

**DECLARATION OF** Erhard Meitinger

I, Erhard Meitinger, make the following declaration under penalty of perjury under the laws of the United States:

1.      My name is Erhard Meitinger. I am employed by Siemens Aktiengesellschaft ("Siemens AG" or the "Company") as the Vice President of the Treasury Department, and my office is located in Munich, Germany. I have been working for Siemens AG for the past 19 years and am familiar with the structure and business operations of the Company. I understand that a lawsuit, has been filed against Siemens AG in the federal district court for the District of Delaware. I am over the age of twenty-one and give this declaration on the basis of my personal knowledge, investigation and belief for use in that litigation.

2.      I have reviewed Plaintiff's Answering Brief in Opposition to Defendant Siemens AG's Motion To Dismiss ("Answering Brief"). A number of the statements and inferences made in that Answering Brief relating to Siemens AG are not factually accurate.

3.      As stated in greater detail in my previous Declaration, attached to Siemens AG's Opening Brief in Support of its Motion to Dismiss Plaintiff's Complaint, Siemens AG does not "direct" or "control" the day-to-day operations or management of its directly and indirectly owned subsidiaries.

4.      Siemens AG does not do or conduct business in Delaware. Further, Siemens AG does not sell or market any products in the state of Delaware.

5.      The Answering Brief of Plaintiff Syed Iqbal Raza refers to various consumer household appliances, including washers and dryers. Siemens AG does not manufacture, sell or market these consumer household appliances anywhere in the United States,

including the state of Delaware. Instead, a different legal entity, BSH Bosch und Siemens Hausgeräte GmbH ("BSH Bosch"), a joint venture with Robert Bosch GmbH Stuttgart, manufactures and sells such consumer household appliances. BSH Bosch licenses the "Siemens" brand name for use on some of its products.

Name: EHETTINGER
Title: Vice President CTT

Dated: May 19, 2006

*EXHIBIT C*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYED IQBAL RAZA, M.D., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 06-132 (JJF) |
| | : | |
| SIEMENS MEDICAL SOLUTIONS USA, INC., | : | |
| SIEMENS MEDICAL SOLUTIONS HEALTH | : | |
| SERVICES CORP., SIEMENS CORPORATION | : | |
| and SIEMENS AG, | : | |
| | : | |
| Defendants. | : | |

## APPENDIX OF UNREPORTED OPINIONS

*Ames v. Whitman's Chocolates*, Civ. No. 91-3271, 1991 WL. 281798
    (Dec. 30, 1991) ............................................................................................ A-1

*Bauman v. Daimlerchrysler AG, Civ.* No. 04-00194, 2005 WL. 3157472
    (N.D. Cal. Nov. 22, 2005) ............................................................................ A-10

*Telcordia Technologies, Inc. v. Alcatel S.A.*, Civ. No. 04-874, 2005 WL. 1268061
    (D. Del. May 27, 2005) ................................................................................ A-27

*TI Group Automotive Systems v. VDO North America LLC,*
    Civ. No. 00-432, 2002 WL. 484838 (D. Del. March 7, 2002) ........................................ A-36

Westlaw.

Not Reported in F.Supp.                                                                Page 1

Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: Not Reported in F.Supp.)**

C
Briefs and Other Related Documents

United States District Court, E.D. Pennsylvania.
Marvin AMES
v.
WHITMAN'S CHOCOLATES, a DIVISION OF
PET INCORPORATED and Jay G. Shoemaker and
Whitman Corporation.
**Civ. A. No. 91-3271.**

Dec. 30, 1991.

Ronald H. Surkin, Media, Pa., Robert G. Haas, Blank, Rome, Comisky, & McCauley, Philadelphia, Pa., for plaintiff.
Allan M. Dabrow, Mitchell Feigenbaum, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for defendants.

*MEMORANDUM AND ORDER*

BARTLE, District Judge.
*1 This is an Age Discrimination in Employment Act ("ADEA") case filed pursuant to 29 U.S.C. § 621 *et seq.* The action was brought by Marvin Ames ("Ames") against (1) Whitman's Chocolates (" the chocolate company"), a division of Pet, Incorporated, which conducts a candy and chocolate manufacturing business in Pennsylvania; (2) Jay G. Shoemaker ("Shoemaker"), the former president of the chocolate company; and (3) Whitman Corporation ("the parent corporation"), the parent corporation of Pet with a principal place of business in Chicago, Illinois.

Plaintiff Ames contends that his employment as Vice President of Manufacturing and Technical Services for the chocolate company was terminated by defendants in violation of the ADEA. (Complaint at ¶¶ 5, 9, 12, 13, 14.) The parent corporation has moved for dismissal under Rule 12(b)(2) of the Federal Rules of Civil Procedure

claiming lack of jurisdiction over the person. Shoemaker has moved for dismissal under Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, claiming lack of subject matter jurisdiction and/or failure to state a cause of action because of Ames' failure to exhaust administrative remedies.[FN1] For the reasons set forth below, the motion of the parent corporation will be granted and the motions of Shoemaker will be denied. Additionally, the request of Ames for attorneys' fees and costs incurred in responding to the motions filed by Shoemaker will be denied.

I. *The Motion of the Parent Corporation to Dismiss for Lack of Jurisdiction Over the Person.*

A district court may assert jurisdiction over a nonresident defendant, such as the parent corporation, to the extent allowable under the due process clause of the federal constitution and the law of the state in which the court sits. *See* Fed.R.Civ.P. 4(e); *International Shoe Co. v. Washington,* 326 U.S. 310, 316-317, 66 S.Ct. 154, 158 (1940); *North Penn Gas v. Corning Natural Gas,* 897 F.2d 687, 689 (3d Cir.1990); *Provident National Bank v. California Savings and Loan Association,* 819 F.2d 434 (3d Cir.1987); *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 63 (3d Cir.1984).

The uncontroverted facts establish that the parent corporation is not incorporated under the laws of the Commonwealth of Pennsylvania, does not qualify as a foreign corporation under the laws of the Commonwealth, and has not consented to be sued within the Commonwealth. Jurisdiction, however, can exist under Pennsylvania's general personal jurisdiction statute if the corporation carries on "a continuous and systematic part of its general business within [the] Commonwealth" and, thus, has maintained continuous and substantial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 1*

Not Reported in F.Supp.                                                      Page 2

Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: Not Reported in F.Supp.)**

forum affiliations. *See* 42 Pa.Cons.Stat.Ann. § 5301; *Reliance Steel Products v. Watson, Ess, Marshall & Enggas,* 675 F.2d 587, 588 (3d Cir.1982); *North Penn Gas v. Corning Natural Gas, supra,* n. 2 at 690.

*2 Alternately, specific jurisdiction exists under Pennsylvania's Long Arm Statute, the reach of which is coextensive with the due process clause of the United States Constitution, if the cause of action arises from activities of defendant within Pennsylvania. The defendant, however, must have had sufficient minimum contacts within the forum so that maintenance of the suit would not offend notions of fair play and substantial justice, and the defendant reasonably could have anticipated being haled into court there. *See* 42 Pa.Cons.Stat.Ann. § 5322(b); *International Shoe v. Washington, supra* at 158; *North Penn Gas v. Corning Natural Gas, supra* at 690; *Provident National Bank v. California Federal Savings and Loan Association, supra* at 436-437; *Time Share Vacation Club v. Atlantic Resorts, Limited, supra* at 63.

Ames seeks to invoke specific jurisdiction on the ground that his termination was authorized and approved in advance by the parent corporation. (Complaint at ¶ 14; Memorandum of Law in Opposition to Motion to Dismiss at 2.) He further alleges the existence of general jurisdiction on the ground that facts exist "tending to show substantial involvement by Whitman Corp. in the operations of Pet and Whitman's [Chocolates]." (Memorandum of Law in Opposition at 3.)

Where, as here, a jurisdictional defense has been raised, plaintiff bears the burden of establishing contacts with the forum state sufficient to confer specific or general jurisdiction. Evidence before the court bearing on this question must be considered in the light most favorable to the plaintiff. Plaintiff, however, must come forward with sworn affidavits or other competent evidence to establish a *prima facie* case of jurisdiction. Pleadings alone and mere allegations will not suffice. *See North Penn Gas v. Corning Natural Gas, supra* at 689; *Stranahan Gear Company v. NL Industries,* 800 F.2d 53, 58 (3d Cir.1986); *Time Share Vacation Club v. Atlantic Resorts, Ltd, supra*

at 63, 66; *LaRose v. Sponco, Manufacturing, Inc.,* 712 F.Supp. 455, 458 (D.N.J.1989); *Boehringer, Inc. v. Murawski Corporation,* 699 F.Supp. 59, 61 (E.D.Pa.1988).

Plaintiff Ames contends that this Court has jurisdiction over the parent corporation because of its putative advance approval and authorization of his termination. Plaintiff, however, has failed to establish any such approval or authorization. The parent corporation has provided affidavits from William Moore, Vice President, Secretary and General Counsel of the parent corporation; defendant Jay G. Shoemaker, former President of the chocolate company; John C. Elbin, Vice President of Pet; and Miles Marsh, who was both Acting President of Pet and President of the parent corporation at the pertinent time. These affidavits establish that plaintiff's termination was not approved or authorized in advance by anyone in the parent corporation, including Mr. Marsh. (Moore affidavit at ¶ 10; Shoemaker affidavit at ¶ 2; Elbin affidavit at ¶ 4; Marsh affidavit at ¶¶ 1, 2.)

*3 Plaintiff alleges in response that he

is already in possession of evidence tending to contradict the assertions in the affidavit of William B. Moore, a Whitman Corp. officer, to the effect that Whitman Corp. was not involved in the day-to-day affairs of Pet, including matters relating to personnel.

(Memorandum of Law in Opposition at 2.) Plaintiff never specifies the nature of such evidence. Such an unsupported allegation is legally insufficient to sustain his burden of proof. Nor does he meet his burden by his additional sworn statement that "[o]n information and belief, Marsh was aware of, authorized and ratified Shoemaker's decision to terminate me." (Ames affidavit at ¶ 7). This plainly is inadmissible hearsay evidence under the Federal Rules of Evidence which apply to this civil proceeding. *See* Fed.R.Evid. 1101.

In addition, plaintiff Ames asserts that he

has already propounded interrogatories and document requests directed in part to fleshing out

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3

Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: Not Reported in F.Supp.)**

these facts [relating to his termination], to which Whitman Corp. has refused to respond pending disposition of its motion.

(Memorandum of Law in Opposition at 2.) The interrogatories are not of record and plaintiff has not moved, pursuant to Rule 37(a) of the Federal Rules of Civil Procedure, for an order compelling discovery. Further, since Ames has not contradicted the parent corporation's affidavit evidence, this Court is persuaded that "[i]t would be inappropriate ... to allow plaintiff to conduct a fishing expedition to construct a basis for jurisdiction." *Poe v. Babcock International, PLC,* 662 F.Supp. 4 (M.D.Pa.1985).

Ames' alternate assertion of general jurisdiction is predicated upon his putative awareness "of significant facts tending to show substantial involvement by Whitman Corp. in the operations of Pet and Whitman's [chocolates]." (Memorandum of Law in Opposition at 3.) The law applicable to specific factual allegations of such involvement is well settled. A foreign corporation is not subject to a forum state's jurisdiction merely because it owns stock in a subsidiary doing business within the state. General jurisdiction does exist, however, when the parent corporation exercises such a degree of control that (1) the subsidiary is its alter ego or agent, (2) the subsidiary is its mere instrumentality, or (3) the corporations function as one integrated enterprise. *See Lucas v. Gulf and Western Industries, Inc.,* 666 F.2d 800 (3d Cir.1981); *Beckwith v. International Mill Services,* 617 F.Supp. 187 (E.D.Pa.1985); *Kamens v. Summit Stainless, Inc.,* 586 F.Supp. 324 (E.D.Pa.1984).

The specifics asserted by Ames to support his claim of the parent corporation's "substantial involvement" in the affairs of the chocolate company are these:

(1) The parent corporation authorized Pet to commission a study into the chocolate company's possible relocation and had officials attend meetings to discuss the relocation plan. Ames "understood" that the "final call" on relocation lay with the parent corporation. (Ames affidavit at ¶ 3.)

*\*4 (2) Six (6) months before Ames' termination parent corporation officials announced, among other things, that the parent corporation "was ' undergoing a transformation from a loosely-held conglomerate to a more focused operating company' " and that additional reorganization might be considered where the parent corporation could " ' gain greater efficiencies as an operating company.' " (Ames affidavit at ¶ 4; Exhibit 1 at 3, 7.)

(3) Two (2) months before Ames' termination the parent corporation announced a plan to discard " ' its holding company structure for a more cost effective operating company structure' " and said that that program "would continue to move forward with 'cost reductions and reorganizations for greater efficiencies.' " (Ames affidavit at ¶ 5, Exhibit 1 at 11.)

(4) During the spring before Ames' termination the parent corporation commissioned a firm to study restructuring "the entire company." Based on conversations with Pet and chocolate company officials Ames "understood that [the parent corporation] had assumed a more active role in the day-to-day operations of the subsidiary." (Ames affidavit ¶ 6.)

(5) During the summer of 1990 there were shared common directors between Pet and the parent corporation when Miles Marsh, President and Chief Operating Officer ("COO") for the parent corporation, also served as President and Chief Executive Officer ("CEO") for Pet after Pet President and CEO J. Robert Cooper resigned because, it was reported in a trade magazine, of " ' apparently agreeing with [the parent corporation's] management on the need for a change at Pet.' " (Ames affidavit at ¶ 7; Exhibit 3.)

(6) A senior human resources officer from the parent corporation accompanied a search firm representative to the chocolate company to prepare to interview candidates for the presidency of the company-the position ultimately filled by Shoemaker. " 'This suggests that [the parent corporation] was directly involved in hiring Shoemaker.' " (Ames affidavit at ¶ 8.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 3*

Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: Not Reported in F.Supp.)**

(7) When he assumed the presidency of the chocolate company Shoemaker stated that revenue and profit goals and timetables had been set by Miles Marsh, the parent corporation's president. (Ames affidavit at ¶ 9.)

(8) Two (2) months after Ames' termination the corporate chairman and CEO announced that Miles Marsh had been given " 'direct management responsibility for Pet' " and that the parent corporation "had moved to reduce operational costs through the elimination of a thousand jobs in its subsidiaries through 'retirement, attrition and severance.' " (Ames affidavit at ¶ 10; Exhibit 4.)

(9) During Ames' tenure as vice president for the chocolate company every capital expenditure over a certain dollar amount had to be approved by the parent corporation. (Ames affidavit at ¶ 11.)

(10) During Ames' employment he and other employees participated in a parent corporation stock ownership plan which was totally separate from Pet and the chocolate company. (Ames affidavit at ¶ 12.)

**\*5** (11) During Ames' employment he and other key employees received stock options from the parent corporation. (Ames affidavit at ¶ 13.)

The competent evidence which plaintiff has proffered must be viewed in the light most favorable to him as the non-moving party, *see Time Share Vacation Club v. Atlantic Resorts, supra* at 63, 66; *LaRose v. Sponco, supra* at 458. The evidence presented by the parent corporation, however, is relevant to the extent that it supplements-rather than contradicts-the plaintiff's competent evidence. Thus, the Court may properly also consider the parent corporation's evidence (1) that the chocolate company was established before both its acquisition by Pet and Pet's acquisition by the parent corporation (Motion to Dismiss at ¶¶ 16-20, Moore affidavit at ¶¶ 1-4); (2) that only capital expenditures of a million dollars or more required corporate approval (Capital Appropriation Approval Policy of the parent corporation); and (3) that the senior human resources officer from the parent corporation who visited the chocolate

company with the executive recruiter did so solely to provide the recruiter the opportunity to familiarize himself with the business and the scope of the company president's responsibilities (Wright affidavit at ¶ 3).

Further, despite the requirement that the evidence be viewed in the light most favorable to plaintiff, the Court need accept only those inferences that reasonably and necessarily follow from the evidence. Accordingly, since other inferences are equally likely, the Court declines to conclude that the parent corporation was " 'directly involved in the hiring of Shoemaker.' " The Court also need not consider mere "plans" which have never been shown to have come to fruition at all, much less during the relevant time period. Neither is it bound by Ames' "understandings" based on non-specified conversations with unnamed Pet and chocolate company officials.

Thus narrowed, the competent evidence before the Court to be considered in deciding whether an alter ego, mere instrumentality or integrated enterprise test has been met, or whether the chocolate company served as an agent of the parent corporation, is as follows:

(1) the parent corporation authorized Pet to consider relocating the chocolate company and may have retained the right finally to decide whether relocation would occur;

(2) plans to change the parent corporation's role were announced and a restructuring study was commissioned;

(3) there was some shared common directorship during the summer of 1990 when Miles Marsh served as President and COO for the parent corporation and President and CEO for Pet;

(4) Marsh set goals and timetables for the chocolate company when Shoemaker assumed its presidency;

(5) the parent corporation retained the right to approve all capital expenditures of a million dollars or more; and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 4*

Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: Not Reported in F.Supp.)**

(6) various chocolate company employees participated in a parent corporation stock ownership plan and received parent corporation stock options.

**\*6** It is this Court's conclusion that the foregoing evidence does not met either the alter ego, the mere instrumentality or the integrated enterprise test. See *Lucas v. Gulf, supra; Beckwith v. International Mill Services, supra.*

The alter ego test allows a court to disregard a parent company's separate existence when the two companies are alter egos and "such disregard will ' prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability of a crime.' " *Kamens v. Summit Stainless, Inc., supra* 327 (quoting *Publicker Industries v. Roman Ceramics,* 603 F.2d 1065, 1069 (3d Cir.1979)).

Where a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are common to both boards of both. It is quite possible that those who occupy such positions might exercise some degree of control over the subsidiary. Nevertheless, as long as the corporations are separate entities, the subsidiary will not be deemed to be the "alter ego" of the parent, no matter how much control the parent exercises.

*Poe v. Babcock International, supra* at 6. *See also Berkowitz v. Allied Stores of Penn-Ohio, Inc.,* 541 F.Supp. 1209, 1214 (E.D.Pa.1982). The evidence before this Court does not meet the alter ego test.

In addition, plaintiff Ames has not established that the chocolate company is a mere instrumentality of the parent corporation or that these entities function as an integrated enterprise. Under the mere instrumentality test

the parent corporation will be held liable if (1) it controls the subsidiary to such a degree that the subsidiary is its instrumentality, (2) it is perpetrating a wrong, *e.g.,* violating a statute, through its subsidiary, and (3) an unjust loss would result if the parent is allowed to be shielded by its separate corporation.

*Kamens v. Summit Stainless, Inc., supra* at 327. Whether entities function as an integrated enterprise, on the other hand, requires a court to assess "the interrelations of the operations, the common management, centralized control of labor relations and common ownership or financial control existing between the parent and the subsidiary." *Beckwith v. International Mill Services, supra* at 189.

Applying these tests the *Beckwith* court, *supra* at 189 and 189-190, found that plaintiff had not met its jurisdictional burden where the executive vice president of the parent corporation was also the chairman of the board of the subsidiary, and where the subsidiary had the authority to develop its own budget, although the parent corporation retained the authority to approve or reject it. The facts in the case before the court are even more compelling in favor of a conclusion of lack of personal jurisdiction over the parent corporation. Here, there is substantially less control than was exercised in *Beckwith.* Further, the chocolate company was not created by the parent corporation for "tax or finance purposes to carry on their business." *Poe v. Babcock International, PLC, supra* at 7. Unlike the situation considered in *Berkowitz v. Allied Stores of Penn-Ohio, Inc., supra* at 1213-1214, the parent corporation here did not directly supervise and control the major decisions concerning the operations of the chocolate company.

**\*7** Neither does the evidence establish an agency relationship between the parent corporation and the chocolate company so that the parent corporation is an "employer," as that term is defined in § 630(b) of the ADEA.[FN2]

An agency relationship requires the presence and exercise of a master's control. The requisite inquiry is whether some nexus exists between the parent corporation and the subsidiary (or subsubsidiary) to indicate that the latter is not independent, "but rather *totally* under the control and dominion" of the parent. *Beckwith v. International Mill Services, supra* at 189 (emphasis added). *See also Odriozola v. Superior Cosmetic Distributors, Inc.,* 531 F.Supp. 1070, 1074 (D.P.R.1982). Unlike the situation considered in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 5*

Not Reported in F.Supp.                                                                    Page 6

Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: Not Reported in F.Supp.)**

*Bumpers v. International Mill Services, Inc.,* 595 F.Supp. 166, 170 (E.D.Pa.1984), where there existed a factual issue as to whether the parent company ordered the termination of older employees receiving high salaries, the evidence does not establish such a relationship in this case.

The parent corporation's motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure will be granted.

II. *The Motion of Shoemaker for Dismissal or for Summary Judgment Because of the Failure of Ames to Exhaust Administrative Remedies.*

Like claimants under Title VII of the Civil Rights Act, claimants under the ADEA must exhaust all federal and any and all existing state law administrative remedies. *See* 42 U.C.S. § 2000(e)-5(f)(1); 29 U.S.C. § 626(d); 29 U.S.C. § 633(b); *Borecki v. Eastern International Management Corporation,* 694 F.Supp. 47, 53 (D.N.J.1988); *Bumpers v. International Mill Services, Inc., supra* at 168.

In this case, Ames filed charges with the Pennsylvania Human Relations Commission (" PHRC"), in accordance with 29 U.S.C. § 626(d), after his employment was terminated on August 21, 1990 by Shoemaker who was then president of the chocolate company. *See also* 29 U.S.C. § 633(a) and 42 Pa.Cons.Stat.Ann. § 957. In that filing Ames named only the chocolate company and the parent corporation. The failure to name Shoemaker is the basis for the pending motion to dismiss and/or motion for summary judgment.

To support his motions Shoemaker alleges

(1) that plaintiff Ames was represented by experienced labor counsel at all stages of the proceedings, including the filing of the administrative complaint (Motion to Dismiss at ¶ 9);

(2) that Ames and his counsel were aware of Shoemaker's involvement in Ames' termination before the filing of the administrative complaint

(Motion to Dismiss at ¶ 14; Complaint at ¶ 12);

(3) that Shoemaker did not participate in the administrative hearings except in his capacity as president of the chocolate company (Motion to Dismiss at ¶ 12; Shoemaker affidavit at ¶ 8);

(4) that Shoemaker did not receive any indication that he would be charged individually (Motion to Dismiss at ¶ 12; Shoemaker affidavit at ¶ 8);

*8 (5) that if Shoemaker had been personally named as a defendant "he may have retained personal counsel at the initiation of this Complaint at the administrative level" (Motion to Dismiss at ¶ 16; Shoemaker affidavit at ¶ 10); and

(6) that if Shoemaker had been aware of the potential for personal liability "he may have pursued an early negotiated settlement of this matter, as it related to him personally, in conjunction with his participation in the fact-finding conference." (Motion to Dismiss at ¶ 17; Shoemaker affidavit at ¶ 11.)

Ames does not dispute most of the foregoing facts stated by Shoemaker. He argues in response, however, that Shoemaker has failed to allege "any actual, as opposed to speculative, prejudice to his interests by not being named as Respondent in the charge." (Memorandum of Law in Opposition at 13.) He further notes that Shoemaker attended the PHRC fact-finding conference with two (2) attorneys-one of whom is presently representing him and one of whom is a member of Pet's in-house legal staff-and that during the conference he consulted with counsel on several occasions when asked questions. (Ames affidavit at ¶ 5.) (*See also* Shoemaker affidavit at ¶ 8 acknowledging participation in the PHRC fact-finding proceeding.)

Plaintiff Ames has presented corroborated and uncontradicted evidence, supported by affidavit and a PHRC memoranda, which establishes that Shoemaker's name was on the complaint originally prepared for filing with the PHRC but that his name was removed upon the advice of a PHRC investigator who said that the filing would otherwise be rejected by the PHRC and by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 6*

Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: Not Reported in F.Supp.)**

EEOC. (Ames affidavit at ¶ 4; Exhibit 2.) He also has provided a letter which was transmitted to Shoemaker's counsel before the now pending motions were filed. It explained the reason for Shoemaker's non-inclusion in the PHRC filing and offered to provide supporting documentation (Exhibit 4).

The test which this Court must apply, in determining whether Shoemaker's exclusion from the PHRC complaint warrants his dismissal from this court action, was articulated by the Third Circuit in *Glus v. G.C. Murphy Company,* 562 F.2d 880 (3d Cir.1977). The four factors pertaining to such administrative filings and complaints which were set forth in that Title VII case and have since been applied in ADEA cases, are these:

1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the ... complaint;

2) whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the ... proceedings;

3) whether its [the unnamed party's] absence from the ... proceedings resulted in actual prejudice to the interests of the unnamed party; and

4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

**\*9** *Glus v. C.G. Murphy Company, supra* at 888. *See also Borecki v. Eastern International Management Corporation, supra* at 53. This four prong test, however, "is not a mechanical one. Instead, each factor should be evaluated in light of the statutory purposes of Title VII and the interests of both parties." *Glus v. G.C. Murphy Company,* 629 F.2d 248, 251 (3d Cir.1980), *vacated on other grounds Retail, Wholesale & Dept. Store Union v. G.C. Murphy Company,* 451 U.S. 935, 101 S.Ct. 2013 (1981). No one factor is determinative and

balancing is required. *See Borecki v. Eastern International Management Corporation, supra* at 55 .

Prongs (1) and (4) of the *Glus* test are closely related in that collectively they "are aimed at ferreting out and assessing the reasons for failing to name an entity." *Kouri v. Todd,* 743 F.Supp. 448, 451 (E.D.Va.1990). In this case the corroborated and uncontradicted evidence establishes that Shoemaker was deleted as a defendant in the PHRC complaint upon the advise of a PHRC employee. Shoemaker's involvement in the relevant events, however, was plainly specified (PHRC Complaint at ¶ 3H, I), and those specifications were clearly sufficient to put both Shoemaker and the state administrative agency on notice as to Shoemaker's alleged role. *Compare Borecki v. International Corporation, supra* at 54. Indeed, Shoemaker " received every indication that [his] conduct was being formally reviewed by the PHRC." *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1140 (E.D.Pa.1990). *See also Sandom v. Travelers Mortgage Services, Inc.,* 752 F.Supp. 1240, 1249 (D.N.J.1990); *Acampora v. Boise Cascade Corporation,* 635 F.Supp. 66, 71 (D.N.J.1986).

Prong (3) of the *Glus* test-pertaining to the similarity of interests of named and unnamed parties-also inures in favor of denying Shoemaker's motions. The allegedly discriminatory actions of Shoemaker occurred while he was acting within the scope of his employment with the result that "his interests could be adequately represented by his employer." *Borecki v. Eastern International Management Corporation, supra* at 54. In fact, it is reasonable to expect that Shoemaker, by virtue of his position as president of the chocolate company, could exercise authority over any litigation involving the company. *Compare Kouri v. Todd, supra* at 451. The law in this circuit is settled that the "court recognizes an exception when the unnamed party has received notice and when there is a shared commonality of interest with the named party." *Schafer v. Board of Public Education,* 903 F.2d 243, 251 (3d Cir.1990).

The final *Glus* prong to be considered-pertaining to whether an unnamed party's absence from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 8

Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: Not Reported in F.Supp.)**

administrative proceedings resulted in actual prejudice to his interests-also is not supportive of Shoemaker's position. The uncontradicted evidence establishes that Shoemaker was in fact present at the PHRC proceeding. Further, the prejudice which he asks this Court to find-based on his assertions that he might have retained personal counsel and sought an early settlement individually-is both speculative and unpersuasive. This is not a case in which Shoemaker faced possible exposure for legal fees and was precluded from attending the PHRC fact-finding hearing because he was not apprised in advance of the proceeding. Compare *Duva v. Bridgeport Textron,* 632 F.Supp. 880, 883 (E.D.Pa.1985). Neither was he deprived of the opportunity to participate in the hearing. *See Kouri v. Todd, supra* at 452. Under the balancing test of *Glus,* which this Court must apply, Shoemaker is not entitled to either dismissal or to a summary judgment, and his motions under Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure will be denied.

### III. *The motion of Ames for Attorneys' Fees and Costs Incurred in Responding to the Motion Filed by Shoemaker.*

**\*10** Ames has moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure, in the form of attorneys' fees and costs, claiming that a reasonable investigation of the facts, and a competent level of legal research, would have led counsel for Shoemaker to conclude that there was no legal basis for his motions filed under Rules 12 and 56 of the Federal Rules of Civil Procedure.

Insofar as counsel for Shoemaker was notified of Shoemaker's deletion as a defendant in the PHRC action based on the advice of a PHRC investigator ( *see* Exhibit 4), this fact certainly could have been noted and discussed in his Rule 12 and Rule 56 motions. Neither the exclusion of a discussion about this deletion nor the applicable law, however, establishes a bad faith filing which would warrant the imposition of attorneys' fees and costs. *See, e.g., Duva v. Bridgeport Textron, supra* at 883. This Court will not assess fees and costs against defendant Shoemaker.

### ORDER

AND NOW, this 30th day of December, 1991, for the reasons set forth in the accompanying Memorandum, IT IS HEREBY ORDERED that

(1) the motion to dismiss, for lack of personal jurisdiction, filed by defendant Whitman Corporation under Rule 12(b)(2) of the Federal Rules of Civil Procedure is GRANTED;

(2) the motion to dismiss and/or motion for summary judgment, for lack of subject matter jurisdiction and/or failure to state a cause of action, filed by defendant Jay G. Shoemaker under Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure is DENIED; and

(3) the motion for attorneys' fees and costs filed by plaintiff Marvin Ames under Rule 11 of the Federal Rules of Civil Procedure is DENIED.

FN1. Rule 12(b)(1) is concerned with " lack of jurisdiction over the subject matter, " while Rule 12(b)(6) involves a "Failure to state a claim upon which relief can be granted." A summary judgment shall issue under Rule 56 if it is established " that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

FN2. § 630(b) defines an "employer" for purposes of the ADEA as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.... The term also means (1) any agent of such a person ..."

E.D.Pa.,1991.
Ames v. Whitman's Chocolates, Div. of Pet Inc.
Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301

Briefs and Other Related Documents (Back to top)

• 2:91cv03271 (Docket) (May. 22, 1991)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 9

Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: Not Reported in F.Supp.)**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 9*

Westlaw.

Slip Copy                                                                                    Page 1

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
(Cite as: Slip Copy)

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Barbara **BAUMAN**, et al., Plaintiffs,
v.
**DAIMLERCHRYSLER** AG, and Does 1 thorough
50, inclusive, Defendants.
**No. C-04-00194 RMW.**

Nov. 22, 2005.

Kim E. Card, Daniel M. Kovalik, Kathryn Chris
Palamountain, Derek J. Baxter, Mark Andrew
Chavez, Terry Collingsworth, for Plaintiffs.
Peter J. Messrobian, Matthew J. Kemner, for
Defendant.

ORDER TENTATIVELY GRANTING
DEFENDANT'S MOTION TO DISMISS
WHYTE, J.

[Re Docket No. 36]

**\*1** Specially-appearing defendant **DaimlerChrysler**
AG ("DCAG") filed a motion to quash service and
dismiss for lack of personal jurisdiction. Plaintiffs
oppose the motion. The motion to dismiss was
heard on June 17, 2005. The motion to quash was
withdrawn. The court has reviewed the parties'
papers filed before the hearing and considered their
arguments. The court has also reviewed plaintiffs'
post-hearing notice of filing of supplemental
authority but sustains defendant's objection to its
consideration. For the reasons set forth below, the
court tentatively grants DCAG's motion to dismiss
for lack of personal jurisdiction but allows plaintiffs
some limited jurisdictional discovery.

I. BACKGROUND

Plaintiffs are twenty-three people, one of whom is a

citizen of Chile and the rest of whom are citizens of
Argentina. Amend. Compl. ¶¶ 3-21. Plaintiffs
allege that Mercedes-Benz Argentina ("MBA"
)-now known as **DaimlerChrysler** Argentina ("
DCA")-collaborated with the Argentine government
to kidnap, detain, torture, or kill plaintiffs or
plaintiffs' relatives during Argentina's military
regime of 1976 to 1983, known as the "Dirty War."
*Id.* ¶¶ 1-21. Claiming that DCA is either a
division or wholly-owned subsidiary of DCAG,
plaintiffs bring this action against DCAG under the
Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350
, and the Torture Victims Protection Act ("TVPA"),
28 U.S.C. § 1350. *Id.*

In 1998, Chrysler Corporation and Daimler-Benz
AG became wholly-owned subsidiaries of DCAG.
Louann Van Der Wiele Decl. Supp. DCAG's Mot. ("
Wiele Decl.") ¶ 2. Consequently, Chrysler
Corporation, which had its principal place of
business in Auburn Hills, Michigan, changed its
name to **DaimlerChrysler** Corporation ("DCC").
*Id.* DCC maintains the same headquarters as
Chrysler Corporation had maintained before. *Id.;*
Miller Decl., Ex. 1.

DCAG contends that it is a German stock company
with headquarters located in Stuttgart, Germany. *Id.;*
Amend. Compl. ¶ 22. DCAG is not qualified or
authorized to do business in California and does not
import, manufacture, sell, service, or warranty cars
in California. It manufactures Mercedes-Benz
vehicles in Germany. Peter Waskonig Decl. Supp.
DCAG's Mot. ("Waskonig Decl.") ¶ 3. A separate
Delaware corporation, Mercedes-Benz United
States, LLC ("MBUSA") purchases Mercedes-Benz
cars in Germany, imports them into the United
States, and distributes them throughout the United
States. *Id.* ¶¶ 7, 10. MBUSA also provides all
product advertisement, service and sales support for
Mercedes-Benz vehicles in the United States. *Id.* ¶
7. Plaintiffs, however, allege that DCAG is both an
American and German corporation with
headquarters in both countries, respectively, in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 10*

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

cities of Auburn Hills and Stuttgart. Brian Campbell Decl. Opp. DCAG's Mot. ("Campbell Decl."), Ex. 1, 2.

Plaintiffs originally named DCC as the defendant. Compl. ¶ 1. They subsequently amended their complaint, replacing DCC with DCAG as the defendant. Amend. Compl. ¶ 1. Plaintiffs originally believed that DCAG had its sole headquarters in Stuttgart, Germany. Compl. ¶ 22. In accord with the procedures set forth by the Hague Convention for international service of process, plaintiffs initiated service attempts upon DCAG through the German courts. Plaintiffs' Ex Parte Appl. Ct. Iss. Amend. Summons (" Appl.Amend.Summons") ¶ 1. The German district court authorized service of process upon DCAG on July 14, 2004. Req. Jud. Not. ("RJN"), Ex. A. On September 7, 2004, however, the German appellate court halted service to determine whether service would violate Germany's sovereignty rights. If that was the case, the requested service could potentially be refused according to the Hague Convention, Article 13(1). *Id.* Whether plaintiffs' requested service in Germany will be permitted awaits resolution by Germany's highest court of a matter involving Napster and Bertelsmann AG, which poses similar issues. *Id.* On March 7, 2005, after hearing the parties' comments on the temporary suspension of service, the German appellate court reaffirmed its original stay order. RJN, Ex. B.

*2 From a proxy statement to shareholders regarding the 1998 merger of Chrysler Corporation with Daimler-Benz AG, plaintiffs discovered that DCAG purports to maintain operational headquarters at the DCC headquarters in Auburn Hills, Michigan. Appl. Amend. Summons at 3. Plaintiffs then applied for and were issued an amended summons for DCAG at the Auburn Hills location.

On January 28, 2005, plaintiffs' process server first attempted to serve DCAG at DCC headquarters but was unsuccessful. Sunny Miller Decl. Opp. DCAG's Mot. ("Miller Decl.") ¶ 3; Elizabeth Tichvon Decl. Supp. DCAG's Mot. ("Tichvon Decl.") ¶¶ 2-5. Elizabeth Tichvon, the service of process paralegal for DCC, explained to the server that she

and DCC were not authorized to accept service of process on behalf of DCAG. *Id.;* Wiele Decl., Letter from Van Der Wiele to Plaintiffs' Counsel of 3/2/05, Ex. 1. On February 15, 2005, plaintiffs' process server Sunny Miller attempted to serve process on DCAG at the DCC headquarters but was not permitted to proceed any further than the reception area. Miller Decl ¶ 5; Tichvon Decl. ¶ 6. Tichvon explained to Miller that DCC and not DCAG was located at the premises. Miller Decl. ¶ 3. In addition, Tichvon reiterated her statements on January 28 to Miller and told Miller that she did not work for DCAG. Tichvon Decl. ¶ 6. Plaintiffs contend that as Tichvon walked away, Miller told her that he was leaving the papers there for DCAG. Miller Decl. ¶ 5. Miller then left the papers at the security desk in the presence of security guard Eric Uzenski, who works for Wackenhut Corporation. *Id.* The papers were returned to plaintiffs' counsel. Wiele Decl. ¶ 6.

On March 3 and March 10, 2005, plaintiffs mailed copies of the summons and complaint to the DCC headquarters by registered mail. *Id.* ¶ 7. Plaintiffs also mailed a copy of the summons and complaint to the Michigan Corporation Securities Bureau. Miller Decl. ¶ 4. The documents were addressed to Jurgen Schrempp, Chief Executive Officer ("CEO") of DCAG. Wiele Decl. ¶ 6. DCAG contends that Schrempp was not present at the DCC headquarters on March 3 and 10. *Id.* at 7; Waskonig Decl. ¶ 11. In addition, DCAG contends that Schrempp has no office in Auburn Hills but has an office in Stuttgart, Germany. Plaintiffs, however, allege that Schrempp has offices in both Auburn Hills and Stuttgart. Waskonig Decl. ¶ 11; Campbell Decl., Ex. 2. Plaintiffs further allege that the copy of the summons and complaint sent on March 10, 2005, was signed for by an agent of DCAG. Miller Decl., Ex. 3.

DCAG filed a motion to dismiss for insufficiency of service of process, pursuant to Federal Rule of Civil Procedure 12(b)(5), and to dismiss for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). Mot. at 1. In response to plaintiffs' opposition, DCAG withdrew its challenge to service of process, but continues to assert that the court must dismiss the complaint for lack of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 11*

Slip Copy                                                                                          Page 3

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

personal jurisdiction. The parties agree that plaintiffs' claim does not arise out of or relate to DCAG's purported activity in California. Mot. at 9; Opp'n at 8. Thus, plaintiffs do not seek to establish specific jurisdiction over DCAG. *Id.*

**\*3** Plaintiffs submitted a notice of filing of supplemental authority and exhibits on August 8, 2005 pursuant to Federal Rule of Civil Procedure 15(d). Defendant filed an objection to its consideration. The court sustains the defendant's objection to plaintiffs' supplemental materials, which were submitted without prior court approval and in violation to Civil L.R. 7-3(d) (except for a new judicial opinion, "once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval."). If the court considered plaintiffs' exhibits for the purpose of determining the existence of personal jurisdiction, the supplemental materials would only add marginally to the calculus in favor of jurisdiction.

## II. ANALYSIS

The court may obtain personal jurisdiction over a defendant if it finds that either specific or general jurisdiction exists. Plaintiffs contend that the court has general jurisdiction over DCAG. General jurisdiction subjects a foreign defendant to suit within the forum state even on matters unrelated to its contacts with the forum. *Doe v. Unocal Corp.,* 248 F.3d 915, 923 (9th Cir.2001). General jurisdiction requires a two-part inquiry: (1) whether defendant has "systematic and continuous contacts" with California; and (2) whether the assertion of general jurisdiction is reasonable. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 416 (1984); *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.,* 1 F.3d 848, 851 (9th Cir.1993) . Consequently, even if "continuous and systematic, contacts exist, the assertion of general jurisdiction must be reasonable." *Gator.com Corp. v. L.L. Bean,* 341 F.3d 1072, 1079-80 (9th Cir.2003) (citing *Amoco,* 1 F.3d at 852-53). This case presents a difficult question: can a federal court exercise personal jurisdiction over a case arising under federal subject matter jurisdiction in which plaintiffs are all foreign nationals and the defendant

is a foreign corporation which has subsidiaries doing business in the United States?

Plaintiff has the burden of establishing that defendant has systematic and continuous contacts with the forum state. *See Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir.2002); *Unocal,* 248 F.3d at 923. The standard for establishing general jurisdiction is "fairly high," requiring defendant's contacts in the state to be of a sort that "approximate physical presence" within the forum state. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000). Conceptually, plaintiff must establish that the defendant has been conducting business in California, not merely with California. *See Bancroft,* 223 F.3d at 1086.

When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the plaintiff need only make a prima facie showing of the jurisdictional facts to withstand the motion. *Unocal,* 248 F.3d at 922. In order to make a prima facie showing, plaintiff must allege facts which, if true, would be sufficient to establish personal jurisdiction. *Id.* If not directly controverted, plaintiffs' version of the facts is taken as true for the purposes of the motion. *Id.* Conflicts between the facts stated in the parties' affidavits must be resolved in plaintiff's favor during a prima facie jurisdictional analysis. *Dole Food Co. v. Watts,* 303 F.3d 1104, 1108 (9th Cir.2002).

**\*4** Defendant has the burden of establishing that exercise of jurisdiction over it is unreasonable. *Amoco,* 1 F.3d at 851. To determine whether exercise of jurisdiction is reasonable, the following seven factors are balanced: (1) the extent of defendant's purposeful interjection into the forum; (2) the burden on the defendant of litigating in the forum; (3) the extent of conflict with the sovereignty of defendant's state; (4) the forum state's interest in adjudicating the issue; (5) the most efficient judicial resolution of the dispute; (6) the importance of the forum to plaintiff's interest in convenient and effective relief; and (7) the existence of an alternate forum. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 12*

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

A. Systematic and Continuous Contacts

Courts focus on two primary areas when applying the "systematic and continuous contacts" test. First, they seek to determine whether there is "some kind of deliberate 'presence' in the forum state, including physical facilities, bank accounts, agents, registration, or incorporation." *Gator.com*, 341 F.3d at 1077. Second, courts "look at whether the company has engaged in active solicitation toward and participation in the state's markets, i.e., the economic reality of the defendant's activities in the state." *Id.* Plaintiffs seek to establish that DCAG has the requisite systematic and continuous contacts with California by arguing that (1) DCAG itself has such contacts or (2) DCAG has sufficient contacts by virtue of MBUSA, which plaintiffs contend acts as DCAG's agent. Opp'n at 8.

1. DCAG's Objections to Evidence

As a preliminary matter, DCAG objects to much of the evidence plaintiffs have submitted in support of their contention that this court has personal jurisdiction over DCAG, particularly to documents attached to the declaration of Brian Campbell. First, DCAG objects that plaintiffs have not properly authenticated certain materials submitted in support of their opposition and that the materials are thus inadmissible as lacking foundation. The materials to which DCAG objects on the basis of authentication are pages printed from the www.daimlerchrysler.com website and a proxy statement and marketing brochure purportedly distributed by DCAG.

Although some courts have refused to consider unauthenticated internet documents for purposes of any motion, *see, e.g., Wady v. Provident Life and Accident Ins. Co. of Am.,* 216 F.Supp.2d 1060 (C.D.Cal.2002) (excluding internet evidence on a summary judgment motion for these reasons), this court agrees with a recent Central District of California decision holding that the court should consider the stage of litigation when determining the admissibility of unauthenticated evidence. In *Moose Creek, Inc. v. Abercrombie & Fitch Co.,* 331 F.Supp.2d 1214 (C.D.Cal.2004), the court

considered unauthenticated internet documents submitted by plaintiffs in support of their motion for preliminary injunction for trademark infringement. The court stated:
*5 Rule 901(a) defines a standard of admissibility that is rather general or elastic: the evidence must merely be 'sufficient to support a finding that the matter in question is what proponent claims.' Although Plaintiffs are correct that these internet documents are not individually authenticated, the Court finds that at this stage they satisfy Rule 901(a).

*Id.* at 1225 n. 4. Likewise, the court will consider plaintiffs' unauthenticated documents for purposes of determining whether DCAG is subject to personal jurisdiction.

Defendant also objects that the statements contained in the internet materials are offered for the truth of their contents and are thus hearsay. District courts have discretion to consider otherwise inadmissible evidence in ruling on an application for a temporary restraining order or preliminary injunction. *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1363 (9th Cir.1988) ( "It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction."). Other courts have held that hearsay may be considered for purposes of determining personal jurisdiction, provided it bears circumstantial indicia of reliability. *Akro Corp. v. Luker,* 45 F.3d 1541, 1546-47 (Fed.Cir.1995) ( " [E]ven if Luker had objected to the hearsay nature of the statements at trial, such an objection would have been overruled, as we have held that hearsay ' bear [ing] circumstantial indicia of reliability' may be admitted for purposes of determining whether personal jurisdiction obtains.") (citing *Beverly Hills Fan v. Royal Sovereign Corp.,* 21 F.3d 1558, 1562 (Fed.Cir.1994)). The court finds that the documents printed from the www.daimlerchrysler.com website bear such circumstantial indicia of reliability, as the printouts bear the date and site from which they were printed, along with the **DaimlerChrysler** banner style. [FN1] The court will consider plaintiffs' evidence printed from the **DaimlerChrysler** and MBUSA websites for the purpose of determining the existence of personal jurisdiction. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 13*

documents printed from other websites, however, do not bear these circumstantial indicia of reliability. The court sustains defendant's objection to the contents of Exhibits 5, 6, 7, 9, 10, 11, 12, 14, 20, and 21 to the Campbell declaration.

> FN1. These documents could, in the alternative, be considered party admissions.

### 2. DCAG's Contacts

Plaintiffs present evidence of nine of DCAG's contacts in support of their claim that DCAG has continuous and systematic contacts with California. Opp'n at 9. DCAG, however, argues that plaintiffs have incorrectly attributed five of those nine contacts to DCAG when, in fact, they are contacts by certain subsidiaries of DCAG. Reply at 3. With regard to the remaining four contacts, DCAG argues that one contact is not supported by plaintiffs' evidence and that the other three contacts are insufficient to establish that DCAG has continuous and systematic contacts with California. *Id.* at 4-5.

#### a. Contacts Allegedly Attributable to Subsidiaries

**\*6** The parent-subsidiary relationship itself is not sufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes. [FN2] *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements, Ltd.,* 328 F.3d 1122, 1134 (9th Cir.2003) (citing *Unocal,* 248 F.3d at 925). Thus, only contacts that can properly be attributed to DCAG, and not its subsidiaries, may be used to determine whether DCAG has systematic and continuous contacts with California.

> FN2. An exception to this general rule occurs when the subsidiary is the alter ego or agent of the parent. Plaintiffs address this exception in the section of the analysis regarding MBUSA's systematic and continuous contacts.

DCAG contends that plaintiffs wrongly attribute five contacts to it. First, plaintiffs point to a

brochure published by DCAG in 2004, entitled *DaimlerChrysler Commitment to North America.* Opp'n at 9. In the section of this brochure entitled "Direct Economic Impact in North America-2003," DCAG reported that it pays more than $64 million annually to 707 California employees, $15 million annually to 1,562 California retirees, $1 billion total to California suppliers, and $31 million annually to California in taxes. Campbell Decl., Ex. 4 at 42. Defendant, however, argues that the information in *DaimlerChrysler Commitment to North America* refers to the North American contacts of DCAG-affiliated subsidiaries and not those of DCAG. Reply at 3-4. Defendant claims that the entire brochure, including the "Direct Economic Impact in North America-2003 section," makes clear that it is discussing a group of **DaimlerChrysler** affiliated subsidiaries located in North America. *Id.* at 3. In further support of its argument that the brochure does not refer to DCAG's own direct impact in North America, DCAG submits that it has no offices, agents, representatives, employees, property, or bank accounts in California. Waskonig Decl. ¶¶ 3-4. Aside from the brochure, plaintiffs have submitted no evidence to oppose DCAG's assertion.

Consolidating the activities of a subsidiary into the parent's reports is a common business practice. *Unocal,* 248 F.3d at 929 (quoting *Calvert v. Huckins,* 875 F.Supp. 674, 678 (E.D.Cal.1995)). Such consolidated statements are allowed by both the Internal Revenue Service and the Securities and Exchange Commission and recommended by generally accepted accounting principles. *Calvert,* 875 F.Supp. 679. Thus, although *DaimlerChrysler Commitment to North America* begins with a letter signed by the Chairman of DCAG, which tells the reader that "this brochure highlights many of our North American activities," the numbers published in *DaimlerChrysler Commitment to North America* do not serve to establish that DCAG itself has California contacts.[FN3]

> FN3. These numbers and documents may prove relevant to establishing DCAG's California contacts where plaintiffs seek to demonstrate that a subsidiary is an agent or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 6

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

alter ego of DCAG. *See, e.g., In Akzona Inc. v. E.I. Du PontNemours and Co.,* 607 F.Supp. 227, 238 (D.Del.1984), *cited in Unocal,* 248 F.3d at 928 (finding parent corporation's annual report clearly indicated parent corporation's corporate status as separate from relevant subsidiary).

Second, plaintiffs point to an expenditure reported in DCAG's 2005 SEC 20-F filing of approximately $595,000 for advertising and related marketing activities with Black Enterprise Magazine in 2004. Campbell Decl., Ex. 15. Because Black Enterprise Magazine has offices in California, plaintiffs contend that this reported expenditure evidences a DCAG contact with California. In response, DCAG presents a declaration from its media purchasing affiliate stating that the amount cited by plaintiff was spent, not on behalf of DCAG, but on behalf of three of its subsidiaries: **DaimlerChrysler** Motors Company LLC, MBUSA, and Mitsubishi Motors North America, Inc. Peter L. Swiecicki Decl. Supp. DCAG's Reply ("Swiecicki Reply Decl.") ¶ 3. Thus, the evidence does not support the conclusion that the reported advertising expenditure may be properly attributed to DCAG.

*7 DCAG's third alleged contact with California is its participation in the Stop Red Light Running Campaign, in which it purportedly made grants worth $200,000 to seven communities in the United States, including the City of Fresno, California. Campbell Decl., Ex. 17. Plaintiffs found the information in a press release from "Auburn Hills/Stuttgart" on the **DaimlerChrysler** website. *Id.* DCAG contends that it was DCC, not DCAG, that participated in the Stop Red Light Running Campaign. Louann Van Der Wiele Decl. Supp. DCAG's Reply ("Wiele Reply Decl.") ¶ 5.

Fourth, plaintiffs contend that DCAG filed for certification from the California Air Resources Board for its engines. The certification allegedly allows DCAG's products to be marketed in California. Campbell Decl., Ex. 8. DCAG, however, contends that it does not make submissions to the California Air Resources Board but that a distinct subsidiary company in the United States does so. [FN4] Peter Waskonig Decl. Supp. DCAG's Reply ("

Waskonig Reply Decl.") ¶ 10. The filing itself does not constitute a contact of DCAG with the forum state. However, the impact of the filing, that DCAG's products may be marketed in California, may be relevant, as set forth below.

> FN4. DCAG does not identify which subsidiary company performs this function.

Fifth, plaintiffs allege that DCAG directly participated in the establishment of the California Fuel Cell Partnership, which involved Ferdinand Panik, Senior Vice President at DCAG, being present in California as chairperson of the organization. DCAG does not refute plaintiffs' allegation but contends first that the evidence is inadmissible and that **DaimlerChrysler** Research and Technology North America, Inc., is the only company in the **DaimlerChrysler** Group of companies that currently is a member of the California Fuel Cell Partnership. Waskonig Reply Decl. ¶ 9.

The court concludes that DCAG has presented sufficient evidence that these contacts are attributable, not to DCAG, but to subsidiaries of DCAG. Accordingly, they are not properly considered direct contacts of DCAG to California.

### b. California-specific product designs

As a sixth contact with California, plaintiffs claim that DCAG designs vehicles specifically for California, which indicates purposeful availment. Opp'n at 10. In support of this argument, plaintiffs offer evidence that DCAG produces cars to meet California's air quality standards. Campbell Decl., Ex. 11-12. Plaintiffs also offer evidence that DCAG built a prototype fuel cell vehicle specifically for United Parcel Service ("UPS") to use in California and that DCAG built a fuel cell for the California Fuel Cell Partnership, which DCAG tested by driving 25,000 miles on California roads. Campbell Decl., Ex. 13. DCAG does not deny that it produces cars to meet California's air quality standards or that it built a fuel cell for the California Fuel Cell Partnership. However, DCAG uses plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 15*

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

evidence to demonstrate that Mercedes-Benz vehicles sold in California have the same design, including emission-system design, as those sold elsewhere in the United States. Reply at 4. DCAG also does not deny its activities with UPS but contends that its Mercedes-Benz hydrogen fuel cell vehicles in California do not differ in design from those elsewhere in the world and that its Mercedes-Benz hydrogen fuel cell vehicles are not sold to the public in California. *Id.* at 4-5.

**\*8** Designing a product specifically for the forum market has traditionally been helpful for establishing purposeful availment for specific jurisdiction. "Whether dealing with specific or general jurisdiction, the touchstone remains ' purposeful availment' ... [to] ensure[ ] that 'a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts." ' *Gator.com,* 341 F.3d at 1076 (citing *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir.2002) ). However, purposeful availment alone is not enough to establish general jurisdiction; the purposeful availment itself must be systematic and continuous. *See, e.g., Asahi Metal Indus. Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 112-13 (1986); *Rockwell Int'l v. Costruzioni Aeronautiche Giovanni Agusta,* 553 F.Supp. 328, 331-32 (E.D.Pa.1982); *see also Calvert,* 875 F.Supp. at 677 (concluding that evidence used to establish specific jurisdiction does not establish general jurisdiction unless it is continuous and systematic). Although plaintiffs' unrefuted evidence establishes that DCAG designed products that could be marketed in California, among other locations, and built prototypes for testing and use on California roads by UPS and others, this purposeful availment is not sufficiently systematic and continuous for the exercise of general jurisdiction.

### c. Remaining Contacts

Of the nine contacts that DCAG allegedly has with California, the three remaining are not disputed by the parties, but DCAG contends that they do not support the assertion of general jurisdiction.

First, DCAG is listed on the Pacific Stock Exchange located in San Francisco, which plaintiffs allege gives DCAG countless benefits including access to innovative electronic trading technology, increased liquidity of its assets, and higher corporate visibility. Second, plaintiffs contend that DCAG has pursued enough litigation in California to retain permanent counsel in San Francisco. This litigation includes DCAG initiating actions in the federal courts of California challenging California's clean air laws and initiating additional actions in California to protect its patent rights. Opp'n at 10. Furthermore, DCAG answered a complaint in a case unrelated to this one but within this district and cross-complained after waiving service of process. Opp'n at 10. Third, as a corporate partner in the Global Nature Fund, DCAG has been participating in the Living Lakes Project at Mono Lake in California. Campbell Decl., Ex. 16. Part of this project involved DCAG employees or their family members traveling to Mono Lake to participate in a nature camp in 2003. *Id* .

The single trip by DCAG employees or their family members to Mono Lake, California, as part of DCAG's participation in the Living Lakes Project, cannot be regarded as a contact of continuous and systematic nature. *See Helicopteros,* 466 U.S. at 416 (reasoning that "the one trip to Houston by Helicol's chief executive officer for the purpose of negotiating the transportation-service contract with Consorcio/WSH cannot be described or regarded as a contact of 'continuous and systematic' nature"). Neither is a listing on a stock exchange, without more, sufficient to confer general jurisdiction. *See Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 97 (2d Cir.2000).

**\*9** The lawsuits that DCAG filed in California courts to challenge California's clean air laws and protect its patents are likely central to DCAG's business functions but do not serve to establish contacts of a continuous and systematic nature sufficient to confer personal jurisdiction. For example, in *Calvert,* the district court determined that the defendant demonstrated a kind of purposeful availment similar to that necessary for the exercise of limited or specific jurisdiction by initiating a lawsuit in a California court. *Calvert,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 16*

Slip Copy                                                                                                    Page 8

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

875 F.Supp. at 677. However, the court determined that a single defendant-initiated lawsuit does not establish general jurisdiction because it was neither continuous nor systematic. *Id.* Similarly, in *Soma Medical Int'l v. Standard Chartered Bank,* 196 F.3d 1292, 1296 (10th Cir.1999), defendant bank had filed a small number of financing statements, recorded several instruments, and filed five civil cases in the forum state to recover monies and/or foreclose on trust deeds. The court in *Soma* held that those were not the kinds of activities which courts have found necessary to subject a defendant to general jurisdiction. *Soma Medical Int'l,* 196 F.3d at 1296. While DCAG's lawsuits may be systematic in the sense that they are part of a larger corporate business or litigation plan, there is no evidence of either a larger corporate plan or such continuous and substantial litigation as to justify finding general jurisdiction over DCAG. Furthermore, retaining permanent counsel in California is "the type of ongoing contact needed for general jurisdiction," but this contact alone is not sufficient to establish general jurisdiction over DCAG. *Calvert,* 875 F.Supp. at 677.

### d. Conclusion

The court finds that plaintiffs' allegations do not establish that DCAG has continuous and systematic contacts with California. Plaintiffs have failed to establish that DCAG has contacts approximating a physical presence in California. *See, e.g., Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437 (1952) (finding general jurisdiction when president of Philippines-based corporation maintained office, kept company files, held director meetings, distributed salaries, and conducted other company business in the forum state). The contacts that plaintiffs allege in support of their contention that DCAG has continuous and systematic contacts with California are not of the pervasive nature required to find general jurisdiction over DCAG. In *Helicopteros,* for example, the defendant had purchased more than $4 million in equipment from a company in the forum state and sent management and maintenance personnel to receive training at that company in the forum state. *Helicopteros,* 466 U.S. at 411-12. During this seven-year period, the

defendant had also negotiated a contract in the forum state and received $5 million in payments from a bank located within the forum state. *Id.* However, the Supreme Court held that these contacts were insufficient for establishing general jurisdiction over the defendant. *Id.* at 418-19.

**\*10** Plaintiffs have not demonstrated that DCAG has directly invested more in California than the defendant in *Helicopteros.* Plaintiffs also have not demonstrated that DCAG's Pacific Stock Exchange listing, California litigation, participation in the Living Lakes Project, building a fuel cell for UPS, and helping to establish the California Fuel Cell Partnership amount to contacts with the forum state that are greater than those of the defendant in *Helicopteros.* In *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 573-74 (2d Cir.1995) the court found that while the defendant's contacts standing alone were not continuous and systematic, together they were sufficient to establish general jurisdiction. However, this is not the case here: even when DCAG's California contacts are considered as a whole, as the court did in *Metropolitan Life Ins. Co.,* they fall short of establishing the systematic and continuous contacts necessary for this court to have general jurisdiction over DCAG.

### 3. Agency Relationship with MBUSA

Plaintiffs alternatively contend that DCAG has continuous and systematic contacts with California through MBUSA's contacts. Opp'n at 17. MBUSA has its principal place of business in New Jersey and is wholly-owned by **DaimlerChrysler** North America Holding Company ("DCNAHC"), a Delaware corporation. DCNAHC is a subsidiary of DCAG. Waskonig Decl. ¶ 8. MBUSA serves the United States market as DCAG's exclusive Mercedes-Benz importer and sales agent for the United States. Waskonig Decl. ¶ 7. Plaintiffs point out that MBUSA is the single largest supplier of luxury vehicles to the California car market, and that over 10 percent of all new vehicle sales in the United States take place in California.[FN5] Furthermore, MBUSA has a regional office in Costa Mesa, California, a Vehicle Preparation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 17*

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

Center in Carson, California, and a Classic Center in Irving, California. Campbell Decl., Ex. 19. DCAG does not dispute that MBUSA is subject to general jurisdiction in California but argues that MBUSA's contacts cannot be imputed to DCAG.

> FN5. This point is, however, unsupported by admissible evidence because the web pages provided by plaintiffs supply only unauthenticated hearsay. However, as DCAG does not directly refute this evidence, the court will consider it for purposes of determining whether DCAG has sufficient minimum contacts through MBUSA.

A subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego or where the subsidiary acts as the general agent of the parent. *Rutsky,* 328 F.3d at 1134. How the courts determine whether a subsidiary is an alter ego or agent of the parent has undergone a gradual evolution. *See, e.g., Unocal,* 248 F.3d at 925 (delineating two separate tests for alter ego and agency); *Chan v. Soc'y Expeditions, Inc.,* 39 F.3d 1398, 1405-06 (9th Cir.1994); *Kramer Motors, Inc. v. Br. Leyland, Ltd.,* 628 F.2d 1175, 1177-78 (9th Cir.1980) (finding that day-to-day control over the subsidiary by the parent was required to find a subsidiary to be an alter ego or agent of the parent); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 422-24 (9th Cir.1977) ("The common law requirements of a 'general agency' demand that such substantial activities be carried on for the benefit of the principal that, in some cases, those same activities may indeed be sufficient to render the principal himself 'present' under the ' continuous and systematic' test of *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 445-46, 72 S.Ct. 413, 96 L.Ed. 485 (1952).").

#### a. Alter Ego

*11 To establish that the subsidiary is the alter ego of the parent corporation, the plaintiffs "must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate

personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." ' *Rutsky,* 328 F.3d at 1134 (quoting *Unocal,* 248 F.3d at 926). Plaintiffs do not seek to demonstrate that MBUSA is an alter ego of DCAG.

#### b. Agency

The Ninth Circuit in *Rutsky* described the agency test:
> To satisfy the agency test, plaintiffs must make a prima facie showing that the subsidiary represents the parent corporation by performing services " sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] corporation ... would undertake to perform similar services." The agency test permits the imputation of contacts where the subsidiary was either "established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself."

*Rutsky,* 328 F.3d at 1135 (citations omitted) (quoting *Chan v.. Soc'y Expeditions, Inc.,* 39 F.3d 1398, 1405 (9th Cir.1994)). In determining whether a subsidiary satisfies the agency test, the following factors may be relevant: (1) what percentage of the parent corporation's business comes from the subsidiary; (2) whether the parent corporation's only agent in the United States is the subsidiary; and (3) whether the parent corporation conducts marketing activities in the United States. *Chan,* 39 F.3d at 1406. Furthermore, while a parent corporation's day-to-day control over the subsidiary's activities may contribute to an agency finding, it is not the *sine qua non* of the agency test. *Modesto City Sch. v. Riso Kagaku Corp.,* 157 F.Supp.2d 1128, 1134 (E.D.Cal.2001) (analyzing *Unocal* ); *see also Synopsys v. Ricoh Co.,* 343 F.Supp.2d 883, 887 (N.D.Cal.2003). As noted by the Ninth Circuit in *Unocal,* " '[t]he question to ask is not whether the American subsidiaries can formally accept orders for their parent, but rather whether, in the truest sense, the subsidiaries' presence substitutes for the presence of the parent." ' *Unocal,* 248 F.3d at 928-29 (quoting *Bulova Watch Co., Inc. v. K.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

*Hattori & Co., Ltd.,* 508 F .Supp. 1322, 1342 (E.D.N.Y.1981)).

Plaintiffs' evidence regarding the factors suggested in *Chan* is inconclusive. Based upon DCAG's declaration that MBUSA is the exclusive distributor of Mercedes-Benz vehicles in the United States, the court can infer that MBUSA must provide a significant amount of business to DCAG through the American automobile market. It is clear that MBUSA is not DCAG's only subsidiary in the United States (or even in California), however, it is certainly a subsidiary that engages in substantial activity by selling Mercedes-Benz products in the United States. Furthermore, DCAG argues that it does no advertising in the United States-all such advertising is performed by its subsidiaries. With regard to day-to-day control, plaintiffs have provided no evidence whatsoever that DCAG exercises operational control over MBUSA.

**\*12** Thus, the court again turns to the question of whether MBUSA's presence in California " substitutes for the presence of" DCAG. To make this determination, a court should look to the main business of the parent and subsidiary. *See, e.g., Unocal,* 248 F.3d at 929. If the business of the parent is carried out entirely at the parent level, the subsidiary's activities are not imputable to the parent. *Id.* DCAG argues its business is manufacturing Mercedes-Benz vehicles and parts. MBUSA is not involved in this manufacturing but purchases Mercedes-Benz vehicles in Germany (where title passes) and imports them into the United States. Waskonig Decl. ¶ 10. DCAG has no control over the ultimate destination of the products in the United States and none of the dealerships at which the vehicles are sold is a subsidiary of Mercedes-Benz. *Id.* DCAG also points out that even before MBUSA (and its predecessor entities) came into existence, independent non-subsidiary companies distributed Mercedes-Benz vehicles in the United States. *Id.* Plaintiffs, on the other hand, argue that without MBUSA or another similar entity to import and sell its products into the United States, DCAG would not be able to sell vehicles in the United States market.

On somewhat analogous facts, a Northern District

of California court found an agency relationship between Ricoh Company, a Japanese corporation with no sales in or other direct contacts with California, and Ricoh Corporation, a subsidiary of Ricoh Company that functioned as its main marketing and distribution arm for North and South America. *Synopsys, Inc. v. Ricoh Co., Ltd.,* 343 F.Supp.2d 883 (N.D.Cal.2003). The court found Ricoh Company subject to personal jurisdiction in California and concluded that "it is evident that Defendant's multifaceted operations are necessary to its viability in the forum and represent tasks Defendant would have to perform itself but for the existence of its subsidiaries based in this forum or registered to do business here." *Id.* at 887. In the present case, without MBUSA or another distributor, DCAG would not be able to sell Mercedes-Benz vehicles in California. However, it is not clear that it would be required to perform such functions itself to avail itself of the California, luxury-vehicle market. In contrast, Ricoh Company had three subsidiaries in California and another registered to do business here. It appears the tasks performed by these subsidiaries were ones the court felt Ricoh Company would have had to perform itself but for the existence of its subsidiaries. No evidence suggested these operations were ones that could be performed, for example, by a wholly independent company. Although admittedly a close question, the court concludes that the activities of MBUSA should not be imputed to defendant for the purpose of establishing personal jurisdiction over DCAG.

### B. Reasonableness

Even assuming the existence of sufficient minimum contacts with the forum state to support the exercise of general jurisdiction, exercise of personal jurisdiction must nonetheless be reasonable. "For jurisdiction to be reasonable, it must comport with ' fair play and substantial justice.' " *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir.1998) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985)). As set forth above, the court considers seven factors in determining whether the exercise of personal jurisdiction is reasonable. *Amoco,* 1 F.3d at 851. DCAG claims

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 19*

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

that all seven factors militate against the exercise of jurisdiction.

### 1. Purposeful Interjection into California

*13 The first factor of the scope of defendant's purposeful interjection into the forum state favors exercising jurisdiction. "When a corporation ' purposefully avails itself of the privilege of conducting activities within the forum State,' it has clear notice that it is subject to suit there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). By initiating lawsuits in California courts to challenge the state's clean air laws and to protect DCAG's patents and other business interests, DCAG has purposefully availed itself of the privilege of conducting business within California. *See Calvert,* 675 F.Supp. at 677 (citing *Vorys, Sater, Seymour, & Pease v. Ryan,* 154 Cal.App.3d 91, 94 (1984)). Additionally, the Supreme Court in *World-Wide Volkswagen* indicated that a corporation demonstrates purposeful availment when the sale of its product " is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other states." *World-Wide Volkswagen Corp.,* 444 U.S. at 297. Given that California consumers account for 10 percent of new vehicles purchased in the United States and that one of DCAG's subsidiaries is the single largest supplier of luxury vehicles to California, it is reasonable to infer that the sale of DCAG's vehicles, including Mercedes-Benz vehicles, in California is not an isolated occurrence but arises from the efforts of DCAG to serve the California market. Thus, on the basis of purposeful availment, exercise of personal jurisdiction over DCAG would not be unreasonable.

### 2. Burden on DCAG of Litigating in California

The second factor tips in DCAG's favor. None of the events in question occurred in California, and there is no contention that any discovery will be conducted in California nor that any potential witnesses are located here. *See Rocke v. Can. Auto. Sport Club,* 660 F.2d 395, 399 (9th Cir.1981)

(concluding that the occurrence of the alleged acts in Canada created substantial burden for the defendant to litigate in California because of the location of potential evidence and witnesses). DCAG will be further burdened because this court will be unable to compel the attendance of any Argentine witness who is not a party in the case and not a current DCAG employee, for either trial or deposition testimony. *See Doe v.. Sun Int'l Hotels, Ltd.,* 20 F.Supp.2d 1328, 1330 (S.D.Fla.1998) (noting, in *forum non conveniens* context, that witnesses who are defendant's employees are under defendant's control); *Duha v. Agrium, Inc.,* 340 F.Supp.2d 787, 796 (E.D.Mich.2004) (noting, in *forum non conveniens* context, that the court cannot compel attendance of unwilling witnesses). Lastly, as DCAG is a German corporation, it may incur unique burdens in defending itself in the United States legal system. *Asahi,* 480 U.S. at 113.

DCAG's burden of having to defend itself under the United States' legal system, however, will likely be minimal as it is a sophisticated, global business, has previously litigated in California, retains permanent counsel in California, and has subsidiaries in California. *See Wiwa,* 226 F.3d at 99 (finding that defendant foreign corporations would not be subject to great inconvenience in litigating in the forum state, despite the fact that the disputed events did not occur in the forum state, because defendants controlled a wealthy and far-flung business empire, had a physical presence in the forum state, had access to enormous resources, faced little or no language barrier, had litigated in the country on previous occasions, had a four-decade long relationship with one of the nation's leading law firms, were the parent companies of one of America's largest corporations, and had to defend themselves in New York City, which was "a major world capital"). It is not clear that the burden on DCAG of litigating in California presents an " inconvenience [that] is so great as to constitute a deprivation of due process." *Caruth v. Int'l Psychoanalytical Ass'n,* 59 F.3d 126, 128-29 (9th Cir.1995). Thus, the burden alone will not overcome otherwise clear justifications for the exercise of jurisdiction. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 20*

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

### 3. Conflict with Sovereignty of Argentina or Germany

*\*14* Potential conflicts with another state's sovereignty, the third factor, also militate against the exercise of jurisdiction over DCAG. This factor is given greater importance where the events giving rise to the suit occurred on the foreign state's territory and when a foreign state has explicitly voiced a sovereign interest in the case. *See Harris Rutsky,* 328 F.3d at 1133 (finding sovereignty considerations cut against jurisdiction where alleged tortious conduct of British defendants occurred in London); *Pac. Atl. Trading Co., Inc. v. M/V Main Exp.,* 758 F.2d 1325, 1330 (9th Cir.1985) (finding Malaysia's sovereign interest weighed against jurisdiction "since the contract was executed in Malaysia by Malaysian citizens on forms supplied by a Malaysian bank"). On the other hand, sovereignty considerations are given less importance where the defendant has manifested an intent to serve and benefit from the United States market, for example, where a foreign defendant maintains a continuing business relationship with its United States agent. *Sinatra v. Nat'l Enquirer, Inc.,* 854 F.2d 1199, 1200 (9th Cir.1988). Moreover, " the factor of conflict with the sovereignty of the defendant's state 'is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court." ' *Id.* at 1199 (citing *Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1333 (9th Cir.1984)).

In this case, DCAG argues that Germany has expressed concern that this suit may violate its sovereignty rights by delaying service under the Hague Convention. Mot. at 13. Additionally, the conduct giving rise to the suit occurred entirely outside of California. These facts increase the importance of "the conflict with sovereignty factor," while DCAG's manifested intent to serve and benefit from the United States market by maintaining continuing business relationships with its multiple United States subsidiaries decreases its importance. Thus, the court concludes that this factor cuts slightly against the exercise of jurisdiction over DCAG.

### 4. California's Interest in Adjudicating the Dispute

The fourth factor requires consideration of California's interest in adjudicating the issue. California has little direct interest in adjudicating this suit. None of the plaintiffs is a California citizen, DCAG is not a California corporation, and the DCAG subsidiary allegedly involved in the human rights violations at issue has absolutely no demonstrated connection with California. However, Congress has expressed that human rights violations are the business of federal courts. *See Wiwa,* 226 F.3d at 106 (reasoning, in *forum non conveniens* context, from TVPA legislative history that " Congress has expressed a policy of U.S. law favoring the adjudication of such suits in U.S. courts "); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 339 (S.D.N.Y.2003). Thus, although the court concludes that California has at least an abstract interest in adjudicating plaintiffs' dispute, its interest is only in a general goal of world-wide preservation of human rights. On balance, this factor weighs against the exercise of personal jurisdiction.

### 5. Absence of an Alternative Forum

*\*15* Although typically listed as the seventh factor in the Ninth Circuit reasonableness analysis, the court next evaluates the absence of an alternative forum because plaintiffs contend that this factor influences the remaining two factors, efficient judicial resolution of the dispute and convenience and effectiveness of relief for plaintiffs. The plaintiffs bear the burden of showing the absence of an alternative forum. *Harris Rutsky,* 328 F.3d at 1133 .[FN6]

> FN6. In performing this evaluation, the court may consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. Accordingly, the court may consider expert testimony in determining the law of a foreign jurisdiction. *See also Lockman Foundation*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

*v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991) (moving party may demonstrate adequacy of alternative forum's law through affidavits and declarations of experts); *accord Zipfel v. Halliburton Co.,* 832 F.2d 1477 (9th Cir.1987). DCAG objects to the admissibility of the testimony of plaintiffs' foreign law experts, arguing that plaintiffs' experts' opinions are not adequately supported by the law. DCAG submits competing expert declarations on Argentine and German law. Because the court may consider testimony regarding foreign law irrespective of admissibility, the court considers the foreign law declarations submitted by both sides, but notes plaintiffs' experts' lack of citation to statutory or other legal authority.

Plaintiffs claim that United States courts are the only courts that are empowered to hear their claims against DCAG and that will allow them to obtain " necessary" evidence. Opp'n at 19. In support of this argument, plaintiffs contend that both Argentina and Germany are unsuitable fora and will provide no effective relief for plaintiffs' claims. *Id.* They further contend that there exists no other alternative forum in which plaintiffs can proceed against DCAG and obtain effective relief. *Id.* at 19-20. DCAG, however, asserts that Germany and Argentina provide alternative fora, especially since the Argentine claims process is still open for victims of "Dirty War" crimes, like the plaintiffs in this case. Mot. at 14-15.

### a. Argentina as an Alternative Forum

Plaintiffs allege that they cannot bring their claims against DCAG in the Argentine legal system because Argentine courts do not permit lawsuits against "juridical persons" like corporations and require a court entrance fee of three percent of the total claim, which plaintiffs cannot afford. Ricardo Sans Decl. Opp. DCAG's Mot. ("Sans Decl.") ¶¶ 5, 14. Specifically in regard to their claims of human rights violations by DCAG, plaintiffs allege that the Argentine claims process, to which

defendant refers, provides relief only for illegal conduct by its government during the "Dirty War" but not for illegal conduct by private parties during that period. *Id.* ¶ 6. In addition, plaintiffs allege that Argentina has amnesty laws protecting entities like DCAG that are accused of committing human rights violations during the "Dirty War." *Id.* ¶ 9. Plaintiffs support their contentions with the declaration of Mr. Monner Sans, their expert on Argentine law. Sans' declaration cites no legal basis for his assertions. *Id.* ¶ 6 ("[T]here are no legal provisions in force under Argentine law to sue a corporation for its responsibility in the violation of human rights.").

DCAG, however, submits expert testimony on Argentine law by Jorge Daniel Ortiz that plaintiffs can bring their claims against DCAG in the Argentine legal system because Argentina courts permit corporations to be sued for "quasi-delicts" or "delicts," which may be either a criminal offense or a civil wrong. [FN7] Ortiz Decl. ¶¶ 6-7. DCAG also asserts that Argentine law may exempt plaintiffs from paying the court entrance fee through a procedure called "benefit to litigate without affording court fees." *Id.* ¶ 9. Specifically with regard to plaintiffs' human rights claims, DCAG provides citations to statutory authority supporting its contention that Argentina provides causes of action similar to those available in the United States for human rights violations by corporations. *Id.* ¶ 8. Furthermore, DCAG contends that the Argentine amnesty laws to which plaintiffs refer were annulled by the Argentine Congress in August of 2003. *Id.* ¶ 16. The court concludes that DCAG has cited sufficient authorities to refute plaintiffs' contention that they may not bring their claims in Argentina.

> FN7. Pursuant to Article 1072 of the Argentine Civil Code, DCAG's Argentine law expert describes delicts as "every illicit act executed knowingly and with intent to damage another person or his rights." Pursuant to Articles 1107-1123 of the Civil Code, the expert describes quasi-delicts as illicit acts committed with fault or negligence, including vicarious tort liability imposed upon employers. Jorge

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 22*

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

Ortiz Decl. Supp. DCAG's Reply ("Ortiz Decl.") ¶ 7.

*16 However, plaintiffs allege that even if they were able to bring their claims in Argentina, they would not be able to obtain evidence necessary to pursue their claims because Argentina cannot order discovery or witness testimony from DCAG, and individuals located in Germany are beyond the reach of Argentine courts. Sans Decl. ¶¶ 5, 15. DCAG, however, claims that plaintiffs would be able to collect and present the evidence necessary to pursue their claims, although this procedure is not termed "discovery" in the Argentine legal system. Ortiz Decl. ¶ 11. Discovery procedures that are not identical to those in the United States but that are nonetheless adequate do not render an alternative forum inadequate. *See Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991) (holding, for *forum non conveniens* motion, that Japanese forum was adequate although discovery procedures were not identical to those in the United States); *Zipfel v. Halliburton Co .,* 832 F.2d 1477, 1484 (9th Cir.1987) (finding, for *forum non conveniens* motion, that Singapore was an adequate forum although depositions were allowed only in certain circumstances); *Mercier v.. Sheraton Int'l, Inc.,* 981 F.2d 1345, 1352-53 (1st Cir.1992) (reasoning, for *forum non conveniens* motion, that an alternative forum ordinarily is not considered inadequate merely because its courts afford different or less generous discovery procedures than are available under American rules).

Finally, plaintiffs allege that the Argentine judiciary is subject to rampant corruption, that judicial resolution is severely hindered in various ways, and that the plaintiffs, judges and witnesses involved in the case would likely be subject to violent intimidation. Sans Decl. ¶¶ 10-12. Opp'n at 21-22. They also contend that the Argentine subsidiary of DCAG is a major contributor to Argentina's economy and would thus be subject to favorable treatment by the Argentine courts. Sans Decl. ¶ 8. In response, DCAG submits expert testimony refuting Sans' statement that "the most recent Report on Human Rights of the U.S. State Department" is the 2003 version. Ortiz states that the most recent version is the 2004 Report on Human Rights of the U.S. State Department ("2004 Report"), which lacks "any reference to reports that security forces are attempting to intimidate the judiciary, witnesses, or human rights organizations." Ortiz Decl. ¶¶ 12-13. Ortiz further points out that the 2004 Report recognizes the Argentine government's continued pursuit of anti-corruption measures and accountability for human rights violations that occurred during the "Dirty War," with a Supreme Court ruling that crimes against humanity were not subject to statutes of limitations. *Id.* ¶ 14.

United States courts "have been reluctant to find foreign courts 'corrupt' or 'biased' " for the purpose of deeming the foreign forum inadequate. *See, e.g., Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr.,* 311 F.3d 488, 499 (2d Cir.2002) (quoting *Blanco v. Banco Indus. de Venez., S.A.,* 997 F.2d 974, 981-82 (2d Cir.1993)). In *Blanco,* plaintiffs alleged that the Venezuelan justice system contained systemic corruption and was biased in favor of defendants. Furthermore, plaintiffs in Blanco submitted evidence of political unrest in Venezuela. The court, however, concluded that Venezuela was a suitable alternative forum because "no convincing showing ha[d] been made of those 'rare circumstances' that render the proposed alternative forum 'clearly unsatisfactory.' " *Blanco,* 997 F.2d at 982 (quoting *Piper Aircraft v. Reyno,* 454 U.S. 235, 254 n. 22 (1981)).

*17 Considering the number of cases that have concluded that the foreign forum is adequate may be helpful in determining the adequacy of alternative fora. *See Blanco,* 997 F.2d at 981-82; *Lockman Found.,* 930 F.2d at 769 n. 3 (considering other courts' findings as to whether alternative forum is adequate). DCAG cites a number of courts that have found Argentina to be a suitable forum, [FN8] however, none of these cases evaluated suitability of the forum in a human rights context. *See, e.g., Wiwa,* 226 F.3d at 88 (recognizing that dismissal of ATCA claims on *forum non conveniens* grounds frustrates Congress' intent to address human rights abuses).

FN8. *See, e.g., Satz v. McDonnell Douglas*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 23*

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

*Corp.,* 244 F.3d 1279, 1284 (11th Cir.2001) (concerning product liability actions against aircraft manufacturer); *Duha,* 340 F.Supp.2d at 801 (concerning various contract and tort actions arising from employment termination).

The suggestion by DCAG's Argentine law expert that the 2004 Report indicates that judiciary and witnesses in Argentina are not subject to intimidation is not supported by the text of the report. Most notably, the 2004 Report states, " Threats and beatings allegedly aimed to intimidate witnesses were common and, in some cases, occurred in connection with killings believed committed by members of security forces or their criminal allies," and "[t]here were credible allegations of efforts by members of security forces and others to intimidate the judiciary and witnesses . .. [with] [a]llegations of corruption in provincial courts ... more frequent than at the federal level, reflecting strong connections between some of the governors and judicial powers in their provinces." Ortiz Decl., Ex. A at 5.

These persisting conditions cause the court concern. The question is whether this concern is sufficient to find the Argentine forum inadequate. For the court to find an alternative forum inadequate, that forum must be characterized by a complete absence of due process or an inability of the forum to offer any satisfactory remedy. *See, e.g., Rasoulzadeh v. Associated Press,* 574 F.Supp. 854, 861 (S.D.N.Y.1983), *aff'd,* 767 F.2d 908 (2d Cir.1985) (mem.); *see also Piper Aircraft,* 454 U.S. at 254. Here, the plaintiffs are asserting human rights violations by a corporation in cooperation with the Argentine military. Although there is a possibility that the Argentine security forces may want to keep certain witnesses from testifying to DCAG's alleged acts, plaintiffs have not alleged a strong rationale for why witnesses in a case against the corporation might be subject to such treatment.

DCAG has convincingly argued that plaintiffs would be able to file similar claims to those asserted here, obtain the equivalent of adequate discovery, and receive appropriate damages. Even in light of the potential intimidation, plaintiffs have not made

out a prima facie case that "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft,* 454 U.S. at 254. Thus, Argentina provides plaintiffs an alternative forum, although, as set forth in further detail below, it may not be the most favorable forum for obtaining relief.

b. Germany as an Alternative Forum

**\*18** Plaintiffs also contend that they cannot bring their claims in German courts because German courts fail to recognize either human rights actions against corporations or equitable tolling, without which plaintiffs' claims would be barred by the statute of limitations. Opp'n at 22; Wolfgang Kaleck Decl. Opp. DCAG Mot. ("Kaleck Decl.") ¶ 5. Plaintiffs additionally contend that Argentine citizens will not have access to German courts for the purpose of filing suit against a German corporation for its illegal actions in Argentina. Kaleck Decl. ¶ 5. Even if plaintiffs were able to file suit in Germany, plaintiffs point out that German courts cannot order document production. *Id.;* Opp'n at 19-20, 22-23.[FN9] DCAG denies plaintiffs' assertion that German courts fail to recognize human rights actions against corporations, contending that German courts recognize causes of action for human rights violations similar to those recognized in the United States. Stefan Rutzel Decl. Supp. DCAG's Reply (" Rutzel Decl.") ¶¶ 6-26. DCAG's German law expert, Dr. Stefan Rutzel, further concludes that " none of [plaintiffs'] relevant causes of action causes an exclusive jurisdiction of a court which would bar the jurisdiction of the German court." *Id.* ¶ 6. Of significance, however, DCAG does not refute plaintiffs' contention that their actions would be barred by the statute of limitations in Germany.

> FN9. Plaintiffs contend that DCAG made these arguments before the German courts in their effort to halt service of process under the Hague Convention. Aside from their expert's assertion, there is no other evidence on the record that this is so.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 24*

Slip Copy

Page 16

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

Preclusion of a claim by the alternative forum's statute of limitations renders the alternative forum inadequate. *See Miracle v. N.Y.P. Holdings, Inc.,* 87 F.Supp.2d 1060 (D.Haw.2000); *Crimson Semiconductor, Inc. v. Electronum,* 629 F.Supp. 903, 909 (S.D.N.Y.1986) (ruling, in *forum non conveniens* motion, that foreign forum was unsatisfactory where statute of limitations bar in foreign forum did not simply go to the merits of plaintiffs' claim or to the quantum of damages but to the very existence of the claim). In the present case, undisputed expert testimony suggests that the assertion of plaintiffs' claims in Germany would be barred by the lack of equitable tolling provisions for this type of claim under German law. Thus, Germany does not appear to be an alternative forum available to the plaintiffs.

6. Efficient Judicial Resolution of the Dispute

The court next evaluates the efficiency of alternative fora. Here, as set forth above, that alternative forum is Argentina. In evaluating this factor, courts have looked primarily at where the witnesses and evidence are likely to be located. *Ziegler v. Indian River County,* 64 F.3d 470, 475-76 (9th Cir.1995) (quoting *Core-Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1489 (9th Cir.1983) ). As noted earlier, it is undisputed that plaintiffs' alleged injuries did not occur in California, and plaintiffs do not contend that relevant evidence is located in California. Thus, a consideration of the location of the dispute and evidence does not initially favor California as the proper forum.

*19 Plaintiffs also argue that this court provides the most efficient forum because proceedings here will be conducted in English. Opp'n at 20. According to plaintiffs, DCAG officially conducts business in English, thus making it efficient for the parties to adjudicate this dispute in United States courts versus Argentine courts. *Id.* Were the dispute to be adjudicated in Argentina, DCAG's evidence would have to be translated into Spanish. Even assuming that DCAG conducts business in English, however, this does not account for the fact that plaintiffs are all Spanish speakers and that many of the alleged events occurred in Argentina. Thus, if adjudicating

in the United States, all Spanish language evidence would need to be translated into English. This argument does not support plaintiffs' contention that the United States provides the most efficient forum for resolution of this dispute.

However, the court notes that the 2004 Report states "while the judiciary is nominally independent and impartial, some judges and judicial personnel were inefficient and, at times, subject to, and apt to exercise political manipulation. [ ] The system was hampered by inordinate delays, procedural logjams, changes of judges, inadequate administrative support, and incompetence." Ortiz Decl., Ex. A at 4. Thus, DCAG's own evidence supports a conclusion that this court would provide the more efficient and trustworthy judicial system for resolution of the present dispute. On the other hand, the witnesses and evidence are not located here but are located in Argentina. This factor is difficult to balance.

7. Convenient and Effective Relief to Plaintiff

Consideration of convenient and effective relief to plaintiffs favors jurisdiction, although it is generally not given as much weight as the other factors. *See Panavision,* 141 F.3d at 1316; *Core-Vent,* 11 F.3d at 1490. As before, plaintiffs contend that only United States courts will hold DCAG accountable for its alleged participation in the "Dirty War." Thus, plaintiffs conclude that this forum will provide them with the most convenient and effective relief. Although this court does not agree with plaintiffs' contention that the United States is the only adequate forum for their claims and, in fact, has found that Argentina presents an alternative forum for plaintiffs' claims, the possibility of plaintiffs encountering intimidation in Argentina for bringing a human rights suit involving actions by the Argentine government during its " Dirty War" tips this factor in favor of plaintiffs.

8. Conclusion

Although the question is a close one, the court tentatively concludes that this court does not have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 25*

Slip Copy, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: Slip Copy)**

personal jurisdiction over DCAG. However, before making a final decision, limited jurisdictional discovery will be allowed on whether an agency relationship exists between DCAG and MBUSA and the ability of plaintiffs to pursue their claims in Germany (e.g., is the claim barred by the statute of limitations?) or Argentina (e.g. does Argentine law allow human rights claims against private parties acting in concert with the government?)

### III. ORDER

**\*20** For the foregoing reasons, the court tentatively grants DCAG's motion to dismiss for lack of personal jurisdiction. However, before making a final decision, limited jurisdictional discovery may be undertaken. The parties may each submit up to twenty-five interrogatories and a narrowly tailored set of requests for production on the jurisdictional issues. A further hearing on the motion is hereby set for March 24, 2006, at 9:00 a.m. Any further briefing by plaintiff must be submitted by March 3, 2006, and any further briefing by defendant by March 10, 2006.

N.D.Cal.,2005.
Bauman v. DaimlerChrysler AG
Slip Copy, 2005 WL 3157472 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 5:04cv00194 (Docket) (Jan. 14, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 26*

Westlaw

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
TELCORDIA TECHNOLOGIES, INC., Plaintiff,
v.
ALCATEL S.A. and Alcatel USA, Inc., Defendants.
**No. Civ.A. 04-874 GMS.**

May 27, 2005.

Steven J. Balick, John G. Day, Ashby & Geddes, Wilmington, DE, for Plaintiff.
Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Kevin M. Baird, Connolly Bove Lodge & Hutz, Wilmington, DE, for Defendants.

*MEMORANDUM*
SLEET, J.

## I. INTRODUCTION

**\*1** On July 16, 2004, the plaintiff, Telcordia Technologies, Inc. ("Telcordia"), filed this patent infringement action against Alcatel S.A. ("Alcatel S.A.") and Alcatel USA, Inc. ("Alcatel USA"). Presently before the court is Alcatel S.A.'s motion to dismiss for lack of personal jurisdiction. For the following reasons, the court will grant the motion.

## II. BACKGROUND

Alcatel S.A. is a French corporation with its principal place of business in Paris, France. Alcatel S.A. is the parent company of Alcatel USA, a Delaware corporation with its principal place of business in Plano, Texas. (D.I. 18 Ex. 2 ¶¶ 2-3.) It is a holding company that does not manufacture, sell, advertise, offer to sell, trade or import any goods or services in the United States or anywhere in the world. (*Id.* ¶¶ 3-5.) It does not maintain any offices or other facilities in Delaware, or the

United States. (*Id.* ¶ 7.) It neither owns nor leases any real property in Delaware or the United States, but it does own United States patents. (*Id.* ¶ 8.) Alcatel S.A. does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. (*Id.* ¶¶ 9-10.)

Telcordia, a Delaware Corporation with its principal place of business in Piscataway, New Jersey, is the assignee and owner of the patent-in-suit, U.S. Patent No. 4,893,306 (the " '306 patent").[FN1] The '306 patent relates to a method and apparatus for multiplexing circuit and packet traffic. The patent discloses a data transmission technique, or Dynamic Time Division Multiplexing ("DTDM"), that is compatible with the digital circuit transmission format, as well as the packet transmission format, thereby providing "a flexible migration strategy between present circuit networks and future broadband packet networks." (U.S. Patent No. 4,893,306 Abstract.) The complaint alleges that Alcatel S.A. and Alcatel USA have infringed, induced infringement of, and/or contributorily infringed one or more claims of the '306 patent by making, using, offering for sale, selling and/or importing into the United States communication network products embodying the patented invention. (D.I. 1 ¶¶ 13-14.)

> FN1. The '306 patent was issued on January 9, 1990 and assigned to Bell Communications Research, Inc. ("Bellcore"), which became Telcordia in 1999.

## III. STANDARD OF REVIEW

Alcatel S.A. moves to dismiss the complaint for lack of personal jurisdiction over the defendant. " Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant[ ]." *E.I. DuPont de Nemours & Co. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*Rhodia Fiber & Resin Intermediates,* 197 F.R.D. 112, 119 (D.Del.2000). In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. *Transportes Aeros de Angola v. Ronair, Inc.,* 544 F.Supp. 864-65 (D.Del.1982). If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* (noting, however, " intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elec., Inc.,* 948 F.Supp. 338, 342 (D.Del.1996) (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend ' traditional notions of fair play and substantial justice." ' *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). Specifically, Telcordia must show that Alcatel S.A. "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Unless the contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

**\*2** In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53, 55 (D.Del.1982). However, Telcordia, the plaintiff, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Alcatel S.A. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268, 270-71 (D.Del.2001). To meet this burden, Telcordia must adduce facts which " 'establish with reasonable

particularity" ' that jurisdiction over Alcatel S.A. exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 193 (D.Del.1996)).

IV. DISCUSSION

A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del.Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over Alcatel S.A. Alcatel S.A. contends that the court has no basis to assert jurisdiction, while Telcordia maintains that the conduct of Alcatel S.A. satisfies the requirements of subsections (c)(1) and (c)(3) of the long-arm statute.

Under subsection (c)(1), the court may exercise jurisdiction over a nonresident or agent of a nonresident who "transacts any business or performs any character of work or service in the State." Del.Code Ann. tit. 10 § 3104(c)(1). Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who "causes tortious injury in the State by an act or omission in this State." Del.Code Ann. tit. 10 § 3104(c)(3). Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del.Super.1997). The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a "nexus " between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). In order to meet the requirements of subsections (c)(1) and (c)(3), Alcatel S.A.'s actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993).

Telcordia asserts that the court should exercise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

jurisdiction under § 3104(c)(1) and/or (c)(3) because Alcatel S.A.'s contacts with Delaware are attributable to its subsidiary, Alcatel USA, under the principles of agency. [FN2] The principles of agency allow a court to establish jurisdiction over the parent based upon its jurisdiction over a subsidiary. Under the agency theory, "the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard Inc. v. Guidant Corp.,* 997 F.Supp. 556, 559 (D.Del.1998) (citing *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989)). Thus, the agency theory "examines the degree of control which the parent exercises over the subsidiary." *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1463 (D.Del.1991). The factors relevant to the court's examination include: (1) "the extent of overlap of officers and directors"; (2) "methods of financing"; (3) "the division of responsibility for day-to-day management"; and (4) "the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant." *Id.* If the court determines that an agency relationship exists, it may attribute certain actions of the subsidiary, Alcatel USA, to the parent corporation, Alcatel S.A., in assessing whether Telcordia has satisfied the requirements of the long-arm statute. *See id.* However, the mere existence of an agency relationship is not sufficient to confer jurisdiction. The court must still apply the Delaware long-arm statute. *See id.* at 1455 ("[A] finding of agency does not render the long-arm statute inapplicable, but simply implicates its 'or through an agent' provision.")

> FN2. Delaware law provides two theories that allow a court to exercise jurisdiction over a parent corporation based on its jurisdiction over a subsidiary: the alter ego theory and the agency theory. *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1463 (D.Del.1991). Under the alter ego theory, the party showing jurisdiction must show fraud or inequity in the use of the corporate form for a court to "pierce the corporate veil," or attribute the

actions of a subsidiary to the parent corporation. *Id.; see Mobile Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989). Telcordia has neither asserted the existence of any fraud in the corporate structure of Alcatel S.A. and Alcatel USA nor introduced evidence that would support a finding of fraud. Accordingly, the court will not address this jurisdictional theory.

**\*3** Telcordia contends that Alcatel S.A. should be subject to jurisdiction under the agency theory because "Alcatel S.A. and Alcatel USA are closely knit together, effectively operating as one." (D.I. 20, at 10.) Telcordia alleges the following to support its contention of an agency theory of jurisdiction: (1) Alcatel S.A. makes it abundantly clear that the United States market is very important to it and raises funds in the United States; (2) it owns patents, *i.e.* property, in the United States; (3) it fails to distinguish among its multinational subsidiaries-that is, it consolidates descriptions of its activities with those of its subsidiaries; (4) it chose to incorporate Alcatel USA in Delaware; (5) its Senior Vice President, Mike Quigley ("Quigley" ) is the CEO of Alcatel USA; and (6) its website solicits requests for information concerning its products, including allegedly infringing products from Delaware residents. (*Id.* at 3-5, 10.) Telcordia further contends that, "at the very least," Alcatel USA has offered to sell in Delaware products accused of infringing the '306 patent and, therefore, transacts business in the state. In addition, because Alcatel USA committed these acts as Alcatel S.A.'s agent, they are attributable to Alcatel S.A. (D.I. 20, at 10.)

Before the court can determine whether it should attribute Alcatel USA's alleged acts in Delaware to Alcatel S.A., it must determine whether an agency relationship exists between the two corporations. As previously stated, in order to make this determination, the court must consider the extent of overlap of officers and directors between Alcatel USA and Alcatel S.A., the methods of financing with respect to the two corporations, the division of responsibility for day-to-day management between the two, and the process by which each corporation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 29*

Not Reported in F.Supp.2d                                                                                    Page 4

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

obtains its business. After having considered these factors, the court concludes that Telcordia has not ca rried its burden. As to the first factor, Telcordia points to one overlap in officers between the two corporations: Quigley is Senior Executive Vice President of Alcatel S.A. and CEO of Alcatel USA. According to Alcatel S.A., there is a second overlap between the two corporations: its President and COO, Philippe Germond, is a member of the Board of Directors of Alcatel USA. (D.I. 23, at 3; D.I. 22 ¶ 6.) This minor overlap, however, is not dispositive, as "it is entirely appropriate for directors of a parent corporation to serve as directors of a subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citations omitted) (noting that it is "well established principle ... that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). As such, this factor does not weigh in favor of a finding of agency.

*4 Likewise, the remaining factors do not weigh in favor of applying the agency theory in the present case. First, Alcatel S.A. is merely a holding company that does not manufacture, sell, or advertise in the United States, or anywhere in the world. (D.I. 18 ¶¶ 3-5.) Thus, this is not a case in which Alcatel S.A. manufactures a product and uses an independent distributor to sell its product. *Cf. C.R. Bard,* 997 F.Supp. at 561. In addition, Alcatel USA maintains its own executive team, which is responsible for the day-to-day management of Alcatel USA, and no employee of Alcatel S.A. is a member of the executive team of Alcatel USA. (D.I. 22 ¶ 5.) It also maintains its own financial statements, separate from those kept by Alcatel S.A. (D.I. 22 ¶ 10.) Alcatel USA files a consolidated United States federal income tax return that is separate from tax returns filed by Alcatel S.A. (*Id.* ¶ 12.) Alcatel USA finances its day-to-day activities through funds generated from its business activities, including the manufacture, marketing and distribution of the accused infringing products. (*See id.* ¶ 13.) Accordingly, the court finds that while there is a minor overlap of officers and directors

between the parent and subsidiary, Telcordia has not produced sufficient evidence for the court to conclude that the specific combination of agency factors militates in favor of a finding that Alcatel USA was acting as Alcatel S.A.'s agent. Thus, sections (c)(1) and (c)(3) do not warrant the exercise of jurisdiction over Alcatel S.A.[FN3]

> FN3. The court need not address whether jurisdiction in Delaware comports with the requirements of the Due Process Clause because it has no statutory authority under the Delaware long-arm statute to exercise jurisdiction over Alcatel S.A.

B. Federal Rule of Civil Procedure 4(k)(2)

Telcordia next asserts that, even if the Delaware long-arm statute does not apply in the present case, the court should not grant Alcatel S.A.'s motion to dismiss because it has the authority to exercise personal jurisdiction over Alcatel S.A. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. Rule 4(k)(2) provides:
If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2). In order to establish jurisdiction pursuant to Rule 4(k)(2), (1) Telcordia's claim must arise under federal law; (2) Alcatel S.A. must lack sufficient contacts with any state to subject it to personal jurisdiction; and (3) Alcatel S.A. must have sufficient contacts with the United States as a whole to satisfy due process. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 258-59 (3d Cir.2000). Telcordia contends that all three requirements of Rule 4(k)(2) are satisfied. The court disagrees.

First, the parties do not dispute, nor could they, that Telcordia's claims arise under federal law. The complaint alleges that Alcatel S.A. has infringed,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

induced infringement of, and/or contributorily infringed the '306 patent. Patents and the protection of patent rights are the subject of Title 35 of the United States Code. 35 U.S.C. § 271 specifically provides the elements of patent infringement. Additionally, 28 U.S.C. § 1338 gives district courts original jurisdiction over patent actions. A patent infringement action, therefore, is one that arises under federal law. Telcordia has thus satisfied the first requirement of Rule 4(k)(2).

**\*5** Having found that the first requirement of Rule 4(k)(2) is satisfied, the court next must determine whether Alcatel S.A. is not subject to jurisdiction in any state. *See United States v. Offshore Marine Ltd.,* 179 F.R.D. 156, 160 (D.Vi.1998); *Revak v. Locatum A.B.,* No. Civ. A. 03-4822, 2005 WL 1017771, at \*2 (E.D.Pa. Apr.28, 2005). As a preliminary matter, the court must determine whether Telcordia or Alcatel S.A. bears the burden of proving that Alcatel S.A. is not subject to the jurisdiction of any state. In *Offshore Marine Ltd.,* the United States District Court for the District of the Virgin Islands noted that "[t]he question [of] which party bears the burden of proving ... that the defendant is not subject to jurisdiction in any state appears to be an issue of first impression in this Court and in this Circuit, probably because it is generally the plaintiff's duty to allege and prove personal jurisdiction." *Offshore Marine Ltd.,* 179 F.R.D. at 160. Indeed, it appears that the Third Circuit has not yet addressed whether the plaintiff or defendant bears the burden of proving that the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, or what is known as the negation requirement. *See Base Metal Trading Ltd. v. OJSC "Novokuzetsky Aluminum Factory",* 47 Fed. Appx. 73, 75 (3d Cir.2002) (unpublished) (determining that negation issues need not be reached because the Due Process requirement of Rule 4(k)(2) was not satisfied). [FN4] Various district courts of the Third Circuit, however, have addressed the negation requirement and concluded that the plaintiff bears the burden of demonstrating that the defendant is not subject to jurisdiction in any state. *See Offshore Marine Ltd.,* 179 F.R.D. at 160 ("Accordingly to survive a motion to dismiss for want of personal jurisdiction, the plaintiff bears the burden to prove that [the defendant] is not otherwise subject to service of process in any state."); *see also Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,* 293 F.Supp.2d 423, 430 (D.Del.2003), *vacated on other grounds by* 395 F.3d 1315 (Fed.Cir.2005) (issue abandoned on appeal) (" Plaintiffs must also demonstrate that defendant is ' not subject to the jurisdiction of *any* state' under Rule 4(k)(2). Therefore, Rule 4(k)(2) "provides 'a narrow exception which may subject an alien defendant to a federal court's jurisdiction." ') The court agrees with the Third Circuit district courts that have addressed the negation requirement and concludes that Telcordia bears the burden of demonstrating that Alcatel S.A. is not subject to jurisdiction in any state.

> FN4. Likewise, it appears that the Federal Circuit has not had occasion to address the negation issue.

Here, Telcordia addresses the negation requirement only by asserting that, based on the information provided by Alcatel S.A. in its opening brief and the publicly available information regarding Alcatel S.A., an analysis of whether any other state has personal jurisdiction over Alcatel S.A. would not be "significantly different" from the analysis regarding Alcatel S.A.'s personal jurisdiction under the Delaware long-arm statute. (D.I. 20, at 13.) According to Telcordia, if the court cannot exercise jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute then Rule 4(k)(2) applies. (*Id.*) The court is not persuaded by this argument, however, and concludes that Telcordia's conclusory statement does not support a finding that Alcatel S.A. lacks sufficient contacts with any state to subject it to personal jurisdiction. Thus, Telcordia has not satisfied the second requirement of Rule 4(k)(2).

**\*6** Even assuming Telcordia was able to show that Alcatel S.A. was not subject to jurisdiction in any other state, it cannot satisfy the third requirement of Rule 4(k)(2) because the record evidence demonstrates that Alcatel S.A. lacks sufficient contacts with the United States as a whole to satisfy due process. The Due Process Clause requires that,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play.' " *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations omitted). In order for the court to find that Alcatel S.A. has "minimum contacts" with the United States, Telcordia must demonstrate either specific or general personal jurisdiction. *Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The court can assert specific jurisdiction over a nonresident defendant that has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or related to' those activities." *Burger King,* 471 U.S. at 472 (citations omitted). The court can assert general jurisdiction over a defendant when its contacts with the forum, regardless of their relation to the litigation, are "continuous and systematic." *Helicopteros Nacionales,* 466 U.S. at 416. The court will address the reasons it cannot exercise specific or general jurisdiction over Alcatel S.A. in turn.

When determining whether a defendant's contacts give rise to specific jurisdiction, "[i]t is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum ... thus invoking the benefits and protections of its laws." *BP Chems.,* 229 F.3d at 259 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 475, 100 S.Ct. 559, 62 L.Ed.2d 490). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980). Thus, a court usually must determine the character of the defendant's activity in the forum, and whether the plaintiff's claim arises out of or has a substantial connection with that activity. *See Burger King,* 471 U.S. at 475-76. In the present case, however, the court need not make this determination because Telcordia bases its

argument on the specific jurisdiction subsections of the Delaware long-arm statute which, as discussed in Section IV.A., *supra,* do not warrant the exercise of jurisdiction over Alcatel S.A. because Alcatel USA is not its United States agent.

The court also concludes that Alcatel S.A.'s contacts with the United States that are unrelated to the present litigation are not "continuous and systematic" so as to give rise to general jurisdiction. Telcordia contends that general jurisdiction exists because there is "ample evidence of Alcatel S.A.'s contacts with the United States." (D.I. 20, at 12.) According to Telcordia, this evidence includes the following: (1) Alcatel S.A. is listed on the New York Stock Exchange; (2) Alcatel S.A. owns property in the United States, specifically hundreds of patents; (3) Alcatel S.A.'s website fails to distinguish among its multinational subsidiaries and uses its name in the name of its subsidiaries; (4) Alcatel S.A.'s website describes its worldwide activities, including its activities in the United States, but never discloses that its United States activities are performed by one of its subsidiaries; and (5) Alcatel S.A. incorporated its subsidiary, Alcatel USA in Delaware. The court does not find the evidence sufficient to support Telcordia's assertion.

**\*7** First, as previously discussed, Alcatel S.A. is a French holding company that does not make, sell, export or import any products into the United States. Alcatel S.A. does not maintain any offices in the United States, or lease or own any real property in the United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. Alcatel S.A.'s employees also all reside outside of the United States.

Moreover, while Alcatel S.A. is listed on the New York Stock Exchange as an American Depository Receipt ("ADR"), this factor alone does not justify the exercise of jurisdiction. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 330 (S.D.N.Y.2003); *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir.2001) (" [T]he Court is not persuaded that Congress intended for the courts to assert jurisdiction under Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 32*

Not Reported in F.Supp.2d                                    Page 7

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

4(k)(2) whenever a corporation lists its stock on a United States exchange."). Likewise, "[o]wnership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,* No. C-95-3577 DLJ, 1996 WL 467293, at *6 n. 5 (N.D.Cal. July 24, 1996) (citing 35 U.S.C. § 293). Furthermore, incorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation and, here, it is not related. *See Applied Biosystems,* 772 F.Supp. at 1468. Additionally, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conduct activity in the forum, knowingly interacting with residents of the forum state via its web site." *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 454 (3d Cir.2003). Here, Telcordia has not adduced evidence to support a finding that Alcatel S.A.'s web site was intended to reach customers in Delaware, or any other state in the United States. [FN5]

> FN5. Telcordia asserts that there can be " no question that Alcatel S.A.'s website solicits requests for information concerning its products (including allegedly infringing products) from Delaware residents, pointing to a "website page concerning the possible purchase of Alcatel products" with Delaware chosen as the potential buyer's state. (D.I. 20, at 5; Ex. 11.) Telcordia misses the point, however, as the record does not support any documented sales to persons in Delaware (or any other state in the United States). Nor does it support any interaction between Alcatel S.A. and Delaware residents, as the web site page, in Telcordia's own words, demonstrates only the *possible* purchase of Alcatel products.

The court also disagrees with Telcordia's assertion that Alcatel's website "never discloses that its U.S.

activities are performed by some entity (or entities) other than Alcatel S.A." (D.I. 20, at 4.) First, when one enters the Alcatel website and clicks on "United States" as its country/region the web address changes from "www.alcatel.com" to " www.usa.alcatel.com." Further, when one clicks on the "About Alcatel" dropdown menu and selects " Alcatel in the U.S.A.," he or she is provided with information regarding Alcatel USA, including its business locations. Moreover, the web page states " [i]t is the policy of *Alcatel USA* to satisfy the expectation of our customers." www.usa.alcatel .com/company/ausa_info.jhtml (last visited May 23, 2005) (emphasis added). Thus, the Alcatel web site does distinguish Alcatel S.A. from Alcatel USA. This fact does not support the exercise of jurisdiction over Alcatel S.A. Accordingly, Alcatel S.A.'s alleged contacts with the United States do not provide a basis for the court to conclude that it has a "continuous and systematic" presence in the United States.

**\*8** Nor does the combination of Alcatel S.A.'s alleged contacts with the United States provide the court with a sufficient basis to conclude that the requirements for general jurisdiction are met. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254 (3d Cir.2000) is instructive on this point. In *BP Chemicals,* the Third Circuit found that a foreign defendant did not have sufficient contacts with the United States as a whole to justify the exercise of Rule 4(k)(2) jurisdiction, even though the defendant exported its products to the United States, held a small ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training. *Id.* at 263. The Court of Appeals also found that the cumulative effect of the defendants contacts did not meet the requirements for general jurisdiction. In the present case, Alcatel S.A.'s alleged contacts fall short of those alleged by the plaintiff in *BP Chemicals.* As such, the court finds that there is no basis for exercising Rule 4(k)(2) jurisdiction over Alcatel S.A.

### C. Jurisdictional Discovery

Lastly, Telcordia asserts that if the court does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 33*

Not Reported in F.Supp.2d

Page 8

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

conclude that Alcatel S.A. "is subject to personal jurisdiction under the *Delaware long-arm statute,*" it should permit limited jurisdictional discovery rather than granting Alcatel S.A.'s motion to dismiss. (D.I. 20, at 11) (emphasis added). Telcordia asserts that its claims against Alcatel S.A. are not clearly frivolous, and that discovery is necessary due to the "limited publicly available information" that it has gathered without discovery. (D.I. 20, at 11.) Telcordia further asserts that the case will not be delayed as a result of any discovery on the personal jurisdiction issue.

Conversly, Alcatel S.A. contends that Telcordia's claims against it are clearly frivolous, because Telcordia has not carried its burden of making "a *prima facie* showing that Alcatel S.A. is subject to personal jurisdiction in Delaware." (D.I. 23, at 17.) In addition, Alcatel S.A. contends that it "strains belief that Plaintiff (1) did not know which entities in the Alcatel Family to sue, and (2) that Alcatel S.A. was not one of them." (*Id.* at 17 .) According to Alcatel S.A., Telcordia has had prior business interactions with Alcatel entities regarding the patent-in-suit, as well as other communications technology. (*Id.* at 2.) Alcatel S.A. further contends that Telcordia is "arguably the most knowledgeable company in the telecommunications field with respect to what products are sold by the various players in the market." (*Id.* at 1.) Thus, it "is hard to believe that it [Telcordia] does not know exactly who the relevant players in the market are." (*Id.*) Lastly, Alcatel S.A. contends that Telcordia is engaging in a fishing expedition, noting that the United States Supreme Court has held that courts should "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." (*Id* at 18-19 (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Dist. Iowa,* 482 U.S. 522, 546, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987)). The court is persuaded by Alcatel S.A.'s argument.

**\*9** "Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.' " *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003) (internal citations omitted). Thus, resolution of Telcordia's request "begins with the presumption in favor of allowing discovery to establish personal jurisdiction." *Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 474 (D.Del. Oct.5, 1995). However, "[t]he court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum." *Id.* at 475. For example, "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." *Id.* at 476. Likewise, "a mere unsupported allegation that [a] defendant ' transacts business' in an area is 'clearly frivolous." ' *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.1997); *see also B.L. Poe v. Babcock Int'l,* 662 F.Supp. 4, 7 (M.D.Pa. Mar.14, 1985) ("Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."). Rather, "there must be *some* competent evidence to demonstrate that personal jurisdiction over [a] defendant might exist before allowing discovery to proceed." *Hansen,* 163 F.R.D. at 475. Furthermore, "[w]hen the lack of personal jurisdiction is clear, ... further discovery serves no purpose and should be denied." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.,* 62 Fed. Appx. 322, 338 (Fed.Cir.2003) (unpublished).

Here, as previously discussed in Section IV.A., *supra,* the record evidence regarding Telcordia's agency theory of specific jurisdiction is insufficient to support the conclusion that Alcatel USA was acting as Alcatel S.A.'s agent. In addition, Telcordia did not assert that the court could exercise personal jurisdiction over Alcatel S.A. based on the general jurisdiction subsection of the Delaware long-arm statute. For these reasons, the court believes it is clear that it may not exercise personal jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute. Thus, further discovery would not be worthwhile. In other words, granting Telcordia's request for jurisdictional discovery would amount

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 9

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

to allowing it to conduct a fishing expedition in order to form a basis for jurisdiction. The court, therefore, will deny Telcordia's request for jurisdictional discovery.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. Alcatel S.A.'s Motion to Dismiss for Lack of Personal Jurisdiction (D.I.17) is GRANTED.
2. Telcordia's request for jurisdictional discovery is DENIED.

D.Del.,2005.
Telcordia Technologies, Inc. v. Alcatel S.A.
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1182445 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s Second Notice of 30(b)(6) Deposition (Mar. 30, 2006) Original Image of this Document (PDF)
• 2006 WL 1182446 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s Third Notice of 30(b)(6) Deposition (Mar. 30, 2006) Original Image of this Document (PDF)
• 2006 WL 1182444 (Trial Pleading) Telcordia's Answering Claim Construction Brief Addressing Telcordia's '633 Patent and Alcatel's '052 Patent (Mar. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 1204461 (Trial Pleading) Alcatel's Answering Claim Construction Brief for U.S. Patent No. 6,247,052 (Mar. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 1182443 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s First Notice of 30(b)(6) Deposition (Mar. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 1182441 (Trial Pleading) Alcatel's Opening Claim Construction Brief for U.S. Patent

Nos. 6,247,052 and Re. 36.633 (Mar. 3, 2006) Original Image of this Document (PDF)
• 2006 WL 1182442 (Trial Pleading) Telcordia's Opening Claim Construction Brief (Mar. 3, 2006) Original Image of this Document (PDF)
• 2005 WL 3666806 (Trial Motion, Memorandum and Affidavit) Telcordia's Reply Brief in Support of its Motion to Dismiss Or, in the Alternative, to Sever and Stay Alcatel Usa, Inc.'s Patent Infringement Counterclaim (Nov. 1, 2005)
• 2005 WL 2867944 (Trial Pleading) Telcordia's Reply to Alcatel USA, Inc.'s Amended Counterclaims and Demand for Jury Trial (Sep. 29, 2005)
• 2005 WL 2867947 (Trial Motion, Memorandum and Affidavit) Telcordia's Motion to Dismiss, or in the Alternative, to Sever and Stay Alcatel USA, Inc.'s Patent Infringement Counterclaim (Sep. 29, 2005)
• 2005 WL 2385505 (Trial Pleading) Alcatel Usa's Answer and Counterclaims to Plaintiff's First Amended Complaint and Demand for Jury Trial (Aug. 10, 2005)
• 1:04cv00874 (Docket) (Jul. 16, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 35*

Westlaw.

Not Reported in F.Supp.2d                                                                                         Page 1

Not Reported in F.Supp.2d, 2002 WL 484838 (D.Del.), 62 U.S.P.Q.2d 1599
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

United States District Court, D. Delaware.
TI GROUP AUTOMOTIVE SYSTEMS, (North
America), Inc. Plaintiff,
v.
VDO NORTH AMERICA L.L.C. et al. Defendant.
**No. C.A. 00-432-GMS.**

March 7, 2002.

Douglas E. Whitney (# 461), Morris, Nichols, Arsht
& Tunnell, Wilmington, William J. Schramm,
Esquire, William H. Francis, Esquire, Matthew J.
Schmidt, Esquire, Reising, Ethington, Barnes,
Kisselle, Learman & McCulloch, P.C., Troy, MI,
for Plaintiff.
Connolly, Bove, Lodge & Hutz, LLP, Arthur G.
Connolly, III (No. 2667), Wilmington, Eric J.
Lobenfeld, Drew M. Wintringham, III, Keeto H.
Sabharwal, Clifford Chance, Rogers & Wells LLP,
New York, NY, for Defendants.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

**\*1** On August 18, 2000, the plaintiff, TI Group
Automotive Systems, NA, Inc. ("TI") filed the
above-captioned action. In that action, TI charges
the defendants, VDO NA ("VDO"), Mannesmann
AG ("Mannesmann"), Siemens AG, Robert Bosch
GMBH, Atecs Mannesmann AG ("Atecs") and
Vodafone Group PLC ("Vodafone") [FN1] with
infringement of its '714 patent.[FN2]

> FN1. The parties have agreed to
> voluntarily dismiss Vodafone AG as a
> defendant.

> FN2. Atecs is Mannesmann's subsidiary
> holding company for its
> non-telecommunications businesses. Prior
> to September 1999, Mannesmann was
> VDO AG's parent corporation. However,
> when Atecs was formed in September
> 1999, it became the parent company of
> VDO AG.

Presently before the court is Atecs' and
Mannesmann's motion to dismiss for failure to state
a claim under Federal Rule of Civil Procedure
12(b)(6). [FN3] In particular, they claim that TI
cannot maintain a claim against them because they
did not design, manufacture, use, or sell any of the
fuel pump modules which are the subject matter of
the '714 patent. They further argue that there is no
evidence that they induced actual infringement or
that they should be held liable on an agency theory
of liability. For the reasons that follow, the court
will grant this motion.

> FN3. As the parties rely on material
> outside the pleadings, the court will treat
> this motion as a motion for summary
> judgment. *See* FED. R. CIV. P. 12(b).

II. STANDARD OF REVIEW

The court may grant summary judgment "if the
pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits,
if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." Fed.R.Civ.P. 56(c);
*see also Boyle v. County of Allegheny,
Pennsylvania,* 139 F.3d 386, 392 (3d Cir.1998).
Thus, the court may grant summary judgment only
if the moving party shows that there are no genuine
issues of material fact that would permit a
reasonable jury to find for the non-moving party.
*See Boyle,* 139 F.3d at 392. A fact is material if it
might affect the outcome of the suit. *Id.* (citing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 36*

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 484838 (D.Del.), 62 U.S.P.Q.2d 1599
(Cite as: Not Reported in F.Supp.2d)

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-174 (3d Cir.1999).

### III. DISCUSSION

#### A. Direct Infringement

TI alleges that the defendants violated Section 271(a) of the U.S. Patent Laws. 35 U.S.C. § 271(a). This Section provides that, "whoever without authority makes, uses, offers to sell or sells any patented invention ... infringes the patent." *Id.* In support of this allegation, TI argues that Mannesmann exercises "control and authority" over VDO which extends far beyond "mere economic approval" of VDO's transactions. Specifically, TI group contends that Mannesmann must approve transactions "which may involve infringement of protective rights of third parties." TI also points to the fact that Mannesmann and VDO have several common members on their respective Board of Directors. Notably, TI offers no evidence that Mannesmann itself made, used, or sold the fuel pump assemblies.

The court finds that these facts do not give rise to a genuine issue of material fact with regard to whether Mannesmann itself made, sold, or used fuel pump assemblies in violation of TI's patent rights.

#### B. Active Inducement

*2 Section 271(b) of the Patent Act provides that " [w]hoever actively induces infringement of a patent shall be liable as an infringer." In order to establish active inducement, the following elements must be proven by a preponderance of the evidence: (1) an inducer's knowledge of the asserted patent; (2) the presence of infringement by the third party allegedly induced; (3) an inducer's actual intent to

cause the acts which he knew or should have known would induce actual infringements; and (4) the commission of an act that constitutes inducement, not merely the power to act or the failure to act. *See Black & Decker (US) Inc. v. Catalina Lighting, Inc.,* 953 F.Supp. 134, 138 (E.D.Va.1997).

In support of its theory, TI alleges the following facts: (1) Mannesmann approved the making and selling of the accused devices, (2) Mannesmann financed VDO, (3) Herbert Koenekamp's (" Koenekamp") knowledge of the '714 patent and its infringement must be imputed to Mannesmann and Atecs,[FN4] and (4) that, because VDO and Mannesmann shared board members, Mannesmann knew or should have known of the infringement.[FN5]

> FN4. TI maintains that Koenkamp's knowledge must be imputed because he is the general counsel for VDO AG, he is also the board's secretary, and he corresponded with TI Group about this lawsuit in early 1999.

> FN5. The board member issue will be more fully discussed below in Section III.C.

Viewing these statements in the light most favorable to TI, as the court must at this stage, the court concludes that they do not sufficiently address each of the elements necessary to establish an active inducement claim.[FN6] While the court does not dispute that a reasonable factfinder could conclude that TI's allegations demonstrate that Mannesmann and Atecs knew or should have known about the alleged infringement, TI has failed to adequately set forth facts to meet the intent element. *See Manville Sales Corp. v.. Paramount Sys., Inc.* 917 F.2d 544,553 (Fed.Cir.1990) (stating that "[i]t must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the specific acts alleged to constitute inducement.") Further, it has failed to demonstrate that Mannesmann's approval requirement and financing of VDO were anything more than routine business practices between a parent and subsidiary.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 484838 (D.Del.), 62 U.S.P.Q.2d 1599
**(Cite as: Not Reported in F.Supp.2d)**

FN6. For purposes of this motion only, the court assumes that a reasonable factfinder would find actual infringement.

### C. Agency

TI next argues that a parent corporation may be liable for the acts of its subsidiary corporation under an agency theory.[FN7] In support of this theory, TI relies upon Koenekamp's failure to deny an agency relationship in his deposition. Specifically, it argues, "Mr. Ko[e]nekamp does *not* state that Atecs had *no* role in the design activity of the accused fuel pump module." (emphasis in original). Based on this statement, TI argues that the court must infer that some design and development activity was ongoing at the time Atecs became VDO's parent. With regard to Mannesmann, TI argues that Koenekamp "does *not* deny that Mannesmann controlled the activity of VDO AG." (emphasis in original)

FN7. The defendants do not deny that a general agency theory may be used to impute liability.

The court finds that, based on these allegations, TI is merely attempting to rely on what Koenekamp did *not* say, rather than what he *did* say. Koenekamp clearly stated that Mannesmann did not participate in the design or development of the VDO NA fuel pumps. He also stated that Atecs had no input into the design and development activity of VDO AG or VDO NA. Thus, TI's argument is effectively that the court should read negative inferences into Koenekamp's statements. This bare argument is unsupported by any factual basis.[FN8] *See Olson v. General Elec. Astrospace,* 101 F .3d 947, 951 (3d Cir.1996) (noting that, "[i]n order to demonstrate the existence of a genuine issue of material fact, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.")

FN8. TI urges the court to adopt the court's reasoning in *Manchack,* where the court declined to dismiss the action for want of

more discovery on "inconsistent and unclear" statements in an affidavit. *Manchak v. Rollins,* 1996 U.S. Dist. LEXIS 20542, at *7-8, (D.Del. Dec. 18, 1996). There are no inconsistent and unclear statements in the present case. Koenekamp unequivocally states that Mannesmann and Atecs did not participate in the design of the fuel pumps. To the extent that TI desires explicit language regarding agency principles, it had the opportunity to ask such direct questions at Koenekamp's deposition.

**\*3** Additionally, TI alleges that there is a "direct link of [Mannesmann's and VDO AG's] controlling boards" as support for its claim that VDO AG's knowledge may be imputed to Mannesmann. Courts have consistently held that more than what TI terms a "direct link" is required to hold a parent liable for its subsidiary. *See Upjohn Co. v. Syntro Corp.,* 14 USPQ 2d. 1469, 1472 (D.Del.1990); *see also Akzona Inc. v. E.I. duPont de Nemours & Co.,* 607 F.Supp. 227 (D.Del.1984). Indeed, on the following facts, a court declined to hold a parent liable for its subsidiary:

"the relationship between the parent and subsidiary was that the parent had 100% ownership of the subsidiary, the parent referred to the subsidiary as a division of the parent, the subsidiary's board reported to the parent, the parent approved substantial capital expenditures, the parent referred to the subsidiary's business as its project and took credit for the project in its annual report and the parent guaranteed loans for the subsidiary." *Akzona,* 607 F.Supp. at 237.

As TI offers nothing more than allegations of a "direct link," the court declines to find a genuine issue of material fact with regard to liability on this basis. *See Upjohn Co. v. Syntro Corp.,* 14 USPQ 2d. 1469, 1472 (D.Del.1990) (noting the "significant" degree of control necessary to warrant holding a parent liable for its subsidiary.)

Next, TI asserts that, because Mannesmann included financial information related to VDO in its annual report, Mannesmann is a proper defendant in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 4

Not Reported in F.Supp.2d, 2002 WL 484838 (D.Del.), 62 U.S.P.Q.2d 1599
**(Cite as: Not Reported in F.Supp.2d)**

the present suit. It offers no further evidence on this issue. However, Mannesmann is the ultimate parent corporation of VDO. Its annual report would necessarily include financial information about its subsidiaries. Thus, on this basis alone, the court cannot find a genuine issue of material fact.

Finally, as discussed above with regard to the issue of direct infringement, TI argues that Mannesmann requires its subsidiaries to obtain approval prior to entering into certain business arrangements, including transactions that may involve patent infringement issues. However, it has adduced no evidence that this approval is anything more than a parent corporation's normal and necessary exercise of control over its subsidiary. *See Akzona,* 607 F.Supp. at 238 (noting that a subsidiary is not the parent's agent where the parent, among other things, must oversee and approve major capital expenditures.) Thus, TI's allegation cannot justify establishing liability against Mannesmann for the alleged patent infringement of its subsidiary.

### D. Ability to Pay

TI group candidly admits that, "from a deep pocket point of view, [it has] named the appropriate foreign parties." It further alleges that Mannesmann is " siphoning off assets" from VDO AG and VDO NA. Thus, in the absence of Mannesmann, its potential judgment will not be satisfied. The court finds this argument to be without merit. It is undisputed that VDO AG transfers its profits at year-end to Atecs, as it did to Mannesmann prior to the formation of Atecs. However, at his deposition, Koenekamp stated that this is a routine business practice in Germany. TI has offered no contradictory evidence. Further, to the extent that damages are awarded in this litigation, such damages will be paid from VDO AG's profits. The profits transferred to Atecs that year would be correspondingly less.

### E. Contributory Infringement

*4 TI makes a passing reference to contributory infringement claims in its opposition brief. However, it fails to offer any evidence that either

Mannesmann or Atecs has supplied any components to VDO AG or VDO NA. Accordingly, to the extent that TI makes such a claim, the court will reject this argument.

### IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Atecs' and Mannesmann's motion to dismiss (D.I. 25 in 01-3-GMS) is GRANTED.

D.Del.,2002.
TI Group Automotive Systems, (North America), Inc. v. VDO North America L.L.C.
Not Reported in F.Supp.2d, 2002 WL 484838 (D.Del.), 62 U.S.P.Q.2d 1599

Briefs and Other Related Documents (Back to top)

• 1:00CV00432 (Docket) (Apr. 25, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A - 39*